## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | |
| | **:** | **Case No.: 21-CR-382 (PLF)** |
| **CHRISTOPHER WARNAGIRIS,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

## UNITED STATES'S OMNIBUS MOTIONS *IN LIMINE*

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this omnibus brief arguing motions *in limine* in advance of the trial in this case scheduled for November 8, 2023.  Although neither the Federal Rules of Civil Procedure nor the Federal Rules of Evidence expressly contemplate motions *in limine*, the practice of allowing such motions has developed over time "pursuant to the district court's inherent authority to manage the course of trials."  *Luce v. United States*, 469 U.S. 38, 41 n. 4 (1984).  "Motions in limine are designed to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions."  *Barnes v. D.C.*, 924 F. Supp. 2d 74, 78 (D.D.C. 2013) (quoting *Graves v. District of Columbia*, 850 F.Supp.2d 6, 10 (D.D.C. 2011)).

The United States offers the authorities and analysis below to promote efficiency and reduce the need to argue objections midtrial.  For each motion herein, the United States asks that the Court grant the requested relief or, if the Court reserves ruling, to consider the below arguments when the relevant issues arise during trial.

### I.      Motion *in Limine* to Admit Certain Categories of Multimedia

On October 7, 2023, the United States will provide its preliminary exhibit list to Defendant Warnagiris and to the Court.  *See* ECF No. 59.  The United States anticipates, on this date, identifying, and providing to the defense, certain categories of photographic and video exhibits

1

that it intends to offer at trial.  The following sections describe each category of evidence and explain why each is admissible as relevant and authentic.

### A.    Categories of Multimedia to Be Offered

The United States plans to introduce at trial: certain multimedia recovered from Defendant Warnagiris' phone, videos and photographs taken by third parties such as other rioters and journalists who were present inside and outside the Capitol on January 6, official Senate and House recordings, CCTV, and potentially BWC footage. Like any other videos, these can be authenticated by any person with direct knowledge of the scene depicted or with sufficient circumstantial knowledge, *see* Fed. R. Evid. 901(b)(1), or through metadata or comparison, *see* Fed. R. Evid. 901(b)(4).  Alternatively, given the automated nature of the recording devices in question, the open source, BWC and CCTV footage can be authenticated under Rule 901(b)(9), which allows authentication by "[e]vidence describing a process or system and showing that it produces an accurate result."  Fed. R. Evid. 901(b)(9); *see Dale*, 991 F.2d at 843; *Pinke*, 614 F. App'x at 653. Among other ways, these materials can be authenticated through the processes described in the below sections.

### B.    Legal Framework

"As a general rule, tangible evidence such as photographs must be properly identified or authenticated before being admitted into evidence at trial."  *United States v. Blackwell*, 694 F.2d 1325, 1329 (D.C. Cir. 1982).  To satisfy this requirement, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."  Fed. R. Evid.

901(a).   Rule 901(b) provides a nonexhaustive list of examples of methods for showing

authenticity.  Those include, as relevant here:

> (1) Testimony of a Witness with Knowledge.  Testimony that an item is what it is claimed to be.
>  . . . .
> (3) Comparison by an Expert Witness or the Trier of Fact.  A comparison with an authenticated specimen by an expert witness or the trier of fact.
> (4) Distinctive Characteristics and the Like.  The appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances.
>  . . . .
> (7) Evidence About Public Records.  Evidence that: (A) a document was recorded or filed in a public office as authorized by law; or (B) a purported public record or statement is from the office where items of this kind are kept.
>  . . . .
> (9) Evidence About a Process or System.  Evidence describing a process or system and showing that it produces an accurate result.

Fed. R. Evid. 901(b).

In making the showing necessary for admissibility, "the proponent's 'burden of proof'" is

"slight," and the "ultimate resolution of the evidence's authenticity is reserved for the jury."

*United States v. Hassanshahi*, 195 F. Supp. 3d 35, 48 (D.D.C. 2016) (quoting *McQueeney v.

Wilmington Tr. Co.*, 779 F.2d 916, 928 (3d Cir. 1985)); *United States v. Safavian*, 435 F. Supp. 2d

36, 38 (D.D.C. 2006).  To make the requisite prima facie showing, "circumstantial evidence of

authenticity can be sufficient."  *United States v. Bruner*, 657 F.2d 1278, 1284 (D.C. Cir. 1981).

And such evidence need not "rule out all possibilities inconsistent with authenticity, or to prove

beyond any doubt that the evidence is what it purports to be," *Hassanshahi*, 195 F. Supp. 3d at 48

(quoting *United States v. Pluta*, 176 F.3d 43, 49 (2d Cir. 1999)).  Rather, the party offering the

evidence need only "demonstrate that, as a matter of reasonable probability, possibilities of

misidentification and adulteration have been eliminated." *United States v. Celis*, 608 F.3d 818, 842 (D.C. Cir. 2010) (quoting *United States v. Stewart*, 104 F.3d 1377, 1383 (D.C. Cir. 1997)).

### C.    Overlapping Bases for Admissibility of Multimedia

As introduced herein, there are multiple, overlapping bases that the United States intends to use for the authentication and introduction of photographs and videos at trial.  The United States offers this nonexclusive list of bases for authentication should the United States be unable to enter into stipulations with Defendant Warnagiris in advance of trial.

### 1.   Authentication by a Witness with Knowledge

To begin, any witness with knowledge of the events depicted in a photograph or video can authenticate the evidence, including but not limited to the person who took the photograph or video.  *See* Fed. R. Evid. 901(b)(1).  Here, that includes any person who was present for the events depicted in the photograph or video and has a recollection sufficient for them to recognize the scene depicted.  *See, e.g.*, *Am. Wrecking Corp. v. Sec'y of Lab.*, 351 F.3d 1254, 1262 (D.C. Cir. 2003).  Any individual that observed the events depicted in the photograph or video can testify that the photograph or video appears to fairly and accurately show the events that took place.  *See* FRE 901(b)(1); *see also United States v. Rembert*, 863 F.2d 1023, 1026 (D.C. Cir. 1988).

Even a person who was not present for a specific event can circumstantially establish the authenticity of a photograph or video depicting that event if they can (1) identify the location(s) depicted in the video; and (2) establish that the video is generally consistent with their knowledge of events that occurred during the Capitol riot.  *See, e.g.*, *Rembert*, 863 F. 2d at 1028 ("Even if direct testimony as to foundation matters is absent . . . the contents of a photograph itself, together with such other circumstantial or indirect evidence as bears upon the issue, may serve to explain and authenticate a photograph sufficiently to justify its admission into evidence." (alteration in

original) (quoting *United States v. Stearns*, 550 F.2d 1167, 1171 (9th Cir. 1977) (Kennedy, J.)));

*United States v. Holmquist*, 36 F.3d 154, 169 (1st Cir. 1994) ("A photograph's contents, buttressed

by indirect or circumstantial evidence, can form a sufficient basis for authentication even without

the testimony of the photographer or some other person who was present at the time it was taken.").

On this authority, the United States could authenticate riot footage through, for example, the

testimony of an experienced U.S. Capitol Police officer who is familiar with all areas of the Capitol

and who knows that the events of January 6 are unique in modern history.  *Cf. Safavian*, 435 F.

Supp. 2d at 40–42 (authenticating emails based on "distinctive characteristics" and citing Fed. R.

Evid. 901(b)(4)); *Klayman v. Judicial Watch*, 299 F. Supp. 3d 141, 145–46 (D.D.C. 2018)

(admitting emails and advertisements by comparing later versions with admitted versions).  Again,

this is a low bar that requires only a prima facie showing that the evidence is what the United States

purports it to be—namely, photographs and videos of the Capitol siege in progress.

### 2.  Authentication by Metadata

Where necessary, the United States can also authenticate the specific time or place of a

photograph or video using metadata.  When a digital media file is extracted from a device or

otherwise seized by the government, it often contains metadata that specifies the time, and

sometimes place, the file was created, along with other information.  At trial, the United States

will sometimes call law enforcement personnel to testify about the process of extracting data from

digital devices and reviewing the extracted materials.  Such testimony is sufficient to make a prima

facie showing that a photograph or video was made at the time or place reflected in the metadata.

*See, e.g.*, *United States v. Banks*, 43 F.4th 912, 918 (8th Cir. 2022) ("While the officers were not

present when the images and videos were first captured, their testimony [about reviewing

extraction reports] provided a rational basis to believe that the exhibits had been created within the

relevant time frame and stored on [the defendant's] cellular phones."); *Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534, 547–48 (D. Md. 2007) ("Because metadata shows the date, time and identity of the creator of an electronic record, as well as all changes made to it, metadata is a distinctive characteristic of all electronic evidence that can be used to authenticate it under Rule 901(b)(4)."); *United States v. Gilbreath*, No. 3:19-CR-127-TAV-HBG, 2020 WL 5441226, at *3 (E.D. Tenn. Sept. 10, 2020) ("Metadata . . . showed that these images were created at defendant's home and on defendant's cell phone on September 12, 2015.").

### 3. Authentication by Comparison

Similarly, and alternatively, in instances where precision of time and place is relevant but cannot be established by a witness with knowledge or by the media's metadata, the United States will authenticate exhibits by reference to other, already-authenticated exhibits depicting the same time and place.  This method of "[a]uthentication by comparison is routine."  *Valve Corp. v. Ironburg Inventions Ltd.*, 8 F.4th 1364, 1371 (Fed. Cir. 2021); *see also United States v. Hoyt*, 946 F.2d 127, at *1 (D.C. Cir. 1991) (unpublished) (noting that Fed. R. Evid. 901(b)(3) permits authentication by comparison); *Stearns*, 550 F.2d at 1171 (finding that first picture "authenticates the other four pictures as to time"); *Safavian*, 435 F. Supp. 2d at 40 (allowing authentication of emails by means of comparison with other "e-mails that already have been independently authenticated").

### 4. Authentication Based on a Process or System that Produces an Accurate Result

Certain multimedia, such as security cameras (CCTV) operated by the U.S. Capitol Police (USCP) and, potentially, body-worn cameras (BWC) worn by officers of the Metropolitan Police Department (MPD) can be authenticated by "describing a process or system and showing that it produces an accurate result," Fed. R. Evid 901(b)(9).  *See United States v. Dale*, 991 F.2d 819,

843 (D.C. Cir. 1993) ("Tapes may be authenticated by testimony describing the process or system that created the tape."); *United States v. Pinke*, 614 F. App'x 651, 653 (4th Cir. 2015) (unpublished) (finding "sufficient evidence of authentication" of a prison's closed circuit video where "a Government witness explained the manner in which the prison's closed circuit video system operates, the means by which he obtained the video, and that he downloaded it onto the DVD that was played for the jury.").  USCP and MPD witnesses to be called by the United States are available to testify to the systems employed by USCP and MPD, respectively.  These witnesses will be able to explain how the system is used, that it reliably records and depicts the areas that the camera faces, and the internal characteristics of videos—such as date and time stamps—which allow USCP and MPD to identify and retrieve segments of video.

### 5.  Authentication Based on Status as an "Official Publication"

Certain evidence in this case, such as video taken by the Senate Recording Studio, is also "self-authenticating," meaning it "require[s] no extrinsic evidence of authenticity in order to be admitted."  Fed. R. Evid. 902.[1]  This is so because it qualifies as an "Official Publication[]," defined as any "book, pamphlet, or other publication purporting to be issued by a public authority."  Fed. R. Evid. 902(5).  Official materials published on government websites fall into this category and are self-authenticating under Rule 902.  *See Williams v. Long*, 585 F. Supp. 2d 679, 685–90 (D. Md. 2008); *cf. MMA Consultants 1, Inc. v. Republic of Peru*, 245 F. Supp. 3d 486, 503–04 (S.D.N.Y. 2017) (Congressional transcripts); *Singletary v. Howard Univ.*, No. 1:17-cv-01198,

---

[1] Further underscoring the multiple paths to authentication, the Senate Recording Studio footage may also be authenticated through any of the mechanisms outlined in this motion, including Fed. R. Evid. 901(b)(1), (3), (4), (9).

2018 WL 4623569, at *4 n.1 (D.D.C., Sept. 26, 2018) (government-issued guidebook), *rev'd on other grounds*, 939 F.3d 287.

The United States Senate uses the Senate Recording Studio to contemporaneously record Senate proceedings and distribute those recordings to the public. *See* https://www.senate.gov/–floor/, last accessed Dec. 15, 2022 (publicly available archived recordings of Senate Recording Studio).  The Senate Recording Studio recorded the proceedings relating to the Electoral College Certification on January 6, 2021, up to the point when the rioters breached the building and forced the proceedings into recess.  *See id.*, January 6, 2021.  Subsequently, the Senate Recording Studio recorded the Electoral College Certification proceedings after the rioters were cleared from the Capitol Building and the session resumed.  *Id.*  During the interim, the Senate Recording Studio captured footage of rioters who were present on the Senate floor during the recess.

## II.   Motion *in Limine* To Admit Certain Statutes and Records

### A.   Judicial Notice of the Federal Electoral College Certification Law

The proceedings that took place on January 6, 2021, were mandated by, and directed under the authority of, several constitutional and federal statutory provisions.  In fact, as Vice President Pence gaveled the Senate to Order on January 6, 2021, to proceed with the Electoral College Certification Official Proceeding, he quoted directly from, and cited to, Title 3, United States Code, Section 17.

The United States requests that the Court take judicial notice of, and admit into evidence, copies of Article II, Section 1 of the Constitution of the United States, the Twelfth Amendment, as well as 3 U.S.C. §§ 15–18 relating to the Electoral College Certification Official Proceedings. It is well established that district courts may take judicial notice of law "without plea or proof." *See United States v. Davila-Nieves*, 670 F.3d 1, 7 (1st Cir. 2012) (quoting *Getty Petroleum Mktg.,*

*Inc. v. Capital Terminal Co.*, 391 F.3d 312, 320 (1st Cir. 2004)).  The United States makes this request even though "no motion is required in order for the court to take judicial notice."  *Moore v. Reno*, No. 00-5180, 2000 WL 1838862, at *1 (D.D.C. Nov. 14, 2000).  Further, "where a federal prosecution hinges on an interpretation or application of state law, it is the district court's function to explain the relevant state law to the jury."  *See United States v. Fazal-Ur-Raheman-Fazal*, 355 F.3d 40, 49 (1st Cir. 2004).

### B.     Admission of the Congressional Record and S. Con. Res 1

The Congressional proceedings on January 6, 2021, were memorialized in the Congressional Record.  The Congressional Record is a public record under Federal Rule of Evidence 902(5).  *See MMA Consultants*, 245 F. Supp. 3d at 503–04.  The United States intends to introduce portions of the Congressional Record at trial, including the bodies' "concurrent resolution to provide for the counting on January 6, 2021, of the electoral votes for President and Vice President of the United States," S. Con. Res. 1, 117th Cong. (2021).  For the same reasons as the Senate Recording Studios footage above, these records should be admitted as self-authenticating.

### III.     Motion in Limine to Limit Cross Examination of Confidential Human Resources

The government requests an order placing reasonable limits on the cross examination of any Confidential Human Source ("CHS" or "Sources") to prevent eliciting unnecessary testimony that would prejudice the witness and the government.  Specifically, the government requests that:

1.  The defense shall be prohibited from asking any questions seeking personal identifying information from the witnesses;

2.  Apart from the instant investigation, the defense shall be prohibited from asking any

questions about the witnesses' participation in past or pending investigations or undercover operations; and

3. The defense shall be prohibited from eliciting testimony, either on cross-examination or on direct, that would reveal details about the FBI's CHS program such as the training and methods used by the FBI as part of their undercover operations.

Protecting witnesses' safety and the integrity of ongoing investigations are compelling interests that courts have long recognized. That precedent readily justifies the reasonable security measures proposed here. The Confrontation Clause of the Sixth Amendment gives a defendant the right to confront and cross-examine the government's witnesses who testify against the defendant. See *Maryland v. Craig*, 497 U.S. 836, 846 (1990); *Smith v. Illinois*, 390 U.S. 129 (1968). The "elements of confrontation—physical presence, oath, cross-examination, and observation of demeanor by the trier or fact—serves the purposes of the Confrontation Clause by ensuring that evidence admitted against an accused is reliable and subject to rigorous adversarial testing that is the norm of Anglo-American criminal proceedings." *Craig*, 497 U.S. at 846. "The rule is that once cross-examination reveals sufficient information to appraise the witnesses' veracity, confrontation demands are satisfied." *United States v. Falsia*, 724 F.2d 1339, 1343 (9th Cir. 1983).

As the Supreme Court recognized in *Delaware v. Van Arsdall*, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross- examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness's safety, or interrogation that is repetitive or only marginally relevant." 475 U.S. 673, 679 (1986); *see also United States v. Palermo*, 410 F.2d 468, 472 (7th

Cir. 1969) (citing *United States v. Varelli*, 407 F.2d 735 (7th Cir. 1969)); *Siegfriedt v. Fair*, 982

F.2d 14, 18 (1st Cir. 1992); *United States v. Contreras*, 602 F.2d 1237, 1239-40 (5th Cir. 1979)

(where there was reasonable fear the disclosure of DEA agent's home address and frequented

locations would endanger him and his family, no error in precluding cross-examination as to

home address and other background information even though agent was "instrumental in

defendant's arrest"); *United States v. Maso*, 2007 WL 3121986, *4 (11th Cir. Oct. 26, 2007) (per

curiam) (unpublished) ("The district court did not violate [the defendant's] right to confront

witnesses by allowing the [cooperating witness] to testify using a pseudonym."); *Brown v.

Kuhlman*, 142 F.3d 529, 532 n.3 (2d Cir. 1998) (undercover detective who testified in closed

courtroom due to safety concerns was permitted to testify using his badge number instead of his

true name).  The protections requested herein, while minimally restrictive, would ensure the

integrity of any ongoing investigations and would reduce the security threat posed to any

testifying Sources.

**IV.     Motion *in Limine* to Preclude Defendant Warnagiris' Introduction of His Own
          Out-of-Court Statements as Inadmissible Hearsay**

Defendant Warnagiris' own out-of-court statements are hearsay that cannot be admitted to

prove the truth of any matter asserted.  Fed. R. Evid. 801, 802.  Although the United States may

offer the defendant's statements as statements of a party opponent, Fed. R. Evid. 801(d)(2)(A), or

other nonhearsay, the defendant has no corresponding right to admit his own statements without

subjecting himself to cross-examination.

**A.     The Rule of Completeness Cannot Circumvent the Rule Against Hearsay**

Nor does Federal Rule of Evidence 106, the "Rule of Completeness," provide an end-run

around the prohibition against hearsay.  That rule provides that, "[i]f a party introduces all or part

of a writing or recorded statement, an adverse party may require the introduction, at that time, of

any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time." Fed. R. Evid. 106. Rule 106 directs the Court to "permit such limited portions [of a statement] to be contemporaneously introduced as will remove the distortion that otherwise would accompany the prosecution's evidence." *United States v. Sutton*, 801 F.2d 1346, 1369 (D.C. Cir. 1986). The rule does not "empower[] a court to admit unrelated hearsay." *United States v. Woolbright*, 831 F.2d 1390, 1395 (8th Cir. 1987). "[T]he provision of Rule 106 grounding admission on 'fairness' reasonably should be interpreted to incorporate the common-law requirements that the evidence be relevant, and be necessary to qualify or explain the already introduced evidence allegedly taken out of context . . . . In almost all cases we think Rule 106 will be invoked rarely and for a limited purpose." *Sutton*, 801 F.2d at 1369.

Accordingly, at trial the Court should reject any effort by Defendant Warnagiris to use the Rule of Completeness as a backdoor to admit otherwise inadmissible hearsay.

### B. Law Enforcement Testimony Cannot Circumvent the Rule Against Hearsay

Another mechanism by which the United States anticipates that Defendant Warnagiris may attempt to introduce his own prior statements is through the testimony of law enforcement officers with whom certain Defendant Warnagiris had communications.

An equally defective mechanism by which counsel might attempt to introduce Defendant Warnagiris' prior statements to the Court would be for Defendant to elicit lay opinion testimony from the officers or agents. As an initial matter, such testimony would likely be irrelevant and inadmissible on that basis. Additionally, if such opinions are predicated on self-serving statements by Defendant, the opinion testimony is likewise inadmissible as a vehicle to admit Defendant Warnagiris' hearsay. The Federal Rules of Evidence allow only expert witnesses to offer opinions based on otherwise-inadmissible evidence, Fed. R. Evid. 703, and even in that context, expert

opinion testimony cannot be a backdoor for hearsay.  *See Gilmore v. Palestinian Interim Self-Government Authority*, 843 F.3d 958, 972 (D.C. Cir. 2016) ("The expert must form his own opinions by applying his extensive experience and a reliable methodology to the inadmissible materials.  Otherwise, the expert is simply repeating hearsay evidence without applying any expertise whatsoever, a practice that allows the [proponent] to circumvent the rules prohibiting hearsay") (internal quotation marks and alterations omitted) (quoting *United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008); *DL v. D.C.*, 109 F. Supp. 3d 12, 30 (D.D.C. 2015) ("An expert is entitled to rely on inadmissible evidence in forming his or her opinion, though the expert 'must form his or her own opinions by applying his or her extensive experience and a reliable methodology to the inadmissible materials,' rather than simply 'transmit' the hearsay to the jury." (alterations omitted) (quoting *Mejia*, 545 F.3d at 197)).  At trial, the Court should reject any effort by Defendant Warnagiris to admit otherwise inadmissible hearsay indirectly through a law enforcement officer or other percipient witness.

## V.      Motion *in Limine* To Preclude Improper Defense Arguments

### A.     First Amendment

The United States moves this Court to admit in its case-in-chief statements that evince Defendant Warnagiris' motive or intent, or which go to prove an element of any offense with which he is charged.  In anticipation that Defendant Warnagiris may seek to oppose introduction of his statements on First Amendment grounds or may cite the First Amendment in arguments to the Court, the United States also moves *in limine* to preclude the defense from eliciting evidence or arguing to the Court that their statements and actions were protected by the First Amendment.

### 1. Admission of Defendant Warnagiris' Statements Does Not Violate the First Amendment

The United States intends to introduce several statements, made by Defendant Warnagiris, that will aid the Court's determination as to whether the United States has met the elements of the statutes at issue and to show motive and intent. *See Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993) (holding that the First Amendment "does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent"). "Evidence of a defendant's previous declarations or statements is commonly admitted in criminal trials subject to evidentiary rules dealing with relevancy, reliability, and the like." *Id.* Accordingly, the United States asks that the Court rule that the First Amendment does not bar admission at trial of any statement that the United States offers to establish Defendant Warnagiris' motive, intent, or an element of the crimes charged.

Courts across the country, including this Court's colleagues in January 6th cases, have allowed evidence of defendants' statements for the purposes sanctioned by *Mitchell*. As Judge Cooper recently ruled:

> Nor does the Court find any First Amendment concerns in the government's use of Robertson's statements to show intent. . . . If Robertson had expressed his views only through social media, he almost certainly would not be here. But he also allegedly took action—entering the Capitol without lawful authority in an alleged attempt to impede the Electoral College vote certification. His words remain relevant to his intent and motive for taking those alleged actions.

*United States v. Robertson*, 588 F. Supp. 3d 114, 124 (D.D.C. 2022) (internal citation omitted). Outside of the context of January 6th, *Mitchell* has been cited to uphold the admission of a wide range of statements, including but not limited to rap lyrics, terrorist materials, and speeches advocating civil disobedience. *See United States v. Smith*, 967 F.3d 1196, 1205 (11th Cir. 2020) (rap lyrics); *United States v. Pierce*, 785 F.3d 832, 841 (2d Cir. 2015) (rap lyrics and tattoos);

*United States v. Salameh*, 152 F.3d 88, 111–12 (2d Cir. 1998) (terrorist materials); *United States v. Fullmer*, 584 F.3d 132, 158 (9th Cir. 2009) (speeches advocating civil disobedience).[2]

Defendant Warnagiris' statements that shed light on the elements of the offenses, or motive or intent, should be admitted in this case as expressly permitted by *Mitchell*, regardless of whether any of those statements may otherwise constitute speech protected by the First Amendment.

### 2. Defendant Warnagiris Should Be Precluded from Raising a First Amendment Defense to the Court

The United States also moves *in limine* to preclude Defendant Warnagiris from arguing to the Court that their conduct was protected by the First Amendment.  None of the offenses with which Defendant Warnagiris is charged punish speech, as crimes such as threats or solicitation do.  The crimes with which the Defendant is charged punish the corrupt obstruction, influence, or impediment of an official proceeding (substantive violation of 18 U.S.C. § 1512(c)(2)); or actions taken during the riot.

If the United States establishes the elements of any of the offenses with which Defendant Warnagiris is charged, the First Amendment provides no defense, even if evidence of defendant's crimes is intertwined with political discussion and rhetoric.  *See United States v. Amawi*, 695 F.3d 457, 482 (6th Cir. 2012) ("[A]lthough the conspiracy was closely related to, and indeed proved by, many of the defendants' conversations about political and religious matters, the conviction was based on an agreement to cooperate in the commission a crime, not simply to talk about it."); *see also United States v. Hassan*, 742 F.3d 104, 127–28 (4th Cir. 2014) (citing *Amawi*).

---

[2] The court in *Fullmer* specifically noted that one particular defendant's conduct—which included writing an editorial and recruiting speakers to travel and advocate on behalf of his organization—was not criminal, and that punishing him based on that conduct alone would be unconstitutional. *Fullmer*, 584 F.3d at 158.  The court nonetheless, citing *Mitchell*, held that this defendant's "conduct . . . does provide circumstantial evidence from which a jury could have reasonably inferred that Harper was involved in a conspiracy." *Id.*

Accordingly, any line of cross-examination or argument that Defendant Warnagiris may wish to make regarding the First Amendment is irrelevant because it lacks a "tendency to make the existence of [a] fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," Fed. R. Evid. 401, and because he is not entitled to a First Amendment defense as a matter of law.  To the extent there is any relevance to any of Defendant Warnagiris' First Amendment claims, the Court should exclude any questioning and argument along those lines under Fed. R. Evid. 403.  Any attempt to shift the Court's attention to questions about whether Defendant Warnagiris' statements were protected by the First Amendment, rather than the charged offenses risks confusing the issues, wasting time, and unfairly prejudicing the fact finder.

### B.     Charging Decisions and Selective Prosecution

The United States moves *in limine* to exclude all evidence and arguments regarding its charging decisions.  The Supreme Court has recognized that the "Attorney General and United States Attorneys retain 'broad discretion' to enforce the Nation's criminal laws."  *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (quoting *Wayte v. United States*, 470 U.S. 598, 607 (1985)).  "They have this latitude because they are designated by statute as the President's delegates to help him discharge his constitutional responsibility to 'take Care that the Laws be faithfully executed.'"  *Id.*  (quoting U.S. Const. Art. II, § 3); *see* 28 U.S.C. §§ 516, 547.  As a general matter, "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion."  *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978); *see also United States v. Batchelder*, 442 U.S. 114, 125 (1979) ("Selectivity in the enforcement of criminal laws is, of course, subject to constitutional constraints.").

Indeed, the D.C. Circuit has recognized that a selective prosecution claim implicates "an issue of law entirely independent of the ultimate issue of whether the defendant actually committed the crimes for which she was charged." *United States v. Washington*, 705 F.2d 489, 495 (D.C. Cir. 1983); *see also United States v. Stone*, 394 F.Supp.3d 1, 30 n.24 (D.D.C. 2019) ("[T]he Supreme Court found that a claim of selective prosecution is not a 'defense' that triggers discovery under Rule 16, because a claim of selective prosecution is not a response to the government's case-in-chief."); *Armstrong*, 517 U.S. at 463 (noting "selective-prosecution claim is not a defense on the merits to the criminal charge"). After all, evidence that some other individual is currently uncharged or has been charged with a lesser crime than those charged here has no probative value to the issues at trial and serves only to confuse or mislead the fact finder. *See* Fed. R. Evid. 402, 403; *see also United States v. Reed*, 641 F.3d 992, 993–94 (8th Cir. 2011) (collecting cases and observing that "[s]everal circuits have unanimously upheld the exclusion of evidence of prior charging decisions on the ground that many factors unrelated to guilt may influence those decisions and their admission therefore risks misleading the jury and confusing the issues"); *United States v. Sutton*, No. CR 21-0598, 2022 WL 13940371, at *18 (D.D.C. Oct. 23, 2022) ("These issues are irrelevant, inappropriate for consideration by the jury, invite jury nullification, and distract from the issues at trial.").

Defendant Warnagiris should be precluded from introducing evidence or making arguments regarding charging decisions made by the United States. To the extent that any Defendant Warnagiris seeks to present evidence or arguments that other individuals have not been charged for related conduct or that it is unfair that he has been charged, while other individuals involved in related criminal conduct remain uncharged or charged with lesser offenses, such

evidence is irrelevant, inadmissible, and serves only to divert the Court's attention to matters unrelated to Defendant Warnagiris' guilt or innocence.[3]

### C.    Entrapment or Public Authority Defenses

Defendant Warnagiris should be prohibited from making arguments or attempting to introduce evidence that law enforcement gave permission to Defendant Warnagiris to enter the U.S. Capitol.  A public authority defense is available only where a defendant "has knowingly acted in violation of federal criminal law, but has done so in reasonable reliance on the authorization of a governmental official."  *United States v. Alvarado*, 808 F.3d 474, 484 (11th Cir. 2015). Relatedly, the defense of entrapment by estoppel applies only "to a defendant who reasonably relies on the assurance of a government official that specified conduct will not violate the law." *Id.* at 484–85.  Such reliance must be "objectively reasonable."  *United States v. Barker*, 546 F.2d 940, 948 (D.C. Cir. 1976).  This defense is unavailable in this case, and the United States moves *in limine* to exclude evidence or argument targeted at such a defense.

### 1.    Defendant Warnagiris Has Not Provided the Requisite Notice

Federal Rule of Criminal Procedure 12.3(a)(1) requires Defendant to provide notice if they "intend[ ] to assert a defense of actual or believed exercise of public authority on behalf of a law enforcement agency or federal intelligence agency at the time of the alleged offense."  Fed. R. Crim. P. 12.3(a)(1).  Such notice must be in writing and be filed with the clerk "within the time provided for filing a pretrial motion, or at any later time the court sets."  *Id.*  The notice must contain the law enforcement or federal intelligence agency involved, the specific agency member on whose behalf the defendant claims to have acted, and the time during which the defendant

---

[3] The United States does not, through this motion, seek to exclude evidence of charging decisions relating to cooperating witnesses for the limited purpose of impeaching the credibility of each witness's testimony.

claims to have acted with public authority.  Fed. R. Crim. P. 12.3(a)(2)(A)–(C).  A failure to comply allows the court to exclude the testimony of any undisclosed witness except the defendant. Fed. R. Crim. P. 12.3(c).

### 2.  Defendant Warnagiris' Actions Were Not Authorized by the President

Regardless of notice, Defendant should be precluded from advancing a public authority defense.  As an initial matter, former President Trump did not have the authority to permit or authorize a conspiracy to obstruct Congress, nor could he have lawfully sanctioned the attack on the United States Capitol on January 6 or any of the other criminal conduct allegedly perpetrated by Defendant.  As Chief Judge Howell wrote last year in rejecting the idea of an entrapment-by-estoppel defense for January 6 defendants:

> [A President] cannot, in keeping with his constitutional function and his responsibilities under Article II, lawfully permit actions that directly undermine the Constitution. Thus, a President cannot, within the confines of his constitutional authority, prevent the constitutionally mandated certification of the results of a Presidential Election or encourage others to do so on his behalf, nor can he direct an assault on the coequal Legislative branch of government. Were a President to attempt to condone such conduct, he would act ultra vires and thus without the force of his constitutional authority. . . . Put simply, even if former President Trump in fact [explicitly directed the rioters' actions,] his statements would not immunize defendants charged with offenses arising from the January 6 assault on the Capitol from criminal liability.

*United States v. Chrestman*, 525 F. Supp. 3d 14, 32–33 (D.D.C. 2021).  The D.C. Circuit came to the same conclusion in *United States v. North*, when addressing Oliver North's contention that President Ronald Reagan authorized his obstruction of Congress in that case.  910 F.2d 843, 879 (D.C. Cir. 1990) (per curiam), *opinion withdrawn and superseded in part on reh'g*, 920 F.2d 940 (D.C. Cir. 1990).  The court made clear that "'[n]either the President nor any of [North's] superiors had the legal authority to order anyone to violate the law,' particularly if such 'orders,' explicit or implicit, represented nothing more than [the President's] desires." *Id.* at 891 n.24.

Chief Judge Howell's opinion in *Chrestman* adopted a four-part test from the Tenth Circuit, which limits the entrapment-by-estoppel defense to narrow circumstances. *Chrestman*, 525 F. Supp. 3d at 33 (citing *United States v. Cox*, 906 F.3d 1170, 1191 (10th Cir. 2018)). "To win an entrapment-by-estoppel claim, a defendant criminally prosecuted for an offense must prove (1) that a government agent actively misled him about the state of the law defining the offense; (2) that the government agent was responsible for interpreting, administering, or enforcing the law defining the offense; (3) that the defendant actually relied on the agent's misleading pronouncement in committing the offense; and (4) that the defendant's reliance was reasonable in light of the identity of the agent, the point of law misrepresented, and the substance of the misrepresentation." *Id.* (quoting *Cox*, 906 at 1191).

Here, Defendant Warnagiris cannot meet the requirements of the Tenth Circuit's four-part test. To begin, Defendant Warnagiris cannot point to any government official who advised Defendant Warnagiris that his conduct was legal. Defendant Warnagiris Warnagiris claims in his notice that he was acting on behalf of former President Trump. But former President Trump's speech on January 6, 2021 could not satisfy the first prong of the Tenth Circuit's test. Former President Trump did not state that the U.S. Capitol grounds were no longer "restricted" under 18 U.S.C. § 1752(a); nor that it would not constitute obstruction of the proceeding to enter the Capitol building under 18 U.S.C. § 1512(c)(2); nor that property inside the Capitol building was not government property, and so could be destroyed notwithstanding 18 U.S.C. § 1361 or stolen notwithstanding 18 U.S.C. § 641; nor that tampering with documents in violation of 18 U.S.C. § 1512(c)(1) or that assaulting a law enforcement officer in violation of 18 U.S.C. § 111 were lawful. Former President Trump did not purport to reinterpret a specific criminal statute to render Defendant Warnagiris' conduct noncriminal. He therefore did not "actively mis[lead]" defendants

"about the state of the law defining the offense." *Cox*, 906 F.3d at 1191.  Defendant Warnagiris has not identified anyone else who might have authority to do so who did so either.

And even if Defendant Warnagiris were able to point to such a government official, which they cannot, Defendant Warnagiris could not show that their reliance was reasonable. "[R]easonable reliance occurs" only "if 'a person sincerely desirous of obeying the law would have accepted the information as true, and would not have been put on notice to make further inquiries.'" *United States v. Lynch*, 903 F.3d 1061, 1077 (9th Cir. 2018) (quoting *United States v. Batterjee*, 361 F.3d 1210, 1216–17 (9th Cir. 2004)); *see United States v. Corso*, 20 F.3d 521, 528 (2d Cir. 1994) (adopting "sincerely desirous" standard).  It is objectively unreasonable to conclude that then-President Trump could authorize citizens to break into the Capitol and interfere with the Electoral College proceedings that were being conducted.  Indeed, the Supreme Court has made clear that an entrapment-by-estoppel defense is not available in cases where a government official's directive constitutes a "waiver of law" beyond the official's lawful authority.  *Cox v. Louisiana*, 379 U.S. 559 (1965) (drawing an "obvious[]" distinction between identifying an area for lawful protest and "allowing one to commit, for example, murder, or robbery").  Any "instruction" from a President to wage an unlawful assault on the Legislative branch of government would exceed the President's constitutional authority.  *See Chrestman*, 525 F. Supp. 3d at 33 ("Were a President to attempt to condone such conduct, he would act *ultra vires* and thus without the force of his constitutional authority." (citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 588–89 (1952))).  This is because "no President may unilaterally abrogate criminal laws duly enacted by Congress as they apply to a subgroup of his most vehement supporters." *Chrestman*, 525 F. Supp. 3d at 32.  Accordingly, any such argument would be *per se* unreasonable.

Defendant Warnagiris' conduct was plainly beyond any conduct that could be reasonably sanctioned.  Defendant Warnagiris should be prohibited from making arguments or attempting to introduce irrelevant evidence that former President Trump or any other government official authorized the Defendant's conduct at the Capitol.

### 3. Defendant Warnagiris' Actions Were Not Authorized by Law Enforcement

The same reasoning applies to any argument based on acts or omissions of the U.S. Capitol Police or other law enforcement: "the logic in *Chrestman* that a U.S. President cannot unilaterally abrogate statutory law applies with equal force to government actors in less powerful offices, such as law enforcement officers protecting the U.S. Capitol Building."  Memorandum and Order, *United States v. Williams*, No. 21-cr-377-BAH, at *2 (D.D.C. June 8, 2022), ECF No. 87.  Even if Defendant Warnagiris could establish that a member of law enforcement told them that it was lawful to enter the Capitol building or allowed them to do so, Defendant Warnagiris' reliance on any such statement would not be reasonable in light of the "obvious police barricades, police lines, and police orders restricting entry at the Capitol."  *Chrestman*, 525 F. Supp. 3d at 32.

In addition to prohibiting any defense arguments that law enforcement actively communicated to Defendant Warnagiris that entering the Capitol building or grounds was lawful, the Court should also bar Defendant Warnagiris from arguing that any failure to act by law enforcement rendered their conduct legal.  The same reasoning that applied in *Chrestman* again applies here.  That is, like the Chief Executive, a Metropolitan Police Officer or U.S. Capitol Police Officer cannot "unilaterally abrogate criminal laws duly enacted by Congress" through his or her purported inaction.  *Chrestman*, 525 F. Supp. 3d at 33.  An officer cannot shield an individual from liability for an illegal act by failing to enforce the law or ratify unlawful conduct by failing to

prevent it.  As Chief Judge Howell explained in the context of another January 6 case, "[s]ettled caselaw makes clear that law officer inaction—whatever the reason for the inaction—cannot sanction unlawful conduct."  *Williams*, No. 21-cr-377-BAH, at *3.

### 4.  Defendant Warnagiris' Actions Were Not Caused by Agent Provocateurs

Defendants in other, unrelated January 6 cases have introduced arguments that the Defendant Warnagiris' actions were encouraged by agents of the government.  Absent a proffer of evidence, such that the Court may evaluate the relevance of any such line of argument, Defendant should be precluded from making any such arguments to the Court, whether during an opening or closing arguments or on cross-examination.  *Cf. Michelson v. United States*, 335 U.S. 469, 481 (1948) (approving of the trial court's "scrupulous" efforts to guard against the asking of "a groundless question to waft an unwarranted innuendo into the jury box.").

### D.    Nullification

Defendant Warnagiris should be prohibited from making arguments or attempting to introduce irrelevant evidence that encourages nullification.  As the D.C. Circuit has made clear:

> A jury has no more "*right*" to find a "guilty" defendant "not guilty" than it has to find a "not guilty" defendant "guilty," and the fact that the former cannot be corrected by a court, while the latter can be, does not create a right out of the power to misapply the law.  Such verdicts are lawless, a denial of due process and constitute an exercise of erroneously seized power.

*Washington*, 705 F.2d at 494.  Evidence that serves only to support a jury nullification argument or verdict has no relevance to guilt or innocence.  *See United States v. Gorham*, 523 F.2d 1088, 1097–98 (D.C. Cir. 1975); *see also United States v. Funches*, 135 F.3d 1405, 1409 (11th Cir. 1998) ("No reversible error is committed when evidence, otherwise inadmissible under Rule 402 of the Federal Rules of Evidence, is excluded, even if the evidence might have encouraged the jury to disregard the law and to acquit the defendant.").  In particular, the Court should permit no

argument, evidence, or questioning regarding the following topics, which would serve only to encourage jurors to decide the case based on factors other than the facts and the law.

### 1.   Use of Federal Resources and the Volume and Timing of Discovery

The United States requests that the Defendant Warnagiris be precluded from arguing or eliciting testimony regarding the volume, nature, or timing of discovery or the volume and type of federal resources used in the investigation and prosecution of the case.   Any attempt by the Defendant Warnagiris to comment on discovery or allocation of federal resources is irrelevant and unduly prejudicial.  Fed. R. Evid. 401, 402, 403.  Instead, such arguments and testimony invite the Court to improperly consider its feelings towards the United States and the government's decision making about how to allocate resources.

### 2.   Defendant Warnagiris' Claimed Good Character

*Character Generally.*  The Court should exclude evidence and argument from Defendant Warnagiris introducing reputation or opinion evidence that he is generous, charitable, family-oriented, religious, or community participants.   Evidence that a defendant possesses certain favorable character traits is admissible only when the trait is "pertinent" to the offense charged. Fed. R. Evid. 404(a)(2)(A); *see, e.g.*, *United States v. Harris*, 491 F.3d 440, 447 (D.C. Cir. 2007); *United States v. Santana-Camacho*, 931 F.2d 966, 967–68 (1st Cir. 1991) (Breyer, C.J.).   But defendants may not provide evidence of possessing a generally good character.  *See, e.g.*, *United States v. Hill*, 40 F.3d 164, 168 (7th Cir. 1994) (court properly excluded "classic character evidence offered to prove that [defendant] had a good character and acted in conformity therewith").   Such evidence only promotes jury nullification and is not allowable.  *See United States v. Joseph*, 567 F. App'x 844, 849 (11th Cir. 2014) ("[W]hen the district court restricted defense counsel's comments about [defendant]'s honor and social contributions—comments that were part of his

jury nullification efforts—the court did not deny [defendant] the opportunity to make a legally tenable argument.  Instead, it kept him from making impermissible arguments.").  Because none of the above characteristics are relevant to the charged offenses, the Court should exclude any evidence and argument addressing these character traits.

*Specific Instances of Conduct.*  The Court should also exclude evidence and argument of specific instances of Defendant Warnagiris' good character, including caring for family members, donations, attending religious services, performing charitable or civic work, or other forms of generosity.  Rule 405(b) makes clear that unless a defendant's character or character trait is "an essential element of a charge, claim, or defense," he may not offer evidence of specific instances of good conduct.  Fed. R. Evid. 405(b).  Because none of the above instances of good conduct are relevant to an essential element of a charge, claim, or defense in this case, evidence of such should be excluded.  *See United States v. Bernard*, 299 F.3d 467, 476 (5th Cir. 2002) (approving court's sentencing instruction that jurors should not "consider the religious views of the defendants"); *Santana-Camacho*, 931 F.2d at 967 (excluding evidence that defendant was a good family man and a kind man because it was not a trait relevant to the offense); *United States v. Nazzaro*, 889 F.2d 1158, 1168 (1st Cir. 1989) (holding evidence of "bravery, attention to duty, perhaps community spirit" were "hardly 'pertinent' to the [charged] crimes"); *United States v. Morison*, 622 F. Supp. 1009, 10111 (D. Md. 1985) (holding "patriotism" was not a relevant trait to the charged offense).

### 3.  Defendant Warnagiris' Claimed Ignorance of the Law.

The Court should exclude evidence and argument from Defendant Warnagiris that they were ignorant of the illegality of the charged conduct.  "The general rule that ignorance of the law or a mistake of law is no defense to criminal prosecution is deeply rooted in the American legal

system." *Cheek v. United States*, 498 U.S. 192, 199 (1991).  While there is a "narrow exception," *United States v. Brooks*, 681 F.3d 678, 700 n.18 (5th Cir. 2012), that exception is "reserved . . . to limited types of statutory violations involving 'complex' statutes—namely those governing federal tax law and antistructuring transactions." *United States v. Kay*, 513 F.3d 432, 448 (5th Cir. 2007); *see Bryan v. United States*, 524 U.S. 184, 195 (1998).

Because ignorance of the law is not a defense to any of the charged offenses, any evidence and argument that Defendant Warnagiris did not know that the charged conduct was illegal should be excluded as irrelevant, and Defendant Warnagiris should not be permitted to ask witnesses if they knew their conduct was illegal or whether they intended to commit crimes.

### 4.  Penalties and Collateral Consequences

The Court should exclude evidence and argument of the potential penalties or consequences Defendant Warnagiris faces if he is convicted, including: (a) the maximum penalties; (b) that could be incarcerated; (d) that Defendant Warnagiris would become a felon and could be prohibited from obtaining some types of jobs or lose certain jobs or rights; and (e) any mention of the defendant's familu.

The potential penalties faced by Defendant Warnagiris is irrelevant to the Court's determination of guilt or innocence.  *See Shannon v. United States*, 512 U.S. 573, 579 (1994) ("[A] jury has no sentencing function, it should be admonished to 'reach its verdict without regard to what sentence might be imposed.'" (quoting *United States v. Rogers*, 422 U.S. 35, 40 (1975))).  "[P]roviding jurors sentencing information invites them to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion."  *Id.* at 579.  Accordingly, the D.C. Circuit has held that "the jury is not to consider the potential punishment which could result from a conviction."  *United States v. Broxton*, 926 F.2d

1180, 1183 (D.C. Cir. 1991); *see, e.g.*, *United States v. Greer*, 620 F.2d 1383, 1384 (10th Cir. 1980) ("The authorities are unequivocal in holding that presenting information to the jury about possible sentencing is prejudicial.").  Any discussion of possible penalties would serve no purpose beside improperly inviting the fact finder to render a verdict based on sympathy for Warnagiris— that is, to engage in nullification.  *See United States v. Bell*, 506 F.2d 207, 226 (D.C. Cir. 1974) ("[E]vidence which has the effect of inspiring sympathy for the defendant or for the victim . . . is prejudicial and inadmissible when otherwise irrelevant.") (quoting 1 Wharton's Criminal Evidence 164 at 304 (13th ed. 1972)); *United States v. White*, 225 F. Supp. 514, 519 (D.D.C 1963) ("The proffered testimony (which was clearly designed solely to arouse sympathy for defendant) was thus properly excluded.").

### E.     Unsupported Claims of Self-Defense or Defense of Others

To establish a prima facie case of self-defense on January 6, defendants must make an offer of proof of "(1) a reasonable belief that the use of force was necessary to defend himself or another against the immediate use of unlawful force and (2) the use of no more force than was reasonably necessary in the circumstances."  *United States v. Acosta-Sierra*, 690 F.3d 1111, 1126 (9th Cir. 2012) (quoting *United States v. Urena*, 659 F.3d 903, 907 (9th Cir. 2011).  "A defendant cannot claim self-defense if he was the aggressor or if he provoked the conflict upon himself."  *Waters v. Lockett*, 896 F.3d 559, 569 (D.C. Cir. 2018) (internal quotation marks and alterations omitted) (quoting *Murphy-Bey v. United States*, 982 A.2d 682, 690 (D.C. 2009)).  That principle applies fully to Section 111 prosecutions.  *See, e.g.*, *United States v. Mumuni Saleh*, 946 F.3d 97, 110 (2d Cir. 2019) ("Mumuni was the initial aggressor in the altercation with Agent Coughlin; as such, he could not, as a matter of law, have been acting in self-defense"); *Acosta-Sierra*, 690 F.3d at 1126 ("[A]n individual who is the attacker cannot make out a claim of self-defense as a justification for

an assault."). Here, the Defendant will not be able to put forth any evidence that they had a reasonable belief that their actions were necessary to defend themselves or others against the immediate use of unlawful force. Absent such a proffer of evidence, Defendant should be precluded from making any such arguments to the Court, whether during an address or on cross-examination.

### VI.    Motion *in Limine* to Preclude Defense Expert Without Notice

The Court should preclude any proposed expert testimony if Defendant Warnagiris fails to comply with the notice requirements under Federal Rule of Criminal Procedure 16(b)(1)(C).

### CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court grant the requested relief or, if the Court reserves ruling, to consider the above arguments when the relevant issues arise during trial.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:    */s/ REBEKAH LEDERER*
Rebekah Lederer
Assistant United States Attorney
Pennsylvania Bar No. 320922
601 D St. N.W, Washington, DC 20530
Tel. No. (202) 252-7012
Email: rebekah.lederer@usdoj.gov

Andrew Haag
Assistant United States Attorney
MA Bar No. 705425
601 D Street NW, Washington, DC 20530
Tel. No. (202) 252-7755
Email: andrew.haag@usdoj.gov