```
1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
2
     UNITED STATES OF AMERICA,      ) Criminal Action
3                                   ) No. 1:21-CR-382
                       Plaintiff,   )
4                                   ) MOTION HEARING
     vs.                            ) VIA ZOOM
5                                   )
     CHRISTOPHER WARNAGIRIS,        ) Washington, D.C.
6                                   ) October 16, 2023
                                    ) Time:  10:00 A.M.
7                       Defendant.  )

8            TRANSCRIPT OF MOTION HEARING - VIA ZOOM
         HELD BEFORE THE HONORABLE JUDGE PAUL L. FRIEDMAN
9                  UNITED STATES DISTRICT JUDGE
     _____
10
             A P P E A R A N C E S - VIA ZOOM
11

12   For Plaintiff:          ANDREW HAAG
                             REBEKAH LEDERER
13                           U.S. Attorney's Office
                             Criminal Division
14                           601 D Street, NW
                             Washington, DC 20530
15
     For Defendant:          MARINA MEDVIN
16                           Medvin Law, PLC
                             916 Prince Street
17                           Suite 109
                             Alexandria, VA 22314
18
     Also Present:           MICHAEL GORDON, AUSA
19

20

21

22   Court Reporter:         Tamara M. Sefranek, RMR, CRR, CRC
                             Official Court Reporter
23                           United States Courthouse, Room 6714
                             333 Constitution Avenue, NW
24                           Washington, D.C. 20001
                             202-354-3246
25
```

```
1                        P R O C E E D I N G S
2              THE COURTROOM DEPUTY:  Good morning.  This is
3    Criminal Action 21-382, United States of America v. Christopher
4    Warnagiris.
5              Counsel, please state your appearances for the
6    record.
7              MS. LEDERER:  Good morning, Your Honor.  Rebekah
8    Lederer and Andrew Haag on behalf of the government.
9              Your Honor, our supervisor, AUSA Michael Gordon, is
10   also here just observing.  He's here on the Zoom today as well.
11             THE COURT:  All right.
12             MS. MEDVIN:  Good morning, Judge Friedman.  This is
13   Marina Medvin on behalf of Mr. Christopher Warnagiris.  He's
14   here as well, and we do consent to proceed via video.
15             THE COURT:  Thank you, Ms. Medvin.  Good morning,
16   Mr. Warnagiris.
17             THE DEFENDANT:  Good morning, Your Honor.
18             THE COURT:  So we're here for the argument on a
19   number of motions.  And just as a preliminary, let me say that,
20   first, I've read all of your papers.  I'm familiar with the --
21   generally familiar with the arguments you're making.
22             Secondly, we did have oral argument, I think,
23   actually, on two separate occasions.  We addressed the motions
24   to dismiss various counts, and I've heard you on that, and I
25   know I owe you a decision on that.
```

1          But I don't think we need to argue any of that

2     again except that the bill of particulars argument is somewhat

3     related to that because if the -- at least with respect to

4     certain counts, if I think that the indictment is sufficient,

5     we still have the question of whether it's specific enough and

6     it goes to the bill of particulars.

7          So it seems to me we've got three matters on this

8     morning's schedule.  One is the bill of particulars -- not

9     necessarily in this order.  One is the bill of particulars; two

10    is *Brady*; and three is the motions in limine, and there are a

11    lot of issues raised in the motions in limine.

12         In that regard, I issued an order on -- last Thursday

13    listing some cases that I thought were relevant on *Brady* and

14    bill of particulars issues, and also directing your attention

15    to an opinion that I issued in another January 6th case, *United*

16    *States v. Baez*, on September 29, 2023, which dealt with a

17    number of the issues that are -- that are raised in the motions

18    in limine; not all of them, but some of them.

19         It may also be that either Ms. Medvin or the

20    government has made somewhat different arguments or additional

21    arguments, but I've at least looked at some of those issues.

22         So what's the most efficient way to proceed, and in

23    what order do you want to proceed?

24         MS. LEDERER:  Your Honor, I apologize.  I think we

25    could start with the general motion in limine, especially using

1  your prior decision in *Baez* as a guidance.  I think that would

2  be the quickest item on our list -- Ms. Medvin can correct me

3  if I'm wrong -- to take care of; then maybe the bill of

4  particulars, because that also, I think, could be quick and

5  efficient argument; and then ending with the motion in

6  limine -- excuse me -- defense's motion to compel.

7           THE COURT:  Ms. Medvin, what's your preference?

8           MS. MEDVIN:  We don't have a preference on the order,

9  Judge.  It's however the Court wishes to take them up.

10          THE COURT:  Well, I'm happy, in that case, to proceed

11 in the way the government is suggesting, and there are a lot of

12 issues.

13          The government has filed a motion in limine or --

14 let's see if I've got this right.  The government has filed a

15 motion -- two motions in limine, I think; one relating to

16 Secret Service witnesses and one relating to cameras, which

17 would be Docket 66 and 67.

18          And then the defense, Ms. Medvin, has filed an

19 omnibus motion raising -- I think this is right.  Wait a

20 minute.

21          MS. MEDVIN:  I apologize, Judge.  The omnibus --

22          THE COURT:  Maybe I've got this wrong.

23          MS. MEDVIN:  Yes, Judge.  It's from the government.

24 The government filed three.

25          THE COURT:  The government's omnibus motion, which is

1    Government 69, and it raises a whole lot of issues.  And then

2    there's a defense motion; I think the only defense motion that

3    is part of the motion in limine package of motions is Docket

4    70, nonparticularized January 6th evidence.

5              Is that right?  Have I got it right?

6              MS. MEDVIN:  Yes, Judge.

7              MS. LEDERER:  Yes, Your Honor.

8              THE COURT:  Well, then I think the government goes

9    first.

10             MR. HAAG:  Your Honor, I'm going to be handling the

11   motions in limine portion.

12             With respect to the camera locations, as I understand

13   it, that was unopposed by the defense, so I'd ask the Court

14   allow that motion.

15             THE COURT:  Is that correct, Ms. Medvin; that's

16   unopposed?

17             MS. MEDVIN:  That's correct, Judge.  The locations of

18   the cameras are not relevant to the defense in this particular

19   case.  So we just don't oppose that.  If the government wishes

20   to keep those locations secret, that is fine.

21             I do think we'll have quite a few agreements as to

22   how we'll proceed on that evidence in advance of trial to make

23   this easier for the Court.

24             THE COURT:  Thank you.

25             MR. HAAG:  With respect to the omnibus motion in

 1    limine, it's --

 2              THE COURT:  What about the Secret Service --

 3              MR. HAAG:  The Secret Service motion in limine, the

 4    defense did not oppose the discussion related to the number of

 5    Secret Service agents and the nature of the detail that was in

 6    their response.

 7              However, with respect to the exact location that

 8    Vice President Pence was during the course of the -- especially

 9    after he had been relocated due to the riot, I'd still ask that

10    the Court allow the motion in limine there.  There's absolutely

11    no relevance to discussing that material.

12              One, it's particularly sensitive national security

13    information.  Additionally, it's just not relevant to the

14    charges here.

15              As the government put in its reply, the expectation

16    at trial is that the evidence to be admitted will describe how

17    the entire Capitol Building, as well as most of the grounds

18    around the Capitol Building, were restricted on January 6th.

19    So for that reason, I just don't see where his location could

20    be relevant.

21              I understand the defense has a different reading of

22    Section 1752 that will allow this kind of smaller area to be

23    the restricted area.  I don't really see where there's a limit

24    on what exactly the smaller area is.  I don't see how the

25    statute says that the restricted area must be smaller than the

1   building or grounds or why an entire building couldn't be

2   captured within a restricted ground.

3          So for those reasons, I'd ask the Court to allow the

4   motion.

5          MS. MEDVIN:  Judge, if I may respond?

6          THE COURT:  Yes.

7          MS. MEDVIN:  So, first of all, I'll just address the

8   smaller area that he's referring to.  We don't use such

9   language.  That's not in the code section.  Let me just take a

10  step back and let the Court know.

11         We filed our trial brief in advance, and the reason

12  for doing that was to put the Court and the opposing party on

13  notice on what this case is really about for us, and that is,

14  number one, defining the law; number two, applying the facts to

15  the law.  That's what this case is about.

16         So we are concentrating heavily on reading the

17  statutes very carefully and making sure we understand what is

18  required as far as proof for each one of these statutes.  So in

19  the 1752, the specific language that I highlighted for the

20  Court saying it's inappropriate for the government to pursue an

21  exclusion in their motion in limine is the "area of" language.

22         The statute talks about a restricted area.  Both

23  parties agree an area can be restricted of any size; could be

24  large, could be small.  You can restrict an area.  The code

25  section doesn't discuss restricting the size of an area -- I'm

1    sorry -- restricting some kind of area itself.

2          But the particular language of the code section

3    doesn't penalize entry into restricted area overall.  It's only

4    a particular portion of the restricted area.  It says that an

5    area of the building or grounds that is restricted where the

6    Vice President is or will be temporarily visiting.

7          So the code section doesn't criminalize all entry,

8    unlimited entry, into the restricted area.  So an area can be

9    restricted for a variety of reasons or for all kinds of

10   different things.  This particular code section is only

11   punishing one type of conduct, and that is an area of a

12   building "where"; so it's a particularly defined area of a

13   building.  An area of a building or grounds where the Vice

14   President is or will be temporarily visiting.

15         So this "is" or "will be" area of language is what we

16   highlighted for the Court.

17         THE COURT:  Well, actually, the word -- the word in

18   the indictment -- I don't have the statute in front of me --

19   says, "where Vice President was and would be temporarily

20   visiting."  Is "was" not the statutory word?

21         MS. MEDVIN:  It is "is" or "will be."  So I think for

22   purposes of how the government -- because it's in the past.  I

23   think that's why the government wrote it that way.  The statute

24   is "is" or "will be."

25         THE COURT:  Okay.

1            MS. MEDVIN:  And so that requirement of the

2      contemporaneous presence or future presence is what we're

3      seeking for the government to prove.  The government can't rely

4      on past presence or some kind of generalized presence.

5            With that being said, we're not looking for

6      particular coordinates, you know, longitudinal.  That's not

7      what we're seeking here.  We're just seeking an area where the

8      defendant is and whether Vice President Pence was in that area.

9            We know from -- I mean, this is not the first

10     January 6th case to move forward.  We know from previous cases

11     that the area where the Vice President was taken was not

12     directly under the Capitol Building itself.  We know that from

13     other cases.  This is on the record.  This is public record.

14           So we already know issues like that.  That type of

15     information is what we're seeking to come into evidence in this

16     case as well; things that have already been admitted or similar

17     to what has already been admitted in other cases.  It's not as

18     specific as, what is the exact coordinate; is it -- you know,

19     can I find it on a map by pointing to X.  That's not what we're

20     seeking.

21           We're seeking a generalized -- not too generalized,

22     but enough for us to be able to determine whether the defendant

23     was in the area of the restricted building or grounds where the

24     Vice President was at that exact time; is or will be, under

25     that language.

1          THE COURT:  Well, let me ask you this question.  So I

2     think it's public knowledge what time, probably a precise time,

3     that he was removed or taken by the Secret Service somewhere,

4     and so we know that time.

5          And, presumably, in discovery and in the statement of

6     facts, we know what time it is alleged that Mr. Warnagiris was

7     present in the Capitol or on the Capitol Grounds.  And is that

8     not sufficient to defend?

9          MS. MEDVIN:  It would be if, in fact, we were to look

10    at the code section and say that the restricted -- so if the

11    government and the Secret Service, in their testimony, are

12    going to say that the area that was restricted for the

13    Vice President was the entirety of the area that they're going

14    to surround in red, and that includes the Capitol Building and

15    a large portion of the grounds around it.

16         There's also going to be testimony, whether direct or

17    cross-examination, that the area was restricted previously

18    unrelated to Mike Pence's entry into the area because they were

19    building -- they were building a stage for the inauguration.

20         And then there's going to be cross-examination on the

21    fact that Mike Pence was only supposed to be in, I think it

22    was, the northern portion -- there was one portion where his

23    motorcade was waiting for him; Vice President Pence arrived in

24    that area, and then he was in the building itself.

25         So in terms of where he was or would be visiting and

1    the plan for Mike Pence himself was only the actual building

2    itself, the Capitol Building, and the outer portion where his

3    motorcade was waiting for him, whichever area that is.

4            So those are the two areas where he is or will be

5    visiting that would relate to this case.  We would need to

6    establish those times and discuss the defendant's presence in

7    those areas, but --

8            THE COURT:  Mr. Haag, what do you have to say in

9    response?

10           MR. HAAG:  Your Honor, I think this is getting to

11   what my argument was earlier.  The defense's position is that

12   the area must be smaller than the whole.

13           I don't think the facts bore that out.  I don't think

14   the law bears that out.

15           THE COURT:  What's the law that says that it doesn't

16   bear it out?

17           MR. HAAG:  So with respect -- there's no limiting

18   adjective within the Section 1752.  It just says, "An area of a

19   restricted building."  It doesn't say anything that the area of

20   the restricted building must be smaller than the building

21   itself.

22           THE COURT:  So it says, "Any posted" to a restricted

23   building and grounds; that is, "Any posted, cordoned off, and

24   otherwise restricted area within the United States Capitol and

25   its grounds."

1    So it's not the whole Capitol the way you've indicted

2    it; it's an area within the Capitol.

3    MR. HAAG:  It can be both, though.  It can be --

4    there's nothing there that says it has to be smaller than the

5    whole Capitol.

6    THE COURT:  What's your authority for that statement

7    in light of the statute and in light of the way you've indicted

8    the case?

9    MR. HAAG:  Because, Your Honor, I'm looking at the

10    fact that there's no limiting adjective.  There's nothing that

11    says --

12    THE COURT:  There is.  A restricted building or

13    grounds, which is defined as "an area within the Capitol."  Not

14    the entire Capitol; an area within the Capitol.  That's what it

15    says.

16    Now, have any of my colleagues addressed this precise

17    question?

18    MR. HAAG:  I'm not aware if they have, Your Honor.

19    But I would also turn to the factual issues in this case where

20    we're expecting the facts in this case will show that the

21    Vice President was walking throughout the Capitol on

22    January 6th.

23    THE COURT:  Well, then you should be able to respond

24    to the motion in limine without any problem.

25    MR. HAAG:  And that's what we have in our reply, Your

1    Honor, is discussing that exact factual issue of where he was

2    throughout the Capitol.

3            THE COURT:  Okay.  Anything else on this issue?

4            MR. HAAG:  I don't believe so; not from the

5    government, Your Honor.

6            MS. MEDVIN:  Judge, for us, because of the way the

7    government's motion is worded, where they're trying to limit

8    the location of Vice President Pence, we would ask for a

9    significant amount of ability to question the -- we're not

10   seeking to find exact coordinates.  We understand the area

11   where he was taken is secret.

12           We're just trying to figure out whether he was in the

13   Capitol Building itself at the same time as Mr. Warnagiris or

14   in any place where Mr. Warnagiris was physically present;

15   whether he is or will be visiting.  So whether he was there at

16   the same time or was planning to be there in the future.

17           THE COURT:  Well, the timing is an easy part of it.

18           MS. MEDVIN:  I'm sorry?

19           THE COURT:  The timing is the easy part of it.  The

20   facts are the facts.  We know what time Vice President Pence

21   arrived; we know what time Vice President Pence was escorted

22   somewhere -- and we don't need to know where -- we know what

23   time Mr. Warnagiris is alleged to have arrived and how long he

24   was there.

25           So that's the easy part of it.  The harder part is

1    the one we were discussing earlier.  Let's move on to

2    Government Motion No. 69.

3                MR. HAAG:  The omnibus motion in limine?

4                THE COURT:  Yes, sir.

5                MR. HAAG:  For that, I'd primarily rest on the brief.

6    As I understand the defense's arguments, it's primarily that

7    most of the motions are premature.

8                There was one particular issue that I wanted to flag,

9    Your Honor, with respect to the *Daubert* motion.  The defense is

10   saying they should be entitled to file a notice of expert.  I

11   think even in the middle of trial, I don't think that's

12   appropriate, and I --

13               THE COURT:  Are you going to have an expert?

14               MR. HAAG:  The government is not anticipating an

15   expert.  This is with respect to the defense potential experts.

16               MS. MEDVIN:  Right now, we're not anticipating an

17   expert.  However, something can come up.

18               In one of these cases, something came up in the

19   middle of trial unexpected, and in that case, an expert was

20   necessitated; but right now as far as --

21               THE COURT:  Well, then we just adjourn the trial --

22   it's a bench trial -- so that everybody can prepare for your

23   expert and the government can find a counter-expert.

24               MS. MEDVIN:  And that's the only thing -- that's

25   exactly what we think is correct.

1          THE COURT:  I mean, even in a jury trial we have been

2     able to juggle witnesses in a way when a late-appearing witness

3     appeared to -- so no one is prejudiced.  In this case, it would

4     be the government who would argue that they're prejudiced and

5     not prepared.

6          And if the defense has an expert at the last minute

7     because of what's developed, it's easier in a bench trial to

8     just take a break.  We're not making a jury wait for hours or

9     weeks -- hours or days; just me.  And I have other things to do

10    while I'm waiting, so it's okay.

11         Let me go through my list of things in the omnibus

12    motion and see if I understand this correctly.  The government

13    argues that certain pieces of multimedia evidence should be

14    admitted.  We're talking about body-worn cameras, CCTV videos,

15    videos from third parties, videos from journalists, right?

16         So let me ask Mr. Haag first.  To the extent that

17    these are going to be offered in evidence, the specific items

18    would be on your witness -- on your exhibit list, correct?

19         MR. HAAG:  That's correct, Your Honor.

20         THE COURT:  Would you remind me when that's due?

21         MR. HAAG:  That would be due -- I know our objections

22    are due next week.  But we have already provided the exhibit

23    list to the defense.

24         THE COURT:  And Ms. Medvin argues that there may be

25    authenticity issues.  Depending upon which exhibit it is, they

1    may or may not have an issue on authenticity that perhaps -- I

2    mean, the body-worn -- if I'm reading you correctly,

3    Ms. Medvin, body-worn cameras from officers, assuming the

4    officers are available, there probably won't be a dispute about

5    authenticity, but maybe some of the third parties.

6            And -- go ahead.

7            MS. MEDVIN:  To make this easier, we wrote this

8    before we received the government's exhibits, and so we don't

9    know what exactly they're going to try to admit.  We looked at

10   them.  I think, for the majority of them, the parties will be

11   able to confer before trial and probably agree on the

12   admissibility on a lot of these.  So I don't think this will be

13   much of an issue.

14           But I think maybe reserving this particular issue for

15   the parties to resolve might be a better idea so we don't waste

16   the Court's time.

17           THE COURT:  I think that's a good idea.  And the

18   truth is that, if you can't resolve them, we either resolve

19   them, quote, pretrial, or during trial.  So that if there's a

20   witness who is sponsoring a particular item, then there's a way

21   to examine that witness and determine whether or not there's a

22   problem or not.  And you may -- it may also turn out that

23   you've got issues with respect to portions of videos but not

24   other portions.

25           So I agree with you that -- Ms. Medvin, that -- let's

1    hold this in abeyance.  And now that you've seen the proffered

2    exhibits, you can try to talk to each other and work it out,

3    and the rest we'll deal with at trial.  Okay?

4            So the next -- I'm just listing them.  The government

5    wants me to take judicial notice of the 12th Amendment and

6    certain parts of the Congressional -- of the U.S. Code and

7    Congressional Record.

8            So I'm not quite sure what the issue is.  I mean,

9    this is a bench trial.  I mean, it seems to me that the

10   12th Amendment statutes are something that I can always look

11   at.  And if we're talking about opinions of other judges,

12   something I can always look at, whether it's a bench trial or a

13   jury trial.

14           So why do we need judicial notice, and is there a

15   real issue between the parties?

16           MR. HAAG:  Your Honor, the government asked the Court

17   to take judicial notice so that we may admit those into

18   evidence.  There's no need to lay any kind of a foundation or

19   authentication.

20           Those are helpful in terms of fully understanding how

21   January 6th was supposed to play out.  So this was just hoping

22   to, kind of, streamline the admission of evidence.

23           THE COURT:  Ms. Medvin?

24           MS. MEDVIN:  There's no foundation to lay for laws.

25   I'm not sure what the request is.  It's not something I've seen

1       outside of a January 6th case.  There's no authority.

2               But the law is for the Court to decide and the

3       parties admit the facts and opinions.  It's not -- I'm not sure

4       of what the request is.

5               THE COURT:  My view is this -- at least my tentative

6       view is this.  We don't need a copy of the 12th Amendment or

7       any of the statutes in evidence.  They're not exhibits.  And

8       any statutes that are relevant, I'll look at the statutes.

9       They don't have to be admitted as evidence.  Any decisions of

10      any judge I can look at; they don't have to be admitted into

11      evidence.

12              The only thing I mention here that might be an issue

13      is portions of the Congressional Record and whether they should

14      be admitted in evidence, and there may be the issues of a rule

15      of completeness depending upon what is offered, things like

16      that.  Otherwise, I don't -- that's my -- that's where I am at

17      the moment.

18              Anybody else want to say anything about that?

19              The next item on the omnibus motion is confidential

20      informants.  Are there any in this case?

21              MR. HAAG:  I am not aware of any, Your Honor.

22              THE COURT:  So I'm not sure why you raised it.

23              MR. HAAG:  I believe that AUSA Lederer had a response

24      to that.

25              MS. LEDERER:  Yes, Your Honor.  That might have been

1    left in in error, and I do apologize.

2              THE COURT:  Okay.  Defendant's out-of-court

3    statements.

4              And the government says you can't have out-of-court

5    statements from Mr. Warnagiris unless he's subject to

6    cross-examination.  And I'm not sure -- maybe you can explain

7    this better.

8              MR. HAAG:  So, Your Honor, with respect to the

9    defendant's own statements, they can't be admitted as a

10   statement of party opponents.  As the government would --

11   additionally, as we were discussing, the rule of completeness

12   can't override that rule of hearsay.

13             So we're just asking that the Court exclude

14   statements of the defendant that the defendant himself offers.

15             THE COURT:  So you're relying on your right to admit

16   his prior statements if you want them in because it's the

17   statement of a party opponent under the Federal Rules of

18   Evidence, 801(d) or whatever it is.  But it shouldn't be

19   broadened beyond what you offer.  That's one of your arguments,

20   at least.

21             Ms. Medvin, what's your position?

22             MS. MEDVIN:  So I think that there's two separate

23   issues here.  Number one is a Rule 801 hearsay.  They're

24   saying, well, it can't come in because it's hearsay, statements

25   of the defendant.  And there are, in fact, hearsay limitations

1    to out-of-court statements by the defendant.

2         However, there are other legal avenues under which to

3    admit out-of-court statements, because in this case the issue

4    is the defendant's intent.  We've got mens rea issues and --

5    for example --

6         THE COURT:  Say that again.  Defendant's what?  I

7    missed what you said.

8         MS. MEDVIN:  I'm sorry.  I'm saying in this case the

9    legal issues have to do with the defendant's mens rea and, for

10    example, the corruptly mens rea.  I'm trying to think of what

11    the government can be referring to.  I understand they dissent

12    over a template motion.

13         For example, in one portion of the videos, the

14    defendant puts up his hands and puts them down and says,

15    "Quiet, quiet," trying to quiet down the crowd.  So the

16    government would say, that statement is inadmissible because

17    it's a statement by the defendant in his interest.

18         But we would say, well, no, that goes to the intent

19    of the defendant; it goes to the element of corruptly.  But

20    that the defendant is acting corruptly.  So statements -- the

21    defendant makes a variety of statements in the restricted area

22    overall as the government has marked; in the building itself.

23    He's making statements on these video recordings.

24         We have tons of videos in this case; a lot, a lot of

25    videos.  There are statements he makes.  He's protesting in one

1   and saying, "USA, USA," and in another one he's trying to quiet

2   the crowd, he appears to be talking to various officers.  So

3   they're statements of a defendant.

4          They're not being added for the truth of the matter

5   for the exact words, but they are being added or would be

6   admissible for purposes of understanding his mens rea.  What

7   did the defendant intend to do when he was in the building?

8   Because he's charged with a variety of offenses.  They have

9   different mens rea components.

10          It's one thing to be disorderly; for example, it's

11  one thing to enter a restricted area unlawfully.  But it's a

12  complete different thing to have done so with the intent to

13  commit a felony, corrupt interference with congressional

14  proceedings.

15          And so the elements of the offense are impacted by

16  the statements made by the defendant in this case.  And they

17  are admissible for purposes of understanding the mens rea.  But

18  as far as truth of the matter and 801, sure, that's separate;

19  they would be inadmissible.  But that's in terms of how this

20  would apply in this case.

21          THE COURT:  All right.  Mr. Haag, anything in

22  response?

23          MR. HAAG:  Just briefly.  Just because evidence goes

24  to a particular element does not mean that it's -- the rules of

25  hearsay don't apply.  Specifically -- I think an example would

1    be the portion in the hallway where the defendant is trying to

2    quiet people down.  That is being offered for the truth of the

3    fact that the defendant tried to quiet people down.

4              So for all of the statements that counsel is just

5    alluding to and most of -- other statements made by the

6    defense, I do believe that the hearsay rule applies to those

7    statements, and they should be excluded unless there's another

8    exception.

9              THE COURT:  Well, it seems to me that any

10   out-of-court statements that are not offered for the truth of

11   the matter asserted and go to -- arguably, go to his state of

12   mind are admissible.

13             State of mind is a very important part of this.

14   Mens rea is a very important part of this; specific intent,

15   corruptly, intent, knowing.  And that's his defense, in part.

16   He didn't have the requisite mens rea and didn't act corruptly.

17             So I think that what we're going to wind up doing is,

18   with these general principles in mind, we'll see how it goes at

19   trial.  I mean, I'll issue a short opinion on the motion in

20   limine.  I'll say something about this.

21             But I think even in a jury trial, we would have to --

22   I'd have to rule on specific questions and objections to

23   specific questions on these very grounds or these very

24   arguments, and it will be even easier in a bench trial because

25   I'll decide what it is I can rely on, and -- what I can rely

1    on.

2                So I think that I understand your arguments, and

3    you're both right to a point.  So we'll deal with it.

4                The next issue in the omnibus motion has to do with

5    the First Amendment, and I'm not quite sure what the

6    government's concern is and what the defendant's position is.

7                MR. HAAG:  Your Honor, with respect to that, I'd

8    primarily rely on the briefing.  The First Amendment is not a

9    defense to the conduct that the defendant engaged in on

10   January 6th.

11               THE COURT:  Okay.

12               MS. MEDVIN:  I'm trying to understand what exactly

13   they were alluding to, and we said we didn't raise a First

14   Amendment issue.  But I'm thinking, overall, for example, the

15   issue of mens rea; the defendant is seen protesting, saying,

16   "USA, USA."  Okay.  So he's protesting in that sense.

17               Is it right for him to protest in that particular

18   location?  Maybe not.  But, nonetheless, it's a description of

19   what he is doing.

20               So the First Amendment, whether it's a specific

21   defense to entry, would be a separate issue.  But in this case,

22   if we're talking about mens rea and the issue of corruptly on

23   the felony, for example, and you see a man who is protesting,

24   you're saying, well, he's exercising his First Amendment

25   rights; at least he thinks that's what he's doing.  Whether

1        it's lawful or unlawful is a separate issue.

2                 But that goes to whether or not he's intending to

3        do something beyond that; whether he's acting corruptly;

4        whether he's attempting to do something entirely different.  So

5        I think it's a discussion that can be had.

6                 Now, is it a specific defense that precludes

7        conviction?  No.  But it's an argument as to what his state of

8        mind was.  And so I'm --

9                 THE COURT:  Well, I think --

10                MS. MEDVIN:  -- not sure what the government is

11       trying to preclude exactly.

12                I mean, are they trying to preclude any argument as

13       to mens rea?  Or are they trying to say that there's a specific

14       defense that I'm not aware of that says First Amendment means

15       that you can't be found guilty of other crimes?  That's not

16       what we're claiming.

17                We do want to be able to discuss what, in fact, the

18       defendant was doing because, again, in the videos he's seen

19       protesting.

20                THE COURT:  Well, I think that the -- I'm not

21       precisely sure.  But in other cases, the argument has been made

22       that the statutes themselves, or some of them, are

23       unconstitutional because the statutes prohibit protected

24       First Amendment rights.

25                In both motions to dismiss and beyond that, I've

1    said, no, that they're not facially unconstitutional because

2    the allegations are -- the statutes have been ruled by many

3    judges to prohibit conduct, not speech; resisting, impeding,

4    you know, assaulting.  You can argue about what those terms

5    mean.  But they don't say speaking and they -- entering a

6    grounds.  And what is a public space; what's a nonpublic space?

7            I'm assuming that none of those -- none of those

8    questions are involved here and --

9            MS. MEDVIN:  We did not raise any of those, Judge.  I

10   did not contest any of the statutes on First Amendment grounds;

11   not in these cases.  So that doesn't relate to any motion I've

12   filed in this case.

13           But I do want to be able to argue what it was that he

14   was doing there because that's relevant to state of mind.

15           THE COURT:  So since you didn't raise the -- one

16   thing I'm concerned about.  I'm wondering whether Mr. Haag's

17   First Amendment concern is more subtle and more discreet than

18   the things that I've raised and discussed in other cases or

19   whether it's the kind of thing we can deal with on a

20   question-by-question basis, if we get there, in the trial.

21           MS. LEDERER:  Your Honor, if I may.  The majority of

22   this omnibus motion was to protect ourselves going forward.

23   There have been a lot of January 6th cases where there have

24   been a lot of repeat defenses.

25           The defendant does not have to give us -- we're not

1    entitled to find out what their defense is, if they have one at

2    all.  So a lot of this was to get ahead and put the Court on

3    notice that we would still be asking you to follow the law and

4    other decisions that have been made if this type of defense

5    arises.

6              Like Ms. Medvin said, there might be a situation that

7    arises that she needs an expert; there might be a situation

8    that arises that all of a sudden she's arguing a First

9    Amendment-type defense.

10             So the majority of our omnibus, we can -- as Mr. Haag

11   said, we can cover in trial.  As Your Honor has pointed out

12   multiple times, a lot of this -- and Ms. Medvin has pointed

13   out -- a lot of this will come mid-trial.

14             But we wanted to put the Court on notice that we

15   would not stand for certain arguments being made if there was

16   not a legal support to it.

17             THE COURT:  Fair enough.  And I think what we're -- I

18   hope what we're all trying to do is to narrow the areas of

19   dispute through these motions in limine to the extent we can,

20   and at least in one case that we've talked about so far -- now

21   that the exhibit list has been filed -- through sitting down

22   and talking to each other.

23             So I understand why the government has raised a lot

24   of these issues, even though they may not actually ever arise

25   in this case.

1          MS. LEDERER:  Yes, Your Honor.  We're not trying to

2     waste the Court's time.  We need to protect the record and

3     protect ourselves and our case going forward.

4          THE COURT:  The next area is selective prosecution.

5     I don't think that that's something that Ms. Medvin is raising.

6     She can say what she wants to about that.

7          I have said both in other January 6th cases, I think,

8     and knowing other January 6th cases -- particularly those where

9     Mr. Pierce has been defense counsel -- that if one were raising

10    a selective prosecution case, you can't do it in generalized

11    terms.  You have to have some proffered evidence or facts that

12    show that your defendant was singled out, whether it's

13    selective prosecution or vindictive prosecution.

14          But as I read Ms. -- I didn't see anything in

15    anything Ms. Medvin filed that suggests that she wants to argue

16    that.

17          MS. MEDVIN:  No.  And I've filed these motions

18    before.  They would know if I was seeking to put forward a

19    complex pleading on the issue because it is a really difficult

20    standard for the defense to meet.  We are not raising that.  We

21    have not raised it.

22          And we would have to do so before trial as far as the

23    rules are concerned.  So this is not, again, an issue that

24    relates to this case.

25          THE COURT:  And the other one, clearly, is kind of

1    maybe a little cut and pasting by the government; is jury

2    nullification because -- unless this was filed earlier.

3    Because this is going to be a bench trial, so there's no such

4    thing as jury nullification.  And I think you have to assume

5    that judges try to follow the law.

6         So there's this other thing that I did talk about in

7    *Baez*, and I'm not sure that Ms. Medvin has raised any of this

8    either; entrapment by estoppel or the public authority defense,

9    which is either that -- which has been raised in some cases

10   that, you know, I did it because President Trump authorized me

11   to do it or told me to do it or because other law enforcement

12   officers authorized me to do it, which raises the question

13   whether either the President or anybody else in an official

14   capacity or in law enforcement could, in fact, authorize

15   conduct if it's illegal conduct, but I don't see that

16   Ms. Medvin is raising any of that.

17        MS. MEDVIN:  Those are inapplicable to this case,

18   Judge.  We're not blaming President Trump for involvement in

19   Mr. Warnagiris's activity that day.  This is not part of this

20   case.

21        I think we've made clear to the government and to

22   this Court what our issues are.  They're legal in nature.  They

23   have to do with defining the law and then applying the facts of

24   this case to the law, saying which facts at all, if any, did

25   the defendant violate through his conduct.  That's all we're

1    seeking to do in this case.

2              THE COURT:  The next one in the omnibus motion is

3    general good character evidence.  And the government's arguing

4    that they shouldn't allow testimony that he's generous,

5    charitable, religious, family-oriented, does good works in the

6    community, et cetera.

7              I'm not sure whether you address that anywhere,

8    Ms. Medvin.

9              MS. MEDVIN:  This is -- I'll say this.  As of now, we

10   don't foresee us admitting any such evidence because it doesn't

11   directly relate to the charges or to the defense arguments on

12   those charges.  It's possible something can come up at trial

13   where that might become relevant.  I think it -- you know,

14   certain things a witness might say that would require a

15   response from the defense.  But I don't foresee that at this

16   moment.

17             When it comes to character evidence and

18   admissibility, there's a lot of rules for us to follow.  But

19   right now, I think it would be premature to address that just

20   because a situation has not come up, and we don't right now

21   foresee one that would relate to the particular defenses in our

22   case that would require discussion of this.

23             THE COURT:  Okay.  I'll let the government say what

24   they want, but let me just comment on that.

25             There are, as you'd suggested, rules within the

1    Federal Rules of Evidence that relate to offering evidence of

2    character if it is a pertinent character trait as defined to a

3    certain extent in the rules and by the case law, you know; and

4    I think in 405, and there may also be some other subpart of

5    404, that relates to the character of the defendant.

6         In the common law -- I remember this from a long time

7    ago.  Wigmore or McCormick used to say, the character -- if

8    it's relevant, does he have a good reputation in the community

9    for peace and good order or honesty or truth and whatever it

10   is.  So the Federal Rules, sort of, supersede all that.

11        But there's a lot -- there are rules that govern

12   this.  So if you choose to offer any character evidence, you'll

13   follow the rules, and we'll talk about it at the time if you're

14   not following the rules.  If there are things that government

15   witnesses say that you want to respond to, again, we'll see

16   what the Federal Rules and the case law says about it.

17        Unless Mr. Haag or Ms. Lederer have anything more to

18   say on that issue?

19        The next thing is ignorance of the law is not a

20   defense.  And Mr. Warnagiris doesn't seem to disagree with

21   that, or at least doesn't make any argument in response to it.

22        MS. MEDVIN:  We did not raise any such issues, Judge.

23   Again, we're following the statutes.  One of them is a strict

24   liability offense.  I'm not sure if any of them are, off the

25   top of my head, but I'm not sure that that applies to us.

1              I don't see the application of this argument to this

2      case.

3              THE COURT:  Right.  And then this also, probably,

4      Ms. Lederer, was taken from other cases or before we knew it

5      was going to be a bench trial, about not admitting evidence

6      about penalties and collateral consequences, you know.

7              That's an argument that is something that in some

8      cases defense lawyers try to do to engender sympathy from the

9      jury, and it's clearly not permissible because it's a judge --

10     it's a judge decision, not a jury decision.

11             MS. LEDERER:  Yes, Your Honor.  Again, I understand

12     that the Court, obviously, has the capability of dismissing any

13     nullification argument and not permitting any argument about

14     penalties, but I have been put in the position, where it's a

15     bench trial or a jury trial, it still comes out from the

16     defense attorney during argument.

17             So to the extent, again, that we were just putting

18     the Court on notice that we would be objecting to any type of

19     argument, and understanding that it is a bench trial, those

20     arguments have been made at bench trials before.  We still

21     would be asking for the same application for nullification but

22     also for penalties to be applied in a bench trial.

23             THE COURT:  We've already talked about the expert

24     question.  The only other thing I think I see in the omnibus

25     motion, Docket 69, is claims of self-defense.

1          And it says, "If the defendant was the initial

2     aggressor or provoked the conflict, he may not claim

3     self-defense," and the government wants me to preclude anything

4     about self-defense.

5          I'm not sure whether or not Ms. Medvin is raising a

6     self-defense or related defense.

7          MS. MEDVIN:  Judge, our argument is that an assault

8     didn't even take place, let alone get to a point of

9     self-defense.  So this is -- I don't know.

10         I asked the government to narrow this down for us

11    because we're trying to figure out what exactly are they

12    accusing the defendant of doing.  They previously have that he

13    caused an injury, then they removed it, saying, oh, sorry, you

14    didn't cause an injury; we just added that to the indictment.

15    So we're trying to figure out what is this alleged assault.

16         But -- because it's not in the indictment.  This is

17    why we asked to dismiss that indictment.  There is no

18    particularity in the indictment, what did he do at what time

19    that you believe constitutes this alleged assault; what are

20    these actions.  Until we can get down to that moment of what

21    exactly it is they're accusing him of doing, we can't say if

22    there's a self-defense claim.

23         I don't think there is an assault in this case, no.

24    I also don't think it's self-defense because there's also no

25    assault.  But I -- self-defense is not an issue that we raised,

1    no, Judge.

2          MS. LEDERER:  Your Honor, again, defenses can move as

3    trials go on.  This was done in the abundance of caution.  The

4    government is, clearly, confident that we can prove a 111.

5          So to the extent that the defense then wants to pivot

6    their argument and then all of a sudden argue estoppel or argue

7    self-defense, we're just putting the Court on notice that we're

8    objecting to any of type of affirmative defense in --

9    requesting the Court to render a verdict of not guilty based

10   off of some affirmative defense that they didn't raise prior or

11   that is inapplicable or that is not appropriate.

12         MS. MEDVIN:  Judge, I'm going to do an omnibus

13   defense to the omnibus motion.  Look, the defense is entitled

14   to a complete defense.  That's his due process right.

15         I understand the government wants to say, well, we

16   object to this in advance because it might happen.  Look, the

17   defendant is entitled to raise a variety of defenses if and

18   when they're applicable.  And discussion can be had before the

19   Court by both parties as to whether that defense applies or

20   not.

21         This in-advance discussion to me, quite honestly,

22   doesn't make sense.  We are, potentially, limiting a

23   defendant's right to a complete defense and rendering

24   constitutional problems in this case that don't need to happen.

25   I don't think that we need to get to that point.  I think we

1    allow the trial to proceed, and if something comes up, we can

2    have arguments on the issue as we're supposed to.

3            I don't think these are arguments that should be

4    happening in limine.  I think we're wasting time of all the

5    parties, quite honestly.

6            THE COURT:  Anything more on Docket 169, the omnibus

7    motion?

8            MS. LEDERER:  Your Honor, the only thing I would add

9    is that multiple times in the omnibus we did say that the

10   defendant will have the ability to argue a lack of intent based

11   off of some of -- I thought I was allowed in there; I thought I

12   was just protesting; I thought I was helping someone out.

13           We're never limiting the defense's ability to argue a

14   lack of requisite intent.  We're just putting the defense and

15   the Court on notice that we will object to any type of defense

16   that should have been raised ahead of time or that's being

17   asked to be applied when it's not appropriate.  That's all,

18   Your Honor.

19           THE COURT:  So the next -- let me find it.  The

20   defense has filed a motion in limine to exclude generalized

21   sweeping nonparticularized January 6th evidence.  So let me

22   hear from Ms. Medvin about that.

23           MS. MEDVIN:  Judge, and this goes to -- we reviewed

24   the exhibits -- because this was filed before exhibits were

25   actually produced to the defense.  So we reviewed the exhibits,

1     and most of the exhibits have to do with this case.

2            And the only exhibit that does not have any

3     particularization to this case is the government's very first

4     exhibit where they do, like, a 15-minute montage of everything

5     that happened on January 6th, and none of it is related to this

6     particular defendant.

7            I think, for example, a valid argument the government

8     can have is, well, there's a civil disorder, for example,

9     because one of the elements in this case is civil disorder.  In

10    order to admit evidence related to the civil disorder, we can

11    talk about January 6th as a whole.

12           Well, first of all, the videos related to the

13    defendant show there's a civil disorder.  But we would also

14    stipulate to the fact that a civil disorder was taking place.

15    I mean, I don't think anybody here disagrees that the

16    definition of civil disorder doesn't apply in these cases.

17           The issue of civil disorder is not going to be

18    present in this case, and it is able to be determined from

19    other videos that actually do include the defendant.

20           But all of that aside, the montage, at the end of the

21    day, serves -- again, this is a bench trial, so -- and we noted

22    that in our memo as well because the Court is very easily able

23    to separate.  So it's not much of an issue in a case like this,

24    but this is the defendant's first trial.  So we'd like to do

25    this fairly for him.

1          That very first video is highly prejudicial.  It

2     includes violent conduct not committed by this defendant.  It

3     includes a lot of officers who are victimized by actions of

4     other people.  It creates emotional reaction and response to

5     the viewer.  It serves as a preliminary way to sway the

6     fact-finder in favor of the government in a way that doesn't

7     include the defendant's facts related to him.

8          So it has an emotional effect and impact that

9     doesn't -- that's not required for this case.  I mean, the

10    evidence related to the defendant himself and around him is

11    sufficient to explain what happened.  But that, in particular,

12    just serves as an emotional reaction.

13         And I don't think it's fair to this defendant to see,

14    well, look, what other people did -- he wasn't there.  He

15    didn't see what those other people did.  He wasn't with them.

16    Well, they did all these other things and it had all these

17    other effects on other people.  None of them are related to --

18    not the victims, not the offenders.  None of them have anything

19    to do with this case, but it provides an overall story of what

20    happened that day.

21         Well, look, police officers every single day have a

22    really tough day.  They deal with all kinds of things.  But

23    those officers don't come to court and talk about the

24    difficulty of their day overall.  They come to court and they

25    testify about dealing with the particular defendant at hand and

1    what happened with his case and his facts.  That's what we're

2    seeking to do here.

3             We just want to particularize the case to this

4    defendant.

5             Also, I think all the parties and the Court are well

6    aware of what happened on January 6th.  I'm not sure we need to

7    reiterate that.

8             THE COURT:  The government's view?

9             MR. HAAG:  So, Your Honor, the last point there,

10   regardless of whether or not the parties and the Court is aware

11   of what happened on January 6th, the government still has an

12   obligation to create a record and preserve the record for its

13   case.

14            So going through, kind of, the counts at issue, the

15   civil disorder count, that, by definition, requires the

16   activity of others.  The way that I interpret and the way that

17   I read the defense motion is that it's not talking about

18   specific exhibits, not just the montage, but it's also

19   statements and testimony about what officers saw and did that

20   day that might be not necessarily unrelated but not directed

21   specifically towards the defendant or in specific reaction to

22   the defendant.

23            However, based on how the statute is worded is that

24   we do need to discuss the actions of others in order to meet

25   our burden with respect to Section 231.

```
 1              Additionally, with respect to Section 1512, that was
 2     charged with a notice of aiding and abetting.  That, also, by
 3     its nature, requires discussion of how there was an interaction
 4     between the defendant's actions and the actions of others.  So
 5     we need to be able to discuss the actions of other individuals
 6     on January 6th, as well as the reactions of police officers
 7     because what exactly is obstruction.  We need to be able to
 8     discuss how Congress was obstructed.
 9              At one point in the defendant's motion, the defendant
10     noted that he should be able to keep out video that doesn't
11     show him in the video.  However, the government may wish to
12     admit video of either the Senate Chamber or the House Chamber
13     which would show, kind of, how the obstruction was playing out.
14              I believe the Court is aware of the video of
15     Vice President Pence being relocated due to the rioters.  So
16     all of those videos don't necessarily capture the defendant on
17     it, but it does show the result of his actions and the actions
18     of other rioters on that day.
19              So that is why I think this idea of general
20     January 6th evidence, despite the fact that it doesn't
21     specifically indicate the defendant either in the testimony or
22     in the videos, still is very relevant to the charges in this
23     case.
24              Just one last thing, Your Honor.  With respect to
25     Rule 403, the prejudice prong, I think, as the defense noted at
```

1    the outset, is not really applicable during a bench trial.

2    It's not something that should really raise much of a concern.

3              MS. MEDVIN:  Your Honor, as far as the evidence the

4    government is discussing, for example, the video of Mike Pence,

5    that's relevant to an element in one of the charges.

6              Our motion was very clear that we're only seeking to

7    exclude evidence not related to an element of one of the

8    charges.  So the arguments made by the government as far as,

9    for example, video of Mike Pence, the defendant is not in that

10   video.  We agree that video is relevant in this case because it

11   touches on one of the elements for the offense.  We did not

12   seek to exclude those.

13             We're only seeking to exclude videos not related to

14   an element of the offense.  And the only one that is more

15   general that -- is relevant here is the 231, civil disorder.

16   As we said, we would be stipulating to that, number one; number

17   two, that can be obtained from videos that do include the

18   defendant.  That's easily observable from there.

19             The montage video doesn't touch on any element of any

20   offense.  The montage video has to do with the overall impact

21   of January 6th and the police officers themselves and how it

22   impacts them.  Those police officers aren't part of our case,

23   and the defendants who commit those acts against those officers

24   are not part of this case.

25             So, again, the 15-minute montage serves just to

1    create an emotional reaction and an initial state of prejudice.

2    That is the only service that it has to this case.  It does not

3    touch on a specific element of the offense other than saying,

4    well, also it can go to civil disorder even though additional

5    videos can go to that as well.

6            THE COURT:  Anything else on that issue?

7            MR. HAAG:  I think I already addressed it in my

8    initial argument.

9            THE COURT:  Anything else on the motion in limine?

10   Before we move -- go ahead.

11           MR. HAAG:  I just -- I don't believe so, Your Honor,

12   no.

13           MS. MEDVIN:  Your Honor, if I can have just one

14   moment.  I wrote myself a note that I wanted to raise, but I

15   think I already addressed it.

16           No.  It has been addressed.  Okay.  Thank you, Judge.

17   Nothing further.

18           THE COURT:  Before we move on to the other motions,

19   there were some things that we discussed here that reminded me

20   that the defendant has filed a trial brief.  And some of the

21   issues she raises in the trial brief, it seems to me, maybe do

22   need to get resolved.

23           I mean, some of these are issues that would normally

24   be resolved as it relates to jury instructions.  And so since

25   this is a bench trial, I could resolve some of these at the end

1  of the case rather than at the beginning of the case.

2  But there are a couple that I wonder whether it would

3  be helpful to have the government's view, if we don't already

4  have it.

5  First, the definitions of assault.  I mean, I have

6  your view, I think, in the motions to dismiss on how to read

7  that statute that has three different versions of assault, and

8  you each have different views on that, and Judge Moss has

9  written about it in *Cua*, and we argued about that at great

10  length on the two days we argued the motions to dismiss.

11  But for Counts 3, 6, and 8, Ms. Medvin says, requires

12  me to define the word assault, and she has a number of pages --

13  bodily injury as well.  The first five pages of Docket 71 go to

14  that.  That might be something the government wants to file

15  something on.

16  And, Meghan, was there one other issue we talked

17  about that might be useful to have something on sooner rather

18  than later?

19  THE LAW CLERK:  Yes.  It was the defense's supplement

20  on Section 111(a) which talks about the definition of forcibly,

21  as well as the definition of simple assault.

22  THE COURT:  And that's also in -- it's in the

23  supplement but it's also in the same trial brief.  The issue of

24  what forcibly means under 111(a) begins in her Docket 71,

25  pages -- just 6 through 7, and then there was the supplemental

1    brief that addressed it, too.

2            The rest of the trial brief, things like corruptly,

3    have been briefed ad nauseam before lots of judges, and we have

4    the *Fischer* opinion; we're waiting for *Robinson* and one other

5    case, I think, from the circuit.

6            And the temporarily visiting issue, which was -- is

7    also on Docket 71, we've discussed this morning in the context

8    of the motions in limine.

9            So I think those are the only two issues that it

10   might be useful to have something from the government now

11   rather than, perhaps, later.  I mean, at some point we're

12   either going to have -- we're going to have opening statements,

13   we're going to have closing arguments.  We're going to have a

14   Rule 29 motion, I guess.

15           And then the question is whether anybody -- we don't

16   have to decide now whether we need post-trial briefs or not.

17           MS. LEDERER:  Yes, Your Honor.  That was actually on

18   the government's to-do list at the end was to ask if you wanted

19   a trial brief and by what date, and if you needed jury

20   instructions, and by what date.  So we're happy to provide

21   those.

22           THE COURT:  We don't need jury instructions if

23   there's no jury, right?

24           MS. LEDERER:  Yes.  But in some cases defense

25   attorneys have -- and certain judges have asked for the

1        government and defense attorneys to provide instructions or

2        defense attorneys have provided instructions and then asked the

3        Court to abide by that specific instruction.

4                THE COURT:  Well --

5                MS. MEDVIN:  Bench instructions, we're calling them

6        for -- Judge Nichols, for example, also requests bench

7        instructions.  That makes it an easier roadmap for the parties

8        as to what are the elements of proof and whether they have met

9        them.

10               So that's why we filed this in advance, thinking the

11       Court will issue its own bench instructions in advance of the

12       trial so that the parties will know what exactly is the

13       standard that they're meeting.

14               But in the event that this Court is not going to

15       issue bench instructions in the end, we would argue what

16       elements of proof should have been there and have not been

17       there.  Our arguments are out in the open.  So the Court knows

18       these are the issues we'll be arguing, regardless of whether

19       this is done in advance or not.  This is the defendant's

20       position as to what the government must prove.

21               THE COURT:  Is there any likelihood, if I ask for

22       bench instructions, you would agree on anything?

23               MS. MEDVIN:  We would not be able to because of the

24       way that we're defining each of the stat- -- I don't believe

25       that there's any agreement.  Maybe on the misdemeanors on some

1    of them, but I don't think so, actually.

2            Because even in the misdemeanors, for example, the

3    definition of what has to be proven for the 1752 charges, the

4    government's position is that they only have to prove that --

5    Vice President Mike Pence was in the restricted area; whereas,

6    the defense is saying, well, no, Judge -- who was it? --

7    Judge -- I'm sorry.  I forgot the judge's name, but it is in

8    our brief.

9            But one of the judges in this district issued an

10   opinion that, actually, the government has to prove two things.

11   That, number one, Mike Pence was in the restricted perimeter,

12   but also that the defendant knew that he was there.  So he has

13   to -- the government would have to prove two things.

14           So even on 1752 misdemeanors, there's really no

15   agreement.  And on the felony -- I'm sorry.  On the

16   misdemeanor, out of the code section specific to the Capitol,

17   they're still charging the defendant with an assault.  We

18   disagree on the definition of assault.

19           THE COURT:  Right.

20           MS. MEDVIN:  Parading, we can agree to parading.  I

21   think that's the one.

22           THE COURT:  Let me think about this, whether I want a

23   brief from the government and/or whether I want bench

24   instructions from the parties.  We'll let you know.

25           Should we move on to one of the other motions?  Bill

1    of particulars or *Brady*?

2          MS. MEDVIN:  We can handle bill of particulars next.

3    *Brady* is a more complex argument.

4          THE COURT:  Okay.  Tell me what exactly you're asking

5    for in the bill of particulars.  In this case, unlike some

6    others I've seen, the officer is identified in the indictment

7    by initials, and I assume that -- to protect his or her

8    privacy, but that in discovery or informal discussions, you

9    know exactly the name of the officer.  And so it's not that --

10   that's not the issue any longer; am I right?

11         MS. MEDVIN:  The identity of the officer is not, no.

12   It was interesting, the government actually gave us his name,

13   still completely crossed out on the document.  But we were able

14   to obtain his name through other means, but we have his name.

15   That's not an issue in this case.  We're not seeking to

16   identify him, even though we did not receive that through the

17   government.

18         But, regardless, we know the name of the officer in

19   this case, and he's addressed by name in our subsequent

20   motions.  So it's not the name of the officer.

21         It is the actus reus at the end of the day.  What are

22   the behaviors that constitute the alleged offense; what is the

23   actus reus?  That's all we're seeking for in this case.  The

24   government says, well, we used recitations from the statute

25   itself to say a variety of things, but those don't define the

1    conduct in question.

2            So is looking at somebody, for example, an assault?

3    Under the government's idea of charging someone with assault,

4    we don't have to define it.  We can just characterize it under

5    the language in the code section.  And if the conduct was

6    looking at someone, then you have to go to trial to determine,

7    well, looking at someone is not sufficient.

8            We don't have any acts which we can file preliminary

9    motions to say, well, this action, as described, does not

10   constitute an assault, for example.  But the idea is that we

11   can do preliminary motions.

12           We've cited a variety of cases from the Supreme Court

13   talking about the necessity of the government to identify the

14   actus reus.  It goes to our motion to dismiss arguments, but it

15   also, in the alternative, goes to the bill of particulars

16   arguments.

17           MS. LEDERER:  Your Honor, the government did cover in

18   its response to the motion for bill of particulars that the

19   government does not have to outline in its bill of particulars

20   the exact theory of its case.  It only needs the basics, which

21   it provides both.

22           When it comes to mens rea, it gives every single mens

23   rea in each single one of the charged conduct.  It's gone above

24   and beyond to list the officer's name.  It's given the day.

25   And then it's also given the actus reus, which the government

1      outlined in its motion.  The fact that a defendant must take

2      some action to obstruct Congress.

3              It lists out the actus reus, all the verbs; the

4      assault, the impede, the interfere.  It doesn't have to clarify

5      the specific actions that were taken; just needs to describe

6      the actus reus in general.

7              Your Honor, all of the cases that you asked for the

8      government and defense counsel to look at also does not

9      instruct the government to describe out its theory, nor its

10     actus reus.  In looking at *Mostofsky* itself, that court found

11     that it was sufficient that the government just lay out all of

12     the verbs in 111.

13             THE COURT:  So that your main case is a similar

14     conduct as Judge Boasberg's opinion in -- what's it called?

15             MS. LEDERER:  *Mostofsky*?

16             THE COURT:  Yes.

17             MS. LEDERER:  Yes.

18             THE COURT:  What else?  I mean, it's -- I've read the

19     briefs, and I've read the -- read Judge Boasberg's opinion, and

20     it seems to be the most directly relevant, and that's in favor

21     of the government.  But --

22             MS. LEDERER:  Yes, Your Honor.  In addition,

23     *Mostofsky* quoted -- it was *Brock* also quoted *Sutton*; you had us

24     read both *Brock* and *Sutton*.

25             Both of those indicated that the bill -- or that the

1       indictment and seeking a bill of particulars is not a

2       work-around for this to be a fishing expedition on the

3       government's theory or to preview the government's theory.  All

4       that is needed is the necessities to put the defense on notice

5       of the charges that are alleged, the date that it is alleged.

6               And then also the government -- or the defense can

7       supplement with the voluminous amounts of discovery that had

8       been provided.  That was Salinger that discussed supplementing

9       the voluminous amounts of discovery to fill in the gaps for

10      defense.

11              THE COURT:  Ms. Medvin, anything?

12              MS. MEDVIN:  Judge, we laid out all of our legal

13      arguments.  Number one, I think, when it comes to bill of

14      particulars, it's in the complete discretion of the Court in

15      the application of a bill of particulars to a particular case.

16              But as far as the general arguments as to

17      sufficiency, they are constitutional in nature as far as the

18      ones we cited.  But the idea is that the bill of particulars is

19      supposed to supplement an indictment that is otherwise

20      constitutional.

21              So the idea of a bill of particulars is to say, well,

22      the defense says that the indictment is insufficient as a

23      matter of law, but I believe that it does hit on the minimum

24      sufficiency elements.

25              However, I think there's a deficiency as far as

1    notifying the defendant on certain issues that would allow the

2    defense to proceed more -- I guess, with a more particularist

3    eye on the issues on this case.  So the bill of particulars

4    would supplement that.

5         That's why a bill of particulars is discretionary;

6    because it serves as a tool to supplement an indictment that is

7    otherwise valid under the Constitution.  And so that would go

8    to the particular opinion of the Court.

9         And we cited cases in our brief that show that an

10   indictment was sufficient under the law, but where a bill of

11   particulars was still ordered by this Court -- I think it may

12   have actually been by you -- where you believed that a bill of

13   particulars would supplement the defense preparations because,

14   otherwise, the indictment didn't have sufficient details.

15        I guess it would help for the parties as far as

16   pretrial motions or whatnot.  But, again, the bill of

17   particulars is one of these things.  It's entirely

18   discretionary.  The standards on it, at the end of the day, are

19   for the Court to decide.

20        MS. LEDERER:  Your Honor, in this case your

21   discretion can come into play in denying this bill of

22   particulars.  Again, we have met every single standard, and

23   it's supported by all of the case law that is not only cited in

24   the government's brief but that Your Honor also asked us to

25   review.

1          Specifically, in *Mostofsky*, I think that case is

2     getting at the heart of what Ms. Medvin is trying to say.  She

3     just, basically, wants to know what is being alleged in the

4     111.  Are we alleging all or just one of the verbs in the 111?

5          And in *Mostofsky*, the Court said the government can

6     prove all of those acts within the list of 111; that it doesn't

7     have to be specifically spliced out for the defense.

8          MS. MEDVIN:  I'm not seeking a verb from the statute.

9     I'm acting for an actus reus to be described.  It can literally

10    be one sentence.  What exactly is the defendant accused of

11    doing that constitutes any of these verbs?  That's all the

12    defense is seeking.  It's a very simplistic explanation,

13    actually.

14         MS. LEDERER:  Again, Your Honor, the indictment is

15    clear about the actus reus that's being alleged.  There has

16    also been a great amount of discovery passed over depicting the

17    alleged incident that puts defense on notice of what's being

18    alleged and exactly to whom it's being alleged and when.

19         THE COURT:  Okay.  Let's turn to *Brady*.

20         MS. MEDVIN:  So that is my motion for additional

21    discovery from the government.  It is a unique motion.

22         I'll tell the Court, there's a new article from

23    *Politico* that came out on Friday that addresses some of this,

24    where the reporter from *Politico* -- he actually wrote a book on

25    this topic.  He was interviewing various -- they called them

1    sedition hunters -- various individuals who work on behalf of

2    the government to run various facial recognition software

3    programs to determine if there is video evidence related to

4    certain individuals and provide that to the government.

5            In that article, he talks about, number one, some

6    website that's apparently not public that is used by these

7    individuals.  And it talks about interviews with law

8    enforcement.  Federal law enforcement and federal officers, in

9    that article, are saying that these individuals are the primary

10   resource that the government is using to identify defendants

11   for January 6th cases.

12           And this reporter wrote a book on it; on this exact

13   topic.  And in the book he mentions again the facial

14   recognition software tools used by these individuals.  They're

15   called sedition hunters and what's accessible to them and that

16   the government relies on their findings.  That's primarily how

17   individuals are identified for January 6th cases is this other

18   group that works in conjunction with but outside of the DOJ,

19   but they're working together.

20           And officers are, apparently, on the record telling

21   reporters they couldn't do this without them.  It's a tool of

22   the government that's unique to these cases.  I've looked at

23   case law.  There's nothing like this.  So it is a new arena; a

24   new legal arena for us to explore.

25           In this case what the defense is seeking is,

1    actually, something that I'm surprised the government has not

2    sought for itself.  We happen to have come upon video --

3    incidentally, come upon video of the officer in this case

4    against whom this alleged assault or impediment allegedly took

5    place.

6              And in those videos, those officers encouraging the

7    trespassers, encouraging individuals who come into the

8    building, giving high fives to individuals.  We've got

9    significant interaction with this officer and people who are

10   now charged with crimes.

11             The individual who, apparently, shot the videos, his

12   name is -- Court's indulgence -- William Dunfee.  He's actually

13   a defendant in one of these cases as well; we just found out.

14   And the government just this morning provided us some

15   supplemental discovery on that individual who was interacting

16   with the officer in those video.

17             It's strange to me that, providing this evidence to

18   the government, they themselves have not gone out and

19   investigated this officer as to why he's interacting with these

20   individuals in such a way.  You know, maybe -- maybe it's

21   because he felt this was a way for him to fit in, or maybe

22   there's something else there.  But there's no investigation as

23   far as the government's response.

24             We didn't investigate this officer; we don't plan to;

25   so we don't have anything exculpatory to give you.  But what

1    we're seeking is, actually, evidence that is already in their

2    possession.  We're just asking for them to pick it out for us,

3    to label it for us.  Because the government has all January 6th

4    evidence already collected, and they saved it, presumably,

5    because they're supposed to under the law.

6         And we're just asking for them to help us identify,

7    seek it out and give it to us, because those specific pieces of

8    evidence which show this defendant -- I'm sorry -- this officer

9    interacting with the defendants would be relevant to our

10    cross-examination, and it's directly relevant to statements

11    he's already made to the FBI agent.

12         Agent Weatherhead has interviewed him, as well as a

13    couple of other agents.  And he's made statements to them.  I

14    think the -- what we saw in the video would contradict --

15         THE COURT:  Agent who has interviewed who?

16         MS. MEDVIN:  Agent Weatherhead is the FBI agent, and

17    the police officer in this case is Officer Warner.  He's

18    Capitol Police.

19         THE COURT:  So the FBI agent has interviewed the

20    person named as -- in the indictment as AW; is that what you're

21    saying?

22         MS. MEDVIN:  Yes.

23         THE COURT:  So if the FBI agent has interviewed the,

24    quote-unquote, victim, presumably, you have any 302s or other

25    memoranda of interview that the agent made from his interviews

1    and have or will have any prior statements Mr. AW provided,

2    right?

3              MS. MEDVIN:  We have.

4              MS. LEDERER:  That is correct, Your Honor.

5              MS. MEDVIN:  In Relativity, it's a database we can

6    search for Officer Warner in there and --

7              THE COURT:  Wait, wait.  No, I'm not talking about

8    what you can search for, what -- what you have -- look, maybe

9    I'll ask both sides this.

10             Typically -- it's unclear to me how the government

11   operates in some cases, but forgetting *Brady* for a minute, we

12   have Rule 16 and we have *Jencks*.  Technically, you don't have

13   to turn over the *Jencks* material until after the witness has

14   testified in direct.  But, typically, a lot of *Jencks* material

15   is turned over early.

16             So talking about the FBI agent, if he has interviewed

17   people and has prepared 302s, the 302s have been turned over or

18   will be turned over, as will, presumably, his notes at some

19   point; and if he's interviewed Mr. AW, he will have 302s and

20   notes of those interviews, which have been or will be turned

21   over.

22             If Mr. AW has talked to other law enforcement other

23   than the primary FBI agent about this or taken notes of his own

24   in his notebook later on, those have been or will be turned

25   over.  Now, if that's all true and the government can confirm

1    or deny, then within that very discrete, limited material

2    provided to you, there will be any exculpatory material.

3            And -- separate point -- technically, even if it is

4    discrete, limited material, the government should have pulled

5    out of there anything that they thought was exculpatory and

6    say, not only are we giving you this under Rule 16 or under

7    *Jencks*, but this one piece of it happens to be, in our view,

8    possibly exculpatory.

9            Maybe I'll interrupt you for the moment and ask

10    Ms. Lederer or Mr. Haag to tell me whether I'm right or wrong

11    or partly right and partly wrong.

12            MS. LEDERER:  You are correct, Your Honor.  The

13    government has and will continue to hand over any type of

14    statement from Officer Warner.  First, the 302 that was given

15    specifically in this case to Agent Weatherhead during the

16    initial investigation has been provided to Ms. Medvin.

17            On top of that, the notes have also been provided to

18    Ms. Medvin.  On top of that, a portion of that original 302,

19    the officer had identified -- had attributed words said by

20    another defendant to Mr. Warnagiris.  The government

21    highlighted that to Ms. Medvin and let her know that.

22            The 302s in other cases have also been provided.  We

23    will continue to provide any type of 302 that is either

24    generated during our trial prep to counsel or generated in any

25    other investigation regarding this officer.  That will -- that

1    has been done and will continue to happen, which is also on our

2    follow-up to do list is asking the Court if you would like a

3    date for *Jencks* to be turned over ahead of time.

4         We do like to provide the *Jencks* ahead of time.

5    We've done it piecemeal.  But going into the advance of trial,

6    I know our exhibit list -- or our witness list is due the 23rd.

7    The government can prepare *Jencks* and continue to monitor to

8    make sure no other *Jencks* has been generated between now and

9    when each witness testifies.  So we would be asking -- we can

10   do it right now or at the end.

11        THE COURT:  It seems to me that if the government is

12   not objecting on grounds of sensitive information or witness

13   security or something, that you ought to turn over your *Jencks*

14   when you turn over your witness list.  Here's our list of

15   witnesses, and here's the *Jencks* material that relates to them.

16        And so we will have gotten Rule 16 and *Jencks* and, if

17   any of it's *Brady*, that has been or will be identified, and

18   then you have an ongoing obligation if there's additional *Brady*

19   discovered or additional *Jencks* developed.

20        What about grand jury testimony of witnesses who

21   testified in the grand jury who may be trial witnesses; what's

22   the normal practice and what have you done here?

23        MS. LEDERER:  Your Honor, that has also been provided

24   to defense.

25        MS. MEDVIN:  Yes, Judge.  We filed motions on this

1    issue, and we received that.

2         MS. LEDERER:  Your Honor, yes.  It would have

3    normally been produced as a part of *Jencks,* but we did provide

4    it earlier.

5         MS. MEDVIN:  The issue in this case isn't the 302s or

6    statements by the FBI agents.  It's the fact that the videos

7    that we've seen contradict those.

8         That's the value of the videos here to the defense

9    and that's the value to this Court; that the contradictory

10   statements on the videos -- again, we, incidentally, found the

11   video.  The government did not provide us with the video.

12        But what's interesting, what we found out after

13   diving deeper into it, is that this is a video that's coming

14   from a defendant in one of the January 6th cases, meaning the

15   government was aware.  Maybe not this prosecutor in particular,

16   but the government was aware of the existence of this video

17   because it's from another January 6th case.

18        And that video was not provided to us, and until

19   today, nothing from that case was provided to us.  It wasn't

20   until we asked about that case that anything was provided to

21   us.  Ms. Lederer did this morning email us videos from that

22   case, but we don't know what else is out there on Officer

23   Warner.

24        What we're seeking is for the government to review

25   the videos that they have related to Officer Warner and provide

1   us videos that are exculpatory, videos that show Officer Warner

2   contradicting the statements he made to the FBI agents or

3   contradicting the allegations in this case.

4           THE COURT:  So you are asking that -- am I right or

5   wrong that the government should search over 30,000 videos in

6   order to look for exculpatory evidence?

7           MS. MEDVIN:  There's, actually, probably over

8   8 million pieces of evidence.  We don't know how many of them

9   are videos.  The government has a tool.  They have a tool where

10  they're able to come up with these lists.  They did this for

11  our defendant, for Mr. Warnagiris.  They do it for every

12  defendant.

13          They run a software, a computer program that does

14  facial recognition.  A computer program looks at all of these

15  videos and simply points out, here, here, here, here -- just

16  like a word search in a PDF file -- points out where the face

17  of the individual they're seeking appears, and they provide a

18  list of those videos.

19          And the government can say, well, here's the list.

20  That's all we're seeking so we can review them for relevance

21  and to make sure we have a complete defense and can properly

22  cross-examine this defendant.  The government's in possession

23  of both the videos and the tool with which to do that; the

24  defense has -- is not.

25          I mean, we have access to the videos in the most

1    difficult-to-access way possible.  Even the CCTV videos are not

2    given to us in time order.  There's nothing given to us easily.

3    We can't search anything easily or readily.  We don't have the

4    tools or capability to do this.

5         I, actually, tried on my own to do this, and it's

6    absolutely impossible.  There's nothing that can be done.  We

7    cannot narrow down, without facial recognition software, the

8    videos related to this officer.

9         MS. LEDERER:  Your Honor, I'm going to take this

10   piecemeal.  I want to start back with the recitation of

11   defense's recap of this video.

12        I want to make it very clear that Officer Warner was

13   out on the East Front.  The video that was provided by defense

14   does not necessarily pick the defendant, nor does it contradict

15   other 302s; brief summations of this officer's time when these

16   302s were focused on defendant's actions against this officer.

17        So, first off, we can't even say that it is

18   impeachment or *Brady*.  Within the video, it's very clear that

19   the officer is simply saying, let me call up in my chain of

20   command and let me see if you can get closer.  Conveniently,

21   the video cuts off because at some point the East Front is

22   completely and violently overrun by rioters.

23        THE COURT:  Say that again.

24        MS. LEDERER:  The East Front is violently overrun by

25   rioters.  It's not like Officer Warner said, hey, everyone,

1    please come this way, follow me; I'm going to let you in now.

2    That's not what happened.

3            I think that that's what Ms. Medvin is trying to

4    allege is this *Brady* material here; is a video where an officer

5    says, hey, let me see if you guys can get closer.  But then the

6    line is overrun.

7            And then the officer is absolutely swallowed up

8    outside the Columbus doors.  He's just asking to get back

9    inside.  He's, like, you guys do you; I just need to get back

10   inside.

11           Again, Mr. Warnagiris is not alleged to have been

12   around there to have heard any of these things.  Mr. Warnagiris

13   is at the very front trying to get into the building.  And then

14   when he does try to get into the building, he then jostles with

15   the officer.

16           So what defense is asking the government to do is to

17   search videos that the defense attorney has access to.  We have

18   provided these videos.  These videos are open-source videos.

19   It's not like they're videos that are sitting underneath our

20   thumb.  These are not government files.

21           This isn't the same thing as going and seeing the

22   different statements; going through our files to see what the

23   different statements are that Officer Warner has given to see

24   if he has any internal affairs investigations.  Those are all

25   things that we will do because that is what is expected of us

1    under *Brady*; not to go to every single open-source video and

2    say, hey, defense, is this what you're looking for; hey,

3    defense, is this what you're looking for?  Hey, we don't

4    know -- are you looking for this?

5         Defense has been given all of the body camera.

6    Defense has access to the internet.  The defense also has

7    access to these commercial products that are out there.  The

8    government isn't using any internal government program to run

9    any type of facial recognition.  These are all commercial

10   softwares.  It's nothing that is exclusive to the government.

11   Therefore, *Brady* does not apply in this situation for what

12   defense is asking for.

13        Obviously, we're happy to assist.  Defense said, hey,

14   I think this video came from this defendant.  Now, today, she's

15   saying it definitely did.  But can you look into it?  Is there

16   any statements from Officer Warner?  No, there was not.  We

17   complied; we answered.

18        There was open-source video.  Since it is open

19   source, defense has access to all this video.  But, despite

20   that, we still assisted and said, hey, these are the

21   open-source videos that were in that file.

22        The government is continuing to assist in the best

23   way that it can, but we're also -- we are completely adhering

24   by our obligations under *Brady*.  What the defense is asking for

25   is for us to go above and beyond what is expected of the

1    government.  We've provided the material.  The material is out

2    there.  We have satisfied our obligations.

3            The article that Ms. Medvin is discussing, we're now

4    bringing in additional names, and we're citing other sources.

5    At that point either defense has to make some supplemental

6    motion or, Your Honor, we have to look into this article that

7    was just published, if you want any more information on that as

8    well.

9            But looking at the defense's motion itself, it is,

10    basically, asking us to just go look at social media for her or

11    go look at the internet for her to find something that might

12    exist that is not under our exclusive control.

13            THE COURT:  Okay.  Go ahead.

14            MS. MEDVIN:  Judge, that's not quite right.  First of

15    all, the government has an obligation to preserve evidence once

16    they know the criminal -- a case can take place, and we've

17    cited that in our reply to them.

18            So we believe the government is actually in

19    possession of this database.  The government is also in the

20    possession of a group, an agent, a group of these agents who

21    they rely on to identify January 6th defendants using a facial

22    recognition software that's only available to them.

23            It is not a commercial product, it's not something

24    that regular people can go buy.  It's literally only done by

25    this one group.

```
 1              I've read multiple articles trying to figure out how

 2     they get access to this.  And this is confidential.  There is

 3     no explanation of how this group came to possess a facial

 4     recognition technology.  There's no information on that.

 5              All of the information points to the federal

 6     government is working with a private group to -- as their agent

 7     to identify defendants.  They're easily able to identify the

 8     defendants using this facial recognition software.  That's

 9     where everything comes from.

10              And we're saying, great, you have access to this

11     tool, and that's your agent.  Under the law, if you control

12     this agent, which you do from everything we have seen -- which

13     the government is still not addressing this agency

14     relationship -- we're asking for this agent of yours to review

15     this database that you already created.  This is not public

16     access of what's out there.  Most of the stuff was actually

17     removed from public access, by the way, Judge.

18              (Interruption by Court Reporter.)

19              MS. MEDVIN:  A lot of the videos that have been in

20     public domain were removed because the individuals who posted

21     these videos lost their accounts, and now there's someone --

22     somewhere in an archival feature that can only be searched, as

23     far as I'm concerned, with the facial recognition software.

24              But the facial recognition software is right now, my

25     understanding, working on a database already created; meaning,
```

1    the government already has these videos saved because they'll

2    need them as pieces of evidence later.  They might have to turn

3    them over to the defense, so they have them preserved already.

4         We're asking for this agent of theirs to search the

5    database that they already have for relevant video files or

6    photo files, and the only way to search through that is the

7    tool that they have exclusive control over.  We don't have that

8    tool.  We also don't have the whole database with the same

9    capability.

10         We can do word searches.  We can't do face searches.

11    So when the government gives me a lot of documents, I can

12    search for the word Warnagiris.  So the government gives me a

13    lot of documents; I have the ability to find what's relevant.

14    I can search for the word Warner, Anthony Warner, the officer

15    in this case, or the FBI agent, Weatherhead.  I can search for

16    documents related to them.

17         I have that capability through the database they give

18    us access to.  The government gave me access to that database.

19    That's the Relativity database.  And the government gave me the

20    tool.  The tool is the word search tool.  They made it

21    available for me, and I'm able to search through it.

22         So Relativity allows for me to narrow down evidence

23    by the defendant's name or by any name I wish to search.  So

24    they gave me usable evidence and the Relativity format as far

25    as Word documents.

1          But when it comes to video files or photo files also

2     in that document, I can't search it in the same way.  The video

3     files I -- it's impossible for us to review with anything other

4     than some kind of computer tool that reviews some kind of

5     recognition.  They have more advanced ones these days available

6     to law enforcement where they can review colors, genders, and

7     narrow down all kinds of things.

8          But it appears the government in these cases is using

9     facial recognition, which is why we've asked them to use that

10    tool, the tool they have.

11          THE COURT:  Ms. Lederer?

12          MS. LEDERER:  Your Honor, I'm going to reiterate the

13    fact that these videos are coming from open source.  The PDF

14    that was provided to Ms. Medvin of her client, the open-source

15    videos have the actual links of where all these videos came

16    from.  They did not come from some secret database.

17          They all came from the internet, including Ms. Medvin

18    discussed this archive site.  That is a public website that

19    anyone can go on to and look at video from January 6th.

20          All of what Ms. Medvin is asking us to review are not

21    files under the obligations of *Brady* for us to go through, and

22    they're not under the government's exclusive control.

23          THE COURT:  Well, she says -- she says that you have

24    exclusive control over this search tool, I guess.  And you say

25    you don't?

1          MS. LEDERER:  Your Honor, that is my understanding.

2     If you need more clarity on that, I would need time to provide

3     clarity.

4          But it's my understanding that there are softwares

5     out there available to defense to do facial recognition

6     searches.  It's almost akin to hiring an expert if you wanted

7     to retest gunshot residue, or if you wanted to do a trigger

8     pull of a gun if you're arguing that's an accidental shooting.

9     It's just an investigative tool.

10          THE COURT:  This is a -- you're like two ships

11     passing in the night.  She says this software to search these

12     30,000 or 7 million videos or digital things is only available

13     to the government.  And there's a private group that the

14     government is working with to identify the defendants, and

15     that's the only way to get access to this stuff is through that

16     group.  And because they're working with you, they've become a

17     government agent.

18          Now, if they're a government agent, then *Brady*

19     applies if they're helping law enforcement.  How do I resolve

20     this?  The two of you are saying different things.

21          MS. LEDERER:  Your Honor, at the end of the day, I

22     think the question is, is what they're reviewing our stuff?

23     It's not.  It's all open source.  It's all being scraped from

24     the internet.

25          That's the real question is -- is what's being

1    reviewed ours, the government's?  This is -- what Ms. Medvin is

2    asking us to do is to go scrape the internet for the officer

3    when she has equal access to the internet.  She also asked us

4    to do it for the body-worn camera.  She has every single

5    body-worn camera from January 6th.  That has been provided.

6           THE COURT:  Well, is either of you aware of this

7    issue having come up before any of my colleagues in any other

8    cases?

9           MS. MEDVIN:  No, Judge.  I've searched for --

10   January 6th cases, every other case, this has never come up

11   because this type of incident, this is unique.  The government

12   working with an independent group that has access to a

13   technology that's not publicly available, this is unique.

14          And so you're going to have to decide on something

15   that really doesn't have precedence.  I've added cases to our

16   reply brief that I think are relevant; cases you've decided in

17   the past related to agency and related to --

18          THE COURT:  The question is, are they an agent?  How

19   do I decide if they're an agent?

20          MS. MEDVIN:  Because they work for the government.

21          THE COURT:  That's what you say.

22          MS. MEDVIN:  Yes.

23          THE COURT:  She disagrees.

24          MS. LEDERER:  Your Honor, if I may.  I'm focusing on

25   the fact that -- the videos from the internet that are being

1   reviewed; is that our stuff?  Is that equivalent to a

2   government file?  Videos, public videos on the internet.

3          And, Your Honor, it was -- I apologize for not

4   bringing this up earlier.  In the case that you gave us to

5   review for bill of particulars, *United States v. Brock*, *Brock*

6   also discussed *Brady* obligations in January 6th context, and it

7   addressed three different requests from *Brock*.

8          The first being the fact that there was a man who

9   appeared to be a Capitol Police officer in close proximity to

10  the defendant.  The defense attorney in that case asked for all

11  video in relation -- and this is on page 22 of *Brock* -- asked

12  for video and the name of that officer.

13         And the Court in *Brock* determined that it was enough

14  that the government had already provided all of the cameras in

15  this case -- or all the cameras from January 6th to defense,

16  and that information of Capitol Police was also out in

17  discovery production.

18         So the government did not have the obligation to,

19  first off, figure out who that officer was; then on top of it,

20  they do not have the obligation to provide all of the video and

21  determine that the Capitol Police department is within the

22  legislative branch, not the Department of Justice.

23         Also then, *Brock* requested information on any type of

24  potential informants or undercover agents on the grounds on

25  January 6th.  Again, the Court said that that was just too

1    sweeping and a fishing expedition, and that the government did

2    not have the obligation to review its files and provide any of

3    that information.

4         So akin to this situation here would be that the

5    government has provided all of the CCTV from January 6th.  The

6    government has provided all of the body-worn camera from

7    January 6th.  There is a plethora of open-source video that is

8    out there for everyone to go access.  So that is not under the

9    possession of the government.

10         Therefore, the government does not have the

11    obligation to then find every video that Officer Warner is in.

12         THE COURT:  Okay.  In the defendant's request for

13    notice of the government's intent to use evidence, et cetera --

14    which I think I've already ruled on -- Docket 61, she says, as

15    of September 11th, 2023, there are 30,634 videos available to

16    January 6th defense lawyers through evidence.com and 7,681,038

17    digital documents available through the Deloitte evidence

18    sharing database created for January 6th cases.  And that's the

19    universe she's talking about, I think.

20         And then she says today that -- or in her -- in her

21    filings and today that they -- the defense, even though they

22    have access to this -- and as I understand all of this from

23    other cases, essentially, the government has provided

24    everything to everybody no matter how irrelevant it might have

25    seemed to you if you were being more discreet.

1          But the theory is that every defendant has a

2     different defense, and they were in different parts of the

3     Capitol.  And so what has been done is stuff that you know is

4     defense-specific provided in a discrete way under Rule 16 and

5     under *Jencks* and under grand jury disclosure and under *Brady*.

6          But if anybody really wants to go look at this stuff,

7     the 30,000 videos or the 7 million digital documents, here it

8     is; enjoy yourselves.  And that's been true in every single

9     case.

10          If you want to look at what's going on in another

11     part of the Capitol, if you wanted to look at stuff in your

12     part of the Capitol but not related to your defendant --

13          MS. MEDVIN:  Your Honor, if I may?

14          THE COURT:  Yeah.

15          MS. MEDVIN:  That's incorrect.

16          THE COURT:  Well, then why was it given to everybody

17     if they can't use it?

18          MS. MEDVIN:  Oh, we can use it, but it's not

19     everything.

20          So the evidence that was provided to us -- for

21     example, we referenced the name of Defendant Dunfee.  His case

22     is not yet in Relativity, so the government had to go search

23     for files and video to provide to us separately.  And the

24     reason it's not in the Relativity --

25          THE COURT:  But that's not what you're talking about.

1    You're talking about the documents I just referred to.

2            MS. MEDVIN:  The documents --

3            THE COURT:  The 30,000 and the 7 million; that's what

4    your motion is about, right?

5            MS. MEDVIN:  No.  My motion refers to even more than

6    that.  Because what those databases have --

7            THE COURT:  You've got to prove to me that the

8    government has access to this stuff and you don't, and that the

9    people that control it are agents of the government.  That's

10   what I need to have from you.

11           MS. MEDVIN:  I don't think the government --

12           THE COURT:  Through declarations, through experts,

13   whatever you got; that you cannot get what you need, the

14   government can get what they need, and they have an arrangement

15   which -- with these people that makes them an agent of the

16   government for purposes of *Brady*.

17           You two are arguing about facts, as well as about

18   law.  I don't think I've got enough to decide this.

19           MS. LEDERER:  Your Honor, I just want to make it

20   clear, the government's main issue is the material that

21   Ms. Medvin is seeking through the government.  It's -- I keep

22   saying open source, and I apologize.  It's video that had been

23   posted on Facebook; it's video that's been posted on YouTube.

24   It's videos from other people, other defendants, who are on the

25   ground or reporters who were on the ground.  There are Getty

1      Images out there.  There are articles out there from every

2      major news publication.

3           And what Ms. Medvin is asking is for us to go to the

4      internet and find videos or photographs or whatever of

5      Officer Warner.  So the government's main issue is, is videos

6      on the internet, what is the government's obligation to go get

7      those for defense or to find those for defense when defense

8      can't articulate necessarily besides I just want the officer,

9      every movement from the officer from that day.  I want to know

10     every single place this officer was.

11          That's what defense is asking for, for us to go onto

12     the internet.  So that's our main concern, the information that

13     Ms. Medvin is asking for.  That that is not under the

14     government's exclusive control.

15          MS. MEDVIN:  And, Judge, as we responded to in our

16     reply, the government has a copy of absolutely everything that

17     has been posted on the internet because it is their requirement

18     to preserve it for their case and for the defendants that they

19     have already charged and which they will charge in the future.

20     Government preserved it.

21          The government has the sedition hunters group that

22     reviews this information.  And the database that is Relativity

23     and the 30,000 videos we're referring to, those are pieces of

24     evidence that go into these cases after sedition hunters

25     identify a defendant and after that case completes.  So that's

1    how those databases are made.

2         So the first step in any information collection is

3    the sedition hunters.  That's because they have the facial

4    identification tools.  So that's how all of these cases start.

5    They start with reviewing the -- as the government calls it,

6    open source, which the government has a copy of already, and

7    the open source becomes pieces of evidence.

8         Once that case completes, that evidence goes into

9    Relativity and into evidence.com.  Evidence.com is mostly a

10   government tool, so I think it's mostly body cams and CCTV

11   footage.  So that's all that is.

12        When it comes to individual videos created by

13   defendants and by other individuals who were just spectators,

14   those videos are not kept by the government until sedition

15   hunters identifies them and says this relates to a specific

16   defendant, and then it goes into a specific case file and then

17   that database.

18        But the government is in possession, control of tools

19   to identify these.  These are, again, search tools.  It's a

20   unique request.

21        As far as the case referenced by the government, in

22   that case they were seeking evidence just based on an idea they

23   had.  We, actually, in this case have identified an officer who

24   is high-fiving -- doing fist bumps to individuals entering the

25   Capitol Building, when he makes statements to the FBI agents

1    that he was trying to keep people out.  So he's trying to keep

2    people out, but at the same time he's fist-bumping and slapping

3    five to those who come in.  That's a contradiction.

4            So we have a direct contradiction of statements made,

5    which is why it's relevant in this case to review other imagery

6    of him and whether or not his actual behaviors contrast those

7    statements he made.

8            THE COURT:  Okay.  Anybody else want to say anything

9    on this issue?

10           MS. LEDERER:  Your Honor, at this point I would be

11    beating a dead horse.  All of these videos that Ms. Medvin

12    wants us to review are all from the internet.

13           It would be like asking a detective to go out and go

14    door to door to go find information that defense thinks is out

15    there in, say, a homicide investigation.  I want you to go to

16    this block because I think one of these people might have seen

17    it, Detective.  Instead of me sending an investigator, you go

18    do it.

19           MS. MEDVIN:  That is just not how that technology

20    works.  It is no different than a word search.  It's a tool

21    to -- it's a computer tool that's run on facial recognition.

22    They do nothing but press a button.  It's not -- videos are

23    identified; see if they fit into that or not.

24           It's no different than doing a word search in a PDF

25    file or a Microsoft Word document.  It's a completely different

1   style of investigating.  It's a computer that does this.  It's

2   a tool that the government has access to.  That's why it's easy

3   for them to identify these defendants.

4          MS. LEDERER:  Again, it's my understanding that it is

5   a tool that is commercially produced that anyone can go buy and

6   then use.

7          MS. MEDVIN:  I've not heard of any private entity

8   with such a tool, nor does anyone other than -- even the

9   federal government is using sedition hunters as opposed to

10  their own.  So I'm not sure what that comment is.  There's no

11  proof of that.

12         If anything, if it was -- it cost millions of

13  dollars, it would make it impossible for the defendant to do

14  himself.  It's no different than the government saying we're

15  going to create a Relativity database because the defense

16  doesn't have the resources to store 9 million pieces of digital

17  evidence.

18         That's why the -- that's why Congress allocated a

19  budget for storage of these videos for the defendants because

20  it renders defense impossible.

21         THE COURT:  I think we can go on for all day on this.

22  I would suggest that if you have anything useful that you want

23  to file to further elucidate me, do so in the next 72 hours or,

24  say, by Friday midday.

25         And I suggest that the parties order a transcript, at

1    least the last part of this hearing, the part relating to

2    *Brady* -- and you can explain to the court reporter what parts

3    we need.  I'd like to read what you've said as soon as possible

4    so that we can try to resolve this matter.

5            What else -- and we have a -- you've got deadlines to

6    file various things, as we've discussed earlier.  We have a

7    final pretrial conference on October 30th at 10:00, which I

8    think we can do virtually unless anybody has a reason they want

9    to be here, because the trial is not immediately thereafter.

10   It's eight or ten days later.

11           What else for today?

12           MS. LEDERER:  Your Honor, I did just want to let you

13   know that I might not be at the pretrial conference.  AUSA

14   Haag, obviously, will take care of it.  I'm starting trial

15   October 25th.

16           So in the event that that goes longer than I would

17   like, I might be missing the pretrial conference; so just to

18   let you know that.

19           THE COURT:  Thanks.  Anything else today?

20           MS. MEDVIN:  Nothing further.  We do not object to a

21   digital conference.

22           THE COURT:  Okay.  Thanks.

23           MR. HAAG:  I had one follow-up question.  Your Honor

24   had mentioned a potential ruling on whether or not the

25   government should be required to file a trial brief or bench --

1          THE COURT:  We'll let you know that shortly.

2          MR. HAAG:  Okay.

3          THE COURT:  Thanks for raising it again.

4          MS. LEDERER:  Your Honor, the only other thing the

5    government would raise at this time would be speedy trial.  We

6    would ask you to continue toll the time.  We still have

7    outstanding motions, but also in the interest of justice.

8          THE COURT:  Does Mr. Warnagiris agree to toll the

9    running of the speedy trial until the day of the trial?

10   Obviously, so long as the motions are undecided, he doesn't

11   have to, but I am going to try to decide these before trial.

12         MS. MEDVIN:  I think we've already tolled until the

13   trial date when we set the hearing, like, seven months ago, but

14   I'm not positive.  But also we have pending motions.

15         We have a lot, because we still have that motion to

16   dismiss.  We have all of these.  We don't have an objection.

17   The trial is in a couple of weeks.

18         I'll tell you this, Judge.  If we have a lot more

19   evidence coming in -- we just had more evidence come in

20   today -- there might be an issue where we run into a timing

21   problem of being prepared by that date, by November 8th.  I

22   hope not.

23         THE COURT:  I understand that.  Let's not discuss

24   that today.  Let's see how things go.  You can raise that

25   either between now and October 30th or on October 30th, if we

```
 1      have -- if we do have that kind of an issue.

 2                  MS. MEDVIN:  Okay.

 3                  THE COURT:  I understand we've -- there's a lot to do

 4      between now and then.

 5                  MS. MEDVIN:  Yes, sir.

 6                  THE COURT:  Okay.  Thank you, everybody.

 7                  And speedy trial is tolled until October 30th, and

 8      then we'll talk about it again.

 9                  MS. LEDERER:  Thank you, Your Honor.

10                  THE COURT:  Thanks, everyone.

11                  THE COURTROOM DEPUTY:  This court is adjourned.

12                  (The Zoom hearing adjourned at 12:00 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                  CERTIFICATE OF OFFICIAL COURT REPORTER

2

3            I, TAMARA M. SEFRANEK, do hereby certify that the

4      above and foregoing constitutes a true and accurate transcript

5      of my stenographic notes and is a full, true, and complete

6      transcript of the proceedings to the best of my ability.

7            Dated this 24th day of October, 2023.

8

9                          /s/ Tamara M. Sefranek_____
                           Tamara M. Sefranek, RMR, CRR, CRC
10                         Official Court Reporter
                           Room 6714
11                         333 Constitution Avenue, N.W.
                           Washington, D.C.  20001
12

13

14

15

16

17

18

19

20

21

22

23

24

25

80

## /

**/s** [1] - 79:9

## 1

**109** [1] - 1:17
**10:00** [2] - 1:6, 76:7
**111** [5] - 33:4, 47:12, 50:4, 50:6
**111(a** [2] - 41:20, 41:24
**11th** [1] - 69:15
**12:00** [1] - 78:12
**12th** [3] - 17:5, 17:10, 18:6
**15-minute** [2] - 35:4, 39:25
**1512** [1] - 38:1
**16** [5] - 1:6, 54:12, 55:6, 56:16, 70:4
**169** [1] - 34:6
**1752** [5] - 6:22, 7:19, 11:18, 44:3, 44:14
**1:21-CR-382** [1] - 1:3

## 2

**20001** [2] - 1:24, 79:11
**202-354-3246** [1] - 1:24
**2023** [4] - 1:6, 3:16, 69:15, 79:7
**20530** [1] - 1:14
**21-382** [1] - 2:3
**22** [1] - 68:11
**22314** [1] - 1:17
**231** [2] - 37:25, 39:15
**23rd** [1] - 56:6
**24th** [1] - 79:7
**25th** [1] - 76:15
**29** [2] - 3:16, 42:14

## 3

**3** [1] - 41:11
**30,000** [5] - 58:5, 66:12, 70:7, 71:3, 72:23
**30,634** [1] - 69:15
**302** [3] - 55:14, 55:18, 55:23
**302s** [8] - 53:24, 54:17, 54:19, 55:22, 57:5, 59:15, 59:16
**30th** [4] - 76:7, 77:25, 78:7
**333** [2] - 1:23, 79:11

## 4

**403** [1] - 38:25
**404** [1] - 30:5
**405** [1] - 30:4

## 6

**6** [2] - 41:11, 41:25
**601** [1] - 1:14
**61** [1] - 69:14
**66** [1] - 4:17
**67** [1] - 4:17
**6714** [2] - 1:23, 79:10
**69** [3] - 5:1, 14:2, 31:25
**6th** [35] - 3:15, 5:4, 6:18, 9:10, 12:22, 17:21, 18:1, 23:10, 25:23, 27:7, 27:8, 34:21, 35:5, 35:11, 37:6, 37:11, 38:6, 38:20, 39:21, 51:11, 51:17, 53:3, 57:14, 57:17, 62:21, 65:19, 67:5, 67:10, 68:6, 68:15, 68:25, 69:5, 69:7, 69:16, 69:18

## 7

**7** [4] - 41:25, 66:12, 70:7, 71:3
**7,681,038** [1] - 69:16
**70** [1] - 5:4
**71** [3] - 41:13, 41:24, 42:7
**72** [1] - 75:23

## 8

**8** [2] - 41:11, 58:8
**801** [2] - 19:23, 21:18
**801(d** [1] - 19:18
**8th** [1] - 77:21

## 9

**9** [1] - 75:16
**916** [1] - 1:16

## A

**A.M** [1] - 1:6
**abetting** [1] - 38:2
**abeyance** [1] - 17:1
**abide** [1] - 43:3
**ability** [4] - 13:9, 34:10, 34:13, 64:13, 79:6

**able** [16] - 9:22, 12:23, 15:2, 16:11, 24:17, 25:13, 35:18, 35:22, 38:5, 38:7, 38:10, 43:23, 45:13, 58:10, 63:7, 64:21
**absolutely** [4] - 6:10, 59:6, 60:7, 72:16
**abundance** [1] - 33:3
**access** [19] - 58:25, 59:1, 60:17, 61:6, 61:7, 61:19, 63:2, 63:10, 63:16, 63:17, 64:18, 66:15, 67:3, 67:12, 69:8, 69:22, 71:8, 75:2
**accessible** [1] - 51:15
**accidental** [1] - 66:8
**accounts** [1] - 63:21
**accurate** [1] - 79:4
**accused** [1] - 50:10
**accusing** [2] - 32:12, 32:21
**act** [1] - 22:16
**acting** [3] - 20:20, 24:3, 50:9
**Action** [2] - 1:2, 2:3
**action** [2] - 46:9, 47:2
**actions** [10] - 32:20, 36:3, 37:24, 38:4, 38:5, 38:17, 47:5, 59:16
**activity** [2] - 28:19, 37:16
**acts** [3] - 39:23, 46:8, 50:6
**actual** [3] - 11:1, 65:15, 74:6
**actus** [9] - 45:21, 45:23, 46:14, 46:25, 47:3, 47:6, 47:10, 50:9, 50:15
**ad** [1] - 42:3
**add** [1] - 34:8
**added** [4] - 21:4, 21:5, 32:14, 67:15
**addition** [1] - 47:22
**additional** [6] - 3:20, 40:4, 50:20, 56:18, 56:19, 62:4
**additionally** [3] - 6:13, 19:11, 38:1
**address** [3] - 7:7, 29:7, 29:19
**addressed** [8] - 2:23, 12:16, 40:7, 40:15, 40:16, 42:1, 45:19, 68:7
**addresses** [1] - 50:23
**addressing** [1] - 63:13

**adhering** [1] - 61:23
**adjective** [2] - 11:18, 12:10
**adjourn** [1] - 14:21
**adjourned** [2] - 78:11, 78:12
**admissibility** [2] - 16:12, 29:18
**admissible** [3] - 21:6, 21:17, 22:12
**admission** [1] - 17:22
**admit** [7] - 16:9, 17:17, 18:3, 19:15, 20:3, 35:10, 38:12
**admitted** [8] - 6:16, 9:16, 9:17, 15:14, 18:9, 18:10, 18:14, 19:9
**admitting** [2] - 29:10, 31:5
**advance** [8] - 5:22, 7:11, 33:16, 33:21, 43:10, 43:11, 43:19, 56:5
**advanced** [1] - 65:5
**affairs** [1] - 60:24
**agency** [2] - 63:13, 67:17
**agent** [22] - 53:11, 53:12, 53:15, 53:16, 53:19, 53:23, 53:25, 54:16, 54:23, 62:20, 63:6, 63:11, 63:12, 63:14, 64:4, 64:15, 66:17, 66:18, 67:18, 67:19, 71:15
**Agent** [1] - 55:15
**agents** [8] - 6:5, 53:13, 57:6, 58:2, 62:20, 68:24, 71:9, 73:25
**aggressor** [1] - 32:2
**ago** [2] - 30:7, 77:13
**agree** [7] - 7:23, 16:11, 16:25, 39:10, 43:22, 44:20, 77:8
**agreement** [2] - 43:25, 44:15
**agreements** [1] - 5:21
**ahead** [7] - 16:6, 26:2, 34:16, 40:10, 56:3, 56:4, 62:13
**aiding** [1] - 38:2
**akin** [2] - 66:6, 69:4
**Alexandria** [1] - 1:17
**allegations** [2] - 25:2, 58:3
**allege** [1] - 60:4
**alleged** [14] - 10:6, 13:23, 32:15, 32:19,

**adhering** — column continues:
**45:22, 48:5, 50:3, 50:15, 50:17, 50:18, 52:4, 60:11**
**allegedly** [1] - 52:4
**alleging** [1] - 50:4
**allocated** [1] - 75:18
**allow** [7] - 5:14, 6:10, 6:22, 7:3, 29:4, 34:1, 49:1
**allowed** [1] - 34:11
**allows** [1] - 64:22
**alluding** [2] - 22:5, 23:13
**almost** [1] - 66:6
**alone** [1] - 32:8
**alternative** [1] - 46:15
**Amendment** [13] - 17:5, 17:10, 18:6, 23:5, 23:8, 23:14, 23:20, 23:24, 24:14, 24:24, 25:10, 25:17, 26:9
**Amendment-type** [1] - 26:9
**America** [1] - 2:3
**AMERICA** [1] - 1:2
**amount** [2] - 13:9, 50:16
**amounts** [2] - 48:7, 48:9
**ANDREW** [1] - 1:12
**Andrew** [1] - 2:8
**answered** [1] - 61:17
**Anthony** [1] - 64:14
**anticipating** [2] - 14:14, 14:16
**apologize** [5] - 3:24, 4:21, 19:1, 68:3, 71:22
**appearances** [1] - 2:5
**appeared** [2] - 15:3, 68:9
**appearing** [1] - 15:2
**applicable** [2] - 33:18, 39:1
**application** [3] - 31:1, 31:21, 48:15
**applied** [2] - 31:22, 34:17
**applies** [4] - 22:6, 30:25, 33:19, 66:19
**apply** [4] - 21:20, 21:25, 35:16, 61:11
**applying** [2] - 7:14, 28:23
**appropriate** [3] - 14:12, 33:11, 34:17
**archival** [1] - 63:22
**archive** [1] - 65:18
**area** [42] - 6:22, 6:23,

6:24, 6:25, 7:8, 7:21, 7:22, 7:23, 7:24, 7:25, 8:1, 8:3, 8:4, 8:5, 8:8, 8:11, 8:12, 8:13, 8:15, 9:7, 9:8, 9:11, 9:23, 10:12, 10:13, 10:17, 10:18, 10:24, 11:3, 11:12, 11:18, 11:19, 11:24, 12:2, 12:13, 12:14, 13:10, 20:21, 21:11, 27:4, 44:5
**areas** [3] - 11:4, 11:7, 26:18
**arena** [2] - 51:23, 51:24
**arguably** [1] - 22:11
**argue** [10] - 3:1, 15:4, 25:4, 25:13, 27:15, 33:6, 34:10, 34:13, 43:15
**argued** [2] - 41:9, 41:10
**argues** [2] - 15:13, 15:24
**arguing** [5] - 26:8, 29:3, 43:18, 66:8, 71:17
**argument** [20] - 2:18, 2:22, 3:2, 4:5, 11:11, 24:7, 24:12, 24:21, 30:21, 31:1, 31:7, 31:13, 31:16, 31:19, 32:7, 33:6, 35:7, 40:8, 45:3
**arguments** [19] - 2:21, 3:20, 3:21, 14:6, 19:19, 22:24, 23:2, 26:15, 29:11, 31:20, 34:2, 34:3, 39:8, 42:13, 43:17, 46:14, 46:16, 48:13, 48:16
**arise** [1] - 26:24
**arises** [3] - 26:5, 26:7, 26:8
**arrangement** [1] - 71:14
**arrived** [3] - 10:23, 13:21, 13:23
**article** [5] - 50:22, 51:5, 51:9, 62:3, 62:6
**articles** [2] - 63:1, 72:1
**articulate** [1] - 72:8
**aside** [1] - 35:20
**assault** [16] - 32:7, 32:15, 32:19, 32:23, 32:25, 41:5, 41:7, 41:12, 41:21, 44:17,

44:18, 46:2, 46:3, 46:10, 47:4, 52:4
**assaulting** [1] - 25:4
**asserted** [1] - 22:11
**assist** [2] - 61:13, 61:22
**assisted** [1] - 61:20
**assume** [2] - 28:4, 45:7
**assuming** [2] - 16:3, 25:7
**attempting** [1] - 24:4
**attention** [1] - 3:14
**attorney** [3] - 31:16, 60:17, 68:10
**Attorney's** [1] - 1:13
**attorneys** [3] - 42:25, 43:1, 43:2
**attributed** [1] - 55:19
**AUSA** [4] - 1:18, 2:9, 18:23, 76:13
**authentication** [1] - 17:19
**authenticity** [3] - 15:25, 16:1, 16:5
**authority** [3] - 12:6, 18:1, 28:8
**authorize** [1] - 28:14
**authorized** [2] - 28:10, 28:12
**available** [7] - 16:4, 62:22, 64:21, 65:5, 66:5, 66:12, 67:13, 69:15, 69:17
**Avenue** [2] - 1:23, 79:11
**avenues** [1] - 20:2
**AW** [4] - 53:20, 54:1, 54:19, 54:22
**aware** [9] - 12:18, 18:21, 24:14, 37:6, 37:10, 38:14, 57:15, 57:16, 67:6

### B

**Baez** [3] - 3:16, 4:1, 28:7
**based** [4] - 33:9, 34:10, 37:23, 73:22
**basics** [1] - 46:20
**basis** [1] - 25:20
**bear** [1] - 11:16
**bears** [1] - 11:14
**beating** [1] - 74:11
**become** [2] - 29:13, 66:16
**becomes** [1] - 73:7
**BEFORE** [1] - 1:8
**beginning** [1] - 41:1

**begins** [1] - 41:24
**behalf** [3] - 2:8, 2:13, 51:1
**behaviors** [2] - 45:22, 74:6
**bench** [21] - 14:22, 15:7, 17:9, 17:12, 22:24, 28:3, 31:5, 31:15, 31:19, 31:20, 31:22, 35:21, 39:1, 40:25, 43:5, 43:6, 43:11, 43:15, 43:22, 44:23, 76:25
**best** [2] - 61:22, 79:6
**better** [2] - 16:15, 19:7
**between** [5] - 17:15, 38:4, 56:8, 77:25, 78:4
**beyond** [5] - 19:19, 24:3, 24:25, 46:24, 61:25
**bill** [25] - 3:2, 3:6, 3:8, 3:9, 3:14, 4:3, 44:25, 45:2, 45:5, 46:15, 46:18, 46:19, 47:25, 48:1, 48:13, 48:15, 48:18, 48:21, 49:3, 49:5, 49:10, 49:12, 49:16, 49:21, 68:5
**blaming** [1] - 28:18
**block** [1] - 74:16
**Boasberg's** [2] - 47:14, 47:19
**bodily** [1] - 41:13
**body** [8] - 15:14, 16:2, 16:3, 61:5, 67:4, 67:5, 69:6, 73:10
**body-worn** [6] - 15:14, 16:2, 16:3, 67:4, 67:5, 69:6
**book** [3] - 50:24, 51:12, 51:13
**bore** [1] - 11:13
**Brady** [19] - 3:10, 3:13, 45:1, 45:3, 50:19, 54:11, 56:17, 56:18, 59:18, 60:4, 61:1, 61:11, 61:24, 65:21, 66:18, 68:6, 70:5, 71:16, 76:2
**branch** [1] - 68:22
**break** [1] - 15:8
**brief** [15] - 7:11, 14:5, 40:20, 40:21, 41:23, 42:1, 42:2, 42:19, 44:8, 44:23, 49:9, 49:24, 59:15, 67:16, 76:25
**briefed** [1] - 42:3
**briefing** [1] - 23:8

**briefly** [1] - 21:23
**briefs** [2] - 42:16, 47:19
**bringing** [2] - 62:4, 68:4
**broadened** [1] - 19:19
**Brock** [8] - 47:23, 47:24, 68:5, 68:7, 68:11, 68:13, 68:23
**budget** [1] - 75:19
**Building** [7] - 6:17, 6:18, 9:12, 10:14, 11:2, 13:13, 73:8
**building** [21] - 7:1, 8:5, 8:12, 8:13, 9:23, 10:19, 10:24, 11:1, 11:19, 11:20, 11:23, 12:12, 20:22, 21:7, 52:8, 60:13, 60:14
**bumping** [1] - 74:2
**bumps** [1] - 73:24
**burden** [1] - 37:25
**button** [1] - 74:22
**buy** [2] - 62:24, 75:5

### C

**camera** [5] - 5:12, 61:5, 67:4, 67:5, 69:6
**cameras** [6] - 4:16, 5:18, 15:14, 16:3, 68:14, 68:15
**cams** [1] - 73:10
**cannot** [2] - 59:7, 71:13
**capability** [4] - 31:12, 59:4, 64:9, 64:17
**capacity** [1] - 28:14
**Capitol** [26] - 6:17, 6:18, 9:12, 10:7, 10:14, 11:2, 11:24, 12:1, 12:2, 12:5, 12:13, 12:14, 12:21, 13:2, 13:13, 44:16, 53:18, 68:9, 68:16, 68:21, 70:3, 70:11, 70:12, 73:25
**capture** [1] - 38:16
**captured** [1] - 7:2
**care** [2] - 4:3, 76:14
**carefully** [1] - 7:17
**case** [93] - 3:15, 4:10, 5:19, 7:13, 7:15, 9:10, 9:16, 11:5, 12:8, 12:19, 12:20, 14:19, 15:3, 18:1, 18:20, 20:3, 20:8, 20:24, 21:16, 21:20, 23:21, 25:12, 26:20,

26:25, 27:3, 27:10, 27:24, 28:17, 28:20, 28:24, 29:1, 29:22, 30:3, 30:16, 31:2, 32:23, 33:24, 35:1, 35:3, 35:9, 35:18, 35:23, 36:9, 36:19, 37:1, 37:3, 37:13, 38:23, 39:10, 39:22, 39:24, 40:2, 41:1, 42:5, 45:5, 45:15, 45:19, 45:23, 46:20, 47:13, 48:15, 49:3, 49:20, 49:23, 50:1, 51:23, 51:25, 52:3, 53:17, 55:15, 57:5, 57:17, 57:19, 57:20, 57:22, 58:3, 62:16, 64:15, 67:10, 68:4, 68:10, 68:15, 70:9, 70:21, 72:18, 72:25, 73:8, 73:16, 73:21, 73:22, 73:23, 74:5
**cases** [35] - 3:13, 9:10, 9:13, 9:17, 14:18, 24:21, 25:11, 25:18, 25:23, 27:7, 27:8, 28:9, 31:4, 31:8, 35:16, 42:24, 46:12, 47:7, 49:9, 51:11, 51:17, 51:22, 52:13, 54:11, 55:22, 57:14, 65:8, 67:8, 67:10, 67:15, 67:16, 69:18, 69:23, 72:24, 73:4
**caused** [1] - 32:13
**caution** [1] - 33:3
**CCTV** [4] - 15:14, 59:1, 69:5, 73:10
**certain** [9] - 3:4, 15:13, 17:6, 26:15, 29:14, 30:3, 42:25, 49:1, 51:4
**CERTIFICATE** [1] - 79:1
**certify** [1] - 79:3
**cetera** [2] - 29:6, 69:13
**chain** [1] - 59:19
**Chamber** [2] - 38:12
**character** [7] - 29:3, 29:17, 30:2, 30:5, 30:7, 30:12
**characterize** [1] - 46:4
**charge** [1] - 72:19
**charged** [5] - 21:8, 38:2, 46:23, 52:10, 72:19
**charges** [8] - 6:14, 29:11, 29:12, 38:22, 39:5, 39:8, 44:3,

48:5
**charging** [2] - 44:17, 46:3
**charitable** [1] - 29:5
**choose** [1] - 30:12
**CHRISTOPHER** [1] - 1:5
**Christopher** [2] - 2:3, 2:13
**circuit** [1] - 42:5
**cited** [5] - 46:12, 48:18, 49:9, 49:23, 62:17
**citing** [1] - 62:4
**civil** [10] - 35:8, 35:9, 35:10, 35:13, 35:14, 35:16, 35:17, 37:15, 39:15, 40:4
**claim** [2] - 32:2, 32:22
**claiming** [1] - 24:16
**claims** [1] - 31:25
**clarify** [1] - 47:4
**clarity** [2] - 66:2, 66:3
**clear** [6] - 28:21, 39:6, 50:15, 59:12, 59:18, 71:20
**clearly** [3] - 27:25, 31:9, 33:4
**CLERK** [1] - 41:19
**client** [1] - 65:14
**close** [1] - 68:9
**closer** [2] - 59:20, 60:5
**closing** [1] - 42:13
**code** [8] - 7:9, 7:24, 8:2, 8:7, 8:10, 10:10, 44:16, 46:5
**Code** [1] - 17:6
**collateral** [1] - 31:6
**colleagues** [2] - 12:16, 67:7
**collected** [1] - 53:4
**collection** [1] - 73:2
**colors** [1] - 65:6
**COLUMBIA** [1] - 1:1
**Columbus** [1] - 60:8
**coming** [3] - 57:13, 65:13, 77:19
**command** [1] - 59:20
**comment** [2] - 29:24, 75:10
**commercial** [3] - 61:7, 61:9, 62:23
**commercially** [1] - 75:5
**commit** [2] - 21:13, 39:23
**committed** [1] - 36:2
**common** [1] - 30:6
**community** [2] - 29:6,

30:8
**compel** [1] - 4:6
**complete** [6] - 21:12, 33:14, 33:23, 48:14, 58:21, 79:5
**completely** [4] - 45:13, 59:22, 61:23, 74:25
**completeness** [2] - 18:15, 19:11
**completes** [2] - 72:25, 73:8
**complex** [2] - 27:19, 45:3
**complied** [1] - 61:17
**components** [1] - 21:9
**computer** [5] - 58:13, 58:14, 65:4, 74:21, 75:1
**concentrating** [1] - 7:16
**concern** [4] - 23:6, 25:17, 39:2, 72:12
**concerned** [3] - 25:16, 27:23, 63:23
**conduct** [8] - 8:11, 23:9, 25:3, 28:15, 28:25, 36:2, 46:1, 46:5, 46:23, 47:14
**confer** [1] - 16:11
**conference** [4] - 76:7, 76:13, 76:17, 76:21
**confident** [1] - 33:4
**confidential** [2] - 18:19, 63:2
**confirm** [1] - 54:25
**conflict** [1] - 32:2
**Congress** [3] - 38:8, 47:2, 75:18
**Congressional** [3] - 17:6, 17:7, 18:13
**congressional** [1] - 21:13
**conjunction** [1] - 51:18
**consent** [1] - 2:14
**consequences** [1] - 31:6
**constitute** [2] - 45:22, 46:10
**constitutes** [3] - 32:19, 50:11, 79:4
**Constitution** [3] - 1:23, 49:7, 79:11
**constitutional** [3] - 33:24, 48:17, 48:20
**contemporaneous** [1] - 9:2
**contest** [1] - 25:10
**context** [2] - 42:7,

68:6
**continue** [5] - 55:13, 55:23, 56:1, 56:7, 77:6
**continuing** [1] - 61:22
**contradict** [3] - 53:14, 57:7, 59:14
**contradicting** [2] - 58:2, 58:3
**contradiction** [2] - 74:3, 74:4
**contradictory** [1] - 57:9
**contrast** [1] - 74:6
**control** [8] - 62:12, 63:11, 64:7, 65:22, 65:24, 71:9, 72:14, 73:18
**conveniently** [1] - 59:20
**conviction** [1] - 24:7
**coordinate** [1] - 9:18
**coordinates** [2] - 9:6, 13:10
**copy** [3] - 18:6, 72:16, 73:6
**cordoned** [1] - 11:23
**correct** [8] - 4:2, 5:15, 5:17, 14:25, 15:18, 15:19, 54:4, 55:12
**correctly** [2] - 15:12, 16:2
**corrupt** [1] - 21:13
**corruptly** [8] - 20:10, 20:19, 20:20, 22:15, 22:16, 23:22, 24:3, 42:2
**cost** [1] - 75:12
**counsel** [5] - 2:5, 22:4, 27:9, 47:8, 55:24
**count** [1] - 37:15
**counter** [1] - 14:23
**counter-expert** [1] - 14:23
**counts** [3] - 2:24, 3:4, 37:14
**Counts** [1] - 41:11
**couple** [3] - 41:2, 53:13, 77:17
**course** [1] - 6:8
**court** [10] - 19:2, 19:4, 20:1, 20:3, 22:10, 36:23, 36:24, 47:10, 76:2, 78:11
**COURT** [103] - 1:1, 2:11, 2:15, 2:18, 4:7, 4:10, 4:22, 4:25, 5:8, 5:15, 5:24, 6:2, 7:6, 8:17, 8:25, 10:1,

11:8, 11:15, 11:22, 12:6, 12:12, 12:23, 13:3, 13:17, 13:19, 14:4, 14:13, 14:21, 15:1, 15:20, 15:24, 16:17, 17:23, 18:5, 18:22, 19:2, 19:15, 20:6, 21:21, 22:9, 23:11, 24:9, 24:20, 25:15, 26:17, 27:4, 27:25, 29:2, 29:23, 31:3, 31:23, 34:6, 34:19, 37:8, 40:6, 40:9, 40:18, 41:22, 42:22, 43:4, 43:21, 44:19, 44:22, 45:4, 47:13, 47:16, 47:18, 48:11, 50:19, 53:15, 53:19, 53:23, 54:7, 56:11, 58:4, 59:23, 62:13, 65:11, 65:23, 66:10, 67:6, 67:18, 67:21, 67:23, 69:12, 70:14, 70:16, 70:25, 71:3, 71:7, 71:12, 74:8, 75:21, 76:19, 76:22, 77:1, 77:3, 77:8, 77:23, 78:3, 78:6, 78:10, 79:1
**Court** [44] - 1:22, 1:22, 4:9, 5:13, 5:23, 6:10, 7:3, 7:10, 7:12, 7:20, 8:16, 17:16, 18:2, 19:13, 26:2, 26:14, 28:22, 31:12, 31:18, 33:7, 33:9, 33:19, 34:15, 35:22, 37:5, 37:10, 38:14, 43:3, 43:11, 43:14, 43:17, 46:12, 48:14, 49:8, 49:11, 49:19, 50:5, 50:22, 56:2, 57:9, 63:18, 68:13, 68:25, 79:10
**Court's** [3] - 16:16, 27:2, 52:12
**Courthouse** [1] - 1:23
**COURTROOM** [2] - 2:2, 78:11
**cover** [2] - 26:11, 46:17
**CRC** [2] - 1:22, 79:9
**create** [3] - 37:12, 40:1, 75:15
**created** [4] - 63:15, 63:25, 69:18, 73:12
**creates** [1] - 36:4
**crimes** [2] - 24:15, 52:10
**criminal** [1] - 62:16

**Criminal** [3] - 1:2, 1:13, 2:3
**criminalize** [1] - 8:7
**cross** [5] - 10:17, 10:20, 19:6, 53:10, 58:22
**cross-examination** [4] - 10:17, 10:20, 19:6, 53:10
**cross-examine** [1] - 58:22
**crossed** [1] - 45:13
**crowd** [2] - 20:15, 21:2
**CRR** [2] - 1:22, 79:9
**Cua** [1] - 41:9
**cut** [1] - 28:1
**cuts** [1] - 59:21

## D

**D.C** [3] - 1:5, 1:24, 79:11
**database** [14] - 54:5, 62:19, 63:15, 63:25, 64:5, 64:8, 64:17, 64:18, 64:19, 65:16, 69:18, 72:22, 73:17, 75:15
**databases** [2] - 71:6, 73:1
**date** [6] - 42:19, 42:20, 48:5, 56:3, 77:13, 77:21
**Dated** [1] - 79:7
**Daubert** [1] - 14:9
**days** [4] - 15:9, 41:10, 65:5, 76:10
**DC** [1] - 1:14
**dead** [1] - 74:11
**deadlines** [1] - 76:5
**deal** [4] - 17:3, 23:3, 25:19, 36:22
**dealing** [1] - 36:25
**dealt** [1] - 3:16
**decide** [8] - 18:2, 22:25, 42:16, 49:19, 67:14, 67:19, 71:18, 77:11
**decided** [1] - 67:16
**decision** [4] - 2:25, 4:1, 31:10
**decisions** [2] - 18:9, 26:4
**declarations** [1] - 71:12
**deeper** [1] - 57:13
**defend** [1] - 10:8
**DEFENDANT** [1] - 2:17

**defendant** [63] - 9:8, 9:22, 19:14, 19:25, 20:1, 20:14, 20:17, 20:19, 20:20, 20:21, 21:3, 21:7, 21:16, 22:1, 22:3, 23:9, 23:15, 24:18, 25:25, 27:12, 28:25, 30:5, 32:1, 32:12, 33:17, 34:10, 35:6, 35:13, 35:19, 36:2, 36:10, 36:13, 36:25, 37:4, 37:21, 37:22, 38:9, 38:16, 38:21, 39:9, 39:18, 40:20, 44:12, 44:17, 47:1, 49:1, 50:10, 52:13, 53:8, 55:20, 57:14, 58:11, 58:12, 58:22, 59:14, 61:14, 68:10, 70:1, 70:12, 72:25, 73:16, 75:13
**Defendant** [3] - 1:7, 1:15, 70:21
**defendant's** [16] - 11:6, 19:2, 19:9, 20:4, 20:6, 20:9, 23:6, 33:23, 35:24, 36:7, 38:4, 38:9, 43:19, 59:16, 64:23, 69:12
**defendants** [12] - 39:23, 51:10, 53:9, 62:21, 63:7, 63:8, 66:14, 71:24, 72:18, 73:13, 75:3, 75:19
**defense** [99] - 4:18, 5:2, 5:13, 5:18, 6:4, 6:21, 14:9, 14:15, 15:6, 15:23, 22:6, 22:15, 23:9, 23:21, 24:6, 24:14, 26:1, 26:4, 26:9, 27:9, 27:20, 28:8, 29:11, 29:15, 30:20, 31:8, 31:16, 31:25, 32:3, 32:4, 32:6, 32:9, 32:22, 32:24, 32:25, 33:5, 33:7, 33:8, 33:10, 33:13, 33:14, 33:19, 33:23, 34:14, 34:15, 34:20, 34:25, 37:17, 38:25, 42:24, 43:1, 43:2, 44:6, 47:8, 48:4, 48:6, 48:10, 48:22, 49:2, 49:13, 50:7, 50:12, 50:17, 51:25, 56:24, 57:8, 58:21, 58:24, 59:13, 60:16, 60:17,

61:2, 61:3, 61:5, 61:6, 61:12, 61:13, 61:19, 61:24, 62:5, 64:3, 66:5, 68:10, 68:15, 69:16, 69:21, 70:2, 70:4, 72:7, 72:11, 74:14, 75:15, 75:20
**defense's** [7] - 4:6, 11:11, 14:6, 34:13, 41:19, 59:11, 62:9
**defense-specific** [1] - 70:4
**defenses** [4] - 25:24, 29:21, 33:2, 33:17
**deficiency** [1] - 48:25
**define** [3] - 41:12, 45:25, 46:4
**defined** [3] - 8:12, 12:13, 30:2
**defining** [3] - 7:14, 28:23, 43:24
**definitely** [1] - 61:15
**definition** [6] - 35:16, 37:15, 41:20, 41:21, 44:3, 44:18
**definitions** [1] - 41:5
**Deloitte** [1] - 69:17
**deny** [1] - 55:1
**denying** [1] - 49:21
**department** [1] - 68:21
**Department** [1] - 68:22
**depicting** [1] - 50:16
**DEPUTY** [2] - 2:2, 78:11
**describe** [3] - 6:16, 47:5, 47:9
**described** [2] - 46:9, 50:9
**description** [1] - 23:18
**despite** [2] - 38:20, 61:19
**detail** [1] - 6:5
**details** [1] - 49:14
**detective** [1] - 74:13
**Detective** [1] - 74:17
**determine** [5] - 9:22, 16:21, 46:6, 51:3, 68:21
**determined** [2] - 35:18, 68:13
**developed** [2] - 15:7, 56:19
**different** [18] - 3:20, 6:21, 8:10, 21:9, 21:12, 24:4, 41:7, 41:8, 60:22, 60:23, 66:20, 68:7, 70:2, 74:20, 74:24, 74:25,

75:14
**difficult** [2] - 27:19, 59:1
**difficult-to-access** [1] - 59:1
**difficulty** [1] - 36:24
**digital** [5] - 66:12, 69:17, 70:7, 75:16, 76:21
**direct** [3] - 10:16, 54:14, 74:4
**directed** [1] - 37:20
**directing** [1] - 3:14
**directly** [4] - 9:12, 29:11, 47:20, 53:10
**disagree** [2] - 30:20, 44:18
**disagrees** [2] - 35:15, 67:23
**disclosure** [1] - 70:5
**discovered** [1] - 56:19
**discovery** [8] - 10:5, 45:8, 48:7, 48:9, 50:16, 50:21, 52:15, 68:17
**discreet** [2] - 25:17, 69:25
**discrete** [3] - 55:1, 55:4, 70:4
**discretion** [2] - 48:14, 49:21
**discretionary** [2] - 49:5, 49:18
**discuss** [7] - 7:25, 11:6, 24:17, 37:24, 38:5, 38:8, 77:23
**discussed** [7] - 25:18, 40:19, 42:7, 48:8, 65:18, 68:6, 76:6
**discussing** [6] - 6:11, 13:1, 14:1, 19:11, 39:4, 62:3
**discussion** [6] - 6:4, 24:5, 29:22, 33:18, 33:21, 38:3
**discussions** [1] - 45:8
**dismiss** [7] - 2:24, 24:25, 32:17, 41:6, 41:10, 46:14, 77:16
**dismissing** [1] - 31:12
**disorder** [10] - 35:8, 35:9, 35:10, 35:13, 35:14, 35:16, 35:17, 37:15, 39:15, 40:4
**disorderly** [1] - 21:10
**dispute** [2] - 16:4, 26:19
**dissent** [1] - 20:11
**DISTRICT** [3] - 1:1, 1:1, 1:9

district [1] - 44:9
**diving** [1] - 57:13
**Division** [1] - 1:13
**Docket** [8] - 4:17, 5:3, 31:25, 34:6, 41:13, 41:24, 42:7, 69:14
**document** [3] - 45:13, 65:2, 74:25
**documents** [8] - 64:11, 64:13, 64:16, 64:25, 69:17, 70:7, 71:1, 71:2
**DOJ** [1] - 51:18
**dollars** [1] - 75:13
**domain** [1] - 63:20
**done** [9] - 21:12, 33:3, 43:19, 56:1, 56:5, 56:22, 59:6, 62:24, 70:3
**door** [2] - 74:14
**doors** [1] - 60:8
**down** [10] - 20:14, 20:15, 22:2, 22:3, 26:21, 32:10, 32:20, 59:7, 64:22, 65:7
**due** [7] - 6:9, 15:20, 15:21, 15:22, 33:14, 38:15, 56:6
**Dunfee** [2] - 52:12, 70:21
**during** [6] - 6:8, 16:19, 31:16, 39:1, 55:15, 55:24

# E

**early** [1] - 54:15
**easier** [5] - 5:23, 15:7, 16:7, 22:24, 43:7
**easily** [5] - 35:22, 39:18, 59:2, 59:3, 63:7
**East** [3] - 59:13, 59:21, 59:24
**easy** [4] - 13:17, 13:19, 13:25, 75:2
**effect** [1] - 36:8
**effects** [1] - 36:17
**efficient** [2] - 3:22, 4:5
**eight** [1] - 76:10
**either** [12] - 3:19, 16:18, 28:8, 28:9, 28:13, 38:12, 38:21, 42:12, 55:23, 62:5, 67:6, 77:25
**element** [7] - 20:19, 21:24, 39:5, 39:7, 39:14, 39:19, 40:3
**elements** [6] - 21:15, 35:9, 39:11, 43:8,

43:16, 48:24
**elucidate** [1] - 75:23
**email** [1] - 57:21
**emotional** [4] - 36:4, 36:8, 36:12, 40:1
**encouraging** [2] - 52:6, 52:7
**end** [8] - 35:20, 40:25, 42:18, 43:15, 45:21, 49:18, 56:10, 66:21
**ending** [1] - 4:5
**enforcement** [7] - 28:11, 28:14, 51:8, 54:22, 65:6, 66:19
**engaged** [1] - 23:9
**engender** [1] - 31:8
**enjoy** [1] - 70:8
**enter** [1] - 21:11
**entering** [2] - 25:5, 73:24
**entire** [3] - 6:17, 7:1, 12:14
**entirely** [2] - 24:4, 49:17
**entirety** [1] - 10:13
**entitled** [4] - 14:10, 26:1, 33:13, 33:17
**entity** [1] - 75:7
**entrapment** [1] - 28:8
**entry** [5] - 8:3, 8:7, 8:8, 10:18, 23:21
**equal** [1] - 67:3
**equivalent** [1] - 68:1
**error** [1] - 19:1
**escorted** [1] - 13:21
**especially** [2] - 3:25, 6:8
**essentially** [1] - 69:23
**establish** [1] - 11:6
**estoppel** [2] - 28:8, 33:6
**et** [2] - 29:6, 69:13
**event** [2] - 43:14, 76:16
**evidence** [47] - 5:4, 5:22, 6:16, 9:15, 15:13, 15:17, 17:18, 17:22, 18:7, 18:9, 18:11, 18:14, 21:23, 27:11, 29:3, 29:10, 29:17, 30:1, 30:12, 31:5, 34:21, 35:10, 36:10, 38:20, 39:3, 39:7, 51:3, 52:17, 53:1, 53:4, 53:8, 58:6, 58:8, 62:5, 64:2, 64:22, 64:24, 69:13, 69:17, 70:20, 72:24, 73:7, 73:8, 73:22, 75:17, 77:19

**Evidence** [2] - 19:18, 30:1

**evidence.com** [3] - 69:16, 73:9

**exact** [8] - 6:7, 9:18, 9:24, 13:1, 13:10, 21:5, 46:20, 51:12

**exactly** [13] - 6:24, 14:25, 16:9, 23:12, 24:11, 32:11, 32:21, 38:7, 43:12, 45:4, 45:9, 50:10, 50:18

**examination** [4] - 10:17, 10:20, 19:6, 53:10

**examine** [2] - 16:21, 58:22

**example** [16] - 20:5, 20:10, 20:13, 21:10, 21:25, 23:14, 23:23, 35:7, 35:8, 39:4, 39:9, 43:6, 44:2, 46:2, 46:10, 70:21

**except** [1] - 3:2

**exception** [1] - 22:8

**exclude** [5] - 19:13, 34:20, 39:7, 39:12, 39:13

**excluded** [1] - 22:7

**exclusion** [1] - 7:21

**exclusive** [6] - 61:10, 62:12, 64:7, 65:22, 65:24, 72:14

**exculpatory** [6] - 52:25, 55:2, 55:5, 55:8, 58:1, 58:6

**excuse** [1] - 4:6

**exercising** [1] - 23:24

**exhibit** [7] - 15:18, 15:22, 15:25, 26:21, 35:2, 35:4, 56:6

**exhibits** [8] - 16:8, 17:2, 18:7, 34:24, 34:25, 35:1, 37:18

**exist** [1] - 62:12

**existence** [1] - 57:16

**expectation** [1] - 6:15

**expected** [2] - 60:25, 61:25

**expecting** [1] - 12:20

**expedition** [2] - 48:2, 69:1

**expert** [11] - 14:10, 14:13, 14:15, 14:17, 14:19, 14:23, 15:6, 26:7, 31:23, 66:6

**experts** [2] - 14:15, 71:12

**explain** [3] - 19:6, 36:11, 76:2

**explanation** [2] - 50:12, 63:3

**explore** [1] - 51:24

**extent** [5] - 15:16, 26:19, 30:3, 31:17, 33:5

**eye** [1] - 49:3

## F

**face** [2] - 58:16, 64:10

**Facebook** [1] - 71:23

**facial** [14] - 51:2, 51:13, 58:14, 59:7, 61:9, 62:21, 63:3, 63:8, 63:23, 63:24, 65:9, 66:5, 73:3, 74:21

**facially** [1] - 25:1

**fact** [15] - 10:9, 10:21, 12:10, 19:25, 22:3, 24:17, 28:14, 35:14, 36:6, 38:20, 47:1, 57:6, 65:13, 67:25, 68:8

**fact-finder** [1] - 36:6

**facts** [13] - 7:14, 10:6, 11:13, 12:20, 13:20, 18:3, 27:11, 28:23, 28:24, 36:7, 37:1, 71:17

**factual** [2] - 12:19, 13:1

**fair** [2] - 26:17, 36:13

**fairly** [1] - 35:25

**familiar** [2] - 2:20, 2:21

**family** [1] - 29:5

**family-oriented** [1] - 29:5

**far** [15] - 7:18, 14:20, 21:18, 26:20, 27:22, 39:3, 39:8, 48:16, 48:17, 48:25, 49:15, 52:23, 63:23, 64:24, 73:21

**favor** [2] - 36:6, 47:20

**FBI** [10] - 53:11, 53:16, 53:19, 53:23, 54:16, 54:23, 57:6, 58:2, 64:15, 73:25

**feature** [1] - 63:22

**Federal** [4] - 19:17, 30:1, 30:10, 30:16

**federal** [4] - 51:8, 63:5, 75:9

**felony** [3] - 21:13, 23:23, 44:15

**felt** [1] - 52:21

**few** [1] - 5:21

**figure** [5] - 13:12, 32:11, 32:15, 63:1, 68:19

**file** [14] - 14:10, 41:14, 46:8, 58:16, 61:21, 68:2, 73:16, 74:25, 75:23, 76:6, 76:25

**filed** [15] - 4:13, 4:14, 4:18, 4:24, 7:11, 25:12, 26:21, 27:15, 27:17, 28:2, 34:20, 34:24, 40:20, 43:10, 56:25

**files** [10] - 60:20, 60:22, 64:5, 64:6, 65:1, 65:3, 65:21, 69:2, 70:23

**filings** [1] - 69:21

**fill** [1] - 48:9

**final** [1] - 76:7

**finder** [1] - 36:6

**findings** [1] - 51:16

**fine** [1] - 5:20

**first** [17] - 2:20, 5:9, 7:7, 9:9, 15:16, 35:3, 35:12, 35:24, 36:1, 41:5, 41:13, 55:14, 59:17, 62:14, 68:8, 68:19, 73:2

**First** [10] - 23:5, 23:8, 23:13, 23:20, 23:24, 24:14, 24:24, 25:10, 25:17, 26:8

**Fischer** [1] - 42:4

**fishing** [2] - 48:2, 69:1

**fist** [2] - 73:24, 74:2

**fist-bumping** [1] - 74:2

**fit** [2] - 52:21, 74:23

**five** [2] - 41:13, 74:3

**fives** [1] - 52:8

**fiving** [1] - 73:24

**flag** [1] - 14:8

**focused** [1] - 59:16

**focusing** [1] - 67:24

**follow** [7] - 26:3, 28:5, 29:18, 30:13, 56:2, 60:1, 76:23

**follow-up** [2] - 56:2, 76:23

**following** [2] - 30:14, 30:23

**footage** [1] - 73:11

**FOR** [1] - 1:1

**forcibly** [2] - 41:20, 41:24

**foregoing** [1] - 79:4

**foresee** [3] - 29:10, 29:15, 29:21

**forgetting** [1] - 54:11

**forgot** [1] - 44:7

**format** [1] - 64:24

**forward** [4] - 9:10, 25:22, 27:3, 27:18

**foundation** [2] - 17:18, 17:24

**Friday** [2] - 50:23, 75:24

**FRIEDMAN** [1] - 1:8

**Friedman** [1] - 2:12

**Front** [3] - 59:13, 59:21, 59:24

**front** [2] - 8:18, 60:13

**full** [1] - 79:5

**fully** [1] - 17:20

**future** [3] - 9:2, 13:16, 72:19

## G

**gaps** [1] - 48:9

**genders** [1] - 65:6

**general** [7] - 3:25, 22:18, 29:3, 38:19, 39:15, 47:6, 48:16

**generalized** [5] - 9:4, 9:21, 27:10, 34:20

**generally** [1] - 2:21

**generated** [3] - 55:24, 56:8

**generous** [1] - 29:4

**Getty** [1] - 71:25

**given** [8] - 46:24, 46:25, 55:14, 59:2, 60:23, 61:5, 70:16

**Gordon** [2] - 1:18, 2:9

**govern** [1] - 30:11

**Government** [2] - 5:1, 14:2

**government** [142] - 2:8, 3:20, 4:11, 4:13, 4:14, 4:23, 4:24, 5:8, 5:19, 6:15, 7:20, 8:22, 8:23, 9:3, 10:11, 13:5, 14:14, 14:23, 15:4, 15:12, 17:4, 17:16, 19:4, 19:10, 20:11, 20:16, 20:22, 24:10, 26:23, 28:1, 28:21, 29:23, 30:14, 32:3, 32:10, 33:4, 33:15, 35:7, 36:6, 37:11, 38:11, 39:4, 39:8, 41:14, 42:10, 43:1, 43:20, 44:10, 44:13, 44:23, 45:12, 45:17, 45:24, 46:13, 46:17, 46:19, 46:25, 47:8, 47:9, 47:11, 47:21, 48:6,

50:5, 50:21, 51:2, 51:4, 51:10, 51:16, 51:22, 52:1, 52:14, 52:18, 53:3, 54:10, 54:25, 55:4, 55:13, 55:20, 56:7, 56:11, 57:11, 57:15, 57:16, 57:24, 58:5, 58:9, 58:19, 60:16, 60:20, 61:8, 61:10, 61:22, 62:1, 62:15, 62:18, 62:19, 63:6, 63:13, 64:1, 64:11, 64:12, 64:18, 64:19, 65:8, 66:13, 66:14, 66:17, 66:18, 67:11, 67:20, 68:2, 68:14, 68:18, 69:1, 69:5, 69:6, 69:9, 69:10, 69:23, 70:22, 71:8, 71:9, 71:11, 71:14, 71:16, 71:21, 72:16, 72:20, 72:21, 73:5, 73:6, 73:10, 73:14, 73:18, 73:21, 75:2, 75:9, 75:14, 76:25, 77:5

**government's** [23] - 4:25, 13:7, 16:8, 23:6, 29:3, 35:3, 37:8, 41:3, 42:18, 44:4, 46:3, 48:3, 49:24, 52:23, 58:22, 65:22, 67:1, 69:13, 71:20, 72:5, 72:6, 72:14

**grand** [3] - 56:20, 56:21, 70:5

**great** [3] - 41:9, 50:16, 63:10

**ground** [3] - 7:2, 71:25

**Grounds** [1] - 10:7

**grounds** [14] - 6:17, 7:1, 8:5, 8:13, 9:23, 10:15, 11:23, 11:25, 12:13, 22:23, 25:6, 25:10, 56:12, 68:24

**group** [10] - 51:18, 62:20, 62:25, 63:3, 63:6, 66:13, 66:16, 67:12, 72:21

**guess** [4] - 42:14, 49:2, 49:15, 65:24

**guidance** [1] - 4:1

**guilty** [2] - 24:15, 33:9

**gun** [1] - 66:8

**gunshot** [1] - 66:7

**guys** [2] - 60:5, 60:9

## H

**HAAG** [27] - 1:12, 5:10, 5:25, 6:3, 11:10, 11:17, 12:3, 12:9, 12:18, 12:25, 13:4, 14:3, 14:5, 14:14, 15:19, 15:21, 17:16, 18:21, 18:23, 19:8, 21:23, 23:7, 37:9, 40:7, 40:11, 76:23, 77:2
**Haag** [8] - 2:8, 11:8, 15:16, 21:21, 26:10, 30:17, 55:10, 76:14
**Haag's** [1] - 25:16
**hallway** [1] - 22:1
**hand** [2] - 36:25, 55:13
**handle** [1] - 45:2
**handling** [1] - 5:10
**hands** [1] - 20:14
**happy** [4] - 4:10, 42:20, 61:13
**harder** [1] - 13:25
**head** [1] - 30:25
**hear** [1] - 34:22
**heard** [3] - 2:24, 60:12, 75:7
**hearing** [3] - 76:1, 77:13, 78:12
**HEARING** [2] - 1:4, 1:8
**hearsay** [6] - 19:12, 19:23, 19:24, 19:25, 21:25, 22:6
**heart** [1] - 50:2
**heavily** [1] - 7:16
**HELD** [1] - 1:8
**help** [2] - 49:15, 53:6
**helpful** [2] - 17:20, 41:3
**helping** [2] - 34:12, 66:19
**hereby** [1] - 79:3
**high** [2] - 52:8, 73:24
**high-fiving** [1] - 73:24
**highlighted** [3] - 7:19, 8:16, 55:21
**highly** [1] - 36:1
**himself** [4] - 11:1, 19:14, 36:10, 75:14
**hiring** [1] - 66:6
**hit** [1] - 48:23
**hold** [1] - 17:1
**homicide** [1] - 74:15
**honestly** [2] - 33:21, 34:5
**honesty** [1] - 30:9
**Honor** [55] - 2:7, 2:9,

2:17, 3:24, 5:7, 5:10, 11:10, 12:9, 12:18, 13:1, 13:5, 14:9, 15:19, 17:16, 18:21, 18:25, 19:8, 23:7, 25:21, 26:11, 27:1, 31:11, 33:2, 34:8, 34:18, 37:9, 38:24, 39:3, 40:11, 40:13, 42:17, 46:17, 47:7, 47:22, 49:20, 49:24, 50:14, 54:4, 55:12, 56:23, 57:2, 59:9, 62:6, 65:12, 66:1, 66:21, 67:24, 68:3, 70:13, 71:19, 74:10, 76:12, 76:23, 77:4, 78:9
**HONORABLE** [1] - 1:8
**hope** [2] - 26:18, 77:22
**hoping** [1] - 17:21
**horse** [1] - 74:11
**hours** [3] - 15:8, 15:9, 75:23
**House** [1] - 38:12
**hunters** [7] - 51:1, 51:15, 72:21, 72:24, 73:3, 73:15, 75:9

## I

**idea** [6] - 16:15, 16:17, 38:19, 46:3, 46:10, 48:18, 48:21, 73:22
**identification** [1] - 73:4
**identified** [6] - 45:6, 51:17, 55:19, 56:17, 73:23, 74:23
**identifies** [1] - 73:15
**identify** [11] - 45:16, 46:13, 51:10, 53:6, 62:21, 63:7, 66:14, 72:25, 73:19, 75:3
**identity** [1] - 45:11
**ignorance** [1] - 30:19
**illegal** [1] - 28:15
**imagery** [1] - 74:5
**Images** [1] - 72:1
**immediately** [1] - 76:9
**impact** [2] - 36:8, 39:20
**impacted** [1] - 21:15
**impacts** [1] - 39:22
**impeachment** [1] - 59:18
**impede** [1] - 47:4
**impediment** [1] - 52:4
**impeding** [1] - 25:3

**important** [2] - 22:13, 22:14
**impossible** [2] - 59:6, 65:3, 75:13, 75:20
**IN** [1] - 1:1
**in-advance** [1] - 33:21
**inadmissible** [2] - 20:16, 21:19
**inapplicable** [2] - 28:17, 33:11
**inappropriate** [1] - 7:20
**inauguration** [1] - 10:19
**incident** [2] - 50:17, 67:11
**incidentally** [2] - 52:3, 57:10
**include** [3] - 35:19, 36:7, 39:17
**includes** [1] - 10:14, 36:2, 36:3
**including** [1] - 65:17
**incorrect** [1] - 70:15
**independent** [1] - 67:12
**indicate** [1] - 38:21
**indicated** [1] - 47:25
**indicted** [2] - 12:1, 12:7
**indictment** [15] - 3:4, 8:18, 32:14, 32:16, 32:17, 32:18, 45:6, 48:1, 48:19, 48:22, 49:6, 49:10, 49:14, 50:14, 53:20
**individual** [4] - 52:11, 52:15, 58:17, 73:12
**individuals** [13] - 38:5, 51:1, 51:4, 51:7, 51:9, 51:14, 51:17, 52:7, 52:8, 52:20, 63:20, 73:13, 73:24
**indulgence** [1] - 52:12
**informal** [1] - 45:8
**informants** [2] - 18:20, 68:24
**information** [13] - 6:13, 9:15, 56:12, 62:7, 63:4, 63:5, 68:16, 68:23, 69:3, 72:12, 72:22, 73:2, 74:14
**initial** [4] - 32:1, 40:1, 40:8, 55:16
**initials** [1] - 45:7
**injury** [3] - 32:13, 32:14, 41:13
**inside** [2] - 60:9, 60:10
**instead** [1] - 74:17

**instruct** [1] - 47:9
**instruction** [1] - 43:3
**instructions** [11] - 40:24, 42:20, 42:22, 43:1, 43:2, 43:5, 43:7, 43:11, 43:15, 43:22, 44:24
**insufficient** [1] - 48:22
**intend** [1] - 21:7
**intending** [1] - 24:2
**intent** [8] - 20:4, 20:18, 21:12, 22:14, 22:15, 34:10, 34:14, 69:13
**interacting** [3] - 52:15, 52:19, 53:9
**interaction** [2] - 38:3, 52:9
**interest** [2] - 20:17, 77:7
**interesting** [2] - 45:12, 57:12
**interfere** [1] - 47:4
**interference** [1] - 21:13
**internal** [2] - 60:24, 61:8
**internet** [13] - 61:6, 62:11, 65:17, 66:24, 67:2, 67:3, 67:25, 68:2, 72:4, 72:6, 72:12, 72:17, 74:12
**interpret** [1] - 37:16
**interrupt** [1] - 55:9
**Interruption** [1] - 63:18
**interview** [1] - 53:25
**interviewed** [6] - 53:12, 53:15, 53:19, 53:23, 54:16, 54:19
**interviewing** [1] - 50:25
**interviews** [3] - 51:7, 53:25, 54:20
**investigate** [1] - 52:24
**investigated** [1] - 52:19
**investigating** [1] - 75:1
**investigation** [4] - 52:22, 55:16, 55:25, 74:15
**investigations** [1] - 60:24
**investigative** [1] - 66:9
**investigator** [1] - 74:17
**involved** [1] - 25:8
**involvement** [1] -

28:18
**irrelevant** [1] - 69:24
**issue** [4] - 13:1, 13:3, 14:8, 16:1, 16:13, 16:14, 17:8, 17:15, 18:12, 20:3, 22:19, 23:4, 23:14, 23:15, 23:21, 23:22, 24:1, 27:19, 27:23, 30:18, 32:25, 34:2, 35:17, 35:23, 37:14, 40:6, 41:16, 41:23, 42:6, 43:11, 43:15, 45:10, 45:15, 57:1, 57:5, 67:7, 71:20, 72:5, 74:9, 77:20, 78:1
**issued** [2] - 3:12, 3:15, 44:9
**issues** [23] - 3:11, 3:14, 3:17, 3:21, 4:12, 5:1, 9:14, 12:19, 15:25, 16:23, 18:14, 19:23, 20:4, 20:9, 26:24, 28:22, 30:22, 40:21, 40:23, 42:9, 43:18, 49:1, 49:3
**item** [3] - 4:2, 16:20, 18:19
**items** [1] - 15:17
**itself** [11] - 8:1, 9:12, 10:24, 11:2, 11:21, 13:13, 20:22, 45:25, 47:10, 52:2, 62:9

## J

**January** [35] - 3:15, 5:4, 6:18, 9:10, 12:22, 17:21, 18:1, 23:10, 25:23, 27:7, 27:8, 34:21, 35:5, 35:11, 37:6, 37:11, 38:6, 38:20, 39:21, 51:11, 51:17, 53:3, 57:14, 57:17, 62:21, 65:19, 67:5, 67:10, 68:6, 68:15, 68:25, 69:5, 69:7, 69:16, 69:18
**Jencks** [14] - 54:12, 54:13, 54:14, 55:7, 56:3, 56:4, 56:7, 56:8, 56:13, 56:15, 56:16, 56:19, 57:3, 70:5
**jostles** [1] - 60:14
**journalists** [1] - 15:15
**judge** [4] - 18:10, 31:9, 31:10, 48:12

**JUDGE** [2] - 1:8, 1:9
**Judge** [28] - 2:12, 4:9, 4:21, 4:23, 5:6, 5:17, 7:5, 13:6, 25:9, 28:18, 30:22, 32:7, 33:1, 33:12, 34:23, 40:16, 41:8, 43:6, 44:6, 44:7, 47:14, 47:19, 56:25, 62:14, 63:17, 67:9, 72:15, 77:18
**judge's** [1] - 44:7
**judges** [6] - 17:11, 25:3, 28:5, 42:3, 42:25, 44:9
**judicial** [3] - 17:5, 17:14, 17:17
**juggle** [1] - 15:2
**jury** [16] - 15:1, 15:8, 17:13, 22:21, 28:1, 28:4, 31:9, 31:10, 31:15, 40:24, 42:19, 42:22, 42:23, 56:20, 56:21, 70:5
**Justice** [1] - 68:22
**justice** [1] - 77:7

### K

**keep** [5] - 5:20, 38:10, 71:21, 74:1
**kept** [1] - 73:14
**kind** [12] - 6:22, 8:1, 9:4, 17:18, 17:22, 25:19, 27:25, 37:14, 38:13, 65:4, 78:1
**kinds** [3] - 8:9, 36:22, 65:7
**knowing** [2] - 22:15, 27:8
**knowledge** [1] - 10:2
**knows** [1] - 43:17

### L

**label** [1] - 53:3
**lack** [2] - 34:10, 34:14
**laid** [1] - 48:12
**language** [7] - 7:9, 7:19, 7:21, 8:2, 8:15, 9:25, 46:5
**large** [2] - 7:24, 10:15
**last** [5] - 3:12, 15:6, 37:9, 38:24, 76:1
**late** [1] - 15:2
**late-appearing** [1] - 15:2
**LAW** [1] - 41:19
**law** [27] - 7:14, 7:15, 11:14, 11:15, 18:2,

26:3, 28:5, 28:11, 28:14, 28:23, 28:24, 30:3, 30:6, 30:16, 30:19, 48:23, 49:10, 49:23, 51:7, 51:8, 51:23, 53:5, 54:22, 63:11, 65:6, 66:19, 71:18
**Law** [1] - 1:16
**lawful** [1] - 24:1
**laws** [1] - 17:24
**lawyers** [2] - 31:8, 69:16
**lay** [3] - 17:18, 17:24, 47:11
**least** [8] - 3:3, 3:21, 18:5, 19:20, 23:25, 26:20, 30:21, 76:1
**LEDERER** [34] - 1:12, 2:7, 3:24, 5:7, 18:25, 25:21, 27:1, 31:11, 33:2, 34:8, 42:17, 42:24, 46:17, 47:15, 47:17, 47:22, 49:20, 50:14, 54:4, 55:12, 56:23, 57:2, 59:9, 59:24, 65:12, 66:1, 66:21, 67:24, 71:19, 74:10, 75:4, 76:12, 77:4, 78:9
**lederer** [1] - 30:17
**Lederer** [6] - 2:8, 18:23, 31:4, 55:10, 57:21, 65:11
**left** [1] - 19:1
**legal** [6] - 20:2, 20:9, 26:16, 28:22, 48:12, 51:24
**legislative** [1] - 68:22
**length** [1] - 41:10
**liability** [1] - 30:24
**light** [2] - 12:7
**likelihood** [1] - 43:21
**limine** [21] - 3:10, 3:11, 3:18, 3:25, 4:6, 4:13, 4:15, 5:3, 5:11, 6:1, 6:3, 6:10, 7:21, 12:24, 14:3, 22:20, 26:19, 34:4, 34:20, 40:9, 42:8
**limit** [2] - 6:23, 13:7
**limitations** [1] - 19:25
**limited** [2] - 55:1, 55:4
**limiting** [4] - 11:17, 12:10, 33:22, 34:13
**line** [1] - 60:6
**links** [1] - 65:15
**list** [15] - 4:2, 15:11, 15:18, 15:23, 26:21, 42:18, 46:24, 50:6,

56:2, 56:6, 56:14, 58:18, 58:19
**listing** [2] - 3:13, 17:4
**lists** [2] - 47:3, 58:10
**literally** [2] - 50:9, 62:24
**location** [4] - 6:7, 6:19, 13:8, 23:18
**locations** [3] - 5:12, 5:17, 5:20
**longitudinal** [1] - 9:6
**look** [19] - 10:9, 17:10, 17:12, 18:8, 18:10, 33:16, 36:14, 36:21, 47:8, 54:8, 58:6, 61:15, 62:6, 62:10, 62:11, 65:19, 70:6, 70:10, 70:11
**Look** [1] - 33:13
**looked** [3] - 3:21, 16:9, 51:22
**looking** [10] - 9:5, 12:9, 46:2, 46:6, 46:7, 47:10, 61:2, 61:3, 61:4, 62:9
**looks** [1] - 58:14
**lost** [1] - 63:21

### M

**main** [4] - 47:13, 71:20, 72:5, 72:12
**major** [1] - 72:2
**majority** [3] - 16:10, 25:21, 26:10
**man** [2] - 23:23, 68:8
**map** [1] - 9:19
**MARINA** [1] - 1:15
**Marina** [1] - 2:13
**marked** [1] - 20:22
**material** [11] - 6:11, 54:13, 54:14, 55:1, 55:2, 55:4, 56:15, 60:4, 62:1, 71:20
**matter** [6] - 21:4, 21:18, 22:11, 48:23, 69:24, 76:4
**matters** [1] - 3:7
**McCormick** [1] - 30:7
**mean** [16] - 9:9, 15:1, 16:2, 17:8, 17:9, 21:24, 22:19, 24:12, 25:5, 35:15, 36:9, 40:23, 41:5, 42:11, 47:18, 58:25
**meaning** [2] - 57:14, 63:25
**means** [3] - 24:14, 41:24, 45:14
**media** [1] - 62:10

**MEDVIN** [65] - 1:15, 2:12, 4:8, 4:21, 4:23, 5:6, 5:17, 7:5, 7:7, 8:21, 9:1, 10:9, 13:6, 13:18, 14:16, 14:24, 16:7, 17:24, 19:22, 20:8, 23:12, 24:10, 25:9, 27:17, 28:17, 29:9, 30:22, 32:7, 33:12, 34:23, 39:3, 40:13, 43:5, 43:23, 44:20, 45:2, 45:11, 48:12, 50:8, 50:20, 53:16, 53:22, 54:3, 54:5, 56:25, 57:5, 58:7, 62:14, 63:19, 67:9, 67:20, 67:22, 70:13, 70:15, 70:18, 71:2, 71:5, 71:11, 72:15, 74:19, 75:7, 76:20, 77:12, 78:2, 78:5
**medvin** [1] - 65:20
**Medvin** [37] - 1:16, 2:13, 2:15, 3:19, 4:2, 4:7, 4:18, 5:15, 15:24, 16:3, 16:25, 17:23, 19:21, 26:6, 26:12, 27:5, 27:15, 28:7, 28:16, 29:8, 32:5, 34:22, 41:11, 48:11, 50:2, 55:16, 55:18, 55:21, 60:3, 62:3, 65:14, 65:17, 67:1, 71:21, 72:3, 72:13, 74:11
**meet** [2] - 27:20, 37:24
**meeting** [1] - 43:13
**Meghan** [1] - 41:16
**memo** [1] - 35:22
**memoranda** [1] - 53:25
**mens** [13] - 20:4, 20:9, 20:10, 21:6, 21:9, 21:17, 22:14, 22:16, 23:15, 23:22, 24:13, 46:22
**mention** [1] - 18:12
**mentioned** [1] - 76:24
**mentions** [1] - 51:13
**met** [2] - 43:8, 49:22
**Michael** [2] - 1:18, 2:9
**Microsoft** [1] - 74:25
**mid** [1] - 26:13
**mid-trial** [1] - 26:13
**midday** [1] - 75:24
**middle** [2] - 14:11, 14:19
**might** [19] - 16:15, 18:12, 18:25, 26:6,

26:7, 29:13, 29:14, 33:16, 37:20, 41:14, 41:17, 42:10, 62:11, 64:2, 69:24, 74:16, 76:13, 76:17, 77:20
**Mike** [7] - 10:18, 10:21, 11:1, 39:4, 39:9, 44:5, 44:11
**million** [5] - 58:8, 66:12, 70:7, 71:3, 75:16
**millions** [1] - 75:12
**mind** [5] - 22:12, 22:13, 22:18, 24:8, 25:14
**minimum** [1] - 48:23
**minute** [3] - 4:20, 15:6, 54:11
**misdemeanor** [1] - 44:16
**misdemeanors** [3] - 43:25, 44:2, 44:14
**missed** [1] - 20:7
**missing** [1] - 76:17
**moment** [5] - 18:17, 29:16, 32:20, 40:14, 55:9
**monitor** [1] - 56:7
**montage** [6] - 35:4, 35:20, 37:18, 39:19, 39:20, 39:25
**months** [1] - 77:13
**morning** [8] - 2:2, 2:7, 2:12, 2:15, 2:17, 42:7, 52:14, 57:21
**morning's** [1] - 3:8
**Moss** [1] - 41:8
**most** [8] - 3:22, 6:17, 14:7, 22:5, 35:1, 47:20, 58:25, 63:16
**mostly** [2] - 73:9, 73:10
**Mostofsky** [5] - 47:10, 47:15, 47:23, 50:1, 50:5
**MOTION** [2] - 1:4, 1:8
**Motion** [1] - 14:2
**motion** [47] - 3:25, 4:5, 4:6, 4:13, 4:15, 4:19, 4:25, 5:2, 5:3, 5:14, 5:25, 6:3, 6:10, 7:4, 7:21, 12:24, 13:7, 14:3, 14:9, 15:12, 18:19, 20:12, 22:19, 23:4, 25:11, 25:22, 29:2, 31:25, 33:13, 34:7, 34:20, 37:17, 38:9, 39:6, 40:9, 42:14, 46:14, 46:18, 47:1, 50:20,

50:21, 62:6, 62:9, 71:4, 71:5, 77:15
**motions** [25] - 2:19, 2:23, 3:10, 3:11, 3:17, 4:15, 5:3, 5:11, 14:7, 24:25, 26:19, 27:17, 40:18, 41:6, 41:10, 42:8, 44:25, 45:20, 46:9, 46:11, 49:16, 56:25, 77:7, 77:10, 77:14
**motorcade** [2] - 10:23, 11:3
**move** [6] - 9:10, 14:1, 33:2, 40:10, 40:18, 44:25
**movement** [1] - 72:9
**MR** [26] - 5:10, 5:25, 6:3, 11:10, 11:17, 12:3, 12:9, 12:18, 12:25, 13:4, 14:3, 14:5, 14:14, 15:19, 15:21, 17:16, 18:21, 18:23, 19:8, 21:23, 23:7, 37:9, 40:7, 40:11, 76:23, 77:2
**MS** [97] - 2:7, 2:12, 3:24, 4:8, 4:21, 4:23, 5:6, 5:7, 5:17, 7:5, 7:7, 8:21, 9:1, 10:9, 13:6, 13:18, 14:16, 14:24, 16:7, 17:24, 18:25, 19:22, 20:8, 23:12, 24:10, 25:9, 25:21, 27:1, 27:17, 28:17, 29:9, 30:22, 31:11, 32:7, 33:2, 33:12, 34:8, 34:23, 39:3, 40:13, 42:17, 42:24, 43:5, 43:23, 44:20, 45:2, 45:11, 46:17, 47:15, 47:17, 47:22, 48:12, 49:20, 50:8, 50:14, 50:20, 53:16, 53:22, 54:3, 54:4, 54:5, 55:12, 56:23, 56:25, 57:2, 57:5, 58:7, 59:9, 59:24, 62:14, 63:19, 65:12, 66:1, 66:21, 67:9, 67:20, 67:22, 67:24, 70:13, 70:15, 70:18, 71:2, 71:5, 71:11, 71:19, 72:15, 74:10, 74:19, 75:4, 75:7, 76:12, 76:20, 77:4, 77:12, 78:2, 78:5, 78:9
**multimedia** [1] - 15:13
**multiple** [3] - 26:12,

34:9, 63:1
**must** [5] - 6:25, 11:12, 11:20, 43:20, 47:1

## N

**N.W** [1] - 79:11
**name** [14] - 44:7, 45:9, 45:12, 45:14, 45:18, 45:19, 45:20, 46:24, 52:12, 64:23, 68:12, 70:21
**named** [1] - 53:20
**names** [1] - 62:4
**narrow** [5] - 26:18, 32:10, 59:7, 64:22, 65:7
**national** [1] - 12:4
**nature** [4] - 6:5, 28:22, 38:3, 48:17
**nauseam** [1] - 42:3
**necessarily** [5] - 3:9, 37:20, 38:16, 59:14, 72:8
**necessitated** [1] - 14:20
**necessities** [1] - 48:4
**necessity** [1] - 46:13
**need** [24] - 3:1, 11:5, 13:22, 17:14, 17:18, 18:6, 27:2, 33:24, 33:25, 37:6, 37:24, 38:5, 38:7, 40:22, 42:16, 42:22, 60:9, 64:2, 66:2, 71:10, 71:13, 71:14, 76:3
**needed** [2] - 42:19, 48:4
**needs** [3] - 26:7, 46:20, 47:5
**never** [2] - 34:13, 67:10
**new** [3] - 50:22, 51:23, 51:24
**news** [1] - 72:2
**next** [10] - 15:22, 17:4, 18:19, 23:4, 27:4, 29:2, 30:19, 34:19, 45:2, 75:23
**Nichols** [1] - 43:6
**night** [1] - 66:11
**none** [5] - 25:7, 35:5, 36:17, 36:18
**nonetheless** [1] - 23:18
**nonparticularized** [2] - 5:4, 34:21
**nonpublic** [1] - 25:6
**normal** [1] - 56:22
**normally** [2] - 40:23,

57:3
**northern** [1] - 10:22
**note** [1] - 40:14
**notebook** [1] - 54:24
**noted** [3] - 35:21, 38:10, 38:25
**notes** [5] - 54:18, 54:20, 54:23, 55:17, 79:5
**nothing** [10] - 12:4, 12:10, 40:17, 51:23, 57:19, 59:2, 59:6, 61:10, 74:22, 76:20
**notice** [14] - 7:13, 14:10, 17:5, 17:14, 17:17, 26:3, 26:14, 31:18, 33:7, 34:15, 38:2, 48:4, 50:17, 69:13
**notifying** [1] - 49:1
**November** [1] - 77:21
**nullification** [4] - 28:2, 28:4, 31:13, 31:21
**number** [12] - 2:19, 3:17, 6:4, 7:14, 19:23, 39:16, 41:12, 44:11, 48:13, 51:5
**NW** [2] - 1:14, 1:23

## O

**object** [3] - 33:16, 34:15, 76:20
**objecting** [1] - 31:18, 33:8, 56:12
**objection** [1] - 77:16
**objections** [2] - 15:21, 22:22
**obligation** [8] - 37:12, 56:18, 62:15, 68:18, 68:20, 69:2, 69:11, 72:6
**obligations** [4] - 61:24, 62:2, 65:21, 68:6
**observable** [1] - 39:18
**observing** [1] - 2:10
**obstruct** [1] - 47:2
**obstructed** [1] - 38:8
**obstruction** [2] - 38:7, 38:13
**obtain** [1] - 45:14
**obtained** [1] - 39:17
**obviously** [4] - 31:12, 61:13, 76:14, 77:10
**occasions** [1] - 2:23
**October** [7] - 1:6, 76:7, 76:15, 77:25, 78:7, 79:7
**OF** [4] - 1:1, 1:2, 1:8,

79:1
**offenders** [1] - 36:18
**offense** [7] - 21:15, 30:24, 39:11, 39:14, 39:20, 40:3, 45:22
**offenses** [1] - 21:8
**offer** [2] - 19:19, 30:12
**offered** [4] - 15:17, 18:15, 22:2, 22:10
**offering** [1] - 30:1
**offers** [1] - 19:14
**Office** [1] - 1:13
**officer** [29] - 45:6, 45:9, 45:11, 45:18, 45:20, 52:3, 52:9, 52:16, 52:19, 52:24, 53:8, 53:17, 55:19, 55:25, 59:8, 59:16, 59:19, 60:4, 60:7, 60:15, 64:14, 67:2, 68:9, 68:12, 68:19, 72:8, 72:9, 72:10, 73:23
**Officer** [12] - 53:17, 54:6, 55:14, 57:22, 57:25, 58:1, 59:12, 59:25, 60:23, 61:16, 69:11, 72:5
**officer's** [2] - 46:24, 59:15
**officers** [15] - 16:3, 16:4, 21:2, 28:12, 36:3, 36:21, 36:23, 37:19, 38:6, 39:21, 39:22, 39:23, 51:8, 51:20, 52:6
**OFFICIAL** [1] - 79:1
**official** [1] - 28:13
**Official** [1] - 1:22, 79:10
**omnibus** [16] - 4:19, 4:21, 4:25, 5:25, 14:3, 15:11, 18:19, 23:4, 25:22, 26:10, 29:2, 31:24, 33:12, 33:13, 34:6, 34:9
**once** [2] - 62:15, 73:8
**one** [55] - 3:8, 3:9, 4:15, 4:16, 6:12, 7:14, 7:18, 8:11, 10:22, 14:1, 14:8, 14:18, 15:3, 19:19, 19:23, 20:13, 20:25, 21:1, 21:10, 21:11, 25:15, 26:1, 26:20, 27:9, 27:25, 29:2, 29:21, 30:23, 35:9, 38:9, 38:24, 39:5, 39:7, 39:11, 39:14, 39:16, 40:13, 41:16,

42:4, 44:9, 44:11, 44:21, 44:25, 46:23, 48:13, 49:17, 50:4, 50:10, 51:5, 52:13, 55:7, 57:14, 62:25, 74:16, 76:23
**ones** [2] - 48:18, 65:5
**ongoing** [1] - 56:18
**open** [13] - 43:17, 60:18, 61:1, 61:18, 61:21, 65:13, 65:14, 66:23, 69:7, 71:22, 73:6, 73:7
**open-source** [6] - 60:18, 61:1, 61:18, 61:21, 65:14, 69:7
**opening** [1] - 42:12
**operates** [1] - 54:11
**opinion** [7] - 3:15, 22:19, 42:4, 44:10, 47:14, 47:19, 49:8
**opinions** [2] - 17:11, 18:3
**opponent** [1] - 19:17
**opponents** [1] - 19:10
**oppose** [2] - 5:19, 6:4
**opposed** [1] - 75:9
**opposing** [1] - 7:12
**oral** [1] - 2:22
**order** [10] - 3:9, 3:12, 3:23, 4:8, 30:9, 35:10, 37:24, 58:6, 59:2, 75:25
**ordered** [1] - 49:11
**oriented** [1] - 29:5
**original** [1] - 55:18
**otherwise** [5] - 11:24, 18:16, 48:19, 49:7, 49:14
**ought** [1] - 56:13
**ourselves** [2] - 25:22, 27:3
**out-of-court** [5] - 19:2, 19:4, 20:1, 20:3, 22:10
**outer** [1] - 11:2
**outline** [1] - 46:19
**outlined** [1] - 47:1
**outset** [1] - 39:1
**outside** [3] - 18:1, 51:18, 60:8
**outstanding** [1] - 77:7
**overall** [6] - 8:3, 20:22, 23:14, 36:19, 36:24, 39:20
**override** [1] - 19:12
**overrun** [3] - 59:22, 59:24, 60:6
**owe** [1] - 2:25
**own** [5] - 19:9, 43:11,

54:23, 59:5, 75:10

# P

**p.m** [1] - 78:12
**package** [1] - 5:3
**page** [1] - 68:11
**pages** [3] - 41:12, 41:13, 41:25
**papers** [1] - 2:20
**parading** [2] - 44:20
**part** [16] - 5:3, 13:17, 13:19, 13:25, 22:13, 22:14, 22:15, 28:19, 39:22, 39:24, 57:3, 70:11, 70:12, 76:1
**particular** [17] - 5:18, 8:2, 8:4, 8:10, 9:6, 14:8, 16:14, 16:20, 21:24, 23:17, 29:21, 35:6, 36:11, 36:25, 48:15, 49:8, 57:15
**particularist** [1] - 49:2
**particularity** [1] - 32:18
**particularization** [1] - 35:3
**particularize** [1] - 37:3
**particularly** [3] - 6:12, 8:12, 27:8
**particulars** [24] - 3:2, 3:6, 3:8, 3:9, 3:14, 4:4, 45:1, 45:2, 45:5, 46:15, 46:18, 46:19, 48:1, 48:14, 48:15, 48:18, 48:21, 49:3, 49:5, 49:11, 49:13, 49:17, 49:22, 68:5
**parties** [16] - 7:23, 15:15, 16:5, 16:10, 16:15, 17:15, 18:3, 33:19, 34:5, 37:5, 37:10, 43:7, 43:12, 44:24, 49:15, 75:25
**partly** [2] - 55:11
**parts** [3] - 17:6, 70:2, 76:2
**party** [3] - 7:12, 19:10, 19:17
**passed** [1] - 50:16
**passing** [1] - 66:11
**past** [3] - 8:22, 9:4, 67:17
**pasting** [1] - 28:1
**PAUL** [1] - 1:8
**PDF** [3] - 58:16, 65:13, 74:24
**peace** [1] - 30:9
**penalize** [1] - 8:3
**penalties** [3] - 31:6,

31:14, 31:22
**Pence** [13] - 6:8, 9:8, 10:21, 10:23, 11:1, 13:8, 13:20, 13:21, 38:15, 39:4, 39:9, 44:5, 44:11
**Pence's** [1] - 10:18
**pending** [1] - 77:14
**people** [15] - 22:2, 22:3, 36:4, 36:14, 36:15, 36:17, 52:9, 54:17, 62:24, 71:9, 71:15, 71:24, 74:1, 74:2, 74:16
**perhaps** [2] - 16:1, 42:11
**perimeter** [1] - 44:11
**permissible** [1] - 31:9
**permitting** [1] - 31:13
**person** [1] - 53:20
**pertinent** [1] - 30:2
**photo** [2] - 64:6, 65:1
**photographs** [1] - 72:4
**physically** [1] - 13:14
**pick** [2] - 53:2, 59:14
**piece** [1] - 55:7
**piecemeal** [2] - 56:5, 59:10
**pieces** [7] - 15:13, 53:7, 58:8, 64:2, 72:23, 73:7, 75:16
**Pierce** [1] - 27:9
**pivot** [1] - 33:5
**place** [6] - 13:14, 32:8, 35:14, 52:5, 62:16, 72:10
**Plaintiff** [1] - 1:3, 1:12
**plan** [2] - 11:1, 52:24
**planning** [1] - 13:16
**play** [2] - 17:21, 49:21
**playing** [1] - 38:13
**PLC** [1] - 1:16
**pleading** [1] - 27:19
**plethora** [1] - 69:7
**point** [11] - 23:3, 32:8, 33:25, 37:9, 38:9, 42:11, 54:19, 55:3, 59:21, 62:5, 74:10
**pointed** [2] - 26:11, 26:12
**pointing** [1] - 9:19
**points** [3] - 58:15, 58:16, 63:5
**police** [5] - 36:21, 38:6, 39:21, 39:22, 53:17
**Police** [4] - 53:18, 68:9, 68:16, 68:21
**Politico** [1] - 50:23,

50:24
**portion** [9] - 5:11, 8:4, 10:15, 10:22, 11:2, 20:13, 22:1, 55:18
**portions** [3] - 16:23, 16:24, 18:13
**position** [6] - 11:11, 19:21, 23:6, 31:14, 43:20, 44:4
**positive** [1] - 77:14
**possess** [1] - 63:3
**possession** [5] - 53:2, 58:22, 62:19, 62:20, 69:9, 73:18
**possible** [3] - 29:12, 59:1, 76:3
**possibly** [1] - 55:8
**post** [1] - 42:16
**post-trial** [1] - 42:16
**posted** [6] - 11:22, 11:23, 63:20, 71:23, 72:17
**potential** [3] - 14:15, 68:24, 76:24
**potentially** [1] - 33:22
**practice** [1] - 56:22
**precedence** [1] - 67:15
**precise** [2] - 10:2, 12:16
**precisely** [1] - 24:21
**preclude** [3] - 24:11, 24:12, 32:3
**precludes** [1] - 24:6
**preference** [2] - 4:7, 4:8
**prejudice** [2] - 38:25, 40:1
**prejudiced** [2] - 15:3, 15:4
**prejudicial** [1] - 36:1
**preliminary** [4] - 2:19, 36:5, 46:8, 46:11
**premature** [2] - 14:7, 29:19
**prep** [1] - 55:24
**preparations** [1] - 49:13
**prepare** [2] - 14:22, 56:7
**prepared** [3] - 15:5, 54:17, 77:21
**presence** [5] - 9:2, 9:4, 11:6
**Present** [1] - 1:18
**present** [3] - 10:7, 13:14, 35:18
**preserve** [3] - 37:12, 62:15, 72:18
**preserved** [2] - 64:3,

72:20
**President** [18] - 6:8, 8:6, 8:14, 8:19, 9:8, 9:11, 9:24, 10:13, 10:23, 12:21, 13:8, 13:20, 13:21, 28:10, 28:13, 28:18, 38:15, 44:5
**press** [1] - 74:22
**presumably** [4] - 10:5, 53:4, 53:24, 54:18
**pretrial** [5] - 16:19, 49:16, 76:7, 76:13, 76:17
**preview** [1] - 48:3
**previous** [1] - 9:10
**previously** [2] - 10:17, 32:12
**primarily** [4] - 14:5, 14:6, 23:8, 51:16
**primary** [2] - 51:9, 54:23
**Prince** [1] - 1:16
**principles** [1] - 22:18
**privacy** [1] - 45:8
**private** [3] - 63:6, 66:13, 75:7
**problem** [3] - 12:24, 16:22, 77:21
**problems** [1] - 33:24
**proceed** [7] - 2:14, 3:22, 3:23, 4:10, 5:22, 34:1, 49:2
**proceedings** [2] - 21:14, 79:6
**process** [1] - 33:14
**produced** [3] - 34:25, 57:3, 75:5
**product** [1] - 62:23
**production** [1] - 68:17
**products** [1] - 61:7
**proffered** [2] - 17:1, 27:11
**program** [3] - 58:13, 58:14, 61:8
**programs** [1] - 51:3
**prohibit** [2] - 24:23, 25:3
**prong** [1] - 38:25
**proof** [4] - 7:18, 43:8, 43:16, 75:11
**properly** [1] - 58:21
**prosecution** [4] - 27:4, 27:10, 27:13
**prosecutor** [1] - 57:15
**protect** [4] - 25:22, 27:2, 27:3, 45:7
**protected** [1] - 24:23
**protest** [1] - 23:17
**protesting** [6] - 20:25,

23:15, 23:16, 23:23, 24:19, 34:12
**prove** [8] - 9:3, 33:4, 43:20, 44:4, 44:10, 44:13, 50:6, 71:7
**proven** [1] - 44:3
**provide** [13] - 42:20, 43:1, 51:4, 55:23, 56:4, 57:3, 57:11, 57:25, 58:17, 66:2, 68:20, 69:2, 70:23
**provided** [24] - 15:22, 43:2, 48:8, 52:14, 54:1, 55:2, 55:16, 55:17, 55:22, 56:23, 57:18, 57:19, 57:20, 59:13, 60:18, 62:1, 65:14, 67:5, 68:14, 69:5, 69:6, 69:23, 70:4, 70:20
**provides** [2] - 36:19, 46:21
**providing** [1] - 52:17
**provoked** [1] - 32:2
**proximity** [1] - 68:9
**public** [10] - 9:13, 10:2, 25:6, 28:8, 51:6, 63:15, 63:17, 63:20, 65:18, 68:2
**publication** [1] - 72:2
**publicly** [1] - 67:13
**published** [1] - 62:7
**pull** [1] - 66:8
**pulled** [1] - 55:4
**punishing** [1] - 8:11
**purposes** [4] - 8:22, 21:6, 21:17, 71:16
**pursue** [1] - 7:20
**put** [7] - 6:15, 7:12, 26:2, 26:14, 27:18, 31:14, 48:4
**puts** [3] - 20:14, 50:17
**putting** [3] - 31:17, 33:7, 34:14

# Q

**question-by-question** [1] - 25:20
**questions** [3] - 22:22, 22:23, 25:8
**quick** [1] - 4:4
**quickest** [1] - 4:2
**Quiet** [1] - 20:15
**quiet** [5] - 20:15, 21:1, 22:2, 22:3
**quite** [6] - 5:21, 17:8, 23:5, 33:21, 34:5, 62:14
**quote** [2] - 16:19,

53:24
**quote-unquote** [1] - 53:24
**quoted** [2] - 47:23

## R

**raise** [10] - 23:13, 25:9, 25:15, 30:22, 33:10, 33:17, 39:2, 40:14, 77:5, 77:24
**raised** [10] - 3:11, 3:17, 18:22, 25:18, 26:23, 27:21, 28:7, 28:9, 32:25, 34:16
**raises** [3] - 5:1, 28:12, 40:21
**raising** [7] - 4:19, 27:5, 27:9, 27:20, 28:16, 32:5, 77:3
**rather** [3] - 41:1, 41:17, 42:11
**rea** [13] - 20:4, 20:9, 20:10, 21:6, 21:9, 21:17, 22:14, 22:16, 23:15, 23:22, 24:13, 46:22, 46:23
**reaction** [4] - 36:4, 36:12, 37:21, 40:1
**reactions** [1] - 38:6
**read** [10] - 2:20, 27:14, 37:17, 41:6, 47:18, 47:19, 47:24, 63:1, 76:3
**readily** [1] - 59:3
**reading** [3] - 6:21, 7:16, 16:2
**real** [2] - 17:15, 66:25
**really** [9] - 6:23, 7:13, 27:19, 36:22, 39:1, 39:2, 44:14, 67:15, 70:6
**reason** [4] - 6:19, 7:11, 70:24, 76:8
**reasons** [2] - 7:3, 8:9
**REBEKAH** [1] - 1:12
**Rebekah** [1] - 2:7
**recap** [1] - 59:11
**receive** [1] - 45:16
**received** [2] - 16:8, 57:1
**recitation** [1] - 59:10
**recitations** [1] - 45:24
**recognition** [14] - 51:2, 51:14, 58:14, 59:7, 61:9, 62:22, 63:4, 63:8, 63:23, 63:24, 65:5, 65:9, 66:5, 74:21
**Record** [2] - 17:7,

18:13
**record** [7] - 2:6, 9:13, 27:2, 37:12, 51:20
**recordings** [1] - 20:23
**red** [1] - 10:14
**referenced** [2] - 70:21, 73:21
**referred** [1] - 71:1
**referring** [3] - 7:8, 20:11, 72:23
**refers** [1] - 71:5
**regard** [1] - 3:12
**regarding** [1] - 55:25
**regardless** [3] - 37:10, 43:18, 45:18
**regular** [1] - 62:24
**reiterate** [2] - 37:7, 65:12
**relate** [5] - 11:5, 25:11, 29:11, 29:21, 30:1
**related** [18] - 3:3, 6:4, 32:6, 35:5, 35:10, 35:12, 36:7, 36:10, 36:17, 39:7, 39:13, 51:3, 57:25, 59:8, 64:16, 67:17, 70:12
**relates** [5] - 27:24, 30:5, 40:24, 56:15, 73:15
**relating** [3] - 4:15, 4:16, 76:1
**relation** [1] - 68:11
**relationship** [1] - 63:14
**Relativity** [1] - 54:5, 64:19, 64:22, 64:24, 70:22, 70:24, 72:22, 73:9, 75:15
**relevance** [2] - 6:11, 58:20
**relevant** [19] - 3:13, 5:18, 6:13, 6:20, 18:8, 25:14, 29:13, 30:8, 38:22, 39:5, 39:10, 39:15, 47:20, 53:9, 53:10, 64:5, 64:13, 67:16, 74:5
**relies** [1] - 51:16
**religious** [1] - 29:5
**relocated** [2] - 6:9, 38:15
**rely** [5] - 9:3, 22:25, 23:8, 62:21
**relying** [1] - 19:15
**remember** [1] - 30:6
**remind** [1] - 15:20
**reminded** [1] - 40:19
**removed** [4] - 10:3, 32:13, 63:17, 63:20

**render** [1] - 33:9
**rendering** [1] - 33:23
**renders** [1] - 75:20
**repeat** [1] - 25:24
**reply** [5] - 6:15, 12:25, 62:17, 67:16, 72:16
**Reporter** [4] - 1:22, 1:22, 63:18, 79:10
**REPORTER** [1] - 79:1
**reporter** [3] - 50:24, 51:12, 76:2
**reporters** [1] - 51:21, 71:25
**reputation** [1] - 30:8
**request** [4] - 17:25, 18:4, 69:12, 73:20
**requested** [1] - 68:23
**requesting** [1] - 33:9
**requests** [2] - 43:6, 68:7
**require** [1] - 29:14, 29:22
**required** [3] - 7:18, 36:9, 76:25
**requirement** [2] - 9:1, 72:17
**requires** [3] - 37:15, 38:3, 41:11
**requisite** [2] - 22:16, 34:14
**reserving** [1] - 16:14
**residue** [1] - 66:7
**resisting** [1] - 25:3
**resolve** [6] - 16:15, 16:18, 40:25, 66:19, 76:4
**resolved** [2] - 40:22, 40:24
**resource** [1] - 51:10
**resources** [1] - 75:16
**respect** [13] - 3:3, 5:12, 5:25, 6:7, 11:17, 14:9, 14:15, 16:23, 19:8, 23:7, 37:25, 38:1, 38:24
**respond** [3] - 7:5, 12:23, 30:15
**responded** [1] - 72:15
**response** [9] - 6:6, 11:9, 18:23, 21:22, 29:15, 30:21, 36:4, 46:18, 52:23
**rest** [3] - 14:5, 17:3, 42:2
**restrict** [1] - 7:24
**restricted** [24] - 6:18, 6:23, 6:25, 7:2, 7:22, 7:23, 8:3, 8:4, 8:5, 8:8, 8:9, 9:23, 10:10, 10:12, 10:17, 11:19,

11:20, 11:22, 11:24, 12:12, 20:21, 21:11, 44:5, 44:11
**restricting** [2] - 7:25, 8:1
**result** [1] - 38:17
**retest** [1] - 66:7
**reus** [9] - 45:21, 45:23, 46:14, 46:25, 47:3, 47:6, 47:10, 50:9, 50:15
**review** [11] - 49:25, 57:24, 58:20, 63:14, 65:3, 65:6, 65:20, 68:5, 69:2, 74:5, 74:12
**reviewed** [4] - 34:23, 34:25, 67:1, 68:1
**reviewing** [2] - 66:22, 73:5
**reviews** [2] - 65:4, 72:22
**rights** [2] - 23:25, 24:24
**riot** [1] - 6:9
**rioters** [4] - 38:15, 38:18, 59:22, 59:25
**RMR** [2] - 1:22, 79:9
**roadmap** [1] - 43:7
**Robinson** [1] - 42:4
**Room** [2] - 1:23, 79:10
**rule** [5] - 18:14, 19:11, 19:12, 22:6, 22:22
**Rule** [7] - 19:23, 38:25, 42:14, 54:12, 55:6, 56:16, 70:4
**ruled** [2] - 25:2, 69:14
**rules** [8] - 21:24, 27:23, 29:18, 29:25, 30:3, 30:11, 30:13, 30:14
**Rules** [4] - 19:17, 30:1, 30:10, 30:16
**ruling** [1] - 76:24
**run** [5] - 51:2, 58:13, 61:8, 74:21, 77:20
**running** [1] - 77:9

## S

**Salinger** [1] - 48:8
**satisfied** [1] - 62:2
**saved** [2] - 53:4, 64:1
**saw** [2] - 37:19, 53:14
**schedule** [1] - 3:8
**scrape** [1] - 67:2
**scraped** [1] - 66:23
**search** [21] - 54:6, 54:8, 58:5, 58:16, 59:3, 60:17, 64:4,

64:6, 64:12, 64:14, 64:15, 64:20, 64:21, 64:23, 65:2, 65:24, 66:11, 70:22, 73:19, 74:20, 74:24
**searched** [2] - 63:22, 67:9
**searches** [3] - 64:10, 66:6
**secondly** [1] - 2:22
**Secret** [6] - 4:16, 6:2, 6:3, 6:5, 10:3, 10:11
**secret** [3] - 5:20, 13:11, 65:16
**Section** [5] - 6:22, 11:18, 37:25, 38:1, 41:20
**section** [8] - 7:9, 7:25, 8:2, 8:7, 8:10, 10:10, 44:16, 46:5
**security** [2] - 6:12, 56:13
**sedition** [7] - 51:1, 51:15, 72:21, 72:24, 73:3, 73:14, 75:9
**see** [20] - 4:14, 6:19, 6:23, 6:24, 15:12, 22:18, 23:23, 27:14, 28:15, 30:15, 31:1, 31:24, 36:13, 36:15, 59:20, 60:5, 60:22, 60:23, 74:23, 77:24
**seeing** [1] - 60:21
**seek** [2] - 39:12, 53:7
**seeking** [24] - 9:3, 9:7, 9:15, 9:20, 9:21, 13:10, 27:18, 29:1, 37:2, 39:6, 39:13, 45:15, 45:23, 48:1, 50:8, 50:12, 51:25, 53:1, 57:24, 58:17, 58:20, 71:21, 73:22
**seem** [1] - 30:20
**SEFRANEK** [1] - 79:3
**Sefranek** [3] - 1:22, 79:9, 79:9
**selective** [3] - 27:4, 27:10, 27:13
**self** [9] - 31:25, 32:3, 32:4, 32:6, 32:9, 32:22, 32:24, 32:25, 33:7
**self-defense** [9] - 31:25, 32:3, 32:4, 32:6, 32:9, 32:22, 32:24, 32:25, 33:7
**Senate** [1] - 38:12
**sending** [1] - 74:17
**sense** [2] - 23:16, 33:22

**sensitive** [2] - 6:12, 56:12
**sentence** [1] - 50:10
**separate** [7] - 2:23, 19:22, 21:18, 23:21, 24:1, 35:23, 55:3
**separately** [1] - 70:23
**September** [2] - 3:16, 69:15
**serves** [5] - 35:21, 36:5, 36:12, 39:25, 49:6
**Service** [6] - 4:16, 6:2, 6:3, 6:5, 10:3, 10:11
**service** [1] - 40:2
**set** [1] - 77:13
**seven** [1] - 77:13
**sharing** [1] - 69:18
**ships** [1] - 66:10
**shooting** [1] - 66:8
**short** [1] - 22:19
**shortly** [1] - 77:1
**shot** [1] - 52:11
**show** [9] - 12:20, 27:12, 35:13, 38:11, 38:13, 38:17, 49:9, 53:8, 58:1
**sides** [1] - 54:9
**significant** [2] - 13:9, 52:9
**similar** [2] - 9:16, 47:13
**simple** [1] - 41:21
**simplistic** [1] - 50:12
**simply** [2] - 58:15, 59:19
**single** [8] - 36:21, 46:22, 46:23, 49:22, 61:1, 67:4, 70:8, 72:10
**singled** [1] - 27:12
**site** [1] - 65:18
**sitting** [2] - 26:21, 60:19
**situation** [5] - 26:6, 26:7, 29:20, 61:11, 69:4
**size** [2] - 7:23, 7:25
**slapping** [1] - 74:2
**small** [1] - 7:24
**smaller** [7] - 6:22, 6:24, 6:25, 7:8, 11:12, 11:20, 12:4
**social** [1] - 62:10
**software** [9] - 51:2, 51:14, 58:13, 59:7, 62:22, 63:8, 63:23, 63:24, 66:11
**softwares** [2] - 61:10, 66:4

21:16, 22:4, 22:5, 22:7, 22:10, 37:19, 42:12, 53:10, 53:13, 54:1, 57:6, 57:10, 58:2, 60:22, 60:23, 61:16, 73:25, 74:4, 74:7
**STATES** [3] - 1:1, 1:2, 1:9
**States** [5] - 1:23, 2:3, 3:16, 11:24, 68:5
**statute** [9] - 6:25, 7:22, 8:18, 8:23, 12:7, 37:23, 41:7, 45:24, 50:8
**statutes** [11] - 7:17, 7:18, 17:10, 18:7, 18:8, 24:22, 24:23, 25:2, 25:10, 30:23
**statutory** [1] - 8:20
**stenographic** [1] - 79:5
**step** [2] - 7:10, 73:2
**still** [14] - 3:5, 6:9, 26:3, 31:15, 31:20, 37:11, 38:22, 44:17, 45:13, 49:11, 61:20, 63:13, 77:6, 77:15
**stipulate** [1] - 35:14
**stipulating** [1] - 39:16
**storage** [1] - 75:19
**store** [1] - 75:16
**story** [1] - 36:19
**strange** [1] - 52:17
**streamline** [1] - 17:22
**Street** [2] - 1:14, 1:16
**strict** [1] - 30:23
**stuff** [8] - 63:16, 66:15, 66:22, 68:1, 70:3, 70:6, 70:11, 71:8
**style** [1] - 75:1
**subject** [1] - 19:5
**subpart** [1] - 30:4
**subsequent** [1] - 45:19
**subtle** [1] - 25:17
**sudden** [2] - 26:8, 33:6
**sufficiency** [2] - 48:17, 48:24
**sufficient** [7] - 3:4, 10:8, 36:11, 46:7, 47:11, 49:10, 49:14
**suggest** [2] - 75:22, 75:25
**suggested** [1] - 29:25
**suggesting** [1] - 4:11
**suggests** [1] - 27:15
**Suite** [1] - 1:17

**someone** [5] - 34:12, 46:3, 46:6, 46:7, 63:21
**somewhat** [2] - 3:2, 3:20
**somewhere** [3] - 10:3, 13:22, 63:22
**soon** [1] - 76:3
**sooner** [1] - 41:17
**sorry** [7] - 8:1, 13:18, 20:8, 32:13, 44:7, 44:15, 53:8
**sort** [1] - 30:10
**sought** [1] - 52:2
**source** [12] - 60:18, 61:1, 61:18, 61:19, 61:21, 65:13, 65:14, 66:23, 69:7, 71:22, 73:6, 73:7
**sources** [1] - 62:4
**space** [2] - 25:6
**speaking** [1] - 25:5
**specific** [20] - 3:5, 7:19, 9:18, 15:17, 22:14, 22:22, 22:23, 23:20, 24:6, 24:13, 37:18, 37:21, 40:3, 43:3, 44:16, 47:5, 53:7, 70:4, 73:15, 73:16
**specifically** [6] - 21:25, 37:21, 38:21, 50:1, 50:7, 55:15
**spectators** [1] - 73:13
**speech** [1] - 25:3
**speedy** [3] - 77:5, 77:9, 78:7
**spliced** [1] - 50:7
**sponsoring** [1] - 16:20
**stage** [1] - 10:19
**stand** [1] - 26:15
**standard** [3] - 27:20, 43:13, 49:22
**standards** [1] - 49:18
**start** [4] - 3:25, 59:10, 73:4, 73:5
**starting** [1] - 76:14
**stat** [1] - 43:24
**state** [6] - 2:5, 22:11, 22:13, 24:7, 25:14, 40:1
**statement** [7] - 10:5, 12:6, 19:10, 19:17, 20:16, 20:17, 55:14
**statements** [32] - 19:3, 19:5, 19:9, 19:14, 19:16, 19:24, 20:1, 20:3, 20:20, 20:21, 20:23, 20:25, 21:3,

**summations** [1] - 59:15
**supersede** [1] - 30:10
**supervisor** [1] - 2:9
**supplement** [7] - 41:19, 41:23, 48:7, 48:19, 49:4, 49:6, 49:13
**supplemental** [3] - 41:25, 52:15, 62:5
**supplementing** [1] - 48:8
**support** [1] - 26:16
**supported** [1] - 49:23
**supposed** [5] - 10:21, 17:21, 34:2, 48:19, 53:5
**Supreme** [1] - 46:12
**surprised** [1] - 52:1
**surround** [1] - 10:14
**Sutton** [2] - 47:23, 47:24
**swallowed** [1] - 60:7
**sway** [1] - 36:5
**sweeping** [2] - 34:21, 69:1
**sympathy** [1] - 31:8

---

**T**

---

**talks** [4] - 7:22, 41:20, 51:5, 51:7
**Tamara** [3] - 1:22, 79:9, 79:9
**TAMARA** [1] - 79:3
**technically** [2] - 54:12, 55:3
**technology** [3] - 63:4, 67:13, 74:19
**template** [1] - 20:12
**temporarily** [4] - 8:6, 8:14, 8:19, 42:6
**ten** [1] - 76:10
**tentative** [1] - 18:5
**terms** [5] - 10:25, 17:20, 21:19, 25:4, 27:11
**testified** [2] - 54:14, 56:21
**testifies** [1] - 56:9
**testify** [1] - 36:25
**testimony** [6] - 10:11, 10:16, 29:4, 37:19, 38:21, 56:20
**THE** [108] - 1:1, 1:1, 1:8, 2:2, 2:11, 2:15, 2:17, 2:18, 4:7, 4:10, 4:22, 4:25, 5:8, 5:15, 5:24, 6:2, 7:6, 8:17, 8:25, 10:1, 11:8,

11:15, 11:22, 12:6, 12:12, 12:23, 13:3, 13:17, 13:19, 14:4, 14:13, 14:21, 15:1, 15:20, 15:24, 16:17, 17:23, 18:5, 18:22, 19:2, 19:15, 20:6, 21:21, 22:9, 23:11, 24:9, 24:20, 25:15, 26:17, 27:4, 27:25, 29:2, 29:23, 31:3, 31:23, 34:6, 34:19, 37:8, 40:6, 40:9, 40:18, 41:19, 41:22, 42:22, 43:4, 43:21, 44:19, 44:22, 45:4, 47:13, 47:16, 47:18, 48:11, 50:19, 53:15, 53:19, 53:23, 54:7, 56:11, 58:4, 59:23, 62:13, 65:11, 65:23, 66:10, 67:6, 67:18, 67:21, 67:23, 69:12, 70:14, 70:16, 70:25, 71:3, 71:7, 71:12, 74:8, 75:21, 76:19, 76:22, 77:1, 77:3, 77:8, 77:23, 78:3, 78:6, 78:10, 78:11
**theirs** [1] - 64:4
**themselves** [3] - 24:22, 39:21, 52:18
**theory** [5] - 46:20, 47:9, 48:3, 70:1
**thereafter** [1] - 76:9
**therefore** [2] - 61:11, 69:10
**they've** [1] - 66:16
**thinking** [2] - 23:14, 43:10
**thinks** [2] - 23:25, 74:14
**third** [2] - 15:15, 16:5
**three** [5] - 3:7, 3:10, 4:24, 41:7, 68:7
**throughout** [2] - 12:21, 13:2
**thumb** [1] - 60:20
**Thursday** [1] - 3:12
**timing** [3] - 13:17, 13:19, 77:20
**to-do** [1] - 42:18
**today** [9] - 2:10, 57:19, 61:14, 69:20, 69:21, 76:11, 76:19, 77:20, 77:24
**together** [1] - 51:19
**toll** [2] - 77:6, 77:8
**tolled** [2] - 77:12, 78:7
**tons** [1] - 20:24

took [1] - 52:4
tool [22] - 49:6, 51:21, 58:9, 58:23, 63:11, 64:7, 64:8, 64:20, 65:4, 65:10, 65:24, 66:9, 73:10, 74:20, 74:21, 75:2, 75:5, 75:8
tools [5] - 51:14, 59:4, 73:4, 73:18, 73:19
top [4] - 30:25, 55:17, 55:18, 68:19
topic [2] - 50:25, 51:13
touch [2] - 39:19, 40:3
touches [1] - 39:11
tough [1] - 36:22
towards [1] - 37:21
trait [1] - 30:2
transcript [3] - 75:25, 79:4, 79:6
TRANSCRIPT [1] - 1:8
trespassers [1] - 52:7
trial [55] - 5:22, 6:16, 7:11, 14:11, 14:19, 14:21, 14:22, 15:1, 15:7, 16:11, 16:19, 17:3, 17:9, 17:12, 17:13, 22:19, 22:21, 22:24, 25:20, 26:11, 26:13, 27:22, 28:3, 29:12, 31:5, 31:15, 31:19, 31:22, 34:1, 35:21, 35:24, 39:1, 40:20, 40:21, 40:25, 41:23, 42:2, 42:16, 42:19, 43:12, 46:6, 55:24, 56:5, 56:21, 76:9, 76:14, 76:25, 77:5, 77:9, 77:11, 77:13, 77:17, 78:7
trials [2] - 31:20, 33:3
tried [2] - 22:3, 59:5
trigger [1] - 66:7
true [4] - 54:25, 70:8, 79:4, 79:5
Trump [2] - 28:10, 28:18
truth [6] - 16:18, 21:4, 21:18, 22:2, 22:10, 30:9
try [7] - 16:9, 17:2, 28:5, 31:8, 60:14, 76:4, 77:11
trying [20] - 13:7, 13:12, 20:10, 20:15, 21:1, 22:1, 23:12, 24:11, 24:12, 24:13, 26:18, 27:1, 32:11, 32:15, 50:2, 60:3,

60:13, 63:1, 74:1
turn [7] - 12:19, 16:22, 50:19, 54:13, 56:13, 56:14, 64:2
turned [6] - 54:15, 54:17, 54:18, 54:20, 54:24, 56:3
two [14] - 2:23, 3:9, 4:15, 7:14, 11:4, 19:22, 39:17, 41:10, 42:9, 44:10, 44:13, 66:10, 66:20, 71:17
type [12] - 8:11, 9:14, 26:4, 26:9, 31:18, 33:8, 34:15, 55:13, 55:23, 61:9, 67:11, 68:23
typically [2] - 54:10, 54:14

## U

U.S [2] - 1:13, 17:6
unclear [1] - 54:10
unconstitutional [2] - 24:23, 25:1
undecided [1] - 77:10
under [24] - 9:12, 9:24, 19:17, 20:2, 41:24, 46:3, 46:4, 49:7, 49:10, 53:5, 55:6, 61:1, 61:24, 62:12, 63:11, 65:21, 65:22, 69:8, 70:4, 70:5, 72:13
undercover [1] - 68:24
underneath [1] - 60:19
unexpected [1] - 14:19
unique [5] - 50:21, 51:22, 67:11, 67:13, 73:20
United [5] - 1:23, 2:3, 3:15, 11:24, 68:5
UNITED [3] - 1:1, 1:2, 1:9
universe [1] - 69:19
unlawful [1] - 24:1
unlawfully [1] - 21:11
unless [5] - 19:5, 22:7, 28:2, 30:17, 76:8
unlike [1] - 45:5
unlimited [1] - 8:8
unopposed [2] - 5:13, 5:16
unquote [1] - 53:24
unrelated [2] - 10:18, 37:20
up [16] - 4:9, 14:17,

14:18, 20:14, 22:17, 29:12, 29:20, 34:1, 56:2, 58:10, 59:19, 60:7, 67:7, 67:10, 68:4, 76:23
USA [4] - 21:1, 23:16
usable [1] - 64:24
useful [3] - 41:17, 42:10, 75:22

## V

VA [1] - 1:17
valid [2] - 35:7, 49:7
value [2] - 57:8, 57:9
variety [6] - 8:9, 20:21, 21:8, 33:17, 45:25, 46:12
various [6] - 2:24, 21:2, 50:25, 51:1, 51:2, 76:6
verb [1] - 50:8
verbs [4] - 47:3, 47:12, 50:4, 50:11
verdict [1] - 33:9
versions [1] - 41:7
VIA [3] - 1:4, 1:8, 1:10
via [1] - 2:14
Vice [15] - 6:8, 8:6, 8:13, 8:19, 9:8, 9:11, 9:24, 10:13, 10:23, 12:21, 13:8, 13:20, 13:21, 38:15, 44:5
victim [1] - 53:24
victimized [1] - 36:3
victims [1] - 36:18
video [44] - 2:14, 20:23, 36:1, 38:10, 38:11, 38:12, 38:14, 39:4, 39:9, 39:10, 39:19, 39:20, 51:3, 52:2, 52:3, 52:16, 53:14, 57:11, 57:3, 57:16, 57:18, 59:11, 59:13, 59:18, 59:21, 60:4, 61:1, 61:14, 61:18, 61:19, 64:5, 65:1, 65:2, 65:9, 68:11, 68:12, 68:20, 69:7, 69:11, 70:23, 71:22, 71:23
videos [59] - 15:14, 15:15, 16:23, 20:13, 20:24, 20:25, 24:18, 35:12, 35:19, 38:16, 38:22, 39:13, 39:17, 40:5, 52:6, 52:11, 57:6, 57:8, 57:10, 57:21, 57:25, 58:1, 58:5, 58:9, 58:15,

58:18, 58:23, 58:25, 59:1, 59:8, 60:17, 60:18, 60:19, 61:21, 63:19, 63:21, 64:1, 65:13, 65:15, 66:12, 67:25, 68:2, 69:15, 70:7, 71:24, 72:4, 72:5, 72:23, 73:12, 73:14, 74:11, 74:22, 75:19
view [6] - 18:5, 18:6, 37:8, 41:3, 41:6, 55:7
viewer [1] - 36:5
views [1] - 41:8
vindictive [1] - 27:13
violate [1] - 28:25
violent [1] - 36:2
violently [2] - 59:22, 59:24
virtually [1] - 76:8
visiting [7] - 8:6, 8:14, 8:20, 10:25, 11:5, 13:15, 42:6
voluminous [2] - 48:7, 48:9
vs [1] - 1:4

## W

wait [4] - 4:19, 15:8, 54:7
waiting [4] - 10:23, 11:3, 15:10, 42:4
walking [1] - 12:21
wants [10] - 17:5, 27:6, 27:15, 32:3, 33:5, 33:15, 41:14, 50:3, 70:6, 74:12
WARNAGIRIS [1] - 1:5
Warnagiris [15] - 2:4, 2:13, 2:16, 10:6, 13:13, 13:14, 13:23, 19:5, 30:20, 55:20, 58:11, 60:11, 60:12, 64:12, 77:8
Warnagiris's [1] - 28:19
Warner [14] - 53:17, 54:6, 55:14, 57:23, 57:25, 58:1, 59:12, 59:25, 60:23, 61:16, 64:14, 69:11, 72:5
Washington [4] - 1:5, 1:14, 1:24, 79:11
waste [2] - 16:15, 27:2
wasting [1] - 34:4
Weatherhead [4] - 53:12, 53:16, 55:15, 64:15

website [2] - 51:6, 65:18
week [1] - 15:22
weeks [2] - 15:9, 77:17
whatnot [1] - 49:16
whereas [1] - 44:5
whichever [1] - 11:3
whole [6] - 5:1, 11:12, 12:1, 12:5, 35:11, 64:8
wigmore [1] - 30:7
William [1] - 52:12
wind [1] - 22:17
wish [2] - 38:11, 64:23
wishes [2] - 4:9, 5:19
witness [10] - 15:2, 15:18, 16:20, 16:21, 29:14, 54:13, 56:6, 56:9, 56:12, 56:14
witnesses [6] - 4:16, 15:2, 30:15, 56:15, 56:20, 56:21
wonder [1] - 41:2
wondering [1] - 25:16
Word [2] - 64:25, 74:25
word [11] - 8:17, 8:20, 41:12, 58:16, 64:10, 64:12, 64:14, 64:20, 74:20, 74:24
worded [2] - 13:7, 37:23
words [2] - 21:5, 55:19
work-around [1] - 48:2
works [3] - 29:5, 51:18, 74:20
worn [6] - 15:14, 16:2, 16:3, 67:4, 67:5, 69:6
written [1] - 41:9
wrote [5] - 8:23, 16:7, 40:14, 50:24, 51:12

## Y

yourselves [1] - 70:8
YouTube [1] - 71:23

## Z

ZOOM [3] - 1:4, 1:8, 1:10
Zoom [2] - 2:10, 78:12