```
 1                  IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
 2
         - - - - - - - - - - - - - - - x
 3       THE UNITED STATES OF AMERICA,
                                              Criminal Action No.
 4                    Plaintiff,             1:21-cr-00382-PLF-1
                                             Tuesday, April 2, 2024
 5       vs.                                 1:35 p.m.

 6       CHRISTOPHER WARNAGIRIS,

 7                    Defendant.
         - - - - - - - - - - - - - - - x
 8

 9       _____

10            TRANSCRIPT OF BENCH TRIAL - AFTERNOON SESSION
            HELD BEFORE THE HONORABLE PAUL L. FRIEDMAN
11                   UNITED STATES DISTRICT JUDGE
         _____
12       APPEARANCES:

13
         For the United States:     REBEKAH LEDERER, ESQ.
14                                   ANDREW HAAG, ESQ.
                                     USAO
15                                   601 D Street NW
                                     Washington, DC 20001
16                                   (202) 252-7012
                                     rebekah.lederer@usdoj.gov
17                                   andrew.haag@usdoj.gov

18       For the Defendant:         MARINA MEDVIN, ESQ.
                                     MEDVIN LAW PLC
19                                   916 Prince Street, Suite 109
                                     Alexandria, VA 22314
20                                   (888) 886-4127
                                     marina@medvinlaw.com
21

22       Court Reporter:            Lisa A. Moreira, RDR, CRR
                                     Official Court Reporter
23                                   U.S. Courthouse, Room 6718
                                     333 Constitution Avenue, NW
24                                   Washington, DC  20001
                                     (202) 354-3187
25
```

1                          I N D E X

2

WITNESS                                              PAGE

3

SERGEANT ANTHONY WARNAGIRIS
4       (By Mr. Haag)..................................... 3
        (By Ms. Medvin)................................. 68
5       (By Mr. Haag)................................... 97

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2              THE COURT:  So are we ready for the next witness,
 3      or is there anything that anybody needs to raise first?
 4              Okay.  Let's get the witness.
 5              MR. HAAG:  Thank you, Your Honor.  At this time
 6      the government calls Sergeant Anthony Warner.
 7              THE COURT:  Sir, good afternoon.
 8              THE WITNESS:  Good afternoon, sir.
 9              THE COURT:  Get comfortable.  Speak into the
10      microphone, if you would, and there's some water and a glass
11      there, if you need it.
12              THE WITNESS:  Yes, sir.
13              MR. HAAG:  May I proceed, Your Honor?
14              THE COURT:  Yes, sir.
15              MR. HAAG:  Thank you.
16                  SERGEANT ANTHONY WARNER, Sworn
17                      DIRECT EXAMINATION
18      BY MR. HAAG:
19      Q.  Good afternoon, sir.  And thank you for your patience.
20      Could you please introduce yourself to the Court, and spell
21      your last name for the record.
22      A.  Yes; Sergeant Anthony Warner, W-A-R-N-E-R.
23      Q.  Where are you employed?
24      A.  United States Capitol Police.
25      Q.  How long have you been employed there?
```

1    A.   Since 2001.

2    Q.   And what is your current rank?

3    A.   Right now I'm currently a sergeant.

4    Q.   When did you become a sergeant?

5    A.   I became a sergeant in 2022.

6    Q.   And what were you prior to being a sergeant?

7    A.   PFC, private first class.

8    Q.   Is another name for that an officer?

9    A.   Yes, just an officer, yes, sir.

10   Q.   And in your current rank, what are your duties from

11   day-to-day?

12   A.   Currently I'm assigned to the House division, first

13   shift, which is 11:00 at night to 7:00 in the morning.  I'm

14   responsible for overseeing the operations of the House

15   division midnight shift.

16   Q.   And House division, what do you mean by that?

17   A.   There are several different divisions; you have House,

18   Senate, Capitol divisions.  So I'm assigned to the Cap House

19   division.  On J6 I was assigned to the Library of Congress.

20   Q.   As you just mentioned, January 6th, were you working

21   that day?

22   A.   Yes, I was.

23   Q.   What was your shift that day?

24   A.   11:00 -- actually, we came in at 11:00, so it was out of

25   our normal shift for that day.  We had an earlier roll call

1    in order to get on line to prepare for the protest.

2    Q.  And did you, in fact, show up at 11:00 that day?

3    A.  Yes, I did.

4         THE COURT:  Showed up at work at what time?

5         THE WITNESS:  11:00, 11:00 a.m.

6    Q.  What was your expectation for the day?

7    A.  Like any other protest.  Protesters coming to shout,

8    chant, but never -- not to the magnitude of what it ended up

9    being.

10   Q.  Would you say that January 6th proceeded as you

11   expected?

12   A.  No, sir.

13   Q.  All right.  So after your roll call at 11:00 a.m., what

14   did you do?

15   A.  From roll call at 11:00 a.m. we were given an assignment

16   by our lieutenant to form a line on the East Front.

17   Q.  The East Front of what?

18   A.  East Front of the Capitol, of the -- yes, sir.

19   Q.  Did you, in fact, go to the East Front of the Capitol?

20   A.  Yes, we did, sir.

21   Q.  What happened when you got there?

22   A.  Pretty much formed a line behind the bike racks facing

23   the Supreme Court.  From there, we just monitored the crowd.

24   Q.  You're talking about bike racks.  Could you just

25   describe what those look like a little bit?

1    A.  Yes, metal racks about six feet long, six feet wide,

2    very thin.  They can be interlocked.

3    Q.  Interlocked how?

4    A.  There's a hook on every opposing rack, so you just place

5    one rack into the other, like a LEGO almost.

6    Q.  What's the purpose of doing that?

7    A.  To give us additional support so you can't just push

8    through the bike racks.

9    Q.  And were the bike racks interlocked on January 6th?

10   A.  They were.  Yes, they were.

11   Q.  How many other officers were with you on the East Front

12   when you arrived?

13   A.  Hard to say.  Maybe 50 to 100 or more.

14   Q.  Were there any, as you described them, protesters there

15   when you arrived?

16   A.  Yes.  They were not on line with the bike racks when we

17   initially formed up, but then they eventually started coming

18   towards the bike racks.

19   Q.  And as they came before the bike racks, could you just

20   describe how that evolved.

21   A.  Again, just felt like any other day, shouting, chanting.

22   You know, in the background you hear music playing.  So it

23   just felt like another day.

24          The only difference was on that day I could see

25   men with tactical gear on moving forward towards the bike

1    racks.

2              MS. MEDVIN:  Objection, Judge; relevance.

3              THE COURT:  Overruled.

4    Q.  If you could continue.

5    A.  Yes.  So, again, just that day I noticed that

6    tactical -- men in tactical gear moved -- it looked like

7    regular participants or regular protesters just standing

8    there to protest, moved to the front of the bike rack.  I

9    remember telling my officer or my fellow officers to the

10   left and right of me --

11             MS. MEDVIN:  Objection; hearsay.

12   A.  -- watch these guys' hands.

13             THE COURT:  I'm sorry, I'm having trouble hearing

14   him.

15   Q.  If you could speak into the microphone a little more

16   clearly.

17             THE WITNESS:  Sorry about that.  Is that better,

18   sir?

19             THE COURT:  Yes.  What was the --

20             THE WITNESS:  Basically I was just telling them

21   that -- the officers to the left and the right of me, I was

22   letting them see -- point out to what I was seeing, the

23   gentlemen in the tactical gear.  We don't normally see that

24   in a protest.

25             THE COURT:  Okay.  I don't understand what the

1    objection is.  I didn't hear any hearsay.

2              MS. MEDVIN:  He was previously talking about words

3    he stated.

4              THE COURT:  Okay.  Well, I didn't hear it.

5              Go ahead.

6    Q.  So at that point you had seen these individuals in

7    tactical gear seemed a little bit different?

8    A.  Yes.

9    Q.  What happened after those individuals approached the

10   fence.

11   A.  The way I recall it is there was a lady who stood up on

12   one of the statues and basically started saying, "We need to

13   do what they're doing on the other side."

14             MS. MEDVIN:  Objection; hearsay.

15             MR. HAAG:  Your Honor, it's not being offered for

16   the truth.

17             THE COURT:  What's relevant?

18             MR. HAAG:  The relevance would be the impact on

19   the officer paying attention to what's in front of him

20   needing to respond to what's going on.

21             THE COURT:  Okay.  Well, I'll strike the

22   statement.  Somebody standing on a statue.

23   Q.  At any point during the day did any of the protesters

24   attempt to breach the bike rack barricades?

25   A.  Yes, they did.  After the chanting statements made,

1    that's when they approached the bike rack or rushed the bike

2    line -- excuse me, rushed the police line and began to

3    breach.

4          I then, from that point, noticed one of the

5    protesters with a bullhorn and just moved directly to him

6    and asked him to get his folks under control and tell us

7    what he wanted.

8    Q.  If I could step back --

9          THE COURT:  Could you tell us about what time the

10   rushing of the bike rack and the police line began roughly?

11         THE WITNESS:  Around 12:00, 12:00ish, sir.

12   12:00ish, maybe 1:00.  I'm not exactly sure.

13   Q.  So stepping back to that instance, were those

14   individuals able to successfully breach the police line at

15   that point?

16   A.  The first attempt, no.  That's when we was able to

17   regain control.  I was able to do a little dialogue with

18   them along with my leadership to try to get additional

19   reinforcements.

20   Q.  During this whole process --

21         THE COURT:  When you said you began a dialogue,

22   were you in charge of the group of men?  Or were you --

23         THE WITNESS:  No, sir.  I'm retired military so --

24   I have 20-plus years of military experience, so what

25   happened that day was one of my military --

```
 1              THE COURT:  Military mindset kicked in.

 2              THE WITNESS:  Kicked in, yes, sir.  So I just did

 3   what I thought was necessary.

 4              It worked for a moment, but then a couple of folks

 5   in the crowd on the protest side started stating, "He's not

 6   in charge.  Why are we listening to him?"

 7              And from there, that's when they did the second

 8   breach and successfully breached the police line.

 9   Q.  So stepping back to that first attempted breach, what

10   was happening with the bike racks at that time?

11   A.  At that time we were doing pushing and shoving trying to

12   maintain a police line.

13   Q.  So you were talking for a bit a moment ago about trying

14   to get the individuals under control; is that correct?

15   A.  Yes, sir.

16   Q.  What did you try to do to get them under control?

17   A.  The only thing I did was tell, again, the gentleman who

18   had the bullhorn, "What is it that you want?  What are you

19   trying to accomplish?  Get your folks under control because

20   I can't -- we can't deal in chaos.  I need to know what

21   you're trying to do."

22              He ended up getting everybody under control.

23              I, from there, took what he asked for to my

24   leadership knowing that our duties for that day was not to

25   let anybody pass the bike racks.  But, again, to try to get
```

 1    additional officers to help because we were being overrun at

 2    that moment.

 3    Q.  Were you able to successfully calm the crowd down with

 4    your --

 5    A.  Yes, sir.  That initial contact with the gentleman with

 6    the bullhorn, he was able to get on the horn, and everybody

 7    calmed down.

 8    Q.  How long did the calm last?

 9    A.  Maybe about three to five minutes, maybe.

10    Q.  And what happened at that point?

11    A.  From that point that's when the other gentleman was

12    saying he's not in charge, the lady's in charge, and that's

13    when they did a full-on breach.

14    Q.  Are you aware if there's any closed-circuit television

15    that records the East Front of the Capitol?

16    A.  Yes, sir.

17    Q.  Would you recognize it, if it was shown to you?

18    A.  Yes, sir.

19            MR. HAAG:  If we could pull up Government Exhibit

20    316 for identification.

21    Q.  Starting here at zero seconds, do you recognize what's

22    depicted here?

23    A.  Yes, I do.

24    Q.  What is depicted?

25    A.  This is a police line that I was referring to to the --

1    with our backs facing the Capitol, and the protesters' backs

2    facing the Library of Congress and the Supreme Court, so the

3    opposite side of the bike racks.

4    Q.  Looking at the bottom of this --

5            MR. HAAG:  Actually, Your Honor, at this time the

6    government would move to admit Government Exhibit 316.

7            THE COURT:  So this is the East Front where you

8    were stationed?

9            THE WITNESS:  Yes, sir.

10           MS. MEDVIN:  No objection, Judge.

11           THE COURT:  Okay.  It will be admitted without

12    objection.

13   Q.  And looking for a moment at the left-hand -- or top

14   left-hand corner of the screen, do you see a date there?

15   A.  Yes, I do.

16   Q.  What is the date?

17   A.  January 6, 2021.

18   Q.  And the time?

19   A.  1:58 p.m.

20   Q.  Looking at the bottom of the screen here, who's standing

21   at the bottom of the screen?

22   A.  At the bottom of the screen are the police officers.

23   Q.  You don't need to give me an exact number, but best

24   guess how many officers are standing there?

25   A.  Maybe about 25.

```
1    Q.  And who are the individuals on the top half of the

2    screen?

3    A.  Those are the protesters.

4    Q.  And best guess, how many of those people are there?

5    A.  Well over 200 maybe.

6    Q.  Fair to say there's a significant difference in the

7    number of officers and the number of individuals?

8    A.  That is correct.

9    Q.  And right through the middle of the screen, what do we

10   see kind of running across the line here?

11   A.  That is the bike rack I'm referring to.

12            MR. HAAG:  Now, if we could just play through the

13   whole video.  It's about one minute.

14            (Video playing)

15            THE WITNESS:  This is the initial -- if I'm not

16   mistaken, it's where they tried to breach.

17            MR. HAAG:  Just pause right here.

18   Q.  Circling in the middle of the screen, what's going on

19   with that bike rack?

20   A.  They are picking the bike rack up and moving it to the

21   back of the protest line.

22   Q.  Are there any officers nearby that bike rack?

23   A.  Yes, sir.

24   Q.  Where are the officers in the location of the bike rack?

25   A.  They're in the forefront with their hands attempting to
```

1     pull the bike racks back.

2     Q.  And is the bike rack on the ground?

3     A.  No, sir.

4     Q.  Where is it?

5     A.  Up in the air.

6     Q.  Do you have any --

7          MS. MEDVIN:  Judge, I object to the line of

8     questioning.  It's not relevant to this case other than

9     there was a border that was removed.  Mr. Warnagiris

10    wasn't --

11         THE COURT:  Civil disorder.  Overruled.

12    Q.  Do you have any concern with where this bike rack is

13    located at this time?

14    A.  Yes, sir, because it could have been used to hit an

15    officer.  Many other ways that they could have gotten -- if

16    they haven't gotten complete control over.

17         MR. HAAG:  If we could just continue playing.

18         (Video playing)

19         MR. HAAG:  Just pause right here.

20    Q.  Circling the middle of the screen here with the

21    officers, is there any more bike racks between those

22    officers and the individuals?

23    A.  No, sir.

24    Q.  Is that any kind of concern?

25    A.  That is a very -- very very much so a concern, yes, sir.

```
1    Q.  What's the concern?

2    A.  That the crowd could push through that opening there,

3    that open area.

4              MR. HAAG:  Just continue playing.

5              (Video playing)

6              MR. HAAG:  So we started there at 40 seconds

7    running for the remaining 21 seconds.

8    Q.  Could you just describe what we saw during those 21

9    seconds?

10   A.  Yes.  In that 21 seconds, that's where the -- I had

11   misspoken initially.  That's where the breach actually took

12   place.  That's when the protesters advanced towards the

13   Capitol, the east stairs of the Capitol.

14   Q.  You had said the actual breach taken place.  Are you

15   saying that there was the first breach that wasn't

16   successful?

17   A.  Correct.

18   Q.  And this is the second one, and it was?

19   A.  That is correct.

20   Q.  Are you aware if you were on the line at this point when

21   it was breached?

22   A.  Oh, yes.  I was.  Yes, sir.

23   Q.  Do you happen to recognize yourself in this video?

24   A.  Not in this image.

25             MR. HAAG:  If we could skip forward to 35 seconds.
```

1          It's fine.  You can just take it down.

2     Q.  After this point of the breach, what did you do?

3     A.  From there we retreated to the base of the East Front

4     stairs and created another line.

5     Q.  What are the East Front stairs?

6     A.  The East Front stairs are the stairs that lead up to the

7     east side of the Capitol.

8     Q.  Why did you retreat there?

9     A.  Because that was the line of defense to continue to

10    advance towards the doors of the Capitol.

11          MR. HAAG:  Now, if we could pull up Government's

12    Exhibit 404A.  I believe the defense had admitted portions

13    of that.

14          THE COURT:  Yes, it's been admitted.

15          MR. HAAG:  If we could jump to 8:05, please.

16    Q.  Do you recognize what's depicted here?

17    A.  Yes, sir.  This is the second -- third line, or, excuse

18    me, this would be our second line that we created at the

19    base of the east stairs.

20          THE COURT:  So this is the east?

21          THE WITNESS:  East Front, yes, sir.

22          THE COURT:  Is that leading into the Capitol

23    building itself?

24          THE WITNESS:  Not at this point.  This is at the

25    bottom.  But yes, it is leading up those stairs, yes, sir.

1    Q.  If you could just describe it again.  I know you

2    mentioned a moment ago, what was the purpose of creating

3    this line here?

4    A.  Again, to prevent the protesters from advancing to the

5    doors of the Capitol and potentially entering the Capitol.

6              MR. HAAG:  If we could continue playing to 8:40.

7              (Video playing)

8    Q.  Looking at the middle of the screen over the past 35

9    seconds, what was going on between the officers and these

10   individuals?

11   A.  The officers were just, again, trying to hold the line,

12   tell the folks -- tell the protesters to move back.

13             MS. MEDVIN:  Objection.  Objection.  There is no

14   communication from the officers in this video.  He's

15   testifying to things not in the video.  It's

16   characterization.

17             THE COURT:  Were you present?

18             THE WITNESS:  Yes, I was, sir.

19             THE COURT:  Okay.  You can testify from your

20   personal knowledge even if it's not on the video.

21             THE WITNESS:  Yes.

22   Q.  So to clarify, Sergeant, at this time were any of the

23   officers, yourself included, giving any kind of verbal

24   commands to the rioters?

25   A.  Yes.  Tell everyone to get back.

```
1    Q.  Were they listening?

2    A.  No, they were not.

3    Q.  Do you know if this line held?

4    A.  It did not.

5              MR. HAAG:  If we could jump forward to ten

6    minutes.

7              Just skip forward one second.

8    Q.  Do you recognize this as the same area we were just

9    talking about?

10   A.  Yes.  This looks like from the back of the protest line

11   leading up to the stairs.

12             MR. HAAG:  If we could just play it at 10:40,

13   please.

14             (Video playing)

15   Q.  What did we just see here?

16   A.  You saw the protesters successfully gain -- take control

17   of the stairs.

18   Q.  How would you describe the volume at this point in the

19   day?

20   A.  The volume?  Very loud.  You could hardly hear yourself

21   talking.

22   Q.  What did you do after this point?

23   A.  At this point we all retreated to the top of the stairs

24   with our lieutenant, formed a line against the back wall

25   adjacent to the door, and pretty much just monitored --
```

1    attempted to try to get some control, but there was nothing.

2    Again, due to the loud noise, no uniformity in our commands,

3    there was nothing we could really do except for monitor and

4    try to keep them away from getting into the doors.

5         But being at those doors, if you're an officer,

6    you know you can't pull the doors open.  They have to be

7    pushed from the inside, so it was mostly monitoring to

8    ensure, you know, that nothing else would happen.

9         MR. HAAG:  If we could jump to 11:47, please.

10   Q.  What's depicted here off to the right-hand side of the

11   screen?

12   A.  It looks like an officer's head right --

13   Q.  I'm sorry, the top right.

14   A.  That's the door.  I'm sorry, that is the door.  Sorry

15   about that.

16        THE COURT:  It's the door leading to where?

17        THE WITNESS:  Leading into the Capitol, sir; to

18   the Rotunda of the Capitol.

19        THE COURT:  Into the Rotunda?

20        THE WITNESS:  Yes, sir.

21        THE COURT:  And the Rotunda's on the second floor?

22        THE WITNESS:  Yes, sir.

23        MR. HAAG:  Now, if we could play at this point to

24   12:05.

25        (Video playing)

1    Q.  Did you hear something at the end of the video there?

2    A.  Yes, that was a flash bang.

3    Q.  What is the purpose of a flash bang?

4    A.  To try to disperse the crowd so we could gain control.

5    Q.  Was that flash bang successful in doing that?

6    A.  No, sir.

7            MR. HAAG:  If we could continue on to 7:15,

8    please.

9            (Video playing)

10           MR. HAAG:  Sorry, 17:15.

11   Q.  Does this appear to be the same area that we were just

12   discussing?

13   A.  This --

14   Q.  I can play it for a couple of seconds.

15           (Video playing)

16   A.  Yes, it is, sir.  Yes, it is.

17   Q.  Were you able to hear anything coming from the crowd?

18   A.  "Stop the Steal" initially.

19   Q.  At this point in the video, were you able to hear

20   anything?

21   A.  No, I wasn't paying too close attention.

22           MR. HAAG:  If we could just go back to 17:15 and

23   play it again.

24           (Video playing)

25   Q.  What could you hear at this point?

1    A.  I think it's, "Let us in.  Let us in."

2    Q.  Do you know where that chanting was coming from?

3    A.  All around.

4    Q.  Was it coming from the officers?

5    A.  No, sir.

6         MR. HAAG:  If we could continue at this point to

7    Government Exhibit 408 for identification and jump to 15

8    seconds in and just pause there.

9    Q.  Do you recognize what's depicted here?

10   A.  Yes.  And for clarification, the initial set of doors

11   that they initially pushed open, those are the exterior

12   doors, what we call decorative doors.  They don't really

13   have any supportive force.

14        The second set of doors where the lieutenant and

15   the officers are standing in front of, that is the set of

16   doors that immediately lead into the Capitol.

17   Q.  So is this the East Rotunda doors as we've been

18   discussing them?

19   A.  Yes, sir.

20   Q.  And is this a fair and accurate representation of what

21   you saw on January 6th?

22   A.  Yes, sir.

23        MR. HAAG:  Your Honor, at this time the government

24   would move to admit Government Exhibit 408.

25        MS. MEDVIN:  No objection from this point to 0047

1    in the video.  Actually, I think that's the entirety of the

2    video.

3             No objection to the video.

4             THE COURT:  Thank you.  It will be admitted.

5    Exhibit 408 is in evidence.

6    Q.  I believe you mentioned this a moment ago, but circling

7    this individual with what appears to be some type of shiny

8    or gold hat on, do you know who that is?

9    A.  I do not know who that is, but that's usually the

10   representation of a lieutenant or higher.

11            THE COURT:  From the Capitol Police?

12            THE WITNESS:  Yes, sir, from the Capitol Police.

13   Q.  Where is that lieutenant standing?

14   A.  Right in front of the doors leading into the Rotunda of

15   the East Front.

16            MR. HAAG:  If we could just play to the end of the

17   video, please.

18            (Video playing)

19   Q.  Were you able to hear what people in the crowd were

20   saying towards the end of the video?

21   A.  It almost sounded like, "Let them go."  "Let them out,"

22   or something to that effect.

23   Q.  Now, during this time were you standing at the doors, or

24   were you at some other location?

25   A.  I was at the center of the stairs at this time.

```
 1              THE COURT:  When you say "the center of the
 2    stairs," we saw this lieutenant standing in front of the
 3    doors.  Were you up at that same level with her?
 4              THE WITNESS:  On the same level, but at the -- as
 5    soon as you get to the top of the stairs, holding a shield
 6    at the top of the stairs.
 7              THE COURT:  Okay.
 8    Q.  How far away between the door that we just saw there and
 9    your location are we talking about?
10    A.  Maybe about 25 feet.
11    Q.  Were you able to get access quickly to the doors?
12    A.  No.
13    Q.  Why not?
14    A.  There was too many people.  We were completely
15    surrounded.
16    Q.  And by "people," are you referring to officers?
17    A.  Correction, there were protesters.  We were surrounded
18    by protesters.
19    Q.  While you're standing at the top of the steps with the
20    riot shield as you're discussing, did you have any other
21    interaction with individuals in the crowd?
22    A.  Yes, I did.  I remember being in the middle of the crowd
23    as they were pushing and shoving, and I strictly stated,
24    "Stop pushing.  Let me through, and then you can go back to
25    pushing."
```

1          And in a kind of arrogant way because, like I
2     stated, those doors couldn't be breached just by pushing on
3     them.  They can only be breached by pushing from the inside.
4     Q.  You're saying you can push.  What was the -- I think you
5     touched on it a bit.  Could you just expand on why you said
6     you can push.
7     A.  Yes, because they were pushing me in the middle of the
8     crowd, and I just needed to get out of that space.  And that
9     was my way of keeping it calm and just -- and it worked.
10    Again, they stopped and let me through.
11         And I don't know what they did after that.  I'm
12    assuming they went back to pushing, but I didn't look back
13    to see.
14    Q.  Were there any other officers in your immediate
15    proximity while you're in the crowd at that point?
16    A.  If I recall, they were peppered through the crowd.  But
17    I was focused on getting my back to the wall near the door.
18    Q.  Did you believe that you were safe in the crowd as you
19    were standing there?
20    A.  No.  There were several conversations, "Oh, this guy's
21    really calm to be in the position he's in."  So at that
22    moment, you know, I'm listening to things as they go on, and
23    I was like I can't be the police officer that I need to be
24    in this particular moment because I'm totally outnumbered,
25    so as a preservation of trying to get to a safe space.

```
 1   Q.  What safe space were you trying to get to?

 2   A.  Only next to fellow officers, and, again, my back

 3   against the wall so I could at least see what was coming

 4   from my front versus all the way completely around me.

 5           MR. HAAG:  If we could pull up Government Exhibit

 6   405, please, and jump to 3:40.  It's already been admitted

 7   as an exhibit.

 8           THE COURT:  Yes.

 9           MR. HAAG:  I'm just going to, before playing, draw

10   your attention to this individual right here in the middle

11   of the screen, if you could just pay attention to him.

12           And if we could play to 3:55.

13           (Video playing)

14   Q.  Now, that individual at the beginning of the video --

15           THE COURT:  Before we get to the individual, where

16   exactly are we?  What area is the video showing us?

17           THE WITNESS:  This is the entrance up to the

18   east -- to the Rotunda, sir, of the Capitol.

19           THE COURT:  Looking at it from the outside?

20           THE WITNESS:  Yes, sir.

21   Q.  And do you know approximately what time this might have

22   been?

23   A.  I do not.

24   Q.  Speaking back to that individual that I asked you to pay

25   attention to, what was that individual doing?
```

1    A.  Can I ask you to play it back again?

2    Q.  Of course.

3    A.  Because I think I lost it in the crowd.

4         MR. HAAG:  Back to 3:40, please, and then play to

5    3:47.

6    A.  If I'm looking at the correct gentleman, he's smashing

7    the glass.  Is that the one in question?

8    Q.  That's the individual, yes.

9    A.  Yes, sir.

10   Q.  Did you see anything in that person's hands?

11   A.  It looks like some kind of metal object.

12   Q.  Was he able to smash the window with that object?

13   A.  If I'm not mistaken, it's triple pane class.  They were

14   able to break the initial exterior glass, yes.

15        MR. HAAG:  If we could continue playing to 3:55.

16   Q.  I'm going to ask you to listen to a statement of one

17   individual towards the end.

18   A.  Yes.

19        (Video playing)

20   Q.  Now, that individual --

21        MR. HAAG:  If we could back up half a frame maybe.

22   Maybe 3:54.  If you just play to 3:54, that's fine.

23        (Video played)

24   Q.  So this individual in the red hat here, did you hear

25   what that individual said?

1    A.   It sounds like he said pepper spray.

2    Q.   Was there any pepper spray deployed at the Capitol on

3    January 6th?

4    A.   There was police officers -- initially, before they

5    breached the top of the stair, we did deploy OC -- what we

6    call OC spray.  It's equivalent to pepper spray.

7    Q.   What's the purpose of using that kind of spray?

8    A.   Again, to disarm an assailant or to get an assailant

9    off -- you know, off balance so we can take control.

10   Q.   What is the impact of being struck with OC spray?

11   A.   It usually blinding for a temporary.  It irritates the

12   eyes and the nose.  But, again, it has to hit directly in

13   the eyes and nose.  Usually it will just -- you can shake it

14   off in a few seconds.

15   Q.   Okay.  Now, this individual who appears to be filming

16   this video here, where are they standing?

17   A.   Again, right at the entrance of the East Front stairs or

18   the East -- or the Rotunda, excuse me.

19        MR. HAAG:  If we can continue playing this video.

20   I'll tell you when to pause.

21            (Video playing)

22   Q.   Sergeant Warner, in your experience as a police

23   sergeant, is what we saw here consistent with being struck

24   with pepper spray or OC spray?

25            MS. MEDVIN:  Objection, Judge.  Asking for expert

1    opinion if he's not sworn in as an expert witness.

2              MR. HAAG:  It's personal knowledge, Your Honor,

3    and it goes to what he was just talking about with the use

4    of pepper spray.  Why would you use it and, in fact, showing

5    the impact.

6              THE COURT:  What's your question?

7              MR. HAAG:  I'm asking if what we saw on the screen

8    here is consistent with what, in his training and

9    experience, the impact on someone --

10             THE COURT:  What in particular?  We saw a lot of

11   stuff on the screen.

12             MR. HAAG:  I'm sorry, Your Honor?

13             THE COURT:  We saw a lot of stuff on the screen.

14   What are you talking about?  The sounds we're hearing?

15             MR. HAAG:  Yes, Your Honor.

16             THE COURT:  I'll sustain the objection.

17             MR. HAAG:  Now, if we could switch to Government's

18   Exhibit 409.

19             THE COURTROOM DEPUTY:  It's not in evidence.

20             MR. HAAG:  It's not.  For identification.  I

21   apologize.

22   Q.  Sergeant Warner, do you recognize what's depicted here?

23   A.  Yes.  This is officers trying to defend the security --

24   this is officers trying to defend the door.

25             THE COURT:  These are the doors in the Rotunda

 1    from the inside or the outside?

 2            THE WITNESS:  From the outside, sir.

 3    Q.  Does this appear to be from January 6, 2021?

 4    A.  Yes, it does.

 5    Q.  And is it a fair and accurate representation of what

 6    that day looked like to you?

 7    A.  Yes, it is.

 8            MR. HAAG:  Your Honor, at this time the government

 9    would move to admit Exhibit 409 into evidence.

10            MS. MEDVIN:  No objection.

11            THE COURT:  Okay.  It will be admitted without

12    objection.

13    Q.  Now I'm going to circle one individual here in the

14    middle of the screen.  Do you see what's on their head?

15    A.  Yes, CDU helmet.

16    Q.  What is a CDU helmet?

17    A.  It's part of an entire preventative or protective

18    garment that officers use that are assigned to the CDU unit

19    of the division.

20    Q.  And why might an officer wear the CDU helmet?

21    A.  Just for instances like this where they have to gain

22    control, and also to prevent themselves from getting hurt

23    from any objects or anyone trying to hit them in the head or

24    the body.

25            MR. HAAG:  If we could take that down and bring up

1    Government Exhibit 434.  It has not -- for identification.

2    And jump to 7:35, please.

3    Q.  Sergeant Warner, do you recognize what's depicted here?

4    A.  Yes.  This looks like, again, the East -- the stairs --

5    excuse me, the door leading into the Rotunda exterior of the

6    East Front.

7    Q.  Does this appear to be from January 6th?

8    A.  It does.

9         MR. HAAG:  Your Honor, at this time the government

10   would move to admit Exhibit 434 into evidence.

11        MS. MEDVIN:  No objection to the admission, but I

12   would ask that it be limited to the relevant portion.  I'd

13   ask the government to tell us what the relevant portion is

14   that they're attempting to admit.

15        MR. HAAG:  Your Honor, at this time the government

16   is going to be playing from this point at 7:35 jumping out a

17   few points but ending at 12 minutes into the video.

18        MS. MEDVIN:  No objection from 7:35 through 12:00.

19        THE COURT:  Thank you.  It sounds like you're on

20   the same page.

21        MR. HAAG:  For once, Your Honor.

22        THE COURT:  You may proceed.  It's admitted.

23        MR. HAAG:  If we could play to 8:05.

24        (Video playing)

25   Q.  Do you recognize yourself in the crowd?

1  A.  I want to say -- I want to say here.

2  Q.  Thank you.

3       MR. HAAG:  Now, if we could continue playing to

4  8:05.

5       (Video playing)

6  Q.  Now, after watching it for a few moments longer, do you

7  believe that was, in fact, you that you had circled earlier?

8  A.  That was me.

9  Q.  What were you holding in your hands partway through that

10  clip?

11  A.  That was a shield that I retrieved from the ground when

12  they did the initial breach.  It was one of the officers

13  that dropped the shield on the ground as well as their asp,

14  and I picked it up and brought it with me.

15  Q.  Why were you holding it at this point?

16  A.  At this point, initially at the center of the stairs, I

17  was just trying to keep the crowd back with the other

18  officers to the left of me.

19       But to the right of me, we interlocked which would

20  keep -- again, use additional force to help push people or

21  push crowds back.

22  Q.  Was that effective?

23  A.  It was not.

24       MR. HAAG:  If we could jump to -- actually, one

25  further question here.

```
 1   Q.  Where are the officers here in relation to the doors
 2   we've been talking about?
 3   A.  They are to the left of the doors.
 4   Q.  Is there a reason why they're to the left of the doors?
 5   A.  I think that's where -- I would only say that's where
 6   everyone gathered once we realized that they were over --
 7   outnumbered.
 8   Q.  And then on the far right-hand side of the screen as
 9   well as the far left-hand side of the screen, are you aware
10   if there's any additional area in which you could stand?
11   A.  No.  That is a tight area, and that's why everyone was
12   kind of bunched up the way they were.  And that's on both
13   sides of the door.
14          MR. HAAG:  If we could jump to 9:30, please.
15   Q.  Is this the same scene we've been looking at?
16   A.  Yes, it is, sir.
17          MR. HAAG:  If we could play to 10:15, please.
18          (Video playing)
19   Q.  That individual in the red hat that I have circled in
20   the middle of the screen, where is he standing?
21   A.  He's standing directly in front of the door.  It looks
22   like he's attempting to grab hold of something to pull the
23   doors or to find something to break the glass.  I'm not sure
24   what he's doing.
25   Q.  What makes you believe that's what he was trying to do?
```

```
 1    A.  The way his body is jerking.  It's like if someone is

 2    trying to pull on a door.

 3            But, again, there's no handles there to pull on

 4    the door so...

 5            MR. HAAG:  If we could jump to 10:40, please.

 6    Q.  Is this the same location?

 7    A.  Yes, it is.

 8            MR. HAAG:  If we could play to 11:15, please.

 9            (Video playing)

10    Q.  This individual in the red hat off to the left-hand side

11    of the screen, what does it appear that he's doing?

12    A.  It looks like it's possibly a pick of some kind picking

13    at the door.  I can't really tell, but it looks like he's

14    making -- swinging at the door.

15            THE COURT:  What did you say?  You said you think

16    he has something in his hand?

17            THE WITNESS:  Yes, like some kind of metal object.

18    I can't really make it out, but it looks like he has

19    something in his hand.

20            MR. HAAG:  If we could go back to 10:40 and play

21    it through to 10:50.  Just pay attention to that individual.

22            (Video playing)

23    Q.  Having watched that again, what was that individual

24    doing?

25    A.  It looks like he was just doing this (indicating) with
```

1       his hands.

2              I can't make out what that is in his hands.

3       Initially it looked like something metal, but I can't make

4       it out clearly.

5              MR. HAAG:  For the record, the witness has shaking

6       his hands back and forth with his finger pointed forward.

7              THE WITNESS:  Yes.

8              MR. HAAG:  If we could jump to -- actually,

9       continue playing to 11:15, please.

10             (Video playing)

11      Q.  Now, were you able to hear a loud boom?

12      A.  Yes, sir.  Another flash bang, I believe.

13             MR. HAAG:  If we could jump to 11:35, please.

14      Q.  Is this the same area?

15      A.  Yes, it is.

16             MR. HAAG:  If we could continue playing to 12

17      minutes, please.

18             (Video playing)

19      Q.  Now, what just happened in this scene here?

20      A.  Initially we were regaining control of the door.

21      Someone from the inside pushed the door open, which then

22      pushed us -- allowed the mob or the crowd to push us out of

23      the way.

24      Q.  How did the crowd react to those doors opening?

25      A.  Very excited that they were able to get the doors open,

1    and, again, just held us at bay until they could get in,

2    start moving in.

3    Q.  What was in your mind at this time?

4    A.  We had a -- at this time, as everything was, you know,

5    done; they had succeeded; initially we didn't think -- I can

6    say -- I will say I didn't think they could get in, but I

7    guess that the only way they could have gotten in was

8    somebody pushing it from the inside.

9    Q.  You mentioned a moment ago it was done.  Is that what --

10   A.  "Done" meaning we had truly lost footing.  They had

11   taken over.  We truly were overrun.  They were able to be

12   successful in gaining entry into the Capitol.

13   Q.  So with that thought in your mind, what was your

14   objective at that point?

15   A.  To try to look for another way to regain control as best

16   as we could.

17           And, again, I keep saying "we."  As I could.

18           So I just waited for a moment to find an opening

19   to try to get -- again, get to that door to get that door

20   closed.

21   Q.  You kind of mentioned throughout your testimony this

22   afternoon about wanting to regain control.  Why were you so

23   focused on trying to regain control?

24   A.  Because we had an active session going on with the vice

25   president in the building, and, again, with a mob -- and,

1    again, I transfer between "mob" and "protesters."  But when

2    a mob comes at us like this, I can't think of anything good

3    coming from it.

4    Q.  At any point in the day did you make your way inside the

5    Capitol building?

6    A.  Yes, sir.  Probably in the next few minutes I was able

7    to get my way to the door and regain entry into the --

8    regain control of the doors by at least pulling on them,

9    trying to get them closed.

10           MR. HAAG:  If we could pull up Government Exhibit

11   301 and just pause at zero seconds.

12   Q.  What's depicted here, sir?

13   A.  This is the inside of the Rotunda, the same doors we

14   were looking at for the last five minutes.  Now we're on the

15   inside of those doors.

16           And actually, this is the foyer.

17   Q.  So just depicted on the other side of the doors is all

18   the events that we've been discussing?

19   A.  That is correct, yes, sir.

20           MR. HAAG:  If we could jump to two minutes in,

21   please.

22           Sorry, this is 2:32.  Just two minutes.

23   Q.  At this point I'm going to have you pay attention to

24   this individual by the door frame here.

25           MR. HAAG:  If we could just play forward to 2:29,

```
1    please.
2                (Video playing)
3                MR. HAAG:  Sorry, if we could pause right there.
4    Q.  Are you able to see where the individual's left foot is
5    in this frame?
6    A.  Yes.  It looks like it's right at the -- right at the
7    door.  He's got his foot wedged at the door, at the base of
8    the door.
9    Q.  Why might one person do that with their foot?
10   A.  To keep --
11               MS. MEDVIN:  Objection, Judge.
12               THE COURT:  Sustained.
13               MR. HAAG:  If we could continue playing to 2:32.
14               (Video playing)
15   Q.  Are you able to see yourself in the frame here?
16   A.  Yes.
17               MR. HAAG:  For the record, the witness has
18   reflected the officer with --
19   Q.  Is that a beanie cap you're wearing?
20   A.  Yes, sir.
21               MR. HAAG:  -- at the top of the frame at the door.
22               Is there any way we can zoom into the frame at
23   this point?
24               Thank you.
25               THE COURT:  Is that you?
```

1           THE WITNESS:  Yes, it is, sir.  Your Honor.

2    Q.   And where are you standing, sir?

3    A.   In the entry -- the opening of the door.

4           THE COURT:  So the door is partway open.

5           THE WITNESS:  Yes, sir.

6           THE COURT:  We're looking at this still from the

7    video, right?

8           THE WITNESS:  Yes, sir.

9           THE COURT:  And you're standing --

10           THE WITNESS:  I'm pushing my way through the door.

11           THE COURT:  Uh-huh.

12    Q.   What are you doing with your right arm at this point?

13    A.   I'm taking hold of the door and pulling it as I push

14    myself in or bring myself inside the door.

15    Q.   Now, the individual to your left, where is he standing

16    in relation to you?

17    A.   Right on my left shoulder or right on my left arm,

18    excuse me.

19    Q.   And where are his arms located?

20    A.   It looks like on my arm.

21    Q.   Are you aware if he's making physical contact with you?

22    A.   It appears to be.  At that moment I couldn't tell you.

23    When I was in the middle of it, I was just trying to focus

24    on getting that door closed.

25    Q.   Do you fully recall this interaction?

1    A.  I do.

2    Q.  Prior to this point, did you give any kind of permission

3    or signal that this individual could put his arms on you?

4    A.  No, sir.

5            MR. HAAG:  If we could play at half speed to 2:36.

6            (Video playing)

7    Q.  What did we just see here in these past four seconds?

8    A.  Again, me pulling the door closed with my right arm, and

9    they're pushing on me, and also the door, trying to push the

10   door back open.

11   Q.  And when you say they're pushing on you, who are you

12   talking about?

13   A.  The gentleman in the -- here, and then the other two or

14   three that come up behind me start pulling on me.

15   Q.  So the individual you have circled in red here is

16   pushing on you; is that correct?

17   A.  Yes, sir.  Yes, sir, as I'm trying to pull the door

18   closed.

19   Q.  For the record, the individual that has been circled has

20   been identified by stipulation as the defendant.

21            Are you aware that the defendant is still pushing

22   you at this point?

23   A.  Yes.

24   Q.  And there was one or two other individuals who came up

25   at the same time.  What were their -- or shortly thereafter.

1     What were they doing?

2          THE WITNESS:  They were the ones who grabbed me

3     from behind to pull me off balance so I couldn't have --

4     couldn't regain -- excuse me, couldn't keep control of the

5     door.

6     Q.  And as we had seen between 2:32 in the video and 2:36

7     here and the defendant was pushing you, what impact was that

8     pushing having on your ability to do your job that day?

9     A.  I couldn't do it.  I couldn't -- again, my initial goal

10    was to get back to those doors to get those doors resecured.

11    With him pushing against me and the door, I couldn't do

12    that.  So it prevented me from resecuring the building.

13          MR. HAAG:  If we could go back to full speed and

14    then zoom back out and play to 2:52, please.

15          (Video playing)

16          THE WITNESS:  This is when they start.

17    Q.  What did we just see from 2:36 to 2:52?

18    A.  This is when the rest of the crowd -- the rest of the

19    group -- I struggle on what to call them.

20          This is when the rest of the mob come to grab on

21    me and pull them away.

22    Q.  By "the rest of the mob," was the defendant part of that

23    mob?

24    A.  Yes.

25    Q.  And was the defendant still pushing on you through these

```
1   last 16 seconds that we saw?

2   A.  Yes, until the person in the tan hat here got control to

3   push me out of the way.

4   Q.  And for the record, the individual with the tan hat is

5   standing just to your left; is that correct?

6   A.  That is correct.

7           MR. HAAG:  If we could just play just a few

8   seconds further.

9           (Video playing)

10          MR. HAAG:  Right there is great.  We're at 2:56

11  here.

12  Q.  Where are you at this point?

13  A.  I'm still in the entryway of the door reassessing what

14  to do next.

15  Q.  Are you still trying to close the door at this point?

16  A.  I'm trying to figure out how to, yes, sir.

17  Q.  When you say "how to," are you currently in your

18  physical location able to close the door?

19  A.  Not at this particular moment, no, sir.

20  Q.  Why did you move away from the door?

21  A.  Again, to get myself -- once they pulled me away, to

22  reassess how I could reengage to get the door closed.

23          MR. HAAG:  If we could play to three minutes,

24  please.

25          (Video playing)
```

```
 1              MR. HAAG:  I'm sorry, if we could go back to 2:56.
 2      I'm going to have you look at the defendant.
 3              Just look at the defendant, and I'm circling this
 4      officer off to the right-hand side of the screen.  If you
 5      could just pay attention to those two.
 6              And just play to three minutes, please.
 7              (Video playing)
 8      Q.  What just happened between that officer and the
 9      defendant?
10      A.  It looks like he was trying to --
11      Q.  What do you mean by "he"?
12      A.  I'm sorry, it looks like the officer was trying to
13      regain positioning to get to the door himself, but then,
14      again, that white hat, tan hat, whatever color hat that is
15      gets behind him.  It looks like he might be ready to pull
16      him.
17              MS. MEDVIN:  Objection; speculating.
18              THE COURT:  Is the white hat person, that's that
19      person there?
20              THE WITNESS:  Yes.
21              THE COURT:  That's not an officer.  That's a
22      protester?
23              THE WITNESS:  That is a protester, yes, sir.
24              THE COURT:  And where is his hand, and what does
25      he appear to be doing?
```

1          THE WITNESS:  It looks like his hand is on the

2   right shoulder -- or the left shoulder, excuse me, of the

3   officer.  Or back.  I can't really make it out.

4          MR. HAAG:  If we can continue playing to 3:18.

5          (Video playing)

6   A.   There we go.

7   Q.   What just happened between yourself and the defendant?

8   A.   I was able to put my body in between the defendant as

9   well as allow the officer to get the door closed, also

10  keeping the remaining mob away from the door, away from the

11  officer.

12  Q.   Did you physically interact with the defendant at all as

13  you saw here?

14  A.   Not in this moment, no.

15          MR. HAAG:  If we could go back to 3:12 and play

16  back to 3:18.

17          (Video playing)

18  Q.   I'm just going to ask -- we're at 3:13 here.  Pay

19  attention to your right arm.

20  A.   Okay.

21          MR. HAAG:  Play forward to 3:18.

22          (Video playing)

23  A.   That's me pulling on him, pulling on his backpack.

24  Q.   Why were you pulling on his backpack?

25  A.   To get him out of the way.

1          THE COURT:  Pulling on what?

2          THE WITNESS:  I'm sorry, pulling on his backpack.

3   Q.  Pull him out of the way of what?

4   A.  Pull him out of the way of the officer trying to

5   resecure the door, allow the officer -- give the officer the

6   opportunity to close the door.

7   Q.  What was the importance of closing that door?

8   A.  Again, to regain control of the building to secure any

9   entry points to the building because, again, the building

10  was closed for a session held by Congress and the vice

11  president.

12         MR. HAAG:  We can take this down and bring up

13  4:14, please, for identification.

14  Q.  Do you recognize what's depicted here, sir?

15  A.  Yes.  This looks as though one of the officers put

16  himself in between the protesters to reclose the door.  I

17  think.

18         THE COURT:  This is at the same spot we were just

19  looking at in the inside of the Rotunda doors with the glass

20  already broken?

21         THE WITNESS:  Yes, sir.  It's just zoomed in, yes,

22  sir.

23         THE COURT:  And do you recognize this officer just

24  above the individual with the --

25  A.  That is me, yes, sir.

```
1              MR. HAAG:  Your Honor, at this time the government

2     would move to admit Government Exhibit 414.

3              MS. MEDVIN:  No objection.

4              THE COURT:  It will be admitted.

5              MR. HAAG:  Now, if we could pull up Exhibit 410

6     for identification.

7     Q.  Do you recognize what's depicted here?

8     A.  Yes, sir.  This looks like where I was initially pulled

9     out of the way and, again, picked up the -- not again, but

10    picked up the shield that was by my feet.

11    Q.  If I could just interrupt.  I'm sorry.

12    A.  No problem.

13    Q.  Is this the same area that we've been talking about?

14    A.  It is, yes, sir.

15    Q.  And just circling an officer off to the right holding a

16    shield, do you recognize who that is?

17    A.  That is me, sir.

18              MR. HAAG:  At this time the government would move

19    to admit Government Exhibit 410.

20              MS. MEDVIN:  No objection.

21    Q.  Now, I'm circling --

22              THE COURT:  Admitted.

23    Q.  -- left here the individual identified as the defendant.

24    Where is he located?

25    A.  He looks like he's in the opening of the door.
```

1    Q.  Who is this individual behind him in the photograph?

2    A.  One of my fellow officers.  I'm not sure which one.

3    Q.  And what is that officer doing?

4    A.  It looks like he's trying to push himself -- push him

5    out of the way --

6            MS. MEDVIN:  Objection to speculation.

7            THE COURT:  Describe what you see.

8    A.  I see the officer placing his hand on the protester

9    to either push him out of the way so he can get the door

10   closed --

11           MS. MEDVIN:  Objection to the speculation.

12   Q.  Is the officer's arm on the defendant's backpack?

13   A.  Yes, it is.

14           THE COURT:  I'll exclude the speculation and keep

15   the description.

16           MR. HAAG:  Thank you, Your Honor.

17   Q.  Now, switching to talking about the doors themselves,

18   are you aware if those doors are alarmed?

19   A.  They are.  Yes, they are.

20   Q.  Why are they alarmed?

21   A.  Because they're only used when they're in session for

22   members to exit.  But when they're in a closed session such

23   as that day and we have an active protest, all doors are

24   secured.  And they can only be opened with a three-second

25   push which that alarms because it's really -- it signifies a

1    door being open incorrectly.

2    Q.  Other than -- is there any other significance to the

3    alarm other than indicating that the doors are open?

4    A.  No.  It's mostly to let us know that basically the door

5    was opened incorrectly and that someone used the doors

6    without authorization.

7            MR. HAAG:  If we could pull up Government Exhibit

8    415.

9            THE COURTROOM DEPUTY:  That has not been admitted.

10    Q.  Do you recognize what's depicted here?

11    A.  Yes.  It looks like a group of the protesters.

12    Q.  I'm sorry, do you recognize the location?  What's

13    depicted here?

14    A.  That's -- I'm not 100 percent sure of where this

15    location is.

16            THE COURT:  What exhibit are we looking at?

17            MR. HAAG:  415, Your Honor.

18            We can pull this one down.  That's okay.

19            If we could jump to Exhibit 416A, which has not

20    been admitted yet.

21            THE COURTROOM DEPUTY:  It has been admitted.

22            MR. HAAG:  It has.  Thank you.

23            THE COURT:  415 --

24            MR. HAAG:  416.

25            THE COURT:  You said 416A.

1    Q.   Do you recognize what's depicted here, sir?

2    A.   Yes, sir.

3    Q.   What is depicted here?

4    A.   This is the doors on the East Front in the Rotunda.

5    Q.   Is this the same area that we've been talking about?

6    A.   Yes, it is, sir.

7            MR. HAAG:  If we could play through to ten

8    seconds.

9            (Video playing)

10   Q.   Do you recognize yourself in the frame here?

11   A.   Yes, I do.

12   Q.   Were you able to hear any alarm in the background?

13   A.   Yes, sir, the entire time.

14   Q.   Is that alarm associated with this door?

15   A.   That is correct, sir.

16   Q.   How would you describe that alarm?

17   A.   Very annoying, very piercing, yes.

18   Q.   Would you yourself want to be in a location that had

19   that alarm going off?

20   A.   No, sir.  It's a very loud and irritating alarm.

21           MR. HAAG:  We can take that down.

22   Q.   Now, after what we saw depicted in this video just now

23   as well as CCTV, what did you do that day?

24   A.   I'm sorry, restate that again.

25   Q.   After what we had just witnessed on the CCTV and the

1    various videos at the East Rotunda doors, where did you go

2    at that point?

3    A.  After the initial door was -- excuse me, after the doors

4    were closed, I stayed there for a period of time.  I'm not

5    sure how long.

6         Then the Rotunda itself began to fill with the

7    mob/protesters.  They then reengaged us at the door and

8    pushed the doors open.

9         From that breach, I found myself wandering around

10   trying to find officials to figure out what our game plan

11   was going to be.

12        And that ended up being the rest of my day, and

13   then we cleared floors.  I cleared floors with other

14   officers, and then we regrouped at one of the -- at the

15   Rotunda, and then we pushed the mob out of the building.

16   Q.  Do you know at what time approximately you were able to

17   push the mob out of the building?

18   A.  Time that day was all over the place, so I have no idea.

19   Q.  Why do you say that, that is time was all over the place

20   that day?

21   A.  Because as I look at the time looking at being on line,

22   when we first took the line, excuse me, from 11:00 roll call

23   to 12:00 getting on line and then almost around 1:00, things

24   were totally off for me on that day, I'm realizing now, as

25   far as time.

1    Q.  1:00 in the morning or --

2    A.  In the afternoon.  In the afternoon, yes, sir.  So the

3    span of time I can't really pinpoint without seeing the CCTV

4    video and the timestamp.

5    Q.  At what point did you leave the Capitol that day?

6    A.  I know for a fact we didn't leave until 2:00 a.m. that

7    next morning.

8    Q.  And in general, what impact did the actions of, as

9    you've described them, the mob have on your ability to

10   conduct your job that day?

11   A.  We couldn't do our job at all.  We -- again, we tried to

12   protect the members.

13          We also try to protect the public, to allow them

14   to peacefully protest.  But because that day was so chaotic,

15   it was trying to figure it out as we went along to do our

16   job as best as we could.

17          MR. HAAG:  If I could have a moment, Your Honor?

18          (Pause)

19   Q.  We spent a little bit of time talking about the

20   defendant's actions.  Did those actions impact your ability

21   to do your job?

22   A.  Yes, they completely did.  Again, with him standing in

23   the door with his foot there, again, kept the officers from

24   closing the door.

25          Him standing in the middle of officers as we were

1    trying to resecure the door, again, things that prevent us

2    from doing our job.

3                MR. HAAG:  Nothing further at this time, Your

4    Honor.  Thank you.

5                THE COURT:  We're going to take another break at

6    3:15, but why don't we take ten minutes now.

7                (Recess taken)

8                THE COURT:  Okay.  Sergeant Warner.

9                MS. MEDVIN:  Judge, I would like to amend the rule

10   on witnesses to exclude the government's agent, FBI Agent

11   Weatherhead, from the room during the defense's cross of

12   Anthony Warner and the government's redirect so as to

13   preserve the integrity of Agent Weatherhead's testimony.

14   The defendant's cross-examination questions will

15   specifically address Sergeant Warner's communications with

16   Agent Weatherhead.

17               THE COURT:  Well, why don't we ask Officer Warner

18   to leave, and we'll have a legal discussion.

19               (Witness exits courtroom)

20               THE COURT:  Rule 615.  Do you want to make an

21   argument, or shall I hear from the government?

22               MS. MEDVIN:  We've made our initial argument.

23   We'll defer to the government and their position, and we can

24   respond.

25               MS. LEDERER:  Your Honor, the government currently

1    is of the position that I think defense is going to have to

2    proffer a little bit more than just giving a very general we

3    want him out because it's going to relate to his testimony.

4    I mean, everything that has been presented thus far is going

5    to relate essentially to the agent's investigation.

6         So defense is going to have to proffer a little

7    bit more of why specifically he would have to step out when

8    it's related to his -- when the entire testimony thus far

9    has been related to the investigation.

10         THE COURT:  Let's do this, just for the sake of

11    preserving the integrity of this legal argument.  Why don't

12    we ask Agent Weatherhead to leave while we have the legal

13    argument because you don't need his assistance while we have

14    the legal argument.

15         MS. LEDERER:  That's fine, Your Honor.

16         THE COURT:  And then perhaps Ms. Medvin can tell

17    us what the problem is.

18         (Agent Weatherhead exits courtroom)

19         MS. MEDVIN:  Judge, Agent Weatherhead had

20    interviewed Anthony Warner as part of his investigation,

21    and the statements that Anthony Warner gave to Agent

22    Weatherhead are a little bit different than what he

23    testified to today, including his recollection of his

24    interaction with Mr. Warnagiris and some various details.

25         Because of that, I want to be able to cross-

1    examine Anthony Warner on his statements, prior inconsistent

2    statements, and I also would potentially be able to impeach

3    Anthony Warner with statements made today with testimony of

4    Officer Weatherhead on cross, potentially.

5              Alternatively, we would call him as a defense

6    witness.

7              THE COURT:  Call who?

8              MS. MEDVIN:  Oh, Agent Weatherhead.  And so

9    there's a variety of ways to -- for the information to be

10   concerning if he is listening to it.

11             The government's position on using him -- and I

12   didn't make the objection initially when Anthony Warner was

13   testifying.  I would have made the objection if he

14   referenced any communications with the agent.  He didn't, so

15   I made no objections to that initial testimony.

16             But now, because it will be specifically

17   referencing those conversations, I think, for purposes of

18   integrity of the testimony of Agent Weatherhead, that he

19   should be excluded.

20             THE COURT:  All right.  So as I understand it, you

21   have Agent Weatherhead's -- as *Jencks* you have the statement

22   that Officer Warner made to Weatherhead.

23             MS. MEDVIN:  Yes.

24             THE COURT:  So you can use that in cross-examining

25   Warner.

1          MS. MEDVIN:  Yes, and it is part of our cross-

2    examination.

3          THE COURT:  Got it.

4          Well, the rule is that a designated representative

5    can be present for a party to the lawsuit who is not a

6    natural person.  So your client is a natural person.  The

7    United States is not a natural person, so they have a right

8    to have someone there.

9          And the entity has the right to decide which

10   officer or employee will serve as the designated

11   representative.  Generally, it's the police officer, law

12   enforcement officer, who has sort of had the overview and

13   oversight of the case.

14         The question, I guess, is why is that -- why is

15   that -- why does the rule say that?  Because there's a

16   separate provision in the rule for a person whose presence a

17   party shows to be essential to presenting the party's claim

18   or defense.

19         Typically, in criminal prosecutions, the

20   government says, well, we have a right to have -- designate

21   somebody to be at the table with us, and we choose Officer X

22   because he's going to help us, and he's got an overview of

23   the case.  So there's a certain overlap between 615(b) and

24   (c) in terms of what their purposes are.

25         The purpose of (b), actually, a party that's not a

1    natural person can designate someone, doesn't really, so far

2    as I can tell, have a rationale beyond having someone who

3    knows the case well and to provide some parity between the

4    side who's representing a natural party and the side that's

5    representing an entity.

6            So I have not thought about this until you raised

7    it on what discretion I have to exclude the person

8    designated under 615(b) for a brief period of time, which is

9    all you're really asking.  Not beyond your cross-

10   examination, as I understand it, of Officer Warner, right?

11           MS. MEDVIN:  Yes, just the cross and the redirect

12   on the same elements.

13           THE COURT:  Cross and redirect.

14           Okay.  So I'll hear what the government has to

15   say.

16           MR. HAAG:  Your Honor, briefly reading from Rule

17   615 starting at (a) saying that the party can request that a

18   witness be excluded; however, this rule does not authorize

19   excluding the list of four individuals; so to the Court's

20   question as to the discretion, this rule seems to plainly

21   state that there isn't much discretion, if any, with respect

22   to excluding an individual that is listed in (a)(1) through

23   (4).

24           THE COURT:  Well, the response to that by

25   Professor Saltzburg and other commentators and treatise-

1   writers is it is true that the rule says that the rule does

2   not authorize excluding the following people, but if you

3   look at the advisory committee notes, there's no indication

4   as to why they use the word "not authorized," why they said

5   that in a mandatory sense.

6           MR. HAAG:  Your Honor, through my own reading of

7   the notes, it does say exclusions of persons who are parties

8   would raise serious problems of confrontation and due

9   process, but I don't believe the defense has sufficiently

10  proffered that we have an issue of confrontation or due

11  process here that would give rise to that exception.

12          MS. MEDVIN:  If I may, Judge --

13          THE COURT:  Wait.

14          (Pause)

15          THE COURT:  Okay.  You were going to say?

16          MS. MEDVIN:  In response to the government's

17  assertion that we did not raise a confrontation issue, that

18  is not true.  We raised a confrontation issue.  We

19  specifically talked about the integrity of witness

20  testimony, and we talked about the potential for calling

21  Agent Weatherhead as a defense witness, and that impacts the

22  defendant's constitutional right to present a complete

23  defense.  It impacts the defendant's right to call witnesses

24  on his behalf.

25          I mean, the reality is it simply impacts the

1    integrity of the Court and the judicial proceedings before

2    this Court, and the judge is the gatekeeper as to what is

3    allowed and what is not.  And I don't see anything in the

4    rules specifically prohibiting this Court from making

5    decisions as to integrity of evidence as it is presented and

6    the testimony of the witnesses before this Court.

7                THE COURT:  Okay.  Anything else -- who else

8    was -- does the government want to say anything further?

9                MR. HAAG:  Your Honor, as I understand what the

10   defense wishes to do between Officer Warner and Officer

11   Weatherhead is -- Agent Weatherhead, I should say -- is to

12   impeach Officer Warner based on what is written in the 302s

13   that Agent Weatherhead produced.  But that would be an

14   improper impeachment.

15               So having Agent Weatherhead present in the

16   courtroom wouldn't impact the defense's ability --

17               THE COURT:  He can -- if it's *Jencks* -- now you're

18   confusing apples and oranges.

19               He interviewed Warner.  He has a 302.  If Warner

20   said these things that were in the 302, he can be asked

21   about what he said.  Right?

22               MR. HAAG:  But bringing the actual 302s into the

23   testimony, the cross-examination --

24               THE COURT:  That's not what she's talking about.

25               MR. HAAG:  That was my one understanding of what

1    the defense is trying to do --

2              THE COURT:  I'm going to deny the motion.  We'll

3    proceed.  Each of them will be under oath when they testify,

4    and presumably they'll tell the truth.

5              So let's get Sergeant Warner back.

6              MS. MEDVIN:  Judge, it appears, according to my

7    colleague, that you actually wrote a decision on this in

8    *Bradshaw v. Perdue* in 2018.

9              THE COURT:  All right.  Let's get my decision, and

10   let's take a break.

11             Do you have a citation?

12             MS. MEDVIN:  The citation, as I have it written,

13   is 319 F. Supp. 3d, 2018, *Bradshaw v. Perdue*.

14             THE COURT:  (To law clerk) Have you got the cite?

15   You've got it?

16             MS. MEDVIN:  319 F. Supp. 3d.

17             THE COURT:  Why don't you just give it to my law

18   clerk.  I'll take a break.

19             (Recess taken)

20             THE COURT:  Why don't we ask the officer to go

21   back to the witness room, and we can ask the agent to go

22   back to the witness room.  We're still arguing law.

23             And the question is whether anybody else wants to

24   say anything about what we were discussing before the break.

25   Otherwise, I'll tell you what I think.

1          MR. HAAG:  If I can be briefly heard, Your Honor?

2          THE COURT:  Sure.

3          MR. HAAG:  Your Honor, this is admittedly a

4    complex issue.  I appreciate defense counsel citing a case

5    that Your Honor had produced.  I've read through that over

6    the break.  It's a very thorough analysis of the issue, so

7    thank you to Your Honor for providing that to the

8    government.

9          However, as indicated at the top of the *Bradshaw*

10   opinion -- just so the record's clear, I'm talking about 319

11   F. Supp. 3d 286.  At the top of that opinion it indicates

12   that it was an order issued following the final pretrial

13   conference.

14         This is something that should have been briefed

15   potentially months ago.  This is not something that should

16   have been raised at the last possible minute before a

17   witness goes on the stand.  And putting the government in

18   this position where it's having to respond at the last

19   possible minute without any opportunity to look into the

20   issue is frankly beyond the pale.

21         So going forward, I would ask that if the defense

22   has these novel legal issues to bring up that should be done

23   in the pretrial process, that it be done today, not at any

24   point in the future.

25         As to the actual facts here, I'd highlight the

1    Court's opinion in *Bradshaw* and cite specifically 289 where

2    the Court said, "This trial is about whom to believe,

3    Mr. Bradshaw or Mr. Jurey.  It's a he said/he said kind of

4    case that largely turns on the credibility of these two

5    witnesses recalling events that occurred over 15 years ago."

6         That is not this case.  This is a case that is

7    almost entirely based off of CCTV open source videos, body-

8    worn camera, certainly some testimony from the witnesses.

9    But this is not a situation where Agent Weatherhead would

10   have any motivation to tailor or modify his testimony based

11   on anything that Sergeant Warner may say on cross-

12   examination or redirect.

13        So based on that, I'd ask that the Court deny the

14   defendant's motion.

15        Additionally, Your Honor, one scheduling issue.  I

16   understand -- I know it's happened a lot in this case.  I

17   understand from Sergeant Warner he's on leave tomorrow, so

18   he will be unavailable.

19        THE COURT:  We're going to finish him today.

20        MR. HAAG:  So we would either finish him today,

21   fortunately.  But he did say he was available Thursday

22   morning, if we have to bifurcate his testimony.

23        THE COURT:  Thank you.

24        Ms. Medvin.

25        MS. MEDVIN:  Judge, every single legal issue that

1    we had a foresight of, we presented to the Court.  This

2    issue, I presented it as it became apparent.

3              As far as the government's statement that they

4    didn't think I notified them in advance about a legal issue.

5    I've notified them in advance of dozens, if not more, legal

6    issues in this case.

7              This one became apparent recently and was

8    presented to the Court when it was relevant and became

9    relevant.

10             THE COURT:  Well, look, let's talk about that.

11   I don't know whether you even knew about *Perdue* until

12   Mr. Coopersmith [sic] handed you this piece of paper.

13             MS. MEDVIN:  I did not.

14             THE COURT:  Right?  So if you and he are

15   consulting -- when did this become apparent?  Did it become

16   apparent over lunch, that for some reason their case agent

17   being present in the courtroom while Warner is going to

18   testify -- you've had the *Jencks* material.  You know you're

19   going to use the FBI 302.

20             Not only did you spring it at the last moment on

21   them, you sprung it at the last moment on me as well, and

22   this is not the first time that that has happened.

23             So we just took a half an hour doing our own legal

24   research, right?  I reread my *Perdue* decision.  I read the

25   cases I cited in *Perdue*.  I read -- looked at two treatises.

1      We found some other cases.  That took a half an hour.

2              If this were a jury trial, I can't tell you how

3      angry I'd be at you because they'd be sitting in the jury

4      room while we are talking about law, which we should do

5      through emails as soon as the issue arises.  "Please look at

6      this case.  This is what's relevant."  Overnight emails or

7      come in at 8:30 in the morning or stay until 6:00 at night,

8      but we don't interrupt the jury.

9              In this case, what you're doing is you're taking

10     me by surprise as well as the government, and we're losing

11     time from witnesses and having to rejigger the schedules of

12     witnesses.  So please, you know, you should have raised this

13     before.

14             And even when you did raise it, you didn't know

15     the *Perdue* case until Mr. Coopersmith handed it to you in

16     the middle of your argument.  So I don't get it, but...

17             You don't have to respond.  It's just an

18     admonition.

19             Now, what do you want to say about the merits in

20     the last point that Mr. Haag made, that this is very

21     different from the situation in *Bradshaw* and the witness

22     whom I excluded?

23             MS. MEDVIN:  What I stated to this Court is there

24     is a potential that the defense would call Officer

25     Weatherhead -- Agent Weatherhead as an impeachment witness,

1    which is distinct, and it is important, and it is something

2    that we should preserve the integrity of the testimony for.

3    So that is the basis as well as potential cross-examination

4    of him.

5              It is important to understand --

6              THE COURT:  But he's always been on your witness

7    list as a potential witness.

8              MS. MEDVIN:  He's always been as a potential

9    witness.

10             THE COURT:  You knew he was going to sit here and

11   listen to every other witness.

12             MS. MEDVIN:  I did not know that Anthony Warner

13   was going to talk about remembering an event that he

14   previously told Agent Weatherhead he did not have a

15   recollection of.  I did not know that he was going to

16   testify to that.  I expected a different type of testimony.

17             As far as the nature of the testimony, Agent

18   Warner's testimony is the basis for two of the government's

19   indictments --

20             THE COURT:  Correct.

21             MS. MEDVIN:  -- where they specifically name him

22   in the indictment, and his testimony and what happened goes

23   directly on point to the issues that this Court has to

24   consider, and so the integrity of potential impeachment

25   testimony from another witness is the type of testimony that

 1    we need to preserve because it becomes potentially a he

 2    said/he said situation between the two.

 3              THE COURT:  All right.  Anything further anybody

 4    wants to say?

 5              MR. HAAG:  Nothing further, Your Honor.  Thank

 6    you.

 7              THE COURT:  Look, I think this is a very close

 8    question in this case, and it's close for a couple of

 9    reasons.

10              First of all, the language of Rule 615 is -- there

11    are two separate verbs in 615.  One is -- are you a law

12    professor, Mr. Coopersmith?

13              One is that I must exclude a witness at the

14    request of a party.

15              The second is with respect to exceptions, and the

16    sentence relating to exceptions says this rule does not

17    authorize excluding various people.

18              The first is a natural person, and in a criminal

19    case that person's the defendant.  And there's no way in the

20    world I could exclude the defendant because he's got a

21    constitutional right to be here and a confrontation clause

22    and all of that.

23              The second one is a designated representative of

24    the attorney to a party who is not a natural person -- the

25    United States in this case -- or any person whose presence a

1    party chose to be essential to presenting the claim or

2    defense.  Agent Weatherhead could fit in either 2 or 3 for

3    that matter.  Sometimes 3 is used for expert witnesses.  And

4    4 is a person authorized by statute to be present.

5         But the language is not -- that the rule does not

6    authorize excluding a person.  And so what Wright & Miller

7    says is that the Courts -- some cases suggest that the

8    Courts have discretion to exclude a 615 witness, if the

9    source of that authority comes from 615.

10         And Judge Kotelly took that discussion and in

11   *El-Amin* -- E-L hyphen A-M-I-N -- *v. George Washington*

12   *University*, 533 F. Supp. 2d, Page 12, 2008.  Beginning on

13   Page 47 she says the rule does not authorize exclusion of a

14   party who, blah, blah, blah, but think that the Court may

15   lack the express authority does not bar the Court from

16   excluding people under some other analysis, and that

17   withholding authorization -- by the rule withholding

18   authorization doesn't mean that the Court doesn't have the

19   authority if it derives from somewhere else.

20         And Judge Ian Williams in *The U.S. v. Mosky*, 1990

21   Westlaw 70819, said something similar.

22         I guess the most thorough discussion of it, which

23   I had forgotten about, is my decision in *Bradshaw v. Perdue*,

24   and Rule 615 -- and you've all read it by now and so I don't

25   have to go over it.  And Mr. Jurey there, J-U-R-E-Y, was the

1    agriculture department's designated representative.  But the

2    fact that the crucial evidence -- the crucial decision in

3    the case came down to who remembered more accurately or who

4    testified more credibly about what happened years earlier

5    between Mr. Jurey and the plaintiff, Mr. Bradshaw, was what

6    motivated me to apply the analysis of Wright & Miller and

7    Judge Kollar-Kotelly.

8           And there's also a case from the First Circuit,

9    *United States v. Charles*, 56 F. 3d 249, saying that the rule

10   does not totally withdraw discretion from the trial court to

11   exclude a case agent in exceptional circumstances.

12          And I said in *Bradshaw* that I found that limited

13   sequestration of Mr. Jurey -- that is, excluding him for a

14   portion of the trial, even though he was the case agent or

15   the representative of the party -- pursuant to the Court's

16   general powers to manage the conduct of trial and to control

17   the mode and order of witness presentation under Rule 611

18   was appropriate because it basically -- because it risked

19   jeopardizing the truth-seeking function because Mr. Jurey

20   was the critical fact witness.

21          Now -- and it was a he said/he said situation --

22   whether this case is precisely that or not, I do agree with

23   Ms. Medvin on the following.

24          The two most serious charges in this case, Count 1

25   under 231(a)(3) and Count 3 under 111(a)(1), or maybe two of

1     the three most serious charges come down to what Officer

2     Warner says happened and, if Mr. Warnagiris chooses to

3     testify, what he says happened and what we all observed on

4     the videos and what inferences we draw from them.  And to

5     the extent that Officer Warner is going to be impeached by

6     interview with Agent Weatherhead, this is really crucial.

7          Without prejudging any of the other counts in the

8     case -- and certainly there's a lot of case law we're

9     waiting to hear from the Supreme Court and from the D.C.

10    Circuit on -- you know, they're easier to resolve because

11    Mr. Warnagiris was there.  We still have to think about

12    intent and whether he saw signs and barriers and all of

13    that.  They're a hell of a lot easier to resolve once I get

14    over those hurdles one way or the other and apply the new --

15    the case law from the D.C. Circuit in *Griffin* and the case

16    law from the Supreme Court; and the questions that come up

17    under Counts 1 and 3, and they're very central to this

18    prosecution in this case and ultimately what sentencing

19    options I would have and what's appropriate if there's a

20    conviction.

21          So for all of those reasons I'm going to take the

22    extraordinary step of excluding Agent Weatherhead during the

23    cross-examination of Sergeant Warner and the redirect.  And

24    that's all I'm going to do for now, and that's what your

25    request is.

```
 1              So that's what we'll do over the government's
 2    strenuous objection.
 3              MR. HAAG:  Your Honor, should I collect Sergeant
 4    Warner at this time?
 5              THE COURT:  Yes.
 6              And I'm really hopeful, Ms. Medvin, that we can
 7    finish with him today because, A, of his schedule and, B, of
 8    our anticipated schedule for this trial.
 9              MS. MEDVIN:  I will try, Judge.
10              THE COURT:  Please take to heart what I said about
11    giving us earlier heads up when you can of -- even if it's
12    just an email saying, "I'm going to raise this; look at
13    these cases" to me and to the other side.
14              (Pause)
15              THE COURT:  All right.  Finally, Sergeant.
16              THE WITNESS:  Yes, sir.
17                        CROSS-EXAMINATION
18    BY MS. MEDVIN:
19    Q.  Hi, Sergeant Warner.  My name is Marina Medvin.  I
20    represent Christopher Warnagiris.
21              And this is the first time you and I are speaking,
22    correct?
23    A.  That is correct.
24    Q.  And you just testified for the prosecution team, but
25    this is not the first time you spoke to these prosecutors;
```

```
1    is that correct?
2    A.  That is correct.
3    Q.  In preparing for testifying here today, you have met
4    with the prosecutors; is that correct?
5    A.  Yes.
6    Q.  How many times have you met with the prosecutors?
7    A.  Once.
8    Q.  Okay.  Have you met with any other prosecutors?
9    A.  Different cases, yes.
10   Q.  For different cases.  But for this case, only with these
11   two prosecutors one time?
12   A.  Correct.
13   Q.  How long was your meeting with them?
14   A.  Maybe about an hour and a half.
15   Q.  You also spoke with Agent Weatherhead from the FBI about
16   this case; is that correct?
17   A.  Yes.
18   Q.  And you spoke to him a few times about this case,
19   correct?
20   A.  Negative.  Only once.
21   Q.  Only once?
22   A.  Correction.  Once initially after J6, and then recently
23   preparing for this case.
24   Q.  Okay.
25   A.  Yes.
```

1    Q.  Well, starting with the time you spoke to him closer to

2    January the 6th, you didn't initiate contact with Agent

3    Weatherhead.  He initiated contact with you.  Correct?

4    A.  Correct.

5    Q.  So you didn't write a report that mentioned the incident

6    you just testified to, correct?

7    A.  I did not.  That's correct.

8    Q.  And prior to the FBI reaching out to you, prior to

9    Officer -- I'm sorry, FBI Agent Weatherhead reaching out to

10   you, prior to that, you actually had no independent

11   recollection of interacting with the man in the green

12   jacket; is that correct?

13   A.  That is correct.

14   Q.  And, in fact, you said to Agent Weatherhead, when you

15   were speaking to him, that you did not recall this incident,

16   correct?

17   A.  That conversation I don't remember because I don't

18   remember him specifically pointing out any one person.

19   Q.  Okay.  You don't recall him pointing out any one person?

20   A.  No, not from my initial J6 meeting.  And, again, that

21   was years ago, so I'm very foggy on what we actually talked

22   about in detail.

23          THE COURT:  This is the first conversation you had

24   with Agent Weatherhead you were talking about?

25          THE WITNESS:  Yes, sir.  After January 6th, yes,

```
 1    sir.

 2              THE COURT:  And approximately when was that?

 3              THE WITNESS:  Maybe two months or less after J6,

 4    yes, sir.

 5              MS. MEDVIN:  I'm going to pull up Defense Image

 6    058.

 7              THE COURT:  What's the number?  I'm sorry.

 8              MS. MEDVIN:  058.

 9              THE COURT:  Thank you.

10    Q.  Do you recall receiving this image in an email from

11    Agent Weatherhead?

12    A.  No, never in an email that I recall, no.

13              Everything was usually when I'm sitting,

14    counseling, preparing for a trial, or they brought it to a

15    meeting with me.  But never in an email.

16    Q.  So you don't recall receiving any emails from Agent

17    Weatherhead?

18    A.  No, ma'am.

19    Q.  Not in March of 2021?

20    A.  No, ma'am, I don't.

21    Q.  Okay.

22    A.  I'm reluctant because I talked to several agents then,

23    so I'm not sure if it's the agent in question or another

24    agent.  So that's why I'm reluctant in answering.

25    Q.  Okay.
```

1    THE COURT:  To your knowledge, did you talk to

2    agents in addition to Agent Weatherhead about this

3    particular defendant?

4    THE WITNESS:  Not necessarily about this

5    particular defendant, but different defendants on that day.

6    THE COURT:  Yes.

7    THE WITNESS:  Yes, sir.

8    Q.  Do you recall the first agent you spoke to -- the first

9    FBI agent you spoke to about any January 6th case?  Do you

10   recall that being Agent Bryden Vukasin?

11   A.  I will not be, ma'am.  No, I don't.

12   THE COURT:  Could you spell it for the court

13   reporter.

14   MS. MEDVIN:  It is V-u-k-a-s-i-n.

15   MR. HAAG:  Your Honor, I would object to the

16   question at this point.  The officer has made very clear

17   that he doesn't remember much about communicating with the

18   FBI in the immediate aftermath of January 6th.

19   THE COURT:  That doesn't mean she doesn't have a

20   right to see if he remembers or to see if she can refresh

21   his recollection.

22   Q.  Do you recall speaking to an FBI agent for the first

23   time about any January 6th case in February of 2021?

24   A.  No, ma'am.

25   Q.  Do you recall generally you spoke to FBI agents around

1    that time?

2    A.  I would say yes.  Again, I struggle with the timeline

3    because J6; then sometime thereafter multiple agents reached

4    out to me about different members in the J6 assault.

5    Q.  Do you recall telling one of the FBI agents that you

6    could not recall anyone specifically from the crowd in the

7    Capitol?

8    A.  Yes.  I told them all the same with that.

9    Q.  You told them all?

10   A.  Yes.

11   Q.  You mentioned speaking to Agent Weatherhead multiple

12   times.  The second time you spoke to him, was that an in-

13   person meeting?

14   A.  Yes.

15   Q.  And is that the first time you met with Agent

16   Weatherhead?

17   A.  No.  The first time was the initial meeting where he met

18   me at the Library of Congress, so it was twice.

19            I said twice that I met him.  The first time was

20   when he initially contacted me, and then the second time was

21   when we had the preparation for talking about this trial.

22   Q.  You don't recall --

23            THE COURT:  And that would be fairly recently?

24            THE WITNESS:  Yes, sir.

25   Q.  You don't recall a phone call as your first contact with

1    Agent Weatherhead?

2    A.  I do not.  I do not.

3    Q.  Instead you remember meeting him in the Library of

4    Congress, and you're sure it was Agent Weatherhead that you

5    met in the Library of Congress?

6    A.  Again, I remember several agents, but I don't remember

7    particularly which ones.

8    Q.  Okay.

9    A.  But I've dealt with three or four.

10    Q.  When you met with the prosecutors to prepare for this

11    case, was Agent Weatherhead present for that hour and a

12    half?

13    A.  Yes.

14    Q.  After meeting with them about this case, did you

15    decide -- let me -- I'll withdraw that.

16          Prior to meeting with the prosecutors about this

17    case, would you have been able to testify the way that you

18    did today?

19    A.  Yes.

20    Q.  Okay.  So after meeting with the prosecutors, you did

21    not change anything in your testimony?

22          THE COURT:  Changes from what?

23    Q.  You did not reduce or increase the information you

24    presented during your testimony?

25    A.  It's possible because each case brings different

1    accounts because I'm able to view and be able to talk from

2    what I viewed to bring my recollection back of that day.

3    Q.  Okay.

4            THE COURT:  When you met with Agent Weatherhead

5    the first time, did he show you any videos, if you remember?

6            THE WITNESS:  I want to say yes.  That's what

7    prompted the questions to my, you know, participation on J6

8    and what I did that day, yes, sir.

9    Q.  Do you recall telling Agent Weatherhead that you engaged

10   in a conversation with a protester about your time in the

11   military?

12   A.  I remember the prosecution, but not with Agent

13   Weatherhead.

14   Q.  Okay.  Do you recall meeting with an FBI agent David

15   Elias, E-L-I-A-S?

16   A.  I would like -- I would say no, I don't.  Again, I'm bad

17   with the names of the agents because, again, they were so

18   far and few -- far in between when I met with them, so,

19   again, we're talking about several years back.

20   Q.  Do you recall meeting with Agent Elias or an agent from

21   the FBI to discuss the name of a man wearing a burgundy

22   beanie?

23           THE COURT:  Burgundy what?

24           MS. MEDVIN:  A burgundy beanie.

25   A.  Not with FBI, but I want to say with prosecution.  But

1   not with FBI.

2   Q.  Okay.  So you recall meeting with prosecutors about a

3   case involving a man in a burgundy beanie?

4   A.  Yes.

5   Q.  Okay.  And do you recall if that man was charged for any

6   offenses against you?

7   A.  No, I'm not aware.

8            THE COURT:  About how many trials have you

9   testified in for --

10           THE WITNESS:  This will be my fourth, yes, sir.

11           THE COURT:  And to your knowledge, you didn't

12   testify in a trial about a man with a burgundy beanie?

13           THE WITNESS:  I do vaguely remember talking about

14   a man with a beanie, but I don't remember going to trial for

15   him, yes, sir.

16   Q.  You said this is your fourth trial?

17   A.  Yes, ma'am; two, then last week, and then this one, yes.

18           MS. MEDVIN:  The Court's indulgence.

19   Q.  At any point during your meetings with any prosecutors,

20   did you discuss a situation where you were confusing the

21   actions or words of two protesters?

22   A.  No.

23   Q.  You watched a video, Government 416A, on direct.

24           MS. MEDVIN:  Actually, that's not 416A.  I'll

25   withdraw that.  It was Government Exhibit 301.

1    You watched Government Exhibit 301 involving the

2    incident in front of the door.  And I'm going to bring up

3    Government Exhibit...

4    (Pause)

5    MS. MEDVIN:  Okay.  If I can please ask the

6    government to bring up Government Exhibit 301, and if we can

7    play that for about 20 seconds one minute into it.  So if we

8    could play starting at about one minute in.

9    (Video playing)

10   Q.  This video in front of the door that you're currently

11   watching in Government Exhibit 301, when is the first time

12   you saw that video?

13   A.  When -- from this angle, the first time I met with

14   prosecution, this team here.

15   Previous prosecution teams, maybe the first two --

16   first two trials I went to.  I attended, excuse me.

17   Q.  Okay.

18   MS. MEDVIN:  If we could bring this to two minutes

19   in, and if we could hit "Play" here.

20   (Video playing)

21   MS. MEDVIN:  We can pause.

22   Q.  This moment of Mr. Warnagiris and you interacting, when

23   is the first time you observed this moment on video?

24   A.  This was dealing with the prosecution, current

25   prosecution.

1    Q.  Up until you observed this video together with the

2    prosecution, did you have a recollection of this moment?

3    A.  Yes, I did.

4    Q.  Okay.  But you didn't have a recollection of that until

5    after you spoke with the FBI?

6    A.  No, no, this has always been an image vivid in my mind.

7            When I initially met with the FBI, again, I don't

8    remember what we looked at, but talking to these prosecution

9    people here, this is where we -- we reviewed it to where I'm

10    now current with it again.

11    Q.  But you said that you told all the FBI agents you spoke

12    to that you couldn't recall anyone specifically from the

13    crowd at the Capitol.

14    A.  Yes, and I can't.  I can't call names.  I can't call --

15    but I can tell, when looking at an image, where I was in

16    that moment and at that time.

17            But as far as did I realize he was to the left of

18    me at the moment, no.

19    Q.  Okay.

20    A.  I was focused on closing the door.

21    Q.  Okay.  So you didn't realize he was to your left.  Do

22    you know if there was any physical contact with the two of

23    you?

24            Outside of watching this video, do you recall any

25    physical contact between --

1    A.  I remember someone pulling on my arm, but again, like I

2    said, I didn't look his way.  I was focused on getting the

3    door closed.

4    Q.  Okay.  And you don't know at what moment -- because a

5    lot of people are pulling on you -- at what minute you felt

6    pulling?

7    A.  At this particular moment somebody's pulling on my arm.

8    Again, I'm not looking back to see.  I'm just trying to get

9    the door closed.

10              THE COURT:  So you didn't look back to see who it

11   was in the moment?

12              THE WITNESS:  In the moment.  Yes, sir, I did not.

13              MS. MEDVIN:  I'd like to play Defense --

14              THE COURT:  What are we looking at next?

15              MS. MEDVIN:  I'm going to play Defense Video 065.

16              To notify the Court, 065 is a zoomed video of the

17   moment that we had up on the screen previously, but it's

18   already zoomed so the Court doesn't have to attempt to zoom

19   during evidence review.

20              THE COURT:  So this is not in evidence.

21              MS. MEDVIN:  Not yet in evidence.

22              THE COURT:  Got it.

23              (Video playing)

24   Q.  Is this the same moment that you were just viewing on

25   CCTV footage?

```
1    A.  Yes, ma'am.

2    Q.  And is it zoomed in?

3    A.  Yes, it is.

4              MS. MEDVIN:  Judge, we ask to admit Defense 065.

5              MR. HAAG:  Your Honor, I would object.  I don't

6    necessarily see the purpose of admitting this exhibit when

7    it's already been proffered that this is the same thing

8    that's been shown on Government --

9              THE COURT:  It's a close-up.

10             MR. HAAG:  Certainly, and certainly Your Honor is

11   able to do the close-up with 301 as well.

12             THE COURT:  This is a lot easier.

13             Thank you.  I'll admit it over your objection.

14   Q.  So this incident involving you and Mr. Warnagiris, the

15   contact lasts about -- well, the contact.  I'll say the

16   incident between the two of you lasts about 20 seconds.  Is

17   that fair?

18   A.  Without looking at the timestamp, I would say yes,

19   maybe.

20   Q.  Have you watched this video on zoom before, or no?

21   A.  I have, but, again, it was only to address the questions

22   of the prosecution.

23   Q.  What questions did you need to address and watch on

24   zoom?

25   A.  Again, it was just basically what you just asked me.
```

1    The gentleman in the -- with the backpack made contact with

2    me.  Yes, he had.

3    Q.  Other than seeing what you think you see on the video,

4    do you recall that contact independent of that video?

5             If you didn't have a video, would you recall

6    contact with the man in the green backpack?

7    A.  I don't recall anyone in particular that day that I came

8    in contact with.

9    Q.  Okay.

10   A.  I just know that I was defending the door.

11   Q.  Okay.  I'm going to play Defense 065 for you, and I'm

12   going to ask you to watch Mr. Warnagiris's hands carefully

13   throughout.

14   A.  Uh-huh.

15   Q.  I'm going to specifically direct your attention to his

16   right hand.  So let's start with the right hand.

17            (Video playing)

18            MS. MEDVIN:  I'm going to pause.  So let's start

19   with the beginning.

20   Q.  Where do you see -- initially see Mr. Warnagiris's hand

21   go?

22   A.  On my left arm.

23   Q.  Okay.

24            MS. MEDVIN:  And the Court's indulgence.

25   Q.  And how long does it stay on your arm for?

1    A.  Maybe five seconds.

2          MS. MEDVIN:  Pause.

3    Q.  Let's count it off.  Let's look at it one more time, and

4    you tell me how many seconds you think go back.

5    A.  One-thousand three, three seconds.

6          MS. MEDVIN:  I'm going to press "Play," and,

7    again, keep an eye on his right hand, please.

8          THE WITNESS:  Uh-huh.

9    Q.  Can you see his right hand right now?

10   A.  I can't see his right hand, but I see his elbow, his

11   right arm pushing into me initially.

12         MS. MEDVIN:  I'm going to pause.

13   Q.  Do you see his right hand right now?

14   A.  Yes, at the door.  It looks like at the door by my hip,

15   my right hip.

16   Q.  Okay.  Let's keep -- I'm going to circle for you this

17   area.  Let's keep an eye on that area.

18         MS. MEDVIN:  I'm going to play it again.  Or

19   actually I'm going to continue playing, and then we'll play

20   it again from the beginning.

21         (Video played)

22   A.  He's bracing himself in the door, using the door as a

23   brace.

24         MS. MEDVIN:  I'm going to play the video for you

25   one more time, and I'm going to ask you to keep an eye on

1    his right hand for me one more time.  I'm going to ask you

2    another question about it.

3               THE WITNESS:  Uh-huh.

4               (Video playing)

5    Q.  Do you ever see Mr. Warnagiris's right hand move from

6    that position on the door while the hand is hidden behind

7    your body as you're in front of it?

8    A.  No, ma'am, but if you look at the image, he's pushing

9    the door as I'm pulling it trying to push it open, so he's

10   bracing himself with his right hand to push against the door

11   while I'm holding.

12   Q.  Against the door.  But his hand is on the door?

13   A.  Yes, as a brace.  To give himself leverage to push

14   against the door.

15   Q.  Okay.

16              MS. MEDVIN:  Now I'm starting the video -- all

17   right.  Well, I'll start it from the beginning one more

18   time, and we're going to look at his left hand.

19              THE WITNESS:  Okay.  Sounds good.

20   Q.  Where is his left hand going?

21   A.  Again, it looks like it's on the push bar.  We can't

22   really see it, but it looks like it's on the push bar, and

23   he's pushing into the door as I'm pulling.

24   Q.  Okay.

25              MR. HAAG:  Your Honor, I would ask that counsel

1    clear the screen.  It could be hard to see.

2            THE COURT:  Pardon me?

3            MR. HAAG:  I'd ask that counsel clear the screen.

4            MS. MEDVIN:  Sorry, I didn't realize that was

5    still on the screen.  I'll start it from the beginning.

6            (Video playing)

7    A.  He's pushing into the door --

8    Q.  With his left hand, correct?

9    A.  -- as I'm pulling.

10           Yes, with his left --

11   Q.  And his right hand --

12           THE COURT REPORTER:  One at a time, please.

13           THE WITNESS:  Yes, ma'am.  I'm sorry.

14           MS. MEDVIN:  Apologies.

15   Q.  And his right hand maintains contact with the door as

16   well?

17   A.  That is correct.

18   Q.  Okay.

19   A.  As the door opens, he releases his hold.

20           MS. MEDVIN:  There's no question before the

21   witness.

22   Q.  In another case you testified that you were being hit

23   over the head with flagpoles, is that correct, when you were

24   outside?

25   A.  I never testified I was hit over the head with

```
 1    flagpoles.

 2    Q.  Okay.

 3              MS. MEDVIN:  The Court's indulgence.

 4              THE COURT:  Uh-huh.

 5              (Pause)

 6    Q.  You were not injured in this incident; is that correct?

 7    A.  That is correct.

 8    Q.  And you were not injured at all on January 6th; is that

 9    correct?

10    A.  That is correct.

11    Q.  Would it surprise you to learn that the government or

12    U.S. Attorney asked a grand jury to indict --

13              MR. HAAG:  Objection.

14    Q.  -- Mr. Warnagiris for injuring you?

15              MR. HAAG:  Objection.

16              THE COURT:  Objection sustained.

17              MS. MEDVIN:  I'm going to bring up Defense Video

18    40?

19              THE COURT:  Four, zero?

20              MS. MEDVIN:  Four, zero.

21    Q.  You testified earlier to interacting with a man with a

22    bullhorn.  Do you remember that?

23    A.  I do.

24              MS. MEDVIN:  I'm going to play for you Defense

25    Video 40.
```

```
 1                    THE COURTROOM DEPUTY:  This is not in evidence,

 2          correct?

 3                    MS. MEDVIN:  Not yet in evidence.

 4                    THE COURT:  Not in evidence.

 5                    MS. MEDVIN:  It's for identification.

 6                    If I can ask for the government's assistance.  My

 7          computer is again freezing up.  If we could pull up Defense

 8          40, please.

 9                    If we could play Defense 40, please.

10                    (Video playing)

11                    MS. MEDVIN:  If we can pause.

12          Q.  Did you see yourself in this video?

13          A.  I did.

14          Q.  And did you see the individual with the bullhorn who you

15          were describing previously?

16          A.  I did.

17          Q.  Was this on January 6th in front of the Capitol?

18          A.  Yes, it is.

19                    MS. MEDVIN:  We move for admission of Defense

20          Video 40.

21                    MR. HAAG:  Your Honor, no objection except for the

22          transcription that's on the video.  I understand it's a

23          bench trial and normally there would be a limiting

24          instruction with this, but I just wanted to note it.

25                    THE COURT:  I understand.  The transcription is
```

1    not the best evidence.  What we hear -- what I, as the

2    fact-finder, hear and what the witness hears is the best

3    evidence.

4            So with that proviso, it will be admitted.

5            MS. MEDVIN:  And we did not add the transcription.

6    It came from the video.

7            THE COURT:  I understand.

8            MS. MEDVIN:  If we could play that from the

9    beginning in full.

10           (Video playing)

11   Q.  The three-minute video, was that featuring different

12   interactions you had with January 6th protesters that day?

13   A.  That is correct.

14   Q.  Well, I'll say this, without any additional commentary

15   on the video, just on what you just saw, it looks like you

16   were inviting protesters to the steps of the Capitol

17   building.  Isn't that fair?

18   A.  No.

19   Q.  Okay.  Do you recall later explaining to two separate

20   FBI agents who were investigating the situation that you

21   were just trying to appease the protesters?

22   A.  Trying to appease as well as wait for reinforcements.

23   Q.  From the perspective of the protesters, would it be fair

24   to say that it appeared to them you were inviting them to

25   the steps of the Capitol?

1              MR. HAAG:  Objection.

2              THE COURT:  Well, you don't deny that you said

3     what you said on that video, right?

4              THE WITNESS:  Correct.

5              THE COURT:  Then I'll sustain the objection.

6              MS. MEDVIN:  Okay.

7     Q.  Towards the end of the video you made a statement to the

8     protesters, "You guys can still push."  Did you see yourself

9     saying that as I stated earlier?

10    A.  I was in the middle of the crowd being pushed to the

11    crowd.

12    Q.  The only question is did you see yourself saying that in

13    the video?

14    A.  I did see myself saying that.

15    Q.  What did you intend at the time you made that statement

16    for the protesters to do when you said it?

17    A.  Can I explain?

18              MR. HAAG:  Objection.

19              THE COURT:  Overruled.

20              MR. HAAG:  Clarity.

21    A.  Can I explain now?

22              Basically, like I said, I was in the middle of the

23    crowd, surrounded 360.  I was trying to get out of the way,

24    and I wanted them to stop, which they did, and I moved out

25    of the way.  And like I said earlier, my arrogance, I knew

1    the door couldn't be opened by pushing in.  It had to be

2    pushed from the inside.

3         So yes, it was a little arrogance on my part, but,

4    again, it wasn't giving permission to do anything but to let

5    myself get out of the area.

6    Q.  But in terms of information you communicated to the

7    protesters, it was only the statement "you guys can still

8    push"; isn't that right?

9    A.  Yes.  Again, to get out of the area.

10   Q.  Later, or at the very end of the video, you're fist-

11   bumping protesters who made their way inside the building.

12   Did you see yourself doing that?

13   A.  I saw myself doing that.

14   Q.  What did you intend to communicate to the protesters

15   when you did it?

16   A.  Nothing to them, but basically like a wave-off.  Go

17   ahead.  Have a good day.  Get out of here.

18        It was nothing giving them permission or

19   acknowledging what they did, but it was a moment of

20   frustration.  Basically keep it moving.  I don't need --

21   Q.  The question was what did you intend to communicate to

22   them, the communication itself?

23   A.  Again, to keep it moving.  I don't care about your fist-

24   bumping or anything of that.  Just keep moving.

25        MS. MEDVIN:  I'm going to ask the government to

1    bring up 416A already in evidence.

2              THE COURT:  Which exhibit?

3              MS. MEDVIN:  I'm sorry?

4              THE COURT:  What exhibit number is this?

5              MS. MEDVIN:  416A.

6    Q.  If we could play from zero to 24 seconds, please.

7              (Video playing)

8    Q.  Do you recall that conversation with the man in the

9    burgundy beanie?

10   A.  I do.

11   Q.  Do you recall ever saying to Agent Weatherhead that that

12   conversation was with Mr. Warnagiris?

13   A.  No, I don't because this is the first time this video

14   has ever been shown to me with this interaction with this

15   prosecution.

16   Q.  The first time you saw this video was when you met with

17   these prosecutors?

18   A.  Yes.  This interaction, yes.

19              I knew what happened that day.  I had talked about

20   it in previous prosecutions, but we've never -- I've never

21   seen this video until we started.

22   Q.  The government showed you a video that was labeled 404A.

23   You may not remember exactly, but in the video you were

24   asked to identify sounds that you identified as a flash

25   bang.  Do you recall that?

1    A.  Yes.

2    Q.  Okay.  You don't know whether it was police or

3    protesters who deployed that device, do you?

4    A.  The first time I saw the police officers deploy it.  The

5    second time I did not know.

6    Q.  Okay.  The first time you say you saw officers deploy

7    it?

8    A.  I saw the officers deploy it, in the general vicinity of

9    where the officers were standing, yes.

10    Q.  Okay.

11            MS. MEDVIN:  I'm going to ask the government to

12    bring up Government's 405 from 3:40 to 3:47.

13            (Video playing)

14            MS. MEDVIN:  Pause.

15            If we can go back to 3:40 and pause it at 3:40 for

16    a moment.

17            3:41, please.  Sorry.

18            Still can't see it.

19            Okay.  Let's play from 3:40 to 3:47 in full.

20            (Video playing)

21            MS. MEDVIN:  If we can go back, let's try 3:30 to

22    3:47.

23            I'm going to ask you to pay attention to the man

24    who is breaking the window, and if you can identify his hat

25    for me.

```
 1                    (Video playing)
 2               MS. MEDVIN:  3:47, if we can keep going.
 3     Q.  Do you see you?
 4               Well, were you able to observe the hat of the man?
 5     A.  I only saw a glimpse of it.
 6     Q.  Was it a burgundy beanie?
 7     A.  I could not tell.
 8     Q.  Okay.
 9               MS. MEDVIN:  If we could rewind and try that one
10     more time, please.
11                    (Video playing)
12               MS. MEDVIN:  If we can pause.
13     Q.  Were you able to observe him this time?
14     A.  It looked brown, more so than burgundy, to me.
15     Q.  Okay.  We'll move on.
16               MS. MEDVIN:  All right.  In the same video from
17     3:50 to 3:56, if we can play that.  Government 405, 3:50 to
18     3:56.
19                    (Video playing)
20     Q.  You identified in direct that you heard the man who we
21     identify as Mr. Warnagiris say something about pepper spray;
22     is that correct?
23     A.  Yes.
24     Q.  You don't know if he's being sprayed by people in the
25     crowd or police based on this video; is that correct?
```

```
 1              MR. HAAG:  Objection; speculation.

 2              THE COURT:  No, it's a yes-or-no question.

 3   A.  No.

 4   Q.  Okay.

 5              MS. MEDVIN:  If we can pull up Government's 434,

 6   please, from 10:45 to 10:50.  And if we could zoom that,

 7   please.

 8              We can play from 10:45 to 10:50, please.

 9              (Video played)

10   Q.  Did you see the defendant waving his hand?

11   A.  Yes.

12   Q.  And his hand had a glove on it; is that correct?

13   A.  That's what it looks like, yes.

14   Q.  And there was nothing in his hand other than he was

15   wearing a glove; isn't that right?

16   A.  That's what it looks like.

17   Q.  On direct you testified he may have been holding

18   something.  Now that you see it on zoom, do you see it more

19   clearly that he's not holding anything?

20   A.  Yes.  It looks more like he's pointing.

21   Q.  Okay.

22              MS. MEDVIN:  I'm going to pull up Defense Image

23   066.

24   Q.  Are you able to identify the clothing of the defendant

25   in this image?
```

```
 1    A.  Yes.
 2               MR. HAAG:  Objection, Your Honor.  Is this image
 3    in evidence?
 4               MS. MEDVIN:  Not yet.  We're identifying it.
 5               MR. HAAG:  Additionally, Your Honor, I'm not
 6    sure --
 7               THE COURT:  What exhibit is this?
 8               MS. MEDVIN:  Defense 066.
 9               MR. HAAG:  -- the relevance to this witness.  This
10    is outside the House main door.  The witness never testified
11    about being out here.
12               MS. MEDVIN:  This is an image depicting gloves
13    which he testified to just a moment ago.
14               THE COURT:  Okay.  Fair enough.  I'll overrule the
15    objection.
16    Q.  And in this image do you recognize the gloves that you
17    were previously testifying about a few minutes ago?
18    A.  I see that there are gloves on his hand, but I can't say
19    that I saw them clearly in the other image.  Just that he
20    had something on his hand.
21    Q.  Okay.  Can you identify from this image if that's the
22    defendant?
23    A.  Yes, by the backpack and the hoodie that he had on.
24               MS. MEDVIN:  We ask to admit Defense Image 066.
25               THE COURT:  For purpose of identification and for
```

1    showing -- for helping -- it's relevant in view of the

2    conflicting testimony about in the earlier video whether or

3    not he had something in his hands or whether it was just a

4    glove.  So I'll admit it over the government's objection.

5    Q.  You said that when you were interacting with the

6    protesters initially at that door, at the Capitol Rotunda

7    door that you were trying to close, you said that at that

8    moment you didn't feel that interaction; is that correct?

9    A.  Yes, because at the time when we were initially trying

10   to close the door there were officers with me, so I wasn't

11   sure it was an officer or who was beside me at the time.

12   Q.  Okay.  So when you later then also testified that they

13   are pushing on me, you were summarizing what you think you

14   saw in the video; is that correct?

15   A.  Negative.  That day I was there, I was in the middle of

16   the crowd.  Again, I had to get out of the middle of the

17   crowd.

18   Q.  You stated that that moment -- in that moment you

19   couldn't do your job, but were you not actually still

20   continuing to do your job?

21   A.  My job entailed having the protesters on the other side

22   of the perimeter.

23   Q.  Okay.

24   A.  In that moment, I couldn't get any kind of control to

25   put them back where they needed to be.

1    Q.  You were not actually stationed in that area though.

2    You found your way to that area, correct?

3    A.  We all fell back.  We started out, like we stated, in

4    the East Front, on the East Front plaza.

5         When the line was breached, we all fell back to

6    the center of the bottom stairs of the East Front.

7    Q.  Right.  But you weren't directed to stand there?

8    A.  No, it was -- again, it was --

9    Q.  That's all I asked.

10   A.  Yes.

11   Q.  Well, let me ask you this.  Hypothetically, and God

12   forbid that you're injured in that type of interaction with

13   somebody, you know, with one of the protesters, you're

14   injured with an interaction, would you say that you weren't

15   on the job and completing your duties at that time and

16   wouldn't collect some kind of compensation through

17   employment?

18        MR. HAAG:  Objection.

19        THE COURT:  Well, look it.  I think we -- I think

20   that's an irrelevant and kind of silly hypothetical.

21        I think we know what he means when he says he

22   couldn't do his job.  He couldn't effectively do his job on

23   that day as he's defined his job.

24        MS. MEDVIN:  I'll move on, Judge.  Court's

25   indulgence.

```
 1                    THE COURT:  Yes.

 2                    (Pause)

 3                    MS. MEDVIN:  No further questions for this

 4      witness, Judge.  Thank you.

 5                    THE COURT:  Thank you, Ms. Medvin.

 6                    Mr. Haag.  Maybe, if you're reasonably brief,

 7      Mr. Haag -- we can go a little beyond 5:00, if we need to,

 8      but if you're reasonably brief, we can excuse --

 9                    MR. HAAG:  I believe I can, Your Honor.  Thank

10      you.

11                    THE COURT:  -- Sergeant Warner so he can go do his

12      real job instead of putting up with all of us.

13                            REDIRECT EXAMINATION

14      BY MR. HAAG:

15      Q.  Sergeant Warner, is it fair to say you've talked to a

16      number of law enforcement agents about January 6th?

17      A.  Yes, it is, sir.

18      Q.  How many would you guess?

19      A.  Five, six, maybe more.

20      Q.  I noticed you took a moment to answer that question.  Is

21      there a reason why you had to pause?

22      A.  Yes, because I wanted to try to give a true account from

23      January 6th that year to current.

24      Q.  And during the course of the past now almost three and a

25      half years, how many January 6th related videos have you
```

1    watched?

2    A.  Several.

3    Q.  Again, you took a moment to pause.  Is there a reason

4    why?

5    A.  Again, trying to make sure I give a clear account in

6    trying to remember each case that I visited or reviewed.

7    Q.  Is it fair to say that given the number of officers, law

8    enforcement officers, you've spoken to and videos that

9    you've seen about January 6th, that everything starts to

10   blend together a little bit?

11   A.  Yes, for sure.  Yes, sir.

12   Q.  Now, turning your attention to the East Rotunda doors,

13   absent video of January 6th, do you recall struggling to

14   close the doors?

15   A.  Yes, sir.

16   Q.  Do you recall any specific individual that you were

17   interacting with as you were trying to close the doors?

18   A.  No, sir.

19   Q.  During that struggle, do you remember -- do you recall

20   if anyone touched you?

21   A.  I do not.  Again, in the struggle I'm thinking those are

22   officers to my left and right trying to pull, so until I see

23   the video is when I realize what was going on.

24   Q.  If I can rephrase my question.

25   A.  Sure.

1    Q.  Do you recall if anyone was touching you while you were

2    struggling to close the door?  Not any particular person,

3    just anyone in general?

4    A.  Yes.  It was -- again, getting into the door I was being

5    surrounded by the crowd, and once I got inside, again, just

6    knowing I was trying to pull the door.  So I don't recall if

7    I was being touched by anyone.

8    Q.  Do you recall if you were being pushed by anyone?

9    A.  Yes, because that's where I had to let go of the door.

10            Again, minus video, I remember having to let go of

11   the door and trying to reassess how we can get the door -- I

12   can still be active in trying to close the door.

13            MR. HAAG:  If we could pull up Government Exhibit

14   301.

15            If we can go to 2:32, please.  Actually, if we can

16   leave the zoom on that it would actually be helpful.  Just

17   move the zoom over to the door, please.

18            Pause right here.

19   Q.  Where are you standing at this moment?

20   A.  I'm standing in between the two doors trying to pull the

21   doors closed on the East Front Rotunda doors.

22   Q.  Fair to say that this individual in the beanie that I'm

23   circling in the middle of the frame is you?

24   A.  That is me.

25   Q.  Is the defendant off to your right?

```
1    A.  No, he's off to my --

2    Q.  Or off to your left?

3    A.  Off to my left, yes, sir.

4    Q.  Where is the defendant's arm at this point?

5    A.  The way -- with me pulling against the door, he's

6    pushing against the door.  I can't see his arms right now,

7    but I'm pulling, he's pushing.

8              MR. HAAG:  If we could advance two seconds,

9    please.  Just play two seconds.

10             (Video playing)

11   Q.  Having seen that clip just then between 2:34 and now

12   2:37, did you see where the defendant's arm was?

13   A.  Yes, on the door and pushing against the door as I -- as

14   he pushed me out of the way the door opened, which works in

15   line with him pushing.

16   Q.  You mentioned on cross-examination the defendant's

17   elbow.  Do you know where the defendant's elbow was at this

18   point?

19   A.  No, I do not.  I can only imagine it looked like, again,

20   from the video, he pushed off with the elbow to get

21   leverage, then he used his right hand from previous videos

22   to brace himself to push against the door.

23             MR. HAAG:  If we could advance it a few more

24   seconds.

25             (Video playing)
```

1          MR. HAAG:  Pause right there.

2     Q.  Sergeant, do you see the defendant's right hand in this

3     video?

4     A.  Yes; down by the door, yes.

5     Q.  If you could circle that, please.

6     A.  (Witness complies)

7          MR. HAAG:  And just so the record is clear, the

8     defendant's hand appears to be on the right door depicted

9     here above the individual with a patterned shirt.

10    Q.  Where are you located at this point?

11    A.  I'm in the center of the door trying to pull the door,

12    again, on the East Front, east steps -- excuse me, East

13    Rotunda -- Rotunda of the Capitol, excuse me, Rotunda of the

14    Capitol pulling on the doors.

15         MR. HAAG:  We can pull that down.  Thank you.

16    Q.  I want to turn your attention to the East Front line.

17    Defense counsel had shown you the exhibit with yourself and

18    the individual with the bullhorn.  What were you trying to

19    do when you were talking to that individual with the

20    bullhorn?

21         MS. MEDVIN:  Objection, Judge; asked and answered.

22    This exact question was asked on direct.

23         THE COURT:  I'll permit it.

24    A.  What I was trying to do -- when the video starts, it was

25    after the initial breach.  We were tussling with the

1    protesters, and it looked like we were losing footing or

2    they were about to breach that first time.

3         What I noticed was the man with the bullhorn.  He

4    seemed to be in charge of the group.  I ran over -- I moved

5    my way over to him and stated what I stated to him.  "What

6    is it that you want?  Get your people under control."

7    Basically, let's talk.

8         Which worked.  Everybody got back in line.  We

9    were able to reestablish the line, and that's from that

10   moment.

11        After that, as you saw in the video, I stated I

12   was going to talk with leadership, see what we could do.

13   Never permission.

14        From there I was identified as not a leader from

15   someone in the crowd.  That's when they rushed the line and

16   was successful in breaching the line.

17   Q.  Were you trying to invite anyone on the line to come

18   into the Capitol?

19   A.  No, sir, not at all.

20        MR. HAAG:  If we could pull up Defense Exhibit 40

21   and jump to 2:13.

22   Q.  Are you aware of where you were at this moment?

23   A.  If I'm not mistaken, I'm right in front of the man with

24   the bullhorn.

25   Q.  If we could play it to 2:18, please.

```
1    A.  So basically I'm in line --

2    Q.  Sorry, if I could just ask the question.

3    A.  Sorry, yes, sir.

4    Q.  What did we just see at the end of the video after he

5    brought the bullhorn down?

6    A.  I told him -- he's working on it.

7    Q.  Did you see him make any gesture with his head?

8    A.  Just tilt his head down, if I'm not mistaken.

9            I didn't pay full attention to his body language,

10   to be honest.

11           MR. HAAG:  If we could just wind it back to 2:13

12   and play it to 2:17.

13           MS. MEDVIN:  Objection, Judge.  This is outside --

14   it's outside of cross.

15           MR. HAAG:  Your Honor, defense counsel played this

16   entire video for Your Honor, so I think this is well within

17   redirect.

18           THE COURT:  Go ahead.  Objection overruled.

19           MR. HAAG:  If you can just play to 2:17.

20   Q.  Did you see what he did?

21   A.  Shook his head, he's giving us an answer.

22   Q.  Shook his head to mean --

23           MS. MEDVIN:  Objection.

24           THE COURT:  Well, he can tell us what he heard and

25   what he saw, but not his interpretation of what he heard and
```

1   what he saw.

2           MR. HAAG:  Understood.

3           THE COURT:  Objection sustained.

4   Q.  Sergeant, do you know what you had done at that moment,

5   if you recall?

6   A.  Do I know what I'd done?  At that moment, again, allowed

7   the officers to get on line to reform the line to secure

8   that area and allow me time to talk to my leadership.

9           MR. HAAG:  Now, if we could --

10  Q.  This area is on the East Front, correct?

11  A.  That is correct.

12  Q.  Quite far away from the East Rotunda doors?

13  A.  That is correct.

14  Q.  Okay.

15          MR. HAAG:  If we could play just two seconds of

16  the video.

17          (Video playing)

18  Q.  What's depicted here?

19  A.  That's the East Front doors.

20  Q.  What occurred between what we just saw on the video on

21  the East Front and what we see here on the video at 2:19?

22          MS. MEDVIN:  Objection, Judge.  This is outside

23  cross.  This is now asking for a time period we did not

24  discuss in outside provisions of the video.

25          MR. HAAG:  Again, defense played this entire

1  video.  This video omits the portion between what happened

2  on the East Front and what happened at the East Rotunda

3  doors.  I'm just asking the witness to fill in the gap.

4           THE COURT:  Okay.  Fair enough.  Objection

5  overruled; completeness, among other things.

6  A.  After the shakingness of the protester's head,

7  acknowledgement, again, about maybe a minute or two talking

8  to leadership.  Another one of the protesters said, "he's

9  not in charge"; they breached the line.

10          From there, we fell back to the bottom of the East

11 Front stairs of the Rotunda; formed another line trying to

12 keep the protesters back.  They broke that line.

13          From there we formed another line at the top of

14 the stairs outside of the door.  Again, we were then

15 surrounded; broke that line.  That's where I was standing in

16 the middle of the crowd asking them to let me through so I

17 can get over to my other officers -- get to my other

18 officers.

19          And from there, we, as you saw in the videos, held

20 our position on the left side of the door.  We held it there

21 because, again, knowing the doors cannot be opened from

22 being pushed in, but only out.  Once -- go ahead.

23 Q.  How long would you estimate between what we had depicted

24 there at 2:17 and what's depicted here at 2:19?

25 A.  Oh, that's way too short.  Way too short.  I'd say a

1    good -- at least a good ten minutes may be missing.

2              MR. HAAG:  If we could continue to play the video.

3              (Video played)

4              MR. HAAG:  Pause and jump to 2:46, please.

5              (Video playing)

6    Q.  Now, I know you had talked a bit with defense counsel

7    about fist bumps.

8    A.  Yes.

9    Q.  About that one that -- we just saw a fist bump with you

10   there, correct?

11   A.  Yes, correct.

12   Q.  About that one particular fist bump, why did you do

13   that?

14   A.  Again, in the middle of the crowd, just trying to keep

15   things at bay.  Again, trying to reassess so we can gain

16   control.

17            My thought process and any agitation that we do at

18   that moment could be catastrophic for us as officers being

19   surrounded.  So, again, it was all about trying to maintain

20   peace until we can get control.  Never a permission of any

21   kind.

22   Q.  Do you recall on any of the footage that you watched for

23   this case that you ever fist-bumped the defendant?

24   A.  No, I can't say I recall that, sir.  No.

25   Q.  Do you recall giving the defendant permission to enter

1    the building?

2    A.  Never.  No one was given permission that day to enter

3    the building.

4           MR. HAAG:  If we could continue playing to the end

5    of the video here.

6           (Video playing)

7    Q.  You had testified during cross-examination about that

8    moment there, that you wanted the rioters to keep it moving.

9    What did you mean by that?

10   A.  Basically get away, get out of the building, just be

11   gone.

12          Because at the end of the day, if you look at my

13   demeanor, it wasn't a positive yeah-you're-good bump.  It

14   was like just go, because, again, it was a day that for me

15   is a black eye.  You know, you breach the building --

16          MS. MEDVIN:  Objection, Judge.

17          THE COURT:  Just answer the question.

18          THE WITNESS:  Yes, sir.

19   A.  So yes, it was a fist bump that was just move along.

20   Q.  Did you have any ability, given the number of rioters

21   inside the building, to actually make them leave at that

22   point?

23   A.  No, sir.

24          MR. HAAG:  If I could have a moment, Your Honor?

25          THE COURT:  Sure.

```
 1                    (Pause)
 2               MR. HAAG:  Nothing further, Your Honor.
 3               THE COURT:  All right.  May Sergeant Warner be
 4      excused?
 5               MS. MEDVIN:  Yes, Judge.
 6               THE COURT:  Thank you.
 7               THE WITNESS:  Thank you, sir.
 8               THE COURT:  All right.  Thank you, Sergeant.
 9               So tomorrow -- okay, anybody have anything they
10      want to raise right now?  You stood up very quickly.
11               MS. LEDERER:  Oh, no, sorry.
12               THE COURT:  So tomorrow we're going to start at
13      10:15 instead of 9:30.  What's our agenda as you can see it?
14      Although prognosis is not always easy.
15               MS. LEDERER:  Yes, Your Honor.  I would ask that
16      we would address the 800 series first thing tomorrow, which
17      are the certified business records from Safeway.  Much like
18      the 700 series, I was just going to mark them collectively
19      and move the 800 series.
20               The 800 series is the business certification and
21      the subsequent business records for Safeway.  Also within
22      the 800 series is the public record from the D.C. Register
23      that recorded the --
24               THE COURT:  Explain to me what you mean you want
25      to deal with them.  Is there an issue?  Do I have affidavits
```

1     saying everything is legitimate?

2               MS. LEDERER:  You do.  I apologize.

3               THE COURT:  Do we have witnesses coming?  Are we

4     looking at exceptions to the hearsay rule?

5               What are you asking me to do between now and

6     tomorrow morning?

7               MS. LEDERER:  Nothing.  I was just asking to deal

8     with them tomorrow morning because I know Ms. Medvin --

9               THE COURT:  What does "deal with them" mean?

10              MS. LEDERER:  Defense is going to object.

11              THE COURT:  On what grounds?

12              MS. LEDERER:  Defense indicated previously she's

13    going to argue that they're not subject to 804.

14              THE COURT:  Okay.  So we've got another federal

15    rule of evidence question.

16              MS. LEDERER:  Yes, Your Honor.

17              THE COURT:  Okay.  Has it been briefed?

18              MS. LEDERER:  It has -- I'm not sure if it has

19    been briefed in this specific case; however, I believe it's

20    been before you in other trials.

21              We have a business certification.  We've also

22    discussed it at the pretrial.  We also discussed it a little

23    bit, I believe, Monday.

24              So it's just like the 902.14 certification that we

25    have already dealt with.  We've previously touched on the

1  fact that it would be subject to the business record

2  exception.

3          I'm just putting on the radar that defense wants

4  to argue.  The government believes it's all satisfied under

5  the rules of evidence.

6          From there, we would deal -- we would be calling

7  Agent Hawa, and then going into the case agent, and then

8  potentially adding another witness.  If defense does make an

9  issue out of chain of custody, we would call an agent who

10  was in the line of chain of custody for the phone.

11          THE COURT:  Got it.

12          MS. MEDVIN:  That sounds like a fair, correct

13  summary of -- just to add, we're arguing the 801 exhibit

14  admissibility under the particular documentation that the

15  government provided as well as the relevance and the --

16          THE COURT:  Well, it's relevant to civil disorder.

17          MS. LEDERER:  Correct, Your Honor.

18          MS. MEDVIN:  That's assuming the particular

19  documents -- that their contents are relevant.  But the --

20  we'll also argue relevance as far as the particular witness

21  the government seeks to admit it under.

22          THE COURT:  Do you have a witness?

23          MS. LEDERER:  Yes, Your Honor.  For the past year

24  the government has been using case agents to introduce the

25  business record exceptions.  I can get you --

1          THE COURT:  Because the trial -- at one of the

2    trials I had, somebody from Safeway came to testify.

3          MS. LEDERER:  Yes, but based off of the fact that

4    we have the signed affidavit from Safeway, we've been using

5    agents --

6          THE COURT:  That's part of 801 or part of 800

7    series, the affidavit?

8          MS. LEDERER:  Yes, Your Honor, the business record

9    certification.  And it's been acceptable in multiple other

10   cases that the case agent can walk the Court -- excuse me,

11   the fact-finder through the business records.

12         MS. MEDVIN:  And for clarification, not all of 801

13   are business records.  One is an email.  801 is an email.

14   805 --

15         THE COURT:  Why don't you send us an email telling

16   us which specific things are not business records.

17         MS. MEDVIN:  801 --

18         THE COURT:  Send us an email and tell us which

19   ones are not business records.  Tell us any case law you

20   have about why this stuff is not admissible.  Send an email

21   to Michaela.

22         I want all this -- I want your legal arguments,

23   your support, whatever you're going to say, whatever cases I

24   should look at, whatever treatises, whatever advisory

25   committee notes, whatever prior cases I've decided it in,

1    whatever prior cases other judges have decided it in by

2    email this evening so we don't go through this and waste

3    another half an hour or hour in the morning.

4          Case law, argument, rules, precedent from me or

5    other judges.  We're not going to wing it in the morning.

6    We've wasted too much time with those processes.

7          Michaela, you know her email?

8          MS. MEDVIN:  Judge, we did raise this in ECF-97 on

9    Page 9, but we'll supplement with additional case law.

10         THE COURT:  Okay.  Sounds like a plan.  See you in

11   the morning.

12         (Whereupon the hearing was

13          adjourned at 5:10 p.m.)

14         **CERTIFICATE OF OFFICIAL COURT REPORTER**

15

16         I, LISA A. MOREIRA, RDR, CRR, do hereby

17   certify that the above and foregoing constitutes a true and

18   accurate transcript of my stenographic notes and is a full,

19   true and complete transcript of the proceedings to the best

20   of my ability.

21      Dated this 3rd day of April, 2024.

22

23

24                          /s/Lisa A. Moreira, RDR, CRR
                           Official Court Reporter
25                          United States Courthouse
                           Room 6718
                           333 Constitution Avenue, NW

Washington, DC 20001

**/**

**/s/Lisa** [1] - 112:23

**0**

**0047** [1] - 21:25
**058** [2] - 71:6, 71:8
**065** [4] - 79:15, 79:16, 80:4, 81:11
**066** [3] - 93:23, 94:8, 94:24

**1**

**1** [2] - 66:24, 67:17
**100** [2] - 6:13, 47:14
**109** [1] - 1:19
**10:15** [2] - 32:17, 108:13
**10:40** [3] - 18:12, 33:5, 33:20
**10:45** [2] - 93:6, 93:8
**10:50** [3] - 33:21, 93:6, 93:8
**111(a)(1** [1] - 66:25
**11:00** [9] - 4:13, 4:24, 5:2, 5:5, 5:13, 5:15, 49:22
**11:15** [2] - 33:8, 34:9
**11:35** [1] - 34:13
**11:47** [1] - 19:9
**12** [3] - 30:17, 34:16, 65:12
**12:00** [3] - 9:11, 30:18, 49:23
**12:00ish** [2] - 9:11, 9:12
**12:05** [1] - 19:24
**15** [2] - 21:7, 60:5
**16** [1] - 41:1
**17:15** [2] - 20:10, 20:22
**1990** [1] - 65:20
**1:00** [3] - 9:12, 49:23, 50:1
**1:21-cr-00382-PLF-1** [1] - 1:4
**1:35** [1] - 1:5
**1:58** [1] - 12:19

**2**

**2** [2] - 1:4, 65:2
**20** [2] - 77:7, 80:16
**20-plus** [1] - 9:24
**200** [1] - 13:5
**20001** [3] - 1:15, 1:24, 113:1
**2001** [1] - 4:1
**2008** [1] - 65:12

**2018** [2] - 58:8, 58:13
**202** [2] - 1:16, 1:24
**2021** [4] - 12:17, 29:3, 71:19, 72:23
**2022** [1] - 4:5
**2024** [2] - 1:4, 112:21
**21** [3] - 15:7, 15:8, 15:10
**22314** [1] - 1:19
**231(a)(3** [1] - 66:25
**24** [1] - 90:6
**249** [1] - 66:9
**25** [2] - 12:25, 23:10
**252-7012** [1] - 1:16
**286** [1] - 59:11
**289** [1] - 60:1
**2:00** [1] - 50:6
**2:13** [2] - 102:21, 103:11
**2:17** [3] - 103:12, 103:19, 105:24
**2:18** [1] - 102:25
**2:19** [2] - 104:21, 105:24
**2:29** [1] - 36:25
**2:32** [4] - 36:22, 37:13, 40:6, 99:15
**2:34** [1] - 100:11
**2:36** [3] - 39:5, 40:6, 40:17
**2:37** [1] - 100:12
**2:46** [1] - 106:4
**2:52** [2] - 40:14, 40:17
**2:56** [2] - 41:10, 42:1
**2d** [1] - 65:12

**3**

**3** [5] - 2:4, 65:2, 65:3, 66:25, 67:17
**301** [7] - 36:11, 76:25, 77:1, 77:6, 77:11, 80:11, 99:14
**302** [3] - 57:19, 57:20, 61:19
**302s** [2] - 57:12, 57:22
**316** [2] - 11:20, 12:6
**319** [3] - 58:13, 58:16, 59:10
**333** [2] - 1:23, 112:25
**35** [2] - 15:25, 17:8
**354-3187** [1] - 1:24
**360** [1] - 88:23
**3:12** [1] - 43:15
**3:13** [1] - 43:18
**3:15** [1] - 51:6
**3:18** [3] - 43:4, 43:16, 43:21
**3:30** [1] - 91:21
**3:40** [6] - 25:6, 26:4,

**91**:12, 91:15, 91:19
**3:41** [1] - 91:17
**3:47** [5] - 26:5, 91:12, 91:19, 91:22, 92:2
**3:50** [2] - 92:17
**3:54** [2] - 26:22
**3:55** [2] - 25:12, 26:15
**3:56** [2] - 92:17, 92:18
**3d** [4] - 58:13, 58:16, 59:11, 66:9
**3rd** [1] - 112:21

**4**

**4** [1] - 65:4
**4)** [1] - 55:23
**40** [7] - 15:6, 85:18, 85:25, 86:8, 86:9, 86:20, 102:20
**404A** [2] - 16:12, 90:22
**405** [3] - 25:6, 91:12, 92:17
**408** [3] - 21:7, 21:24, 22:5
**409** [2] - 28:18, 29:9
**410** [2] - 45:5, 45:19
**414** [1] - 45:2
**415** [3] - 47:8, 47:17, 47:23
**416** [1] - 47:24
**416A** [6] - 47:19, 47:25, 76:23, 76:24, 90:1, 90:5
**434** [3] - 30:1, 30:10, 93:5
**47** [1] - 65:13
**4:14** [1] - 44:13

**5**

**50** [1] - 6:13
**533** [1] - 65:12
**56** [1] - 66:9
**5:00** [1] - 97:7
**5:10** [1] - 112:13

**6**

**6** [2] - 12:17, 29:3
**601** [1] - 1:15
**611** [1] - 66:17
**615** [7] - 51:20, 55:17, 64:10, 64:11, 65:8, 65:9, 65:24
**615(b** [2] - 54:23, 55:8
**6718** [2] - 1:23, 112:25
**68** [1] - 2:4
**6:00** [1] - 62:7
**6th** [19] - 4:20, 5:10, 6:9, 21:21, 27:3, 30:7, 70:2, 70:25,

**72**:9, 72:18, 72:23, 85:8, 86:17, 87:12, 97:16, 97:23, 97:25, 98:9, 98:13

**7**

**700** [1] - 108:18
**70819** [1] - 65:21
**7:00** [1] - 4:13
**7:15** [1] - 20:7
**7:35** [3] - 30:2, 30:16, 30:18

**8**

**800** [5] - 108:16, 108:19, 108:20, 108:22, 111:6
**801** [5] - 110:13, 111:6, 111:12, 111:13, 111:17
**804** [1] - 109:13
**805** [1] - 111:14
**886-4127** [1] - 1:20
**888** [1] - 1:20
**8:05** [3] - 16:15, 30:23, 31:4
**8:30** [1] - 62:7
**8:40** [1] - 17:6

**9**

**9** [1] - 112:9
**902.14** [1] - 109:24
**916** [1] - 1:19
**97** [1] - 2:5
**9:30** [2] - 32:14, 108:13

**A**

**a)(1** [1] - 55:22
**a.m** [4] - 5:5, 5:13, 5:15, 50:6
**ability** [6] - 40:8, 50:9, 50:20, 57:16, 107:20, 112:20
**able** [31] - 9:14, 9:16, 9:17, 11:3, 11:6, 20:17, 20:19, 22:19, 23:11, 26:12, 26:14, 34:11, 34:25, 35:11, 36:6, 37:4, 37:15, 41:18, 43:8, 48:12, 49:16, 52:25, 53:2, 74:17, 75:1, 80:11, 92:4, 92:13, 93:24, 102:9
**absent** [1] - 98:13
**acceptable** [1] - 111:9

**access** [1] - 23:11
**accomplish** [1] - 10:19
**according** [1] - 58:6
**account** [2] - 97:22, 98:5
**accounts** [1] - 75:1
**accurate** [3] - 21:20, 29:5, 112:18
**accurately** [1] - 66:3
**acknowledgement** - 105:7
**acknowledging** [1] - 89:19
**Action** [1] - 1:3
**actions** [4] - 50:8, 50:20, 76:21
**active** [3] - 35:24, 46:23, 99:12
**actual** [3] - 15:14, 57:22, 59:25
**add** [2] - 87:5, 110:13
**adding** [1] - 110:8
**addition** [1] - 72:2
**additional** [7] - 6:7, 9:18, 11:1, 31:20, 32:10, 87:14, 112:9
**additionally** [2] - 60:15, 94:5
**address** [4] - 51:15, 80:21, 80:23, 108:16
**adjacent** [1] - 18:25
**adjourned** [1] - 112:13
**admissibility** [1] - 110:14
**admissible** [1] - 111:20
**admission** [2] - 30:11, 86:19
**admit** [12] - 12:6, 21:24, 29:9, 30:10, 30:14, 45:2, 45:19, 80:4, 80:13, 94:24, 95:4, 110:21
**admitted** [13] - 12:11, 16:12, 16:14, 22:4, 25:6, 29:11, 30:22, 45:4, 45:22, 47:9, 47:20, 47:21, 87:4
**admittedly** [1] - 59:3
**admitting** [1] - 80:6
**admonition** [1] - 62:18
**advance** [5] - 16:10, 61:4, 61:5, 100:8, 100:23
**advanced** [1] - 15:12
**advancing** [1] - 17:4
**advisory** [2] - 56:3, 111:24
**affidavit** [2] - 111:4, 111:7

**affidavits** [1] - 108:25
**aftermath** [1] - 72:18
**AFTERNOON** [1] - 1:9
**afternoon** [6] - 3:7, 3:8, 3:19, 35:22, 50:2
**agenda** [1] - 108:13
**agent** [16] - 51:10, 53:14, 58:21, 61:16, 66:11, 66:14, 71:23, 71:24, 72:8, 72:9, 72:22, 75:14, 75:20, 110:7, 110:9, 111:10
**Agent** [41] - 51:10, 51:13, 51:16, 52:12, 52:18, 52:19, 52:21, 53:8, 53:18, 53:21, 56:21, 57:11, 57:13, 57:15, 60:9, 62:25, 63:14, 63:17, 65:2, 67:6, 67:22, 69:15, 70:2, 70:9, 70:14, 70:24, 71:11, 71:16, 72:2, 72:10, 73:11, 73:15, 74:1, 74:4, 74:11, 75:4, 75:9, 75:12, 75:20, 90:11, 110:7
**agent's** [1] - 52:5
**agents** [12] - 71:22, 72:2, 72:25, 73:3, 73:5, 74:6, 75:17, 78:11, 87:20, 97:16, 110:24, 111:5
**agitation** [1] - 106:17
**ago** [9] - 10:13, 17:2, 22:6, 35:9, 59:15, 60:5, 70:21, 94:13, 94:17
**agree** [1] - 66:22
**agriculture** [1] - 66:1
**ahead** [4] - 8:5, 89:17, 103:18, 105:22
**air** [1] - 14:5
**alarm** [6] - 47:3, 48:12, 48:14, 48:16, 48:19, 48:20
**alarmed** [2] - 46:18, 46:20
**alarms** [1] - 46:25
**Alexandria** [1] - 1:19
**allow** [4] - 43:9, 44:5, 50:13, 104:8
**allowed** [3] - 34:22, 57:3, 104:6
**almost** [5] - 6:5, 22:21, 49:23, 60:7, 97:24
**alternatively** [1] - 53:5
**amend** [1] - 51:9
**AMERICA** [1] - 1:3

**Amin** [1] - 65:11
**AMIN** [1] - 65:11
**analysis** [3] - 59:6, 65:16, 66:6
**ANDREW** [1] - 1:14
**andrew.haag@usdoj .gov** [1] - 1:17
**angle** [1] - 77:13
**angry** [1] - 62:3
**annoying** [1] - 48:17
**answer** [3] - 97:20, 103:21, 107:17
**answered** [1] - 101:21
**answering** [1] - 71:24
**ANTHONY** [2] - 2:3, 3:16
**Anthony** [9] - 3:6, 3:22, 51:12, 52:20, 52:21, 53:1, 53:3, 53:12, 63:12
**anticipated** [1] - 68:8
**Apologies** [1] - 84:14
**apologize** [2] - 28:21, 109:2
**apparent** [4] - 61:2, 61:7, 61:15, 61:16
**appear** [5] - 20:11, 29:3, 30:7, 33:11, 42:25
**APPEARANCES** [1] - 1:12
**appeared** [1] - 87:24
**appease** [2] - 87:21, 87:22
**apples** [1] - 57:18
**apply** [2] - 66:6, 67:14
**appreciate** [1] - 59:4
**approached** [2] - 8:9, 9:1
**appropriate** [2] - 66:18, 67:19
**April** [2] - 1:4, 112:21
**area** [17] - 15:3, 18:8, 20:11, 25:16, 32:10, 32:11, 34:14, 45:13, 48:5, 82:17, 89:5, 89:9, 96:1, 96:2, 104:8, 104:10
**argue** [3] - 109:13, 110:4, 110:20
**arguing** [2] - 58:22, 110:13
**argument** [7] - 51:21, 51:22, 52:11, 52:13, 52:14, 62:16, 112:4
**arguments** [1] - 111:22
**arises** [1] - 62:5
**arm** [13] - 38:12, 38:17, 38:20, 39:8,

43:19, 46:12, 79:1, 79:7, 81:22, 81:25, 82:11, 100:4, 100:12
**arms** [3] - 38:19, 39:3, 100:6
**arrived** [2] - 6:12, 6:15
**arrogance** [2] - 88:25, 89:3
**arrogant** [1] - 24:1
**asp** [1] - 31:13
**assailant** [2] - 27:8
**assault** [1] - 73:4
**assertion** [1] - 56:17
**assigned** [4] - 4:12, 4:18, 4:19, 29:18
**assignment** [1] - 5:15
**assistance** [2] - 52:13, 86:6
**associated** [1] - 48:14
**assuming** [2] - 24:12, 110:18
**attempt** [3] - 8:24, 9:16, 79:18
**attempted** [2] - 10:9, 19:1
**attempting** [3] - 13:25, 30:14, 32:22
**attended** [1] - 77:16
**attention** [14] - 8:19, 20:21, 25:10, 25:11, 25:25, 33:21, 36:23, 42:5, 43:19, 81:15, 91:23, 98:12, 101:16, 103:9
**Attorney** [1] - 85:12
**attorney** [1] - 64:24
**authority** [2] - 65:9, 65:15, 65:19
**authorization** [3] - 47:6, 65:17, 65:18
**authorize** [5] - 55:18, 56:2, 64:17, 65:6, 65:13
**authorized** [2] - 56:4, 65:4
**available** [1] - 60:21
**Avenue** [2] - 1:23, 112:25
**aware** [8] - 11:14, 15:20, 32:9, 38:21, 39:21, 46:18, 76:7, 102:22

---

### B

**background** [2] - 6:22, 48:12
**backpack** [7] - 43:23, 43:24, 44:2, 46:12, 81:1, 81:6, 94:23

**backs** [2] - 12:1
**bad** [1] - 75:16
**balance** [2] - 27:9, 40:3
**bang** [5] - 20:2, 20:3, 20:5, 34:12, 90:25
**bar** [3] - 65:15, 83:21, 83:22
**barricades** [1] - 8:24
**barriers** [1] - 67:12
**base** [3] - 16:3, 16:19, 37:7
**based** [6] - 57:12, 60:7, 60:10, 60:13, 92:25, 111:3
**basis** [2] - 63:3, 63:18
**bay** [2] - 35:1, 106:15
**beanie** [9] - 37:19, 75:22, 75:24, 76:3, 76:12, 76:14, 90:9, 92:6, 99:22
**became** [4] - 4:5, 61:2, 61:7, 61:8
**become** [3] - 4:4, 61:15
**becomes** [1] - 64:1
**BEFORE** [1] - 1:10
**began** [4] - 9:2, 9:10, 9:21, 49:6
**beginning** [7] - 25:14, 65:12, 81:19, 82:20, 83:17, 84:5, 87:9
**behalf** [1] - 56:24
**behind** [6] - 5:22, 39:14, 40:3, 42:15, 46:1, 83:6
**believes** [1] - 110:4
**bench** [1] - 86:23
**BENCH** [1] - 1:9
**beside** [1] - 95:11
**best** [7] - 12:23, 13:4, 35:15, 50:16, 87:1, 87:2, 112:19
**better** [1] - 7:17
**between** [23] - 14:21, 17:9, 23:8, 36:1, 40:6, 42:8, 43:7, 43:8, 44:16, 54:23, 55:3, 57:10, 64:2, 66:5, 75:18, 78:25, 80:16, 99:20, 100:11, 104:20, 105:1, 105:23, 109:5
**beyond** [4] - 55:2, 55:9, 59:20, 97:7
**bifurcate** [1] - 60:22
**bike** [25] - 5:22, 5:24, 6:8, 6:9, 6:16, 6:18, 6:19, 6:25, 7:8, 8:24, 9:1, 9:10, 10:10,

10:25, 12:3, 13:11, 13:19, 13:20, 13:22, 13:24, 14:1, 14:2, 14:12, 14:21
**bit** [11] - 5:25, 8:7, 10:13, 24:5, 50:19, 52:2, 52:7, 52:22, 98:10, 106:6, 109:23
**black** [2] - 107:15
**blah** [3] - 65:14
**blend** [1] - 98:10
**blinding** [1] - 27:11
**body** [6] - 29:24, 33:1, 43:8, 60:7, 83:7, 103:9
**boom** [1] - 34:11
**border** [1] - 14:9
**bottom** [7] - 12:4, 12:20, 12:21, 12:22, 16:25, 96:6, 105:10
**brace** [3] - 82:23, 83:13, 100:22
**bracing** [2] - 82:22, 83:10
**Bradshaw** [9] - 58:8, 58:13, 59:9, 60:1, 60:3, 62:21, 65:23, 66:5, 66:12
**breach** [6] - 8:24, 9:3, 9:14, 10:8, 10:9, 11:13, 13:16, 15:11, 15:14, 15:15, 16:2, 31:12, 49:9, 101:25, 102:2, 107:15
**breached** [7] - 10:8, 15:21, 24:2, 24:3, 27:5, 96:5, 105:9
**breaching** [1] - 102:16
**break** [7] - 26:14, 32:23, 51:5, 58:10, 58:18, 58:24, 59:6
**breaking** [1] - 91:24
**brief** [3] - 55:8, 97:6, 97:8
**briefed** [3] - 59:14, 109:17, 109:19
**briefly** [2] - 55:16, 59:1
**bring** [11] - 29:25, 38:14, 44:12, 59:22, 75:2, 77:2, 77:6, 77:18, 85:17, 90:1, 91:12
**bringing** [1] - 57:22
**brings** [1] - 74:25
**broke** [2] - 105:12, 105:15
**broken** [1] - 44:20
**brought** [3] - 31:14, 71:14, 103:5
**brown** [1] - 92:14

**Bryden** [1] - 72:10
**building** [16] - 16:23, 35:25, 36:5, 40:12, 44:8, 44:9, 49:15, 49:17, 87:17, 89:11, 107:1, 107:3, 107:10, 107:15, 107:21
**bullhorn** [10] - 9:5, 10:18, 11:6, 85:22, 86:14, 101:18, 101:20, 102:3, 102:24, 103:5
**bump** [4] - 106:9, 106:12, 107:13, 107:19
**bumped** [1] - 106:23
**bumping** [2] - 89:11, 89:24
**bumps** [1] - 106:7
**bunched** [1] - 32:12
**burgundy** [8] - 75:21, 75:23, 75:24, 76:3, 76:12, 90:9, 92:6, 92:14
**business** [11] - 108:17, 108:20, 108:21, 109:21, 110:1, 110:25, 111:8, 111:11, 111:13, 111:16, 111:19
**but..** [1] - 62:16
**BY** [3] - 3:18, 68:18, 97:14

**C**

**calm** [4] - 11:3, 11:8, 24:9, 24:21
**calmed** [1] - 11:7
**camera** [1] - 60:8
**cannot** [1] - 105:21
**cap** [1] - 37:19
**Cap** [1] - 4:18
**Capitol** [32] - 3:24, 4:18, 5:18, 5:19, 11:15, 12:1, 15:13, 16:7, 16:10, 16:22, 17:5, 19:17, 19:18, 21:16, 22:11, 22:12, 25:18, 27:2, 35:12, 36:5, 50:5, 73:7, 78:13, 86:17, 87:16, 87:25, 95:6, 101:13, 101:14, 102:18
**care** [1] - 89:23
**carefully** [1] - 81:12
**case** [49] - 14:8, 54:13, 54:23, 55:3, 59:4,

60:4, 60:6, 60:16, 61:6, 61:16, 62:6, 62:9, 62:15, 64:8, 64:19, 64:25, 66:3, 66:8, 66:11, 66:14, 66:22, 66:24, 67:8, 67:15, 67:18, 69:10, 69:16, 69:18, 69:23, 72:9, 72:23, 74:11, 74:14, 74:17, 74:25, 76:3, 84:22, 98:6, 106:23, 109:19, 110:7, 110:24, 111:10, 111:19, 112:4, 112:9
**cases** [10] - 61:25, 62:1, 65:7, 68:13, 69:9, 69:10, 111:10, 111:23, 111:25, 112:1
**catastrophic** [1] - 106:18
**CCTV** [5] - 48:23, 48:25, 50:3, 60:7, 79:25
**CDU** [4] - 29:15, 29:16, 29:18, 29:20
**center** [5] - 22:25, 23:1, 31:16, 96:6, 101:11
**central** [1] - 67:17
**certain** [1] - 54:23
**certainly** [4] - 60:8, 67:8, 80:10
**CERTIFICATE** [1] - 112:14
**certification** [4] - 108:20, 109:21, 109:24, 111:9
**certified** [1] - 108:17
**certify** [1] - 112:17
**chain** [2] - 110:9, 110:10
**change** [1] - 74:21
**changes** [1] - 74:22
**chant** [1] - 5:8
**chanting** [3] - 6:21, 8:25, 21:2
**chaos** [1] - 10:20
**chaotic** [1] - 50:14
**characterization** [1] - 17:16
**charge** [6] - 9:22, 10:6, 11:12, 102:4, 105:9
**charged** [1] - 76:5
**charges** [2] - 66:24, 67:1
**Charles** [1] - 66:9
**choose** [1] - 54:21
**chooses** [1] - 67:2

**chose** [1] - 65:1
**CHRISTOPHER** [1] - 1:6
**Christopher** [1] - 68:20
**circle** [3] - 29:13, 82:16, 101:5
**circled** [4] - 31:7, 32:19, 39:15, 39:19
**circling** [7] - 13:18, 14:20, 22:6, 42:3, 45:15, 45:21, 99:23
**Circuit** [3] - 66:8, 67:10, 67:15
**circuit** [1] - 11:14
**circumstances** [1] - 66:11
**citation** [2] - 58:11, 58:12
**cite** [2] - 58:14, 60:1
**cited** [1] - 61:25
**citing** [1] - 59:4
**Civil** [1] - 14:11
**civil** [1] - 110:16
**claim** [2] - 54:17, 65:1
**clarification** [1] - 21:10, 111:12
**clarify** [1] - 17:22
**clarity** [1] - 88:20
**class** [2] - 4:7, 26:13
**clause** [1] - 64:21
**clear** [6] - 59:10, 72:16, 84:1, 84:3, 98:5, 101:7
**cleared** [2] - 49:13
**clearly** [4] - 7:16, 34:4, 93:19, 94:19
**clerk** [2] - 58:14, 58:18
**client** [1] - 54:6
**clip** [2] - 31:10, 100:11
**close** [14] - 20:21, 41:15, 41:18, 44:6, 64:7, 64:8, 80:9, 80:11, 95:7, 95:10, 98:14, 98:17, 99:2, 99:12
**close-up** [2] - 80:9, 80:11
**closed** [15] - 11:14, 35:20, 36:9, 38:24, 39:8, 39:18, 41:22, 43:9, 44:10, 46:10, 46:22, 49:4, 79:3, 79:9, 99:21
**closed-circuit** [1] - 11:14
**closer** [1] - 70:1
**closing** [3] - 44:7, 50:24, 78:20
**clothing** [1] - 93:24

**colleague** [1] - 58:7
**collect** [2] - 68:3, 96:16
**collectively** [1] - 108:18
**color** [1] - 42:14
**COLUMBIA** [1] - 1:1
**comfortable** [1] - 3:9
**coming** [8] - 5:7, 6:17, 20:17, 21:2, 21:4, 25:3, 36:3, 109:3
**commands** [2] - 17:24, 19:2
**commentary** [1] - 87:14
**commentators** [1] - 55:25
**committee** [2] - 56:3, 111:25
**communicate** [2] - 89:14, 89:21
**communicated** [1] - 89:6
**communicating** [1] - 72:17
**communication** [2] - 17:14, 89:22
**communications** [2] - 51:15, 53:14
**compensation** [1] - 96:16
**complete** [3] - 14:16, 56:22, 112:19
**completely** [3] - 23:14, 25:4, 50:22
**completeness** [1] - 105:5
**completing** [1] - 96:15
**complex** [1] - 59:4
**complies** [1] - 101:6
**computer** [1] - 86:7
**concern** [4] - 14:12, 14:24, 14:25, 15:1
**concerning** [1] - 53:10
**conduct** [2] - 50:10, 66:16
**conference** [1] - 59:13
**conflicting** [1] - 95:2
**confrontation** [5] - 56:8, 56:10, 56:17, 56:18, 64:21
**confusing** [2] - 57:18, 76:20
**Congress** [6] - 4:19, 12:2, 44:10, 73:18, 74:4, 74:5
**consider** [1] - 63:24
**consistent** [2] - 27:23, 28:8
**constitutes** [1] -

112:17
**Constitution** [2] - 1:23, 112:25
**constitutional** [2] - 56:22, 64:21
**consulting** [1] - 61:15
**contact** [14] - 11:5, 38:21, 70:2, 70:3, 73:25, 78:22, 78:25, 80:15, 81:1, 81:4, 81:6, 81:8, 84:15
**contacted** [1] - 73:20
**contents** [1] - 110:19
**continue** [17] - 7:4, 14:17, 15:4, 16:9, 17:6, 20:7, 21:6, 26:15, 27:19, 31:3, 34:9, 34:16, 37:13, 43:4, 82:19, 106:2, 107:4
**continuing** [1] - 95:20
**control** [25] - 9:6, 9:17, 10:14, 10:16, 10:19, 10:22, 14:16, 18:16, 19:1, 20:4, 27:9, 29:22, 34:20, 35:15, 35:22, 35:23, 36:8, 40:4, 41:2, 44:8, 66:16, 95:24, 102:6, 106:16, 106:20
**conversation** [5] - 70:17, 70:23, 75:10, 90:8, 90:12
**conversations** [2] - 24:20, 53:17
**conviction** [1] - 67:20
**Coopersmith** [3] - 61:12, 62:15, 64:12
**corner** [1] - 12:14
**correct** [49] - 10:14, 13:8, 15:17, 15:19, 26:6, 36:19, 39:16, 41:5, 41:6, 48:15, 63:20, 68:22, 68:23, 69:1, 69:2, 69:4, 69:12, 69:16, 69:19, 70:3, 70:4, 70:6, 70:7, 70:12, 70:13, 70:16, 84:8, 84:17, 84:23, 85:6, 85:7, 85:9, 85:10, 86:2, 87:13, 88:4, 92:22, 92:25, 93:12, 95:8, 95:14, 96:2, 104:10, 104:11, 104:13, 106:10, 106:11, 110:12, 110:17
**correction** [2] - 23:17, 69:22
**counsel** [6] - 59:4,

83:25, 84:3, 101:17, 103:15, 106:6
**counseling** [1] - 71:14
**count** [1] - 82:3
**Count** [2] - 66:24, 66:25
**counts** [1] - 67:7
**Counts** [1] - 67:17
**couple** [3] - 10:4, 20:14, 64:8
**course** [2] - 26:2, 97:24
**court** [2] - 66:10, 72:12
**Court** [24] - 1:22, 1:22, 3:20, 5:23, 12:2, 57:1, 57:2, 57:4, 57:6, 60:2, 60:13, 61:1, 61:8, 62:23, 63:23, 65:14, 65:15, 65:18, 67:9, 67:16, 79:16, 79:18, 111:10, 112:24
**COURT** [164] - 1:1, 3:2, 3:7, 3:9, 3:14, 5:4, 7:3, 7:13, 7:19, 7:25, 8:4, 8:17, 8:21, 9:9, 9:21, 10:1, 12:7, 12:11, 14:11, 16:14, 16:20, 16:22, 17:17, 17:19, 19:16, 19:19, 19:21, 22:4, 22:11, 23:1, 23:7, 25:8, 25:15, 25:19, 28:6, 28:10, 28:13, 28:16, 28:25, 29:11, 30:19, 30:22, 33:15, 37:12, 37:25, 38:4, 38:6, 38:9, 38:11, 42:18, 42:21, 42:24, 44:1, 44:18, 44:23, 45:4, 45:22, 46:7, 46:14, 47:16, 47:23, 47:25, 51:5, 51:8, 51:17, 51:20, 52:10, 52:16, 53:7, 53:20, 53:24, 54:3, 55:13, 55:24, 56:13, 56:15, 57:7, 57:17, 57:24, 58:2, 58:9, 58:14, 58:17, 58:20, 59:2, 60:19, 60:23, 61:10, 61:14, 63:6, 63:10, 63:20, 64:3, 64:7, 68:5, 68:10, 68:15, 70:23, 71:2, 71:7, 71:9, 72:1, 72:6, 72:12, 72:19, 73:23, 74:22, 75:4, 75:23, 76:8, 76:11, 79:10, 79:14,

79:20, 79:22, 80:9, 80:12, 84:2, 84:12, 85:4, 85:16, 85:19, 86:4, 86:25, 87:7, 88:2, 88:5, 88:19, 90:2, 90:4, 93:2, 94:7, 94:14, 94:25, 96:19, 97:1, 97:5, 97:11, 101:23, 103:18, 103:24, 104:3, 105:4, 107:17, 107:25, 108:3, 108:6, 108:8, 108:12, 108:24, 109:3, 109:9, 109:11, 109:14, 109:17, 110:11, 110:16, 110:22, 111:1, 111:6, 111:15, 111:18, 112:10, 112:14
**court's** [1] - 96:24
**Court's** [6] - 55:19, 60:1, 66:15, 76:18, 81:24, 85:3
**Courthouse** [2] - 1:23, 112:24
**courtroom** [4] - 51:19, 52:18, 57:16, 61:17
**COURTROOM** [4] - 28:19, 47:9, 47:21, 86:1
**Courts** [2] - 65:7, 65:8
**created** [2] - 16:4, 16:18
**creating** [1] - 17:2
**credibility** [1] - 60:4
**credibly** [1] - 66:4
**Criminal** [1] - 1:3
**criminal** [2] - 54:19, 64:18
**critical** [1] - 66:20
**cross** [17] - 51:11, 51:14, 52:25, 53:4, 53:24, 54:1, 55:9, 55:11, 55:13, 57:23, 60:11, 63:3, 67:23, 100:16, 103:14, 104:23, 107:7
**CROSS** [1] - 68:17
**cross-examination** [6] - 51:14, 57:23, 63:3, 67:23, 100:16, 107:7
**CROSS-EXAMINATION** [1] - 68:17
**cross-examining** [1] - 53:24
**crowd** [31] - 5:23, 10:5, 11:3, 15:2,

20:4, 20:17, 22:19, 23:21, 23:22, 24:8, 24:15, 24:16, 24:18, 26:3, 30:25, 31:17, 34:22, 34:24, 40:18, 73:6, 78:13, 88:10, 88:11, 88:23, 92:25, 95:16, 95:17, 99:5, 102:15, 105:16, 106:14
**crowds** [1] - 31:21
**CRR** [3] - 1:22, 112:16, 112:23
**crucial** [3] - 66:2, 67:6
**current** [5] - 4:2, 4:10, 77:24, 78:10, 97:23
**custody** [2] - 110:9, 110:10

## D

**D.C** [3] - 67:9, 67:15, 108:22
**date** [2] - 12:14, 12:16
**Dated** [1] - 112:21
**David** [1] - 75:14
**day-to-day** [1] - 4:11
**DC** [3] - 1:15, 1:24, 113:1
**deal** [5] - 10:20, 108:25, 109:7, 109:9, 110:6
**dealing** [1] - 77:24
**dealt** [2] - 74:9, 109:25
**decide** [2] - 54:9, 74:15
**decided** [2] - 111:25, 112:1
**decision** [5] - 58:7, 58:9, 61:24, 65:23, 66:2
**decisions** [1] - 57:5
**decorative** [1] - 21:12
**defend** [2] - 28:23, 28:24
**defendant** [22] - 39:20, 39:21, 40:7, 40:22, 40:25, 42:2, 42:3, 42:9, 43:7, 43:8, 43:12, 45:23, 64:19, 64:20, 72:3, 72:5, 93:10, 93:24, 94:22, 99:25, 106:23, 106:25
**Defendant** [2] - 1:7, 1:18
**defendant's** [12] - 46:12, 50:20, 51:14, 56:22, 56:23, 60:14, 100:4, 100:12,

100:16, 100:17, 101:2, 101:8
**defendants** [1] - 72:5
**defending** [1] - 81:10
**defense** [24] - 16:9, 16:12, 52:1, 52:6, 53:5, 54:18, 56:9, 56:21, 56:23, 57:10, 58:1, 59:4, 59:21, 62:24, 65:2, 94:8, 101:17, 103:15, 104:25, 106:6, 109:10, 109:12, 110:3, 110:8
**Defense** [13] - 71:5, 79:13, 79:15, 80:4, 81:11, 85:17, 85:24, 86:7, 86:9, 86:19, 93:22, 94:24, 102:20
**defense's** [2] - 51:11, 57:16
**defer** [1] - 51:23
**defined** [1] - 96:23
**demeanor** [1] - 107:13
**deny** [3] - 58:2, 60:13, 88:2
**department's** [1] - 66:1
**depicted** [20] - 11:22, 11:24, 16:16, 19:10, 21:9, 28:22, 30:3, 36:12, 36:17, 44:14, 45:7, 47:10, 47:13, 48:1, 48:3, 48:22, 101:8, 104:18, 105:23, 105:24
**depicting** [1] - 94:12
**deploy** [4] - 27:5, 91:4, 91:6, 91:8
**deployed** [2] - 27:2, 91:3
**DEPUTY** [4] - 28:19, 47:9, 47:21, 86:1
**derives** [1] - 65:19
**describe** [7] - 5:25, 6:20, 15:8, 17:1, 18:18, 46:7, 48:16
**described** [2] - 6:14, 50:9
**describing** [1] - 86:15
**description** [1] - 46:15
**designate** [2] - 54:20, 55:1
**designated** [5] - 54:4, 54:10, 55:8, 64:23, 66:1
**detail** [1] - 70:22
**details** [1] - 52:24
**device** [1] - 91:3
**dialogue** [2] - 9:17,

9:21
**difference** [2] - 6:24, 13:6
**different** [11] - 4:17, 8:7, 52:22, 62:21, 63:16, 69:9, 69:10, 72:5, 73:4, 74:25, 87:11
**DIRECT** [1] - 3:17
**direct** [5] - 76:23, 81:15, 92:20, 93:17, 101:22
**directed** [1] - 96:7
**directly** [4] - 9:5, 27:12, 32:21, 63:23
**disarm** [1] - 27:8
**discretion** [5] - 55:7, 55:20, 55:21, 65:8, 66:10
**discuss** [3] - 75:21, 76:20, 104:24
**discussed** [2] - 109:22
**discussing** [5] - 20:12, 21:18, 23:20, 36:18, 58:24
**discussion** [3] - 51:18, 65:10, 65:22
**disorder** [2] - 14:11, 110:16
**disperse** [1] - 20:4
**distinct** [1] - 63:1
**DISTRICT** [3] - 1:1, 1:1, 1:10
**division** [5] - 4:12, 4:15, 4:16, 4:19, 29:19
**divisions** [2] - 4:17, 4:18
**documentation** [1] - 110:14
**documents** [1] - 110:19
**done** [7] - 35:5, 35:9, 35:10, 59:22, 59:23, 104:4, 104:6
**door** [103] - 18:25, 19:14, 19:16, 23:8, 24:17, 28:24, 30:5, 32:13, 32:21, 33:2, 33:4, 33:13, 33:14, 34:20, 34:21, 35:19, 36:7, 36:24, 37:7, 37:8, 37:21, 38:3, 38:4, 38:10, 38:13, 38:14, 38:24, 39:8, 39:9, 39:10, 39:17, 40:5, 40:11, 41:13, 41:15, 41:18, 41:20, 41:22, 42:13, 43:9, 43:10, 44:5, 44:6,

44:7, 44:16, 45:25, 46:9, 47:1, 47:4, 48:14, 49:3, 49:7, 50:23, 50:24, 51:1, 77:2, 77:10, 78:20, 79:3, 79:9, 81:10, 82:14, 82:22, 83:6, 83:9, 83:10, 83:12, 83:14, 83:23, 84:7, 84:15, 84:19, 89:1, 94:10, 95:6, 95:7, 95:10, 99:2, 99:4, 99:6, 99:9, 99:11, 99:12, 99:17, 100:5, 100:6, 100:13, 100:14, 100:22, 101:4, 101:8, 101:11, 105:14, 105:20
**doors** [50] - 16:10, 17:5, 19:4, 19:5, 19:6, 21:10, 21:12, 21:14, 21:16, 21:17, 22:14, 22:23, 23:3, 23:11, 24:2, 28:25, 32:1, 32:3, 32:4, 32:23, 34:24, 34:25, 36:8, 36:13, 36:15, 36:17, 40:10, 44:19, 46:17, 46:18, 46:23, 47:3, 47:5, 48:4, 49:1, 49:3, 49:8, 98:12, 98:14, 98:17, 99:20, 99:21, 101:14, 104:12, 104:19, 105:3, 105:21
**down** [13] - 11:3, 11:7, 16:1, 29:25, 44:12, 47:18, 48:21, 66:3, 67:1, 101:4, 101:15, 103:5, 103:8
**dozens** [1] - 61:5
**draw** [2] - 25:9, 67:4
**dropped** [1] - 31:13
**due** [3] - 19:2, 56:8, 56:10
**during** [12] - 8:23, 9:20, 15:8, 22:23, 51:11, 67:22, 74:24, 76:19, 79:19, 97:24, 98:19, 107:7
**duties** [2] - 4:10, 10:24, 96:15

**E**

**easier** [3] - 67:10, 67:13, 80:12
**east** [6] - 15:13, 16:7, 16:19, 16:20, 25:18,

101:12
**East** [34] - 5:16, 5:17, 5:18, 5:19, 6:11, 11:15, 12:7, 16:3, 16:5, 16:6, 16:21, 21:17, 22:15, 27:17, 27:18, 30:4, 30:6, 48:4, 49:1, 96:4, 96:6, 98:12, 99:21, 101:12, 101:16, 104:10, 104:12, 104:19, 104:21, 105:2, 105:10
**easy** [1] - 108:14
**ECF-97** [1] - 112:8
**effect** [1] - 22:22
**effective** [1] - 31:22
**effectively** [1] - 96:22
**either** [3] - 46:9, 60:20, 65:2
**El** [1] - 65:11
**EL** [1] - 65:11
**El-Amin** [1] - 65:11
**elbow** [4] - 82:10, 100:17, 100:20
**elements** [1] - 55:12
**Elias** [2] - 75:15, 75:20
**ELIAS** [1] - 75:15
**email** [11] - 68:12, 71:10, 71:12, 71:15, 111:13, 111:15, 111:18, 111:20, 112:2, 112:7
**emails** [3] - 62:5, 62:6, 71:16
**employed** [2] - 3:23, 3:25
**employee** [1] - 54:10
**employment** [1] - 96:17
**end** [9] - 20:1, 22:16, 22:20, 26:17, 88:7, 89:10, 103:4, 107:4, 107:12
**ended** [3] - 5:8, 10:22, 49:12
**ending** [1] - 30:17
**enforcement** [3] - 54:12, 97:16, 98:8
**engaged** [1] - 75:9
**ensure** [1] - 19:8
**entailed** [1] - 95:21
**enter** [2] - 106:25, 107:2
**entering** [1] - 17:5
**entire** [5] - 29:17, 48:13, 52:8, 103:16, 104:25
**entirely** [1] - 60:7
**entirety** [1] - 22:1

**entity** [2] - 54:9, 55:5
**entrance** [2] - 25:17, 27:17
**entry** [4] - 35:12, 36:7, 38:3, 44:9
**entryway** [1] - 41:13
**equivalent** [1] - 27:6
**ESQ** [3] - 1:13, 1:14, 1:18
**essential** [2] - 54:17, 65:1
**essentially** [1] - 52:5
**estimate** [1] - 105:23
**evening** [1] - 112:2
**event** [1] - 63:13
**events** [2] - 36:18, 60:5
**eventually** [1] - 6:17
**evidence** [18] - 22:5, 28:19, 29:9, 30:10, 57:5, 66:2, 79:19, 79:20, 79:21, 86:1, 86:3, 86:4, 87:1, 87:3, 90:1, 94:3, 109:15, 110:5
**evolved** [1] - 6:20
**exact** [2] - 12:23, 101:22
**exactly** [3] - 9:12, 25:16, 90:23
**EXAMINATION** [3] - 3:17, 68:17, 97:13
**examination** [9] - 51:14, 54:2, 55:10, 57:23, 60:12, 63:3, 67:23, 100:16, 107:7
**examine** [1] - 53:1
**examining** [1] - 53:24
**except** [2] - 19:3, 86:21
**exception** [2] - 56:11, 110:2
**exceptional** [1] - 66:11
**exceptions** [4] - 64:15, 64:16, 109:4, 110:25
**excited** [1] - 34:25
**exclude** [7] - 46:14, 51:10, 55:7, 64:13, 64:20, 65:8, 66:11
**excluded** [3] - 53:19, 55:18, 62:22
**excluding** [8] - 55:19, 55:22, 56:2, 64:17, 65:6, 65:16, 66:13, 67:22
**exclusion** [1] - 65:13
**exclusions** [1] - 56:7
**excuse** [14] - 9:2, 16:17, 27:18, 30:5, 38:18, 40:4, 43:2,

49:3, 49:22, 77:16, 97:8, 101:12, 103:13, 111:10
**excused** [1] - 108:4
**Exhibit** [23] - 11:19, 12:6, 16:12, 21:7, 21:24, 22:5, 25:5, 28:18, 29:9, 30:1, 30:10, 36:10, 45:2, 45:5, 45:19, 47:7, 47:19, 76:25, 77:1, 77:6, 77:11, 99:13, 102:20
**exhibit** [8] - 25:7, 47:16, 80:6, 90:2, 90:4, 94:7, 101:17, 110:13
**Exhibit..** [1] - 77:3
**exit** [1] - 46:22
**exits** [2] - 51:19, 52:18
**expand** [1] - 24:5
**expectation** [1] - 5:6
**expected** [2] - 5:11, 63:16
**experience** [3] - 9:24, 27:22, 28:9
**expert** [3] - 27:25, 28:1, 65:3
**explain** [3] - 88:17, 88:21, 108:24
**explaining** [1] - 87:19
**express** [1] - 65:15
**extent** [1] - 67:5
**exterior** [3] - 21:11, 26:14, 30:5
**extraordinary** [1] - 67:22
**eye** [4] - 82:7, 82:17, 82:25, 107:15
**eyes** [2] - 27:12, 27:13

**F**

**facing** [3] - 5:22, 12:1, 12:2
**fact** [12] - 5:2, 5:19, 28:4, 31:7, 50:6, 66:2, 66:20, 70:14, 87:2, 110:1, 111:3, 111:11
**fact-finder** [2] - 87:2, 111:11
**facts** [1] - 59:25
**fair** [12] - 13:6, 21:20, 29:5, 80:17, 87:17, 87:23, 94:14, 97:15, 98:7, 99:22, 105:4, 110:12
**fairly** [1] - 73:23
**far** [14] - 23:8, 32:8,

32:9, 49:25, 52:4, 52:8, 55:1, 61:3, 63:17, 75:18, 78:17, 104:12, 110:20
**FBI** [18] - 51:10, 61:19, 69:15, 70:8, 70:9, 72:9, 72:18, 72:22, 72:25, 73:5, 75:14, 75:21, 75:25, 76:1, 78:5, 78:7, 78:11, 87:20
**featuring** [1] - 87:11
**February** [1] - 72:23
**federal** [1] - 109:14
**feet** [4] - 6:1, 23:10, 45:10
**fell** [3] - 96:3, 96:5, 105:10
**fellow** [3] - 7:9, 25:2, 46:2
**felt** [3] - 6:21, 6:23, 79:5
**fence** [1] - 8:10
**few** [9] - 27:14, 30:17, 31:6, 36:6, 41:7, 69:18, 75:18, 94:17, 100:23
**figure** [3] - 41:16, 49:10, 50:15
**fill** [2] - 49:6, 105:3
**filming** [1] - 27:15
**final** [1] - 59:12
**finally** [1] - 68:15
**finder** [2] - 87:2, 111:11
**fine** [3] - 16:1, 26:22, 52:15
**finger** [1] - 34:6
**finish** [3] - 60:19, 60:20, 68:7
**First** [1] - 66:8
**first** [32] - 3:3, 4:7, 4:12, 9:16, 10:9, 15:15, 49:22, 61:22, 64:10, 64:18, 68:21, 68:25, 70:23, 72:8, 72:22, 73:15, 73:17, 73:19, 73:25, 75:5, 77:11, 77:13, 77:15, 77:16, 77:23, 90:13, 90:16, 91:4, 91:6, 102:2, 108:16
**fist** [7] - 89:10, 89:23, 106:7, 106:9, 106:12, 106:23, 107:19
**fist-bumped** [1] - 106:23
**fit** [1] - 65:2
**five** [4] - 11:9, 36:14,

82:1, 97:19
**flagpoles** [2] - 84:23, 85:1
**flash** [5] - 20:2, 20:3, 20:5, 34:12, 90:24
**floor** [1] - 19:21
**floors** [2] - 49:13
**focus** [1] - 38:23
**focused** [4] - 24:17, 35:23, 78:20, 79:2
**foggy** [1] - 70:21
**folks** [4] - 9:6, 10:4, 10:19, 17:12
**following** [3] - 56:2, 59:12, 66:23
**foot** [4] - 37:4, 37:7, 37:9, 50:23
**footage** [2] - 79:25, 106:22
**footing** [2] - 35:10, 102:1
**FOR** [1] - 1:1
**forbid** [1] - 96:12
**force** [2] - 21:13, 31:20
**forefront** [1] - 13:25
**foregoing** [1] - 112:17
**foresight** [1] - 61:1
**forgotten** [1] - 65:23
**form** [1] - 5:16
**formed** [5] - 5:22, 6:17, 18:24, 105:11, 105:13
**forth** [1] - 34:6
**fortunately** [1] - 60:21
**forward** [8] - 6:25, 15:25, 18:5, 18:7, 34:6, 36:25, 43:21, 59:21
**four** [5] - 39:7, 55:19, 74:9, 85:19, 85:20
**fourth** [2] - 76:10, 76:16
**foyer** [1] - 36:16
**frame** [8] - 26:21, 36:24, 37:5, 37:15, 37:21, 37:22, 48:10, 99:23
**frankly** [1] - 59:20
**freezing** [1] - 86:7
**FRIEDMAN** [1] - 1:10
**front** [12] - 7:8, 8:19, 21:15, 22:14, 23:2, 25:4, 32:21, 77:2, 77:10, 83:7, 86:17, 102:23
**Front** [26] - 5:16, 5:17, 5:18, 5:19, 6:11, 11:15, 12:7, 16:3, 16:5, 16:6, 16:21, 22:15, 27:17, 30:6,

48:4, 96:4, 96:6, 99:21, 101:12, 101:16, 104:10, 104:19, 104:21, 105:2, 105:11
**frustration** [1] - 89:20
**full** [6] - 11:13, 40:13, 87:9, 91:19, 103:9, 112:18
**full-on** [1] - 11:13
**fully** [1] - 38:25
**function** [1] - 66:19
**future** [1] - 59:24

## G

**gain** [4] - 18:16, 20:4, 29:21, 106:15
**gaining** [1] - 35:12
**game** [1] - 49:10
**gap** [1] - 105:3
**garment** [1] - 29:18
**gatekeeper** [1] - 57:2
**gathered** [1] - 32:6
**gear** [4] - 6:25, 7:6, 7:23, 8:7
**general** [5] - 50:8, 52:2, 66:16, 91:8, 99:3
**generally** [2] - 54:11, 72:25
**gentleman** [6] - 10:17, 11:5, 11:11, 26:6, 39:13, 81:1
**gentlemen** [1] - 7:23
**George** [1] - 65:11
**gesture** [1] - 103:7
**given** [4] - 5:15, 98:7, 107:2, 107:20
**glass** [5] - 3:10, 26:7, 26:14, 32:23, 44:19
**glimpse** [1] - 92:5
**glove** [3] - 93:12, 93:15, 95:4
**gloves** [3] - 94:12, 94:16, 94:18
**goal** [1] - 40:9
**God** [1] - 96:11
**gold** [1] - 22:8
**Government** [18] - 11:19, 12:6, 21:7, 21:24, 25:5, 30:1, 36:10, 45:2, 45:19, 47:7, 76:23, 76:25, 77:1, 77:3, 77:6, 77:11, 80:8, 99:13
**government** [28] - 3:6, 12:6, 21:23, 29:8, 30:9, 30:13, 30:15, 45:1, 45:18, 51:21,

51:23, 51:25, 54:20, 55:14, 57:8, 59:8, 59:17, 62:10, 77:6, 85:11, 89:25, 90:22, 91:11, 92:17, 110:4, 110:15, 110:21, 110:24
**Government's** [4] - 16:11, 28:17, 91:12, 93:5
**government's** [9] - 51:10, 51:12, 53:11, 56:16, 61:3, 63:18, 68:1, 86:6, 95:4
**grab** [2] - 32:22, 40:20
**grabbed** [1] - 40:2
**grand** [1] - 85:12
**great** [1] - 41:10
**green** [2] - 70:11, 81:6
**Griffin** [1] - 67:15
**ground** [3] - 14:2, 31:11, 31:13
**grounds** [1] - 109:11
**group** [4] - 9:22, 40:19, 47:11, 102:4
**guess** [6] - 12:24, 13:4, 35:7, 54:14, 65:22, 97:18
**guys** [2] - 88:8, 89:7
**guys'** [1] - 7:12

## H

**HAAG** [134] - 1:14, 3:5, 3:13, 3:15, 3:18, 8:15, 8:18, 11:19, 12:5, 13:12, 13:17, 14:17, 14:19, 15:4, 15:6, 15:25, 16:11, 16:15, 17:6, 18:5, 18:12, 19:9, 19:23, 20:7, 20:10, 20:22, 21:6, 21:23, 22:16, 25:5, 25:9, 26:4, 26:15, 26:21, 27:19, 28:2, 28:7, 28:12, 28:15, 28:17, 28:20, 29:8, 29:25, 30:9, 30:15, 30:21, 30:23, 31:3, 31:24, 32:14, 32:17, 33:5, 33:8, 33:20, 34:5, 34:8, 34:13, 34:16, 36:10, 36:20, 36:25, 37:3, 37:13, 37:17, 37:21, 39:5, 40:13, 41:7, 41:10, 41:23, 42:1, 43:4, 43:15, 43:21, 44:12, 45:1, 45:5, 45:18, 46:16, 47:7, 47:17, 47:22, 47:24,

48:7, 48:21, 50:17, 51:3, 55:16, 56:6, 57:9, 57:22, 57:25, 59:1, 59:3, 60:20, 64:5, 68:3, 72:15, 80:5, 80:10, 83:25, 84:3, 85:13, 85:15, 86:21, 88:1, 88:18, 88:20, 93:1, 94:2, 94:5, 94:9, 96:18, 97:9, 97:14, 99:13, 100:8, 100:23, 101:1, 101:7, 101:15, 102:20, 103:11, 103:15, 103:19, 104:2, 104:9, 104:15, 104:25, 106:2, 106:4, 107:4, 107:24, 108:2
**Haag** [3] - 62:20, 97:6, 97:7
**Haag)........................**
**...........** [2] - 2:4, 2:5
**half** [9] - 13:1, 26:21, 39:5, 61:23, 62:1, 69:14, 74:12, 97:25, 112:3
**hand** [37] - 12:13, 12:14, 19:10, 32:8, 32:9, 33:10, 33:16, 33:19, 42:4, 42:24, 43:1, 46:8, 81:16, 81:20, 82:7, 82:9, 82:10, 82:13, 83:1, 83:5, 83:6, 83:10, 83:12, 83:18, 83:20, 84:8, 84:11, 84:15, 93:10, 93:12, 93:14, 94:18, 94:20, 100:21, 101:2, 101:8
**handed** [2] - 61:12, 62:15
**handles** [1] - 33:3
**hands** [9] - 7:12, 13:25, 26:10, 31:9, 34:1, 34:2, 34:6, 81:12, 95:3
**hard** [2] - 6:13, 84:1
**hardly** [1] - 18:20
**hat** [12] - 22:8, 26:24, 32:19, 33:10, 41:2, 41:4, 42:14, 42:18, 91:24, 92:4
**Hawa** [1] - 110:7
**head** [10] - 19:12, 29:14, 29:23, 84:23, 84:25, 103:7, 103:8, 103:21, 103:22, 105:6

**heads** [1] - 68:11
**hear** [17] - 6:22, 8:1, 8:4, 18:20, 20:1, 20:17, 20:19, 20:25, 22:19, 26:24, 34:11, 48:12, 51:21, 55:14, 67:9, 87:1, 87:2
**heard** [4] - 59:1, 92:20, 103:24, 103:25
**hearing** [3] - 7:13, 28:14, 112:12
**hears** [1] - 87:2
**hearsay** [4] - 7:11, 8:1, 8:14, 109:4
**heart** [1] - 68:10
**held** [3] - 18:3, 35:1, 44:10, 105:11, 105:20
**HELD** [1] - 1:10
**hell** [1] - 67:13
**helmet** [3] - 29:15, 29:16, 29:20
**help** [3] - 11:1, 31:20, 54:22
**helpful** [1] - 99:16
**helping** [1] - 95:1
**hereby** [1] - 112:16
**hi** [1] - 68:19
**hidden** [1] - 83:6
**higher** [1] - 22:10
**highlight** [1] - 59:25
**himself** [7] - 42:13, 44:16, 46:4, 82:22, 83:10, 83:13, 100:22
**hip** [2] - 82:14, 82:15
**hit** [6] - 14:14, 27:12, 29:23, 77:19, 84:22, 84:25
**hold** [4] - 17:11, 32:22, 38:13, 84:19
**holding** [7] - 23:5, 31:9, 31:15, 45:15, 83:11, 93:17, 93:19
**honest** [1] - 103:10
**Honor** [47] - 3:5, 3:13, 8:15, 12:5, 21:23, 28:2, 28:12, 28:15, 29:8, 30:9, 30:15, 30:21, 38:1, 45:1, 46:16, 47:17, 50:17, 51:4, 51:25, 52:15, 55:16, 56:6, 57:9, 59:1, 59:3, 59:5, 59:7, 60:15, 64:5, 68:3, 72:15, 80:5, 80:10, 83:25, 86:21, 94:2, 94:5, 97:9, 103:15, 103:16, 107:24, 108:2, 108:15, 109:16,

110:17, 110:23,
111:8
**HONORABLE** [1] -
1:10
**hoodie** [1] - 94:23
**hook** [1] - 6:4
**hopeful** [1] - 68:6
**horn** [1] - 11:6
**hour** [6] - 61:23, 62:1,
69:14, 74:11, 112:3
**House** [6] - 4:12, 4:14,
4:16, 4:17, 4:18,
94:10
**hurdles** [1] - 67:14
**hurt** [1] - 29:22
**hyphen** [1] - 65:11
**hypothetical** [1] -
96:20
**hypothetically** [1] -
96:11

## I

**Ian** [1] - 65:20
**idea** [1] - 49:18
**identification** [8] -
11:20, 21:7, 28:20,
30:1, 44:13, 45:6,
86:5, 94:25
**identified** [5] - 39:20,
45:23, 90:24, 92:20,
102:14
**identify** [5] - 90:24,
91:24, 92:21, 93:24,
94:21
**identifying** [1] - 94:4
**Image** [3] - 71:5,
93:22, 94:24
**image** [11] - 15:24,
71:10, 78:6, 78:15,
83:8, 93:25, 94:2,
94:12, 94:16, 94:19,
94:21
**imagine** [1] - 100:19
**immediate** [2] - 24:14,
72:18
**immediately** [1] -
21:16
**impact** [8] - 8:18,
27:10, 28:5, 28:9,
40:7, 50:8, 50:20,
57:16
**impacts** [3] - 56:21,
56:23, 56:25
**impeach** [2] - 53:2,
57:12
**impeached** [1] - 67:5
**impeachment** [3] -
57:14, 62:25, 63:24
**importance** [1] - 44:7

**important** [2] - 63:1,
63:5
**improper** [1] - 57:14
**IN** [1] - 1:1
**incident** [6] - 70:5,
70:15, 77:2, 80:14,
80:16, 85:6
**included** [1] - 17:23
**including** [1] - 52:23
**inconsistent** [1] - 53:1
**incorrectly** [2] - 47:1,
47:5
**increase** [1] - 74:23
**independent** [2] -
70:10, 81:4
**indicated** [2] - 59:9,
109:12
**indicates** [1] - 59:11
**indicating** [2] - 33:25,
47:3
**indication** [1] - 56:3
**indict** [1] - 85:12
**indictment** [1] - 63:22
**indictments** [1] -
63:19
**individual** [33] - 22:7,
25:10, 25:14, 25:15,
25:24, 25:25, 26:8,
26:17, 26:20, 26:24,
26:25, 27:15, 29:13,
32:19, 33:10, 33:21,
33:23, 36:24, 38:15,
39:3, 39:15, 39:19,
41:4, 44:24, 45:23,
46:1, 55:22, 86:14,
98:16, 99:22, 101:9,
101:18, 101:19
**individual's** [1] - 37:4
**individuals** [14] - 8:6,
8:9, 9:14, 10:14,
13:1, 13:7, 14:22,
17:10, 23:21, 39:24,
55:19
**indulgence** [4] -
76:18, 81:24, 85:3,
96:25
**inferences** [1] - 67:4
**information** [3] - 53:9,
74:23, 89:6
**initial** [12] - 11:5,
13:15, 21:10, 26:14,
31:12, 40:9, 49:3,
51:22, 53:15, 70:20,
73:17, 101:25
**initiate** [1] - 70:2
**initiated** [1] - 70:3
**injured** [4] - 85:6,
85:8, 96:12, 96:14
**injuring** [1] - 85:14
**inside** [14] - 19:7,

24:3, 29:1, 34:21,
35:8, 36:4, 36:13,
36:15, 38:14, 44:19,
89:2, 89:11, 99:5,
107:21
**instance** [1] - 9:13
**instances** [1] - 29:21
**instead** [3] - 74:3,
97:12, 108:13
**instruction** [1] - 86:24
**integrity** [8] - 51:13,
52:11, 53:18, 56:19,
57:1, 57:5, 63:2,
63:24
**intend** [3] - 88:15,
89:14, 89:21
**intent** [1] - 67:12
**interact** [1] - 43:12
**interacting** [5] - 70:11,
77:22, 85:21, 95:5,
98:17
**interaction** [8] - 23:21,
38:25, 52:24, 90:14,
90:18, 95:8, 96:12,
96:14
**interactions** [1] -
87:12
**interlocked** [4] - 6:2,
6:3, 6:9, 31:19
**interpretation** [1] -
103:25
**interrupt** [2] - 45:11,
62:8
**interview** [1] - 67:6
**interviewed** [2] -
52:20, 57:19
**introduce** [2] - 3:20,
110:24
**investigating** [1] -
87:20
**investigation** [3] -
52:5, 52:9, 52:20
**invite** [1] - 102:17
**inviting** [2] - 87:16,
87:24
**involving** [3] - 76:3,
77:1, 80:14
**irrelevant** [1] - 96:20
**irritates** [1] - 27:11
**irritating** [1] - 48:20
**issue** [13] - 56:10,
56:17, 56:18, 59:4,
59:6, 59:20, 60:15,
60:25, 61:2, 61:4,
62:5, 108:25, 110:9
**issued** [1] - 59:12
**issues** [3] - 59:22,
61:6, 63:23
**itself** [3] - 16:23, 49:6,
89:22

## J

**J6** [7] - 4:19, 69:22,
70:20, 71:3, 73:3,
73:4, 75:7
**jacket** [1] - 70:12
**January** [21] - 4:20,
5:10, 6:9, 12:17,
21:21, 27:3, 29:3,
30:7, 70:2, 70:25,
72:9, 72:18, 72:23,
85:8, 86:17, 87:12,
97:16, 97:23, 97:25,
98:9, 98:13
**Jencks** [3] - 53:21,
57:17, 61:18
**jeopardizing** [1] -
66:19
**jerking** [1] - 33:1
**job** [14] - 40:8, 50:10,
50:11, 50:16, 50:21,
51:2, 95:19, 95:20,
95:21, 96:15, 96:22,
96:23, 97:12
**judge** [6] - 14:7, 51:9,
52:19, 57:2, 58:6,
60:25, 80:4, 112:8
**JUDGE** [1] - 1:10
**Judge** [16] - 7:2,
12:10, 27:25, 37:11,
56:12, 65:10, 65:20,
66:7, 68:9, 96:24,
97:4, 101:21,
103:13, 104:22,
107:16, 108:5
**judges** [2] - 112:1,
112:5
**judicial** [1] - 57:1
**jump** [15] - 16:15,
18:5, 19:9, 21:7,
25:6, 30:2, 31:24,
32:14, 33:5, 34:8,
34:13, 36:20, 47:19,
102:21, 106:4
**jumping** [1] - 30:16
**Jurey** [5] - 60:3, 65:25,
66:5, 66:13, 66:19
**JUREY** [1] - 65:25
**jury** [4] - 62:2, 62:3,
62:8, 85:12

## K

**keep** [18] - 19:4, 31:17,
31:20, 35:17, 37:10,
40:4, 46:14, 82:7,
82:16, 82:17, 82:25,
89:20, 89:23, 89:24,
92:2, 105:12,
106:14, 107:8
**keeping** [2] - 24:9,

43:10
**kept** [1] - 50:23
**kicked** [2] - 10:1, 10:2
**kind** [16] - 13:10,
14:24, 17:23, 24:1,
26:11, 27:7, 32:12,
33:12, 33:17, 35:21,
39:2, 60:3, 95:24,
96:16, 96:20, 106:21
**knowing** [3] - 10:24,
99:6, 105:21
**knowledge** [4] - 17:20,
28:2, 72:1, 76:11
**knows** [1] - 55:3
**Kollar** [1] - 66:7
**Kollar-Kotelly** [1] -
66:7
**Kotelly** [2] - 65:10,
66:7

## L

**labeled** [1] - 90:22
**lack** [1] - 65:15
**lady** [1] - 8:11
**lady's** [1] - 11:12
**language** [3] - 64:10,
65:5, 103:9
**largely** [1] - 60:4
**last** [10] - 3:21, 11:8,
36:14, 41:1, 59:16,
59:18, 61:20, 61:21,
62:20, 76:17
**lasts** [2] - 80:15, 80:16
**LAW** [1] - 1:18
**law** [14] - 54:11, 58:14,
58:17, 58:22, 62:4,
64:11, 67:8, 67:15,
67:16, 97:16, 98:7,
111:19, 112:4, 112:9
**lawsuit** [1] - 54:5
**lead** [2] - 16:6, 21:16
**leader** [1] - 102:14
**leadership** [5] - 9:18,
10:24, 102:12,
104:8, 105:8
**leading** [7] - 16:22,
16:25, 18:11, 19:16,
19:17, 22:14, 30:5
**learn** [1] - 85:11
**least** [3] - 25:3, 36:8,
106:1
**leave** [7] - 50:5, 50:6,
51:18, 52:12, 60:17,
99:16, 107:21
**LEDERER** [15] - 1:13,
51:25, 52:15,
108:11, 108:15,
109:2, 109:7,
109:10, 109:12,

109:16, 109:18,
110:17, 110:23,
111:3, 111:8
**left** [27] - 7:10, 7:21,
12:13, 12:14, 31:18,
32:3, 32:4, 32:9,
33:10, 37:4, 38:15,
38:17, 41:5, 43:2,
45:23, 78:17, 78:21,
81:22, 83:18, 83:20,
84:8, 84:10, 98:22,
100:2, 100:3, 105:20
**left-hand** [4] - 12:13,
12:14, 32:9, 33:10
**legal** [10] - 51:18,
52:11, 52:12, 52:14,
59:22, 60:25, 61:4,
61:5, 61:23, 111:22
**legitimate** [1] - 109:1
**LEGO** [1] - 6:5
**less** [1] - 71:3
**letting** [1] - 7:22
**level** [2] - 23:3, 23:4
**leverage** [2] - 83:13,
100:21
**Library** [5] - 4:19,
12:2, 73:18, 74:3,
74:5
**lieutenant** [6] - 5:16,
18:24, 21:14, 22:10,
22:13, 23:2
**limited** [2] - 30:12,
66:12
**limiting** [1] - 86:23
**line** [44] - 5:1, 5:16,
5:22, 6:16, 9:2, 9:10,
9:14, 10:8, 10:12,
11:25, 13:10, 13:21,
14:7, 15:20, 16:4,
16:9, 16:17, 16:18,
17:3, 17:11, 18:3,
18:10, 18:24, 49:21,
49:22, 49:23, 96:5,
100:15, 101:16,
102:8, 102:9,
102:15, 102:16,
102:17, 103:1,
104:7, 105:9,
105:11, 105:12,
105:13, 105:15,
110:10
**Lisa** [1] - 1:22
**LISA** [1] - 112:16
**list** [2] - 55:19, 63:7
**listed** [1] - 55:22
**listen** [2] - 26:16,
63:11
**listening** [4] - 10:6,
18:1, 24:22, 53:10
**located** [4] - 14:13,

38:19, 45:24, 101:10
**location** [8] - 13:24,
22:24, 23:9, 33:6,
41:18, 47:12, 47:15,
48:18
**look** [20] - 5:25, 24:12,
35:15, 42:2, 42:3,
49:21, 56:3, 59:19,
61:10, 62:5, 64:7,
68:12, 79:2, 79:10,
82:3, 83:8, 83:18,
96:19, 107:12,
111:24
**looked** [8] - 7:6, 29:6,
34:3, 61:25, 78:8,
92:14, 100:19, 102:1
**looking** [17] - 12:4,
12:13, 12:20, 17:8,
25:19, 26:6, 32:15,
36:14, 38:6, 44:19,
47:16, 49:21, 78:15,
79:8, 79:14, 80:18,
109:4
**looks** [27] - 18:10,
19:12, 26:11, 30:4,
32:21, 33:12, 33:13,
33:18, 33:25, 37:6,
38:20, 42:10, 42:12,
42:15, 43:1, 44:15,
45:8, 45:25, 46:4,
47:11, 82:14, 83:21,
83:22, 87:15, 93:13,
93:16, 93:20
**losing** [2] - 62:10,
102:1
**lost** [2] - 26:3, 35:10
**loud** [4] - 18:20, 19:2,
34:11, 48:20
**lunch** [1] - 61:16

## M

**ma'am** [8] - 71:18,
71:20, 72:11, 72:24,
76:17, 80:1, 83:8,
84:13
**magnitude** [1] - 5:8
**main** [1] - 94:10
**maintain** [2] - 10:12,
106:19
**maintains** [1] - 84:15
**man** [14] - 70:11,
75:21, 76:3, 76:5,
76:12, 76:14, 81:6,
85:21, 90:8, 91:23,
92:4, 92:20, 102:3,
102:23
**manage** [1] - 66:16
**mandatory** [1] - 56:5
**March** [1] - 71:19

**MARINA** [1] - 1:18
**Marina** [1] - 68:19
**marina@medvinlaw.
com** [1] - 1:20
**mark** [1] - 108:18
**material** [1] - 61:18
**matter** [1] - 65:3
**mean** [10] - 4:16,
42:11, 52:4, 56:25,
65:18, 72:19,
103:22, 107:9,
108:24, 109:9
**meaning** [1] - 35:10
**means** [1] - 96:21
**MEDVIN** [104] - 1:18,
1:18, 7:2, 7:11, 8:2,
8:14, 12:10, 14:7,
17:13, 21:25, 27:25,
29:10, 30:11, 30:18,
37:11, 42:17, 45:3,
45:20, 46:6, 46:11,
51:9, 51:22, 52:19,
53:8, 53:23, 54:1,
55:11, 56:12, 56:16,
58:6, 58:12, 58:16,
60:25, 61:13, 62:23,
63:8, 63:12, 63:21,
68:9, 68:18, 71:5,
71:8, 72:14, 75:24,
76:18, 76:24, 77:5,
77:18, 77:21, 79:13,
79:15, 79:21, 80:4,
81:18, 81:24, 82:2,
82:6, 82:12, 82:18,
82:24, 83:16, 84:4,
84:14, 84:20, 85:3,
85:17, 85:20, 85:24,
86:3, 86:5, 86:11,
86:19, 87:5, 87:8,
88:6, 89:25, 90:3,
90:5, 91:11, 91:14,
91:21, 92:2, 92:9,
92:12, 92:16, 93:5,
93:22, 94:4, 94:8,
94:12, 94:24, 96:24,
97:3, 101:21,
103:13, 103:23,
104:22, 107:16,
108:5, 110:12,
110:18, 111:12,
111:17, 112:8
**Medvin** [7] - 52:16,
60:24, 66:23, 68:6,
68:19, 97:5, 109:8
**Medvin)....................
..............** [1] - 2:4
**meeting** [12] - 69:13,
70:20, 71:15, 73:13,
73:17, 74:3, 74:14,
74:16, 74:20, 75:14,

75:20, 76:2
**meetings** [1] - 76:19
**members** [3] - 46:22,
50:12, 73:4
**men** [3] - 6:25, 7:6,
9:22
**mentioned** [8] - 4:20,
17:2, 22:6, 35:9,
35:21, 70:5, 73:11,
100:16
**merits** [1] - 62:19
**met** [13] - 69:3, 69:6,
69:8, 73:15, 73:17,
73:19, 74:5, 74:10,
75:4, 75:18, 77:13,
78:7, 90:16
**metal** [4] - 6:1, 26:11,
33:17, 34:3
**Michaela** [2] - 111:21,
112:7
**microphone** [2] - 3:10,
7:15
**middle** [19] - 13:9,
13:18, 14:20, 17:8,
23:22, 24:7, 25:10,
29:14, 32:20, 38:23,
50:25, 62:16, 88:10,
88:22, 95:15, 95:16,
99:23, 105:16,
106:14
**midnight** [1] - 4:15
**might** [4] - 25:21,
29:20, 37:9, 42:15
**military** [5] - 9:23,
9:24, 9:25, 10:1,
75:11
**Miller** [2] - 65:6, 66:6
**mind** [3] - 35:3, 35:13,
78:6
**mindset** [1] - 10:1
**minus** [1] - 99:10
**minute** [8] - 13:13,
59:16, 59:19, 77:7,
77:8, 79:5, 87:11,
105:7
**minutes** [14] - 11:9,
18:6, 30:17, 34:17,
36:6, 36:14, 36:20,
36:22, 41:23, 42:6,
51:6, 77:18, 94:17,
106:1
**missing** [1] - 106:1
**misspoken** [1] - 15:11
**mistaken** [4] - 13:16,
26:13, 102:23, 103:8
**mob** [11] - 34:22,
35:25, 36:1, 36:2,
40:20, 40:22, 40:23,
43:10, 49:15, 49:17,
50:9

**mob/protesters** [1] -
49:7
**mode** [1] - 66:17
**modify** [1] - 60:10
**moment** [44] - 10:4,
10:13, 11:2, 12:13,
17:2, 22:6, 24:22,
24:24, 35:9, 35:18,
38:22, 41:19, 43:14,
50:17, 61:20, 61:21,
77:22, 77:23, 78:2,
78:16, 78:18, 79:4,
79:7, 79:11, 79:12,
79:17, 79:24, 89:19,
91:16, 94:13, 95:8,
95:18, 95:24, 97:20,
98:3, 99:19, 102:10,
102:22, 104:4,
104:6, 106:18,
107:8, 107:24
**moments** [1] - 31:6
**Monday** [1] - 109:23
**monitor** [1] - 19:3
**monitored** [2] - 5:23,
18:25
**monitoring** [1] - 19:7
**months** [2] - 59:15,
71:3
**Moreira** [2] - 1:22,
112:23
**MOREIRA** [1] - 112:16
**morning** [10] - 4:13,
50:1, 50:7, 60:22,
62:7, 109:6, 109:8,
112:3, 112:5, 112:11
**Mosky** [1] - 65:20
**most** [3] - 65:22,
66:24, 67:1
**mostly** [2] - 19:7, 47:4
**motion** [2] - 58:2,
60:14
**motivated** [1] - 66:6
**motivation** [1] - 60:10
**move** [15] - 12:6,
17:12, 21:24, 29:9,
30:10, 41:20, 45:2,
45:18, 83:5, 86:19,
92:15, 96:24, 99:17,
107:19, 108:19
**moved** [5] - 7:6, 7:8,
9:5, 88:24, 102:4
**moving** [7] - 6:25,
13:20, 35:2, 89:20,
89:23, 89:24, 107:8
**MR** [133] - 3:5, 3:13,
3:15, 3:18, 8:15,
8:18, 11:19, 12:5,
13:12, 13:17, 14:17,
14:19, 15:4, 15:6,
15:25, 16:11, 16:15,

17:6, 18:5, 18:12, 19:9, 19:23, 20:7, 20:10, 20:22, 21:6, 21:23, 22:16, 25:5, 25:9, 26:4, 26:15, 26:21, 27:19, 28:2, 28:7, 28:12, 28:15, 28:17, 28:20, 29:8, 29:25, 30:9, 30:15, 30:21, 30:23, 31:3, 31:24, 32:14, 32:17, 33:5, 33:8, 33:20, 34:5, 34:8, 34:13, 34:16, 36:10, 36:20, 36:25, 37:3, 37:13, 37:17, 37:21, 39:5, 40:13, 41:7, 41:10, 41:23, 42:1, 43:4, 43:15, 43:21, 44:12, 45:1, 45:5, 45:18, 46:16, 47:7, 47:17, 47:22, 47:24, 48:7, 48:21, 50:17, 51:3, 55:16, 56:6, 57:9, 57:22, 57:25, 59:1, 59:3, 60:20, 64:5, 68:3, 72:15, 80:5, 80:10, 83:25, 84:3, 85:13, 85:15, 86:21, 88:1, 88:18, 88:20, 93:1, 94:2, 94:5, 94:9, 96:18, 97:9, 97:14, 99:13, 100:8, 100:23, 101:1, 101:7, 101:15, 102:20, 103:11, 103:15, 103:19, 104:2, 104:9, 104:15, 104:25, 106:2, 106:4, 107:4, 107:24, 108:2

**MS** [116] - 7:2, 7:11, 8:2, 8:14, 12:10, 14:7, 17:13, 21:25, 27:25, 29:10, 30:11, 30:18, 37:11, 42:17, 45:3, 45:20, 46:6, 46:11, 51:9, 51:22, 51:25, 52:15, 52:19, 53:8, 53:23, 54:1, 55:11, 56:12, 56:16, 58:6, 58:12, 58:16, 60:25, 61:13, 62:23, 63:8, 63:12, 63:21, 68:9, 68:18, 71:5, 71:8, 72:14, 75:24, 76:18, 76:24, 77:5, 77:18, 77:21, 79:13, 79:15, 79:21, 80:4, 81:18, 81:24, 82:2, 82:6, 82:12, 82:18,

82:24, 83:16, 84:4, 84:14, 84:20, 85:3, 85:17, 85:20, 85:24, 86:3, 86:5, 86:11, 86:19, 87:5, 87:8, 88:6, 89:25, 90:3, 90:5, 91:11, 91:14, 91:21, 92:2, 92:9, 92:12, 92:16, 93:5, 93:22, 94:4, 94:8, 94:12, 94:24, 96:24, 97:3, 101:21, 103:13, 103:23, 104:22, 107:16, 108:5, 108:11, 108:15, 109:2, 109:7, 109:10, 109:12, 109:16, 109:18, 110:12, 110:17, 110:18, 110:23, 111:3, 111:8, 111:12, 111:17, 112:8

**multiple** [3] - 73:3, 73:11, 111:9
**music** [1] - 6:22
**must** [1] - 64:13

## N

**name** [5] - 3:21, 4:8, 63:21, 68:19, 75:21
**names** [2] - 75:17, 78:14
**natural** [7] - 54:6, 54:7, 55:1, 55:4, 64:18, 64:24
**nature** [1] - 63:17
**near** [1] - 24:17
**nearby** [1] - 13:22
**necessarily** [2] - 72:4, 80:6
**necessary** [1] - 10:3
**need** [10] - 3:11, 8:12, 10:20, 12:23, 24:23, 52:13, 64:1, 80:23, 89:20, 97:7
**needed** [2] - 24:8, 95:25
**needing** [1] - 8:20
**needs** [1] - 3:3
**negative** [2] - 69:20, 95:15
**never** [10] - 5:8, 71:12, 71:15, 84:25, 90:20, 94:10, 102:13, 106:20, 107:2
**new** [1] - 67:14
**next** [6] - 3:2, 25:2, 36:6, 41:14, 50:7,

79:14
**night** [2] - 4:13, 62:7
**noise** [1] - 19:2
**normal** [1] - 4:25
**normally** [2] - 7:23, 86:23
**nose** [2] - 27:12, 27:13
**note** [1] - 86:24
**notes** [4] - 56:3, 56:7, 111:25, 112:18
**nothing** [10] - 19:1, 19:3, 19:8, 51:3, 64:5, 89:16, 89:18, 93:14, 108:2, 109:7
**noticed** [4] - 7:5, 9:4, 97:20, 102:3
**notified** [2] - 61:4, 61:5
**notify** [1] - 79:16
**novel** [1] - 59:22
**number** [8] - 12:23, 13:7, 71:7, 90:4, 97:16, 98:7, 107:20
**NW** [3] - 1:15, 1:23, 112:25

## O

**oath** [1] - 58:3
**object** [7] - 14:7, 26:11, 26:12, 33:17, 72:15, 80:5, 109:10
**objection** [45] - 7:2, 7:11, 8:1, 8:14, 12:10, 12:12, 17:13, 21:25, 22:3, 27:25, 28:16, 29:10, 29:12, 30:11, 30:18, 37:11, 42:17, 45:3, 45:20, 46:6, 46:11, 53:12, 53:13, 68:2, 80:13, 85:13, 85:16, 86:21, 88:1, 88:5, 88:18, 93:1, 94:2, 94:15, 95:4, 96:18, 101:21, 103:13, 103:18, 103:23, 104:3, 104:22, 105:4, 107:16
**Objection** [1] - 85:15
**objections** [1] - 53:15
**objective** [1] - 35:14
**objects** [1] - 29:23
**observe** [2] - 92:4, 92:13
**observed** [3] - 67:3, 77:23, 78:1
**OC** [4] - 27:5, 27:6, 27:10, 27:24
**occurred** [2] - 60:5,

104:20
**OF** [4] - 1:1, 1:3, 1:9, 112:14
**offenses** [1] - 76:6
**offered** [1] - 8:15
**officer** [29] - 4:8, 4:9, 7:9, 8:19, 14:15, 19:5, 24:23, 29:20, 37:18, 42:4, 42:8, 42:12, 42:21, 43:3, 43:9, 43:11, 44:4, 44:5, 44:23, 45:15, 46:3, 46:8, 54:10, 54:11, 54:12, 58:20, 72:16, 95:11
**Officer** [12] - 51:17, 53:4, 53:22, 54:21, 55:10, 57:10, 57:12, 62:24, 67:1, 67:5, 70:9
**officer's** [2] - 19:12, 46:12
**officers** [44] - 6:11, 7:9, 7:21, 11:1, 12:22, 12:24, 13:7, 13:22, 13:24, 14:21, 14:22, 17:9, 17:11, 17:14, 17:23, 21:4, 21:15, 23:16, 24:14, 25:2, 27:4, 28:23, 28:24, 29:18, 31:12, 31:18, 32:1, 44:15, 46:2, 49:14, 50:23, 50:25, 91:4, 91:6, 91:8, 91:9, 95:10, 98:7, 98:8, 98:22, 104:7, 105:17, 105:18, 106:18
**Official** [1] - 1:22
**OFFICIAL** [1] - 112:14
**official** [1] - 112:24
**officials** [1] - 49:10
**omits** [1] - 105:1
**once** [10] - 30:21, 32:6, 41:21, 67:13, 69:7, 69:20, 69:21, 69:22, 99:5, 105:22
**one** [46] - 6:5, 8:12, 9:4, 9:25, 13:13, 15:18, 18:7, 26:7, 26:16, 29:13, 31:12, 31:24, 37:9, 39:24, 44:15, 46:2, 47:18, 49:14, 57:25, 60:15, 61:7, 64:11, 64:13, 64:23, 67:14, 69:11, 70:18, 70:19, 73:5, 76:17, 77:7, 77:8, 82:3, 82:5, 82:25, 83:1, 83:17, 92:9,

96:13, 105:8, 106:9, 106:12, 107:2, 111:1, 111:13
**One** [1] - 84:12
**one-thousand** [1] - 82:5
**ones** [3] - 40:2, 74:7, 111:19
**open** [12] - 15:3, 19:6, 21:11, 34:21, 34:25, 38:4, 39:10, 47:1, 47:3, 49:8, 60:7, 83:9
**opened** [5] - 46:24, 47:5, 89:1, 100:14, 105:21
**opening** [5] - 15:2, 34:24, 35:18, 38:3, 45:25
**opens** [1] - 84:19
**operations** [1] - 4:14
**opinion** [4] - 28:1, 59:10, 59:11, 60:1
**opportunity** [2] - 44:6, 59:19
**opposing** [1] - 6:4
**opposite** [1] - 12:3
**options** [1] - 77:19
**oranges** [1] - 57:18
**order** [3] - 5:1, 59:12, 66:17
**otherwise** [1] - 58:25
**outnumbered** [2] - 24:24, 32:7
**outside** [11] - 25:19, 29:1, 29:2, 78:24, 84:24, 94:10, 103:13, 103:14, 104:22, 104:24, 105:14
**overlap** [1] - 54:23
**overnight** [1] - 62:6
**overrule** [1] - 94:14
**overruled** [5] - 7:3, 14:11, 88:19, 103:18, 105:5
**overrun** [2] - 11:1, 35:11
**overseeing** [1] - 4:14
**oversight** [1] - 54:13
**overview** [2] - 54:12, 54:22
**own** [2] - 56:6, 61:23

## P

**p.m** [3] - 1:5, 12:19, 112:13
**Page** [3] - 65:12, 65:13, 112:9

**page** [1] - 30:20
**PAGE** [1] - 2:2
**pale** [1] - 59:20
**pane** [1] - 26:13
**paper** [1] - 61:12
**pardon** [1] - 84:2
**parity** [1] - 55:3
**part** [7] - 29:17, 40:22, 52:20, 54:1, 89:3, 111:6
**participants** [1] - 7:7
**participation** [1] - 75:7
**particular** [12] - 24:24, 28:10, 41:19, 72:3, 72:5, 79:7, 81:7, 99:2, 106:12, 110:14, 110:18, 110:20
**particularly** [1] - 74:7
**parties** [1] - 56:7
**partway** [2] - 31:9, 38:4
**party** [10] - 54:5, 54:17, 54:25, 55:4, 55:17, 64:14, 64:24, 65:1, 65:14, 66:15
**party's** [1] - 54:17
**pass** [1] - 10:25
**past** [4] - 17:8, 39:7, 97:24, 110:23
**patience** [1] - 3:19
**patterned** [1] - 101:9
**PAUL** [1] - 1:10
**Pause** [7] - 50:18, 56:14, 68:14, 77:4, 85:5, 97:2, 108:1
**pause** [19] - 13:17, 14:19, 21:8, 27:20, 36:11, 37:3, 77:21, 81:18, 82:2, 82:12, 86:11, 91:14, 91:15, 92:12, 97:21, 98:3, 99:18, 101:1, 106:4
**pay** [8] - 25:11, 25:24, 33:21, 36:23, 42:5, 43:18, 91:23, 103:9
**paying** [2] - 8:19, 20:21
**peace** [1] - 106:20
**peacefully** [1] - 50:14
**people** [12] - 13:4, 22:19, 23:14, 23:16, 31:20, 56:2, 64:17, 65:16, 78:9, 79:5, 92:24, 102:6
**pepper** [6] - 27:1, 27:2, 27:6, 27:24, 28:4, 92:21
**peppered** [1] - 24:16
**percent** [1] - 47:14

**Perdue** [7] - 58:8, 58:13, 61:11, 61:24, 61:25, 62:15, 65:23
**perhaps** [1] - 52:16
**perimeter** [1] - 95:22
**period** [3] - 49:4, 55:8, 104:23
**permission** [7] - 39:2, 89:4, 89:18, 102:13, 106:20, 106:25, 107:2
**permit** [1] - 101:23
**person** [19] - 37:9, 41:2, 42:18, 42:19, 54:6, 54:7, 54:16, 55:1, 55:7, 64:18, 64:24, 64:25, 65:4, 65:6, 70:18, 70:19, 73:13, 99:2
**person's** [2] - 26:10, 64:19
**personal** [2] - 17:20, 28:2
**persons** [1] - 56:7
**perspective** [1] - 87:23
**PFC** [1] - 4:7
**phone** [2] - 73:25, 110:10
**photograph** [1] - 46:1
**physical** [4] - 38:21, 41:18, 78:22, 78:25
**physically** [1] - 43:12
**pick** [1] - 33:12
**picked** [3] - 31:14, 45:9, 45:10
**picking** [1] - 13:20, 33:12
**piece** [1] - 61:12
**piercing** [1] - 48:17
**pinpoint** [1] - 50:3
**place** [5] - 6:4, 15:12, 15:14, 49:18, 49:19
**placing** [1] - 46:8
**plainly** [1] - 55:20
**plaintiff** [1] - 66:5
**Plaintiff** [1] - 1:4
**plan** [2] - 49:10, 112:10
**Play** [2] - 77:19, 82:6
**play** [44] - 13:12, 18:12, 19:23, 20:14, 20:23, 22:16, 25:12, 26:1, 26:4, 26:22, 30:23, 32:17, 33:8, 33:20, 36:25, 39:5, 40:14, 41:7, 41:23, 42:6, 43:15, 43:21, 48:7, 77:7, 77:8, 79:13, 79:15, 81:11,

82:18, 82:19, 82:24, 85:24, 86:9, 87:8, 90:6, 91:19, 92:17, 93:8, 100:9, 102:25, 103:12, 103:19, 104:15, 106:22
**played** [6] - 26:23, 82:21, 93:9, 103:15, 104:25, 106:3
**playing** [65] - 6:22, 13:14, 14:17, 14:18, 15:4, 15:5, 17:6, 17:7, 18:14, 19:25, 20:9, 20:15, 20:24, 22:18, 25:9, 25:13, 26:15, 26:19, 27:19, 27:21, 30:16, 30:24, 31:3, 31:5, 32:18, 33:9, 33:22, 34:9, 34:10, 34:16, 34:18, 37:2, 37:13, 37:14, 39:6, 40:15, 41:9, 41:25, 42:7, 43:4, 43:5, 43:17, 43:22, 48:9, 77:9, 77:20, 79:23, 81:17, 82:19, 83:4, 84:6, 86:10, 87:10, 90:7, 91:13, 91:20, 92:1, 92:11, 92:19, 100:10, 100:25, 104:17, 106:5, 107:4, 107:6
**plaza** [1] - 96:4
**PLC** [1] - 1:18
**point** [42] - 7:22, 8:6, 8:23, 9:4, 9:15, 11:10, 11:11, 15:20, 16:2, 16:24, 18:18, 18:22, 18:23, 19:23, 20:19, 20:25, 21:6, 21:25, 24:15, 30:16, 31:15, 31:16, 35:14, 36:4, 36:23, 37:23, 38:12, 39:2, 39:22, 41:12, 41:15, 49:2, 50:5, 59:24, 62:20, 63:23, 72:16, 76:19, 100:4, 100:18, 101:10, 107:22
**pointed** [1] - 34:6
**pointing** [3] - 70:18, 70:19, 93:20
**points** [2] - 30:17, 44:9
**Police** [3] - 3:24, 22:11, 22:12
**police** [14] - 9:2, 9:10, 9:14, 10:8, 10:12, 11:25, 12:22, 24:23, 27:4, 27:22, 54:11, 91:2, 91:4, 92:25

**portion** [4] - 30:12, 30:13, 66:14, 105:1
**portions** [1] - 16:12
**position** [7] - 24:21, 51:23, 52:1, 53:11, 59:18, 83:6, 105:20
**positioning** [1] - 42:13
**positive** [1] - 107:13
**possible** [3] - 59:16, 59:19, 74:25
**possibly** [1] - 33:12
**potential** [6] - 56:20, 62:24, 63:3, 63:7, 63:8, 63:24
**potentially** [6] - 17:5, 53:2, 53:4, 59:15, 64:1, 110:8
**powers** [1] - 66:16
**precedent** [1] - 112:4
**precisely** [1] - 66:22
**prejudging** [1] - 67:7
**preparation** [1] - 73:21
**prepare** [2] - 5:1, 74:10
**preparing** [3] - 69:3, 69:23, 71:14
**presence** [2] - 54:16, 64:25
**present** [7] - 17:17, 54:5, 56:22, 57:15, 61:17, 65:4, 74:11
**presentation** [1] - 66:17
**presented** [6] - 52:4, 57:5, 61:1, 61:2, 61:8, 74:24
**presenting** [2] - 54:17, 65:1
**preservation** [1] - 24:25
**preserve** [3] - 51:13, 63:2, 64:1
**preserving** [1] - 52:11
**president** [2] - 35:25, 44:11
**press** [1] - 82:6
**presumably** [1] - 58:4
**pretrial** [3] - 59:12, 59:23, 109:22
**pretty** [2] - 5:22, 18:25
**prevent** [3] - 17:4, 29:22, 51:1
**preventative** [1] - 29:17
**prevented** [1] - 40:12
**previous** [7] - 77:15, 90:20, 100:21
**previously** [7] - 8:2, 63:14, 79:17, 86:15, 94:17, 109:12,

109:25
**Prince** [1] - 1:19
**private** [1] - 4:7
**problem** [2] - 45:12, 52:17
**problems** [1] - 56:8
**proceed** [3] - 3:13, 30:22, 58:3
**proceeded** [1] - 5:10
**proceedings** [2] - 57:1, 112:19
**process** [5] - 9:20, 56:9, 56:11, 59:23, 106:17
**processes** [1] - 112:6
**produced** [2] - 57:13, 59:5
**professor** [1] - 64:12
**Professor** [1] - 55:25
**proffer** [2] - 52:2, 52:6
**proffered** [2] - 56:10, 80:7
**prognosis** [1] - 108:14
**prohibiting** [1] - 57:4
**prompted** [1] - 75:7
**prosecution** [12] - 67:18, 68:24, 75:12, 75:25, 77:14, 77:15, 77:24, 77:25, 78:2, 78:8, 80:22, 90:15
**prosecutions** [2] - 54:19, 90:20
**prosecutors** [11] - 68:25, 69:4, 69:6, 69:8, 69:11, 74:10, 74:16, 74:20, 76:2, 76:19, 90:17
**protect** [2] - 50:12, 50:13
**protective** [1] - 29:17
**protest** [9] - 5:1, 5:7, 7:8, 7:24, 10:5, 13:21, 18:10, 46:23, 50:14
**protester** [4] - 42:22, 42:23, 46:8, 75:10
**protester's** [1] - 105:6
**protesters** [32] - 5:7, 6:14, 7:7, 8:23, 9:5, 13:3, 15:12, 17:4, 17:12, 18:16, 23:17, 23:18, 36:1, 44:16, 47:11, 76:21, 87:12, 87:16, 87:21, 87:23, 88:8, 88:16, 89:7, 89:11, 89:14, 91:3, 95:6, 95:21, 96:13, 102:1, 105:8, 105:12
**protesters'** [1] - 12:1
**provide** [1] - 55:3

**provided** [1] - 110:15
**providing** [1] - 59:7
**provision** [1] - 54:16
**provisions** [1] - 104:24
**proviso** [1] - 87:4
**proximity** [1] - 24:15
**public** [2] - 50:13, 108:22
**pull** [29] - 11:19, 14:1, 16:11, 19:6, 25:5, 32:22, 33:2, 33:3, 36:10, 39:17, 40:3, 40:21, 42:15, 44:3, 44:4, 45:5, 47:7, 47:18, 71:5, 86:7, 93:5, 93:22, 98:22, 99:6, 99:13, 99:20, 101:11, 101:15, 102:20
**pulled** [2] - 41:21, 45:8
**pulling** [18] - 36:8, 38:13, 39:8, 39:14, 43:23, 43:24, 44:2, 79:1, 79:5, 79:6, 79:7, 83:9, 83:23, 84:9, 100:5, 100:7, 101:14
**Pulling** [1] - 44:1
**purpose** [7] - 6:6, 17:2, 20:3, 27:7, 54:25, 80:6, 94:25
**purposes** [2] - 53:17, 54:24
**pursuant** [1] - 66:15
**push** [23] - 6:7, 15:2, 24:4, 24:6, 31:20, 31:21, 34:22, 38:13, 39:9, 41:3, 46:4, 46:9, 46:25, 49:17, 83:9, 83:10, 83:13, 83:21, 83:22, 88:8, 89:8, 100:22
**pushed** [12] - 19:7, 21:11, 34:21, 34:22, 49:8, 49:15, 88:10, 89:2, 99:8, 100:14, 100:20, 105:22
**pushing** [28] - 10:11, 23:23, 23:24, 23:25, 24:2, 24:3, 24:7, 24:12, 35:8, 38:10, 39:9, 39:11, 39:16, 39:21, 40:7, 40:8, 40:11, 40:25, 82:11, 83:8, 83:23, 84:7, 89:1, 95:13, 100:6, 100:7, 100:13, 100:15
**put** [4] - 39:3, 43:8,

44:15, 95:25
**putting** [3] - 59:17, 97:12, 110:3

## Q

**questioning** [1] - 14:8
**questions** [6] - 51:14, 67:16, 75:7, 80:21, 80:23, 97:3
**quickly** [2] - 23:11, 108:10
**quite** [1] - 104:12

## R

**rack** [13] - 6:4, 6:5, 7:8, 8:24, 9:1, 9:10, 13:11, 13:19, 13:20, 13:22, 13:24, 14:2, 14:12
**racks** [14] - 5:22, 5:24, 6:1, 6:8, 6:9, 6:16, 6:18, 6:19, 7:1, 10:10, 10:25, 12:3, 14:1, 14:21
**radar** [1] - 110:3
**raise** [7] - 3:3, 56:8, 56:17, 62:14, 68:12, 108:10, 112:8
**raised** [4] - 55:6, 56:18, 59:16, 62:12
**ran** [1] - 102:4
**rank** [2] - 4:2, 4:10
**rationale** [1] - 55:2
**RDR** [3] - 1:22, 112:16, 112:23
**reached** [1] - 73:3
**reaching** [2] - 70:8, 70:9
**react** [1] - 34:24
**read** [4] - 59:5, 61:24, 61:25, 65:24
**reading** [2] - 55:16, 56:6
**ready** [2] - 3:2, 42:15
**real** [1] - 97:12
**reality** [1] - 56:25
**realize** [4] - 78:17, 78:21, 84:4, 98:23
**realized** [1] - 32:6
**realizing** [1] - 49:24
**really** [13] - 19:3, 21:12, 24:21, 33:13, 33:18, 43:3, 46:25, 50:3, 55:1, 55:9, 67:6, 68:6, 83:22
**reason** [4] - 32:4, 61:16, 97:21, 98:3
**reasonably** [2] - 97:6, 97:8

**reasons** [2] - 64:9, 67:21
**reassess** [3] - 41:22, 99:11, 106:15
**reassessing** [1] - 41:13
**REBEKAH** [1] - 1:13
**rebekah.lederer@ usdoj.gov** [1] - 1:16
**recalling** [1] - 60:5
**receiving** [2] - 71:10, 71:16
**recently** [1] - 61:7, 69:22, 73:23
**Recess** [2] - 51:7, 58:19
**reclose** [1] - 44:16
**recognize** [18] - 11:17, 11:21, 15:23, 16:16, 18:8, 21:9, 28:22, 30:3, 30:25, 44:14, 44:23, 45:7, 45:16, 47:10, 47:12, 48:1, 48:10, 94:16
**recollection** [7] - 52:23, 63:15, 70:11, 72:21, 75:2, 78:2, 78:4
**record** [10] - 3:21, 34:5, 37:17, 39:19, 41:4, 101:7, 108:22, 110:1, 110:25, 111:8
**record's** [1] - 59:10
**recorded** [1] - 108:23
**records** [7] - 11:15, 108:17, 108:21, 111:11, 111:13, 111:16, 111:19
**red** [4] - 26:24, 32:19, 33:10, 39:15
**redirect** [6] - 51:12, 55:11, 55:13, 60:12, 67:23, 103:17
**REDIRECT** [1] - 97:13
**reduce** [1] - 74:23
**reengage** [1] - 41:22
**reengaged** [1] - 49:7
**reestablish** [1] - 102:9
**referenced** [1] - 53:14
**referencing** [1] - 53:17
**referring** [3] - 11:25, 13:11, 23:16
**reflected** [1] - 37:18
**reform** [1] - 104:7
**refresh** [1] - 72:20
**regain** [9] - 9:17, 35:15, 35:22, 35:23, 36:7, 36:8, 40:4, 42:13, 44:8
**regaining** [1] - 34:20

**Register** [1] - 108:22
**regrouped** [1] - 49:14
**regular** [2] - 7:7
**reinforcements** [2] - 9:19, 87:22
**rejigger** [1] - 62:11
**relate** [2] - 52:3, 52:5
**related** [3] - 52:8, 52:9, 97:25
**relating** [1] - 64:16
**relation** [2] - 32:1, 38:16
**releases** [1] - 84:19
**relevance** [5] - 7:2, 8:18, 94:9, 110:15, 110:20
**relevant** [10] - 8:17, 14:8, 30:12, 30:13, 61:8, 61:9, 62:6, 95:1, 110:16, 110:19
**reluctant** [2] - 71:22, 71:24
**remaining** [2] - 15:7, 43:10
**remember** [19] - 7:9, 23:22, 70:17, 70:18, 72:17, 74:3, 74:6, 75:5, 75:12, 76:13, 76:14, 78:8, 79:1, 85:22, 90:23, 98:6, 98:19, 99:10
**remembered** [1] - 66:3
**remembering** [1] - 63:13
**remembers** [1] - 72:20
**removed** [1] - 14:9
**rephrase** [1] - 98:24
**report** [1] - 70:5
**REPORTER** [2] - 84:12, 112:14
**reporter** [1] - 72:13
**Reporter** [3] - 1:22, 1:22, 112:24
**represent** [1] - 68:20
**representation** [3] - 21:20, 22:10, 29:5
**representative** [5] - 54:4, 54:11, 64:23, 66:1, 66:15
**representing** [2] - 55:4, 55:5
**request** [3] - 55:17, 64:14, 67:25
**reread** [1] - 61:24
**research** [1] - 61:24
**resecure** [2] - 44:5, 51:1
**resecured** [1] - 40:10
**resecuring** [1] - 40:12
**resolve** [2] - 67:10,

67:13
**respect** [2] - 55:21, 64:15
**respond** [4] - 8:20, 51:24, 59:18, 62:17
**response** [2] - 55:24, 56:16
**responsible** [1] - 4:14
**rest** [5] - 40:18, 40:20, 40:22, 49:12
**restate** [1] - 48:24
**retired** [1] - 9:23
**retreat** [1] - 16:8
**retreated** [2] - 16:3, 18:23
**retrieved** [1] - 31:11
**review** [1] - 79:19
**reviewed** [2] - 78:9, 98:6
**rewind** [1] - 92:9
**right-hand** [3] - 19:10, 32:8, 42:4
**riot** [1] - 23:20
**rioters** [3] - 17:24, 107:8, 107:20
**rise** [1] - 56:11
**risked** [1] - 66:18
**roll** [4] - 4:25, 5:13, 5:15, 49:22
**room** [4] - 51:11, 58:21, 58:22, 62:4
**Room** [1] - 1:23, 112:25
**Rotunda** [23] - 19:18, 19:19, 21:17, 22:14, 25:18, 27:18, 28:25, 30:5, 36:13, 44:19, 48:4, 49:1, 49:6, 49:15, 95:6, 98:12, 99:21, 101:13, 104:12, 105:2, 105:11
**Rotunda's** [1] - 19:21
**roughly** [1] - 9:10
**rule** [15] - 51:9, 54:4, 54:15, 54:16, 55:18, 55:20, 56:1, 64:16, 65:5, 65:13, 65:17, 66:9, 109:4, 109:15
**Rule** [5] - 51:20, 55:16, 64:10, 65:24, 66:17
**rules** [5] - 57:4, 110:5, 112:4
**running** [2] - 13:10, 15:7
**rushed** [3] - 9:1, 9:2, 102:15
**rushing** [1] - 9:10

## S

**safe** [3] - 24:18, 24:25, 25:1
**Safeway** [4] - 108:17, 108:21, 111:2, 111:4
**said/he** [3] - 60:3, 64:2, 66:21
**sake** [1] - 52:10
**Saltzburg** [1] - 55:25
**satisfied** [1] - 110:4
**saw** [29] - 15:8, 18:16, 21:21, 23:2, 23:8, 27:23, 28:7, 28:10, 28:13, 41:1, 43:13, 48:22, 67:12, 77:12, 87:15, 89:13, 90:16, 91:4, 91:6, 91:8, 92:5, 94:19, 95:14, 102:11, 103:25, 104:1, 104:20, 105:19, 106:9
**scene** [2] - 32:15, 34:19
**schedule** [2] - 68:7, 68:8
**schedules** [1] - 62:11
**scheduling** [1] - 60:15
**screen** [24] - 12:14, 12:20, 12:21, 12:22, 13:2, 13:9, 13:18, 14:20, 17:8, 19:11, 25:11, 28:7, 28:11, 28:13, 29:14, 32:8, 32:9, 32:20, 33:11, 42:4, 79:17, 84:1, 84:3, 84:5
**second** [13] - 10:7, 15:18, 16:17, 16:18, 18:7, 19:21, 21:14, 46:24, 64:15, 64:23, 73:12, 73:20, 91:5
**seconds** [25] - 11:21, 15:6, 15:7, 15:9, 15:10, 15:25, 17:9, 20:14, 21:8, 27:14, 36:11, 39:7, 41:1, 41:8, 48:8, 77:7, 80:16, 82:1, 82:4, 82:5, 90:6, 100:8, 100:9, 100:24, 104:15
**secure** [2] - 44:8, 104:7
**secured** [1] - 46:24
**security** [1] - 28:23
**see** [55] - 6:24, 7:22, 7:23, 12:14, 13:10, 18:15, 24:13, 25:3, 26:10, 29:14, 37:4,

37:15, 39:7, 40:17, 46:7, 46:8, 57:3, 72:20, 79:8, 79:10, 80:6, 81:3, 81:20, 82:9, 82:10, 82:13, 83:5, 83:22, 84:1, 86:12, 86:14, 88:8, 88:12, 88:14, 89:12, 91:18, 92:3, 93:10, 93:18, 94:18, 98:22, 100:6, 100:12, 101:2, 102:12, 103:4, 103:7, 103:20, 104:21, 108:13, 112:10
**seeing** [3] - 7:22, 50:3, 81:3
**seeking** [1] - 66:19
**seeks** [1] - 110:21
**Senate** [1] - 4:18
**send** [3] - 111:15, 111:18, 111:20
**sense** [1] - 56:5
**sentence** [1] - 64:16
**sentencing** [1] - 67:18
**separate** [3] - 54:16, 64:11, 87:19
**sequestration** [1] - 66:13
**SERGEANT** [2] - 2:3, 3:16
**sergeant** [5] - 4:3, 4:4, 4:5, 4:6, 27:23
**Sergeant** [21] - 3:6, 3:22, 17:22, 27:22, 28:22, 30:3, 51:8, 51:15, 58:5, 60:11, 60:17, 67:23, 68:3, 68:15, 68:19, 97:11, 97:15, 101:2, 104:4, 108:3, 108:8
**series** [6] - 108:16, 108:18, 108:19, 108:20, 108:22, 111:7
**serious** [3] - 56:8, 66:24, 67:1
**serve** [1] - 54:10
**SESSION** [1] - 1:9
**session** [4] - 35:24, 44:10, 46:21, 46:22
**set** [3] - 21:10, 21:14, 21:15
**several** [6] - 4:17, 24:20, 71:22, 74:6, 75:19, 98:2
**shake** [1] - 27:13
**shaking** [1] - 34:5
**shakingness** [1] - 105:6

**shall** [1] - 51:21
**shield** [6] - 23:5, 23:20, 31:11, 31:13, 45:10, 45:16
**shift** [4] - 4:13, 4:15, 4:23, 4:25
**shiny** [1] - 22:7
**shirt** [1] - 101:9
**shook** [2] - 103:21, 103:22
**short** [2] - 105:25
**shortly** [1] - 39:25
**shoulder** [3] - 38:17, 43:2
**shout** [1] - 5:7
**shouting** [1] - 6:21
**shoving** [2] - 10:11, 23:23
**show** [2] - 5:2, 75:5
**showed** [2] - 5:4, 90:22
**showing** [3] - 25:16, 28:4, 95:1
**shown** [4] - 11:17, 80:8, 90:14, 101:17
**shows** [1] - 54:17
**sic** [1] - 61:12
**side** [15] - 8:13, 10:5, 12:3, 16:7, 19:10, 32:8, 32:9, 33:10, 36:17, 42:4, 55:4, 68:13, 95:21, 105:20
**sides** [1] - 32:13
**signal** [1] - 39:3
**signed** [1] - 111:4
**significance** [1] - 47:2
**significant** [1] - 13:6
**signifies** [1] - 46:25
**signs** [1] - 67:12
**silly** [1] - 96:20
**similar** [1] - 65:21
**simply** [1] - 56:25
**single** [1] - 60:25
**sit** [1] - 63:10
**sitting** [2] - 62:3, 71:13
**situation** [6] - 60:9, 62:21, 64:2, 66:21, 76:20, 87:20
**six** [3] - 6:1, 97:19
**skip** [2] - 15:25, 18:7
**smash** [1] - 26:12
**smashing** [1] - 26:6
**so..** [1] - 33:4
**someone** [9] - 28:9, 33:1, 34:21, 47:5, 54:8, 55:1, 55:2, 79:1, 102:15
**sometime** [1] - 73:3
**sometimes** [1] - 65:3

**somewhere** [1] - 65:19
**soon** [2] - 23:5, 62:5
**sorry** [24] - 7:13, 7:17, 19:13, 19:14, 20:10, 28:12, 36:22, 37:3, 42:1, 42:12, 44:2, 45:11, 47:12, 48:24, 70:9, 71:7, 84:4, 84:13, 90:3, 91:17, 103:2, 103:3, 108:11
**sort** [1] - 54:12
**sounded** [1] - 22:21
**sounds** [7] - 27:1, 28:14, 30:19, 83:19, 90:24, 110:12, 112:10
**source** [2] - 60:7, 65:9
**space** [3] - 24:8, 24:25, 25:1
**span** [1] - 50:3
**speaking** [5] - 25:24, 68:21, 70:15, 72:22, 73:11
**specific** [3] - 98:16, 109:19, 111:16
**specifically** [11] - 51:15, 52:7, 53:16, 56:19, 57:4, 60:1, 63:21, 70:18, 73:6, 78:12, 81:15
**speculating** [1] - 42:17
**speculation** [4] - 46:6, 46:11, 46:14, 93:1
**speed** [2] - 39:5, 40:13
**spell** [2] - 3:20, 72:12
**spent** [1] - 50:19
**spoken** [1] - 98:8
**spot** [1] - 44:18
**spray** [10] - 27:1, 27:2, 27:6, 27:7, 27:10, 27:24, 28:4, 92:21
**sprayed** [1] - 92:24
**spring** [1] - 61:20
**sprung** [1] - 61:21
**stair** [1] - 27:5
**stairs** [20] - 15:13, 16:4, 16:5, 16:6, 16:19, 16:25, 18:11, 18:17, 18:23, 22:25, 23:2, 23:5, 23:6, 27:17, 30:4, 31:16, 96:6, 105:11, 105:14
**stand** [3] - 32:10, 59:17, 96:7
**standing** [23] - 7:7, 8:22, 12:20, 12:24, 21:15, 22:13, 22:23, 23:2, 23:19, 24:19, 27:16, 32:20, 32:21,

38:2, 38:9, 38:15, 41:5, 50:22, 50:25, 91:9, 99:19, 99:20, 105:15
**start** [8] - 35:2, 39:14, 40:16, 81:16, 81:18, 83:17, 84:5, 108:12
**started** [6] - 6:17, 8:12, 10:5, 15:6, 90:21, 96:3
**starting** [5] - 11:21, 55:17, 70:1, 77:8, 83:16
**starts** [2] - 98:9, 101:24
**state** [1] - 55:21
**statement** [7] - 8:22, 26:16, 53:21, 61:3, 88:7, 88:15, 89:7
**statements** [5] - 8:25, 52:21, 53:1, 53:2, 53:3
**STATES** [3] - 1:1, 1:3, 1:10
**States** [6] - 1:13, 3:24, 54:7, 64:25, 66:9, 112:24
**stating** [1] - 10:5
**stationed** [2] - 12:8, 96:1
**statue** [1] - 8:22
**statues** [1] - 8:12
**statute** [1] - 65:4
**stay** [2] - 62:7, 81:25
**stayed** [1] - 49:4
**Steal** [1] - 20:18
**stenographic** [1] - 112:18
**step** [3] - 9:8, 52:7, 67:22
**stepping** [2] - 9:13, 10:9
**steps** [4] - 23:19, 87:16, 87:25, 101:12
**still** [13] - 38:6, 39:21, 40:25, 41:13, 41:15, 58:22, 67:11, 84:5, 88:8, 89:7, 91:18, 95:19, 99:12
**stipulation** [1] - 39:20
**stood** [2] - 8:11, 108:10
**stop** [1] - 88:24
**Stop** [2] - 20:18, 23:24
**stopped** [1] - 24:10
**Street** [2] - 1:15, 1:19
**strenuous** [1] - 68:2
**strictly** [1] - 23:23
**strike** [1] - 8:21
**struck** [2] - 27:10,

27:23
**struggle** [4] - 40:19, 73:2, 98:19, 98:21
**struggling** [2] - 98:13, 99:2
**stuff** [3] - 28:11, 28:13, 111:20
**subject** [2] - 109:13, 110:1
**subsequent** [1] - 108:21
**succeeded** [1] - 35:5
**successful** [4] - 15:16, 20:5, 35:12, 102:16
**successfully** [4] - 9:14, 10:8, 11:3, 18:16
**sufficiently** [1] - 56:9
**suggest** [1] - 65:7
**Suite** [1] - 1:19
**summarizing** [1] - 95:13
**summary** [1] - 110:13
**Supp** [4] - 58:13, 58:16, 59:11, 65:12
**supplement** [1] - 112:9
**support** [2] - 6:7, 111:23
**supportive** [1] - 21:13
**Supreme** [4] - 5:23, 12:2, 67:9, 67:16
**surprise** [2] - 62:10, 85:11
**surrounded** [6] - 23:15, 23:17, 88:23, 99:5, 105:15, 106:19
**sustain** [2] - 28:16, 88:5
**sustained** [3] - 37:12, 85:16, 104:3
**swinging** [1] - 33:14
**switch** [1] - 28:17
**switching** [1] - 46:17
**Sworn** [1] - 3:16
**sworn** [1] - 28:1

## T

**table** [1] - 54:21
**tactical** [5] - 6:25, 7:6, 7:23, 8:7
**tailor** [1] - 60:10
**tan** [3] - 41:2, 41:4, 42:14
**team** [2] - 68:24, 77:14
**teams** [1] - 77:15
**television** [1] - 11:14
**temporary** [1] - 27:11
**ten** [4] - 18:5, 48:7,

51:6, 106:1
**terms** [2] - 54:24, 89:6
**testified** [13] - 52:23, 66:4, 68:24, 70:6, 76:9, 84:22, 84:25, 85:21, 93:17, 94:10, 94:13, 95:12, 107:7
**testify** [8] - 17:19, 58:3, 61:18, 63:16, 67:3, 74:17, 76:12, 111:2
**testifying** [4] - 17:15, 53:13, 69:3, 94:17
**testimony** [23] - 35:21, 51:13, 52:3, 52:8, 53:3, 53:15, 53:18, 56:20, 57:6, 57:23, 60:8, 60:10, 60:22, 63:2, 63:16, 63:17, 63:18, 63:22, 63:25, 74:21, 74:24, 95:2
**THE** [221] - 1:1, 1:1, 1:10, 3:2, 3:7, 3:8, 3:9, 3:12, 3:14, 5:4, 5:5, 7:3, 7:13, 7:17, 7:19, 7:20, 7:25, 8:4, 8:17, 8:21, 9:9, 9:11, 9:21, 9:23, 10:1, 10:2, 12:7, 12:9, 12:11, 13:15, 14:11, 16:14, 16:20, 16:21, 16:22, 16:24, 17:17, 17:18, 17:19, 17:21, 19:16, 19:17, 19:19, 19:20, 19:21, 19:22, 22:4, 22:11, 22:12, 23:1, 23:4, 23:7, 25:8, 25:15, 25:17, 25:19, 25:20, 28:6, 28:10, 28:13, 28:16, 28:19, 28:25, 29:2, 29:11, 30:19, 30:22, 33:15, 33:17, 34:7, 37:12, 37:25, 38:1, 38:4, 38:5, 38:6, 38:8, 38:9, 38:10, 38:11, 40:2, 40:16, 42:18, 42:20, 42:21, 42:23, 42:24, 43:1, 44:1, 44:2, 44:18, 44:21, 44:23, 45:4, 45:22, 46:7, 46:14, 47:9, 47:16, 47:21, 47:23, 47:25, 51:5, 51:8, 51:17, 51:20, 52:10, 52:16, 53:7, 53:20, 53:24, 54:3, 55:13, 55:24, 56:13, 56:15, 57:7, 57:17, 57:24, 58:2, 58:9,

58:14, 58:17, 58:20, 59:2, 60:19, 60:23, 61:10, 61:14, 63:6, 63:10, 63:20, 64:3, 64:7, 68:5, 68:10, 68:15, 68:16, 70:23, 70:25, 71:2, 71:3, 71:7, 71:9, 72:1, 72:4, 72:6, 72:7, 72:12, 72:19, 73:23, 73:24, 74:22, 75:4, 75:6, 75:23, 76:8, 76:10, 76:11, 76:13, 79:10, 79:12, 79:14, 79:20, 79:22, 80:9, 80:12, 82:8, 83:3, 83:19, 84:2, 84:12, 84:13, 85:4, 85:16, 85:19, 86:1, 86:4, 86:25, 87:7, 88:2, 88:4, 88:5, 88:19, 90:2, 90:4, 93:2, 94:7, 94:14, 94:25, 96:19, 97:1, 97:5, 97:11, 101:23, 103:18, 103:24, 104:3, 105:4, 107:17, 107:18, 107:25, 108:3, 108:6, 108:7, 108:8, 108:12, 108:24, 109:3, 109:9, 109:11, 109:14, 109:17, 110:11, 110:16, 110:22, 111:1, 111:6, 111:15, 111:18, 112:10
**themselves** [2] - 29:22, 46:17
**thereafter** [2] - 39:25, 73:3
**thin** [1] - 6:2
**thinking** [1] - 98:21
**third** [1] - 16:17
**thorough** [2] - 59:6, 65:22
**thousand** [1] - 82:5
**three** [11] - 11:9, 39:14, 41:23, 42:6, 46:24, 67:1, 74:9, 82:5, 87:11, 97:24
**three-minute** [1] - 87:11
**three-second** [1] - 46:24
**throughout** [2] - 35:21, 81:13
**Thursday** [1] - 60:21
**tight** [1] - 32:11

**tilt** [1] - 103:8
**timeline** [1] - 73:2
**timestamp** [2] - 50:4, 80:18
**today** [8] - 52:23, 53:3, 59:23, 60:19, 60:20, 68:7, 69:3, 74:18
**together** [2] - 78:1, 98:10
**tomorrow** [6] - 60:17, 108:9, 108:12, 108:16, 109:6, 109:8
**took** [8] - 10:23, 15:11, 49:22, 61:23, 62:1, 65:10, 97:20, 98:3
**top** [12] - 12:13, 13:1, 18:23, 19:13, 23:5, 23:6, 23:19, 27:5, 37:21, 59:9, 59:11, 105:13
**totally** [3] - 24:24, 49:24, 66:10
**touched** [4] - 24:5, 98:20, 99:7, 109:25
**touching** [1] - 99:1
**towards** [7] - 6:18, 6:25, 15:12, 16:10, 22:20, 26:17, 88:7
**training** [1] - 28:8
**TRANSCRIPT** [1] - 1:9
**transcript** [2] - 112:18, 112:19
**transcription** [3] - 86:22, 86:25, 87:5
**transfer** [1] - 36:1
**treatise** [1] - 55:25
**treatises** [2] - 61:25, 111:24
**trial** [13] - 60:2, 62:2, 66:10, 66:14, 66:16, 68:8, 71:14, 73:21, 76:12, 76:14, 76:16, 86:23, 111:1
**TRIAL** [1] - 1:9
**trials** [4] - 76:8, 77:16, 109:20, 111:2
**tried** [2] - 13:16, 50:11
**triple** [1] - 26:13
**trouble** [1] - 7:13
**true** [5] - 56:1, 56:18, 97:22, 112:17, 112:19
**truly** [2] - 35:10, 35:11
**truth** [3] - 8:16, 58:4, 66:19
**truth-seeking** [1] - 66:19
**try** [9] - 9:18, 10:16, 10:25, 19:1, 19:4, 20:4, 35:15, 35:19,

50:13, 68:9, 91:21, 92:9, 97:22
**trying** [51] - 10:11, 10:13, 10:19, 10:21, 17:11, 24:25, 25:1, 28:23, 28:24, 29:23, 31:17, 32:25, 33:2, 35:23, 36:9, 38:23, 39:9, 39:17, 41:15, 41:16, 42:10, 42:12, 44:4, 46:4, 49:10, 50:15, 51:1, 58:1, 79:8, 83:9, 87:21, 87:22, 88:23, 95:7, 95:9, 98:5, 98:6, 98:17, 98:22, 99:6, 99:11, 99:12, 99:20, 101:11, 101:18, 101:24, 102:17, 105:11, 106:14, 106:15, 106:19
**Tuesday** [1] - 1:4
**turn** [1] - 101:16
**turning** [1] - 98:12
**turns** [1] - 60:4
**tussling** [1] - 101:25
**twice** [2] - 73:18, 73:19
**two** [27] - 36:20, 36:22, 39:13, 39:24, 42:5, 60:4, 61:25, 63:18, 64:2, 64:11, 66:24, 66:25, 69:11, 71:3, 76:17, 76:21, 77:15, 77:16, 77:18, 78:22, 80:16, 87:19, 99:20, 100:8, 100:9, 104:15, 105:7
**type** [4] - 22:7, 63:16, 63:25, 96:12
**typically** [1] - 54:19

## U

**U.S** [3] - 1:23, 65:20, 85:12
**ultimately** [1] - 67:18
**unavailable** [1] - 60:18
**under** [16] - 9:6, 10:14, 10:16, 10:19, 10:22, 55:8, 58:3, 65:16, 66:17, 66:25, 67:17, 102:6, 110:4, 110:14, 110:21
**understood** [1] - 104:2
**uniformity** [1] - 19:2
**unit** [1] - 29:18
**UNITED** [3] - 1:1, 1:3, 1:10
**United** [6] - 1:13, 3:24,

54:7, 64:25, 66:9, 112:24
**University** [1] - 65:12
**up** [50] - 5:2, 5:4, 5:8, 6:17, 8:11, 10:22, 11:19, 13:20, 14:5, 16:6, 16:11, 16:25, 18:11, 23:3, 25:5, 25:17, 26:21, 29:25, 31:14, 32:12, 36:10, 39:14, 39:24, 44:12, 45:5, 45:9, 45:10, 47:7, 49:12, 59:22, 67:16, 68:11, 71:5, 77:2, 77:6, 78:1, 79:17, 80:9, 80:11, 85:17, 86:7, 90:1, 91:12, 93:5, 93:22, 97:12, 99:13, 102:20, 108:10
**USAO** [1] - 1:14

## V

**V-u-k-a-s-i-n** [1] - 72:14
**VA** [1] - 1:19
**vaguely** [1] - 76:13
**variety** [1] - 53:9
**various** [3] - 49:1, 52:24, 64:17
**verbal** [1] - 17:23
**verbs** [1] - 64:11
**versus** [1] - 25:4
**vice** [2] - 35:24, 44:10
**vicinity** [1] - 91:8
**video** [69] - 13:13, 15:23, 17:14, 17:15, 17:20, 20:1, 20:19, 22:1, 22:2, 22:3, 22:17, 22:20, 25:14, 25:16, 27:16, 27:19, 30:17, 38:7, 40:6, 48:22, 50:4, 76:23, 77:10, 77:12, 77:23, 78:1, 78:24, 79:16, 80:20, 81:3, 81:4, 81:5, 82:24, 83:16, 86:12, 86:22, 87:6, 87:11, 87:15, 88:3, 88:7, 88:13, 89:10, 90:13, 90:16, 90:21, 90:22, 90:23, 92:16, 92:25, 95:2, 95:14, 98:13, 98:23, 99:10, 100:20, 101:3, 101:24, 102:11, 103:4, 103:16, 104:16, 104:20, 104:21, 104:24, 105:1, 106:2, 107:5

**Video** [58] - 13:14, 14:18, 15:5, 17:7, 18:14, 19:25, 20:9, 20:15, 20:24, 22:18, 25:13, 26:19, 26:23, 27:21, 30:24, 31:5, 32:18, 33:9, 33:22, 34:10, 34:18, 37:2, 37:14, 39:6, 40:15, 41:9, 41:25, 42:7, 43:5, 43:17, 43:22, 48:9, 77:9, 77:20, 79:15, 79:23, 81:17, 82:21, 83:4, 84:6, 85:17, 85:25, 86:10, 86:20, 87:10, 90:7, 91:13, 91:20, 92:1, 92:11, 92:19, 93:9, 100:10, 100:25, 104:17, 106:3, 106:5, 107:6
**videos** [8] - 49:1, 60:7, 67:4, 75:5, 97:25, 98:8, 100:21, 105:19
**view** [2] - 75:1, 95:1
**viewed** [1] - 75:2
**viewing** [1] - 79:24
**visited** [1] - 98:6
**vivid** [1] - 78:6
**volume** [2] - 18:18, 18:20
**vs** [1] - 1:5
**Vukasin** [1] - 72:10

## W

**W-A-R-N-E-R** [1] - 3:22
**wait** [2] - 56:13, 87:22
**waited** [1] - 35:18
**waiting** [1] - 67:9
**walk** [1] - 111:10
**wall** [3] - 18:24, 24:17, 25:3
**wandering** [1] - 49:9
**wants** [3] - 58:23, 64:4, 110:3
**WARNAGIRIS** [2] - 1:6, 2:3
**Warnagiris** [10] - 14:9, 52:24, 67:2, 67:11, 68:20, 77:22, 80:14, 85:14, 90:12, 92:21
**Warnagiris's** [3] - 81:12, 81:20, 83:5
**Warner** [33] - 3:6, 3:22, 27:22, 28:22, 30:3, 51:8, 51:12, 51:17, 52:20, 52:21, 53:1, 53:3, 53:12,

53:22, 53:25, 55:10, 57:10, 57:12, 57:19, 58:5, 60:11, 60:17, 61:17, 63:12, 67:2, 67:5, 67:23, 68:4, 68:19, 97:11, 97:15, 108:3
**WARNER** [1] - 3:16
**Warner's** [2] - 51:15, 63:18
**Washington** [4] - 1:15, 1:24, 65:11, 113:1
**waste** [1] - 112:2
**wasted** [1] - 112:6
**watch** [3] - 7:12, 80:23, 81:12
**watched** [6] - 33:23, 76:23, 77:1, 80:20, 98:1, 106:22
**watching** [3] - 31:6, 77:11, 78:24
**water** [1] - 3:10
**wave** [1] - 89:16
**wave-off** [1] - 89:16
**waving** [1] - 93:10
**ways** [2] - 14:15, 53:9
**wear** [1] - 29:20
**wearing** [3] - 37:19, 75:21, 93:15
**Weatherhead** [39] - 51:11, 51:16, 52:12, 52:18, 52:19, 52:22, 53:4, 53:8, 53:18, 53:22, 56:21, 57:11, 57:13, 57:15, 60:9, 62:25, 63:14, 65:2, 67:6, 67:22, 69:15, 70:3, 70:9, 70:14, 70:24, 71:11, 71:17, 72:2, 73:11, 73:16, 74:1, 74:4, 74:11, 75:4, 75:9, 75:13, 90:11
**Weatherhead's** [2] - 51:13, 53:21
**wedged** [1] - 37:7
**week** [1] - 76:17
**Westlaw** [1] - 65:21
**white** [2] - 42:14, 42:18
**whole** [2] - 9:20, 13:13
**wide** [1] - 6:1
**Williams** [1] - 65:20
**wind** [1] - 103:11
**window** [2] - 26:12, 91:24
**wing** [1] - 112:5
**wishes** [1] - 57:10
**withdraw** [3] - 66:10, 74:15, 76:25

**withholding** [2] - 65:17
**Witness** [1] - 101:6
**WITNESS** [53] - 2:2, 3:8, 3:12, 5:5, 7:17, 7:20, 9:11, 9:23, 10:2, 12:9, 13:15, 16:21, 16:24, 17:18, 17:21, 19:17, 19:20, 19:22, 22:12, 23:4, 25:17, 25:20, 29:2, 33:17, 34:7, 38:1, 38:5, 38:8, 38:10, 40:2, 40:16, 42:20, 42:23, 43:1, 44:2, 44:21, 68:16, 70:25, 71:3, 72:4, 72:7, 73:24, 75:6, 76:10, 76:13, 79:12, 82:8, 83:3, 83:19, 84:13, 88:4, 107:18, 108:7
**witness** [33] - 3:2, 3:4, 28:1, 34:5, 37:17, 51:19, 53:6, 55:18, 56:19, 56:21, 58:21, 58:22, 59:17, 62:21, 62:25, 63:6, 63:7, 63:9, 63:11, 63:25, 64:13, 65:8, 66:17, 66:20, 84:21, 87:2, 94:9, 94:10, 97:4, 105:3, 110:8, 110:20, 110:22
**witnessed** [1] - 48:25
**witnesses** [9] - 51:10, 56:23, 57:6, 60:5, 60:8, 62:11, 62:12, 65:3, 109:3
**word** [1] - 56:4
**words** [2] - 8:2, 76:21
**works** [1] - 100:14
**world** [1] - 64:20
**worn** [1] - 60:8
**Wright** [2] - 65:6, 66:6
**write** [1] - 70:5
**writers** [1] - 56:1
**written** [2] - 57:12, 58:12
**wrote** [1] - 58:7

## Y

**yeah-you're-good** [1] - 107:13
**year** [2] - 97:23, 110:23
**years** [6] - 9:24, 60:5, 66:4, 70:21, 75:19, 97:25
**yes-or-no** [1] - 93:2

**yourself** [14] - 3:20, 15:23, 17:23, 18:20, 30:25, 37:15, 43:7, 48:10, 48:18, 86:12, 88:8, 88:12, 89:12, 101:17

## Z

**zero** [5] - 11:21, 36:11, 85:19, 85:20, 90:6
**zoom** [9] - 37:22, 40:14, 79:18, 80:20, 80:24, 93:6, 93:18, 99:16, 99:17
**zoomed** [4] - 44:21, 79:16, 79:18, 80:2