```
 1                 IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2
     - - - - - - - - - - - - - - - x
 3   THE UNITED STATES OF AMERICA,
                                          Criminal Action No.
 4                  Plaintiff,            1:21-cr-00382-PLF-1
                                          Tuesday, April 2, 2024
 5   vs.                                  9:17 a.m.

 6   CHRISTOPHER WARNAGIRIS,

 7                  Defendant.
     - - - - - - - - - - - - - - - x
 8

 9   _____

10         TRANSCRIPT OF BENCH TRIAL - MORNING SESSION
          HELD BEFORE THE HONORABLE PAUL L. FRIEDMAN
11                UNITED STATES DISTRICT JUDGE
     _____
12
     APPEARANCES:
13
     For the United States:      REBEKAH LEDERER, ESQ.
14                               ANDREW HAAG, ESQ.
                                 USAO
15                               601 D Street NW
                                 Washington, DC 20001
16                               (202) 252-7012
                                 rebekah.lederer@usdoj.gov
17                               andrew.haag@usdoj.gov

18   For the Defendant:          MARINA MEDVIN, ESQ.
                                 MEDVIN LAW PLC
19                               916 Prince Street, Suite 109
                                 Alexandria, VA 22314
20                               (888) 886-4127
                                 marina@medvinlaw.com
21

22   Court Reporter:             Lisa A. Moreira, RDR, CRR
                                 Official Court Reporter
23                               U.S. Courthouse, Room 6718
                                 333 Constitution Avenue, NW
24                               Washington, DC  20001
                                 (202) 354-3187
25
```

1                              I N D E X

2

    WITNESS                                                    PAGE
3
    CHIEF DEPUTY THOMAS LLOYD, Resumed
4         (By Ms. Medvin)...................................13
          (By Ms. Lederer)..................................69
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2            THE COURTROOM DEPUTY:  This is Criminal Action
 3   21-382, United States v. Christopher Warnagiris.
 4            For the United States, I have Andrew Haag and
 5   Rebekah Lederer.  For defendant, I have Marina Medvin.  All
 6   parties are present.
 7            THE COURT:  Good morning, everybody.
 8            (Everyone greets the Court)
 9            THE COURT:  So I think we'll start with some
10   law.  Thank you both for your briefs last night.  Michaela
11   and I were happy to receive them, and I'm happy to see that
12   Ms. Medvin took the wise course and did not wait for the
13   government's brief first and decided she wanted to go to
14   sleep last night.  So they filed more or less
15   simultaneously.
16            So what I would like to do and will do is to sort
17   of lay out the general principles that I think are the law
18   surrounding the questions that were raised, which has to do
19   with statements that were made by Mr. Warnagiris on the
20   scene on the day of January 6th, as I understand it, and
21   were captured on video or audio.  And we stopped as
22   Ms. Medvin was attempting to introduce one such statement,
23   and I raised a lot of questions about it.
24            I'm now ready -- I think what would make sense is
25   for me to tell you what I think -- how I read these three
```

1    hearsay exceptions in the Federal Rules of Evidence in

2    general and not to -- and then what will happen is that if

3    there are statements she tries to introduce that the

4    government thinks are objectionable beyond the scope of what

5    I say the rules mean, they can object.  But hopefully, once

6    I tell you what I think the rules mean, under D.C. Circuit

7    case law and under the language of the rules themselves, we

8    won't have too many objections.

9         I think Ms. Medvin is right that each of these

10   three exceptions may apply to some of the statements that he

11   has made, and the exception she relies on are Rule 803(1),

12   present sense impression, Rule 803(2), excited utterance,

13   and Rule 803(3), then-existing mental, emotional or physical

14   condition.  And they're all a little bit different, as you

15   all know and were reminded in your research last night.

16        So starting with 803(1), present sense expression,

17   the statement describing or explaining an event or condition

18   made while or immediately after the declarant perceived

19   it -- and in this case the declarant is Mr. Warnagiris

20   himself so we don't have to worry about a corroboration of

21   somebody else testifying about what he said; we see it on

22   the screen itself -- I'm persuaded that whether or not he

23   testifies these statements can come in under one or more of

24   these exceptions.

25        So 803(1) is an exception, and it says that the

1    hearsay rule does not exclude a statement describing or

2    explaining an event or condition made while the declarant

3    was perceiving the event or condition or immediately

4    thereafter.  The advisory committee note says the underlying

5    theory of this exception is that substantially

6    contemporaneity of the event and statement -- that the

7    statement is made contemporaneous to the event -- negate the

8    likelihood of deliberate or conscious misrepresentation.

9         The critical element is contemporaneity.  The

10   statement must be made at the time of the event condition as

11   being perceived or immediately after the condition was

12   perceived.  And I discuss that in a case called *Partido* --

13   P-A-R-T-I-D-O -- 311 F. Supp. 2d 14 in 2004, and also in

14   *Wills*, a 2018 case, which one or both of you cited.

15        The statement applies regardless -- the hearsay

16   exception applies regardless of whether the declarant is

17   available as a witness.  It's grounded on the theory that

18   statements about an event and made soon after perceiving it

19   or while perceiving it are especially trustworthy because if

20   the statement and the event are contemporaneous or

21   substantially contemporaneous, that negates the likelihood

22   of deliberate or conscious misrepresentation.

23        The fact that it's contemporaneous or

24   substantially contemporaneous and that it's spontaneous are

25   crucial.  The permissible subject matter of a present sense

1    impression is limited to describing or explaining the event

2    or condition.  The assumption being that spontaneity may

3    extend no further.  And that's the advisory committee note.

4         The proponent of the statement must show that the

5    statement describes or explains an event or condition;

6    second, that the declarant perceived it firsthand; and

7    third, that the statement was made contemporaneously or

8    substantially contemporaneously, while the declarant

9    perceived the event or condition or immediately thereafter.

10   That's substantially contemporaneous.

11        So that's 803(1).

12        803(2) is excited utterance, and 803(2) says a

13   statement relating to a startling event or condition made

14   while the declarant was under the stress of excitement that

15   it caused.  And I think the D.C. Circuit's opinion in *The*

16   *United States v. Alexander*, 331 F. 3d 116 in 2003, an

17   opinion written by Judge Henderson, who used to be a trial

18   judge, beginning on Page 122 says the rationale underlying

19   the excited utterance exception is that the excitement

20   suspends the declarant's powers of reflection and

21   fabrication, consequently minimizing the possibility that

22   the utterance will be influenced by self-interest and

23   therefore be unreliable.  It's premised on the belief that a

24   person is unlikely to fabricate lies, which presumably take

25   some deliberate reflection, while his mind is preoccupied

1    with the stress of an exciting event.  To qualify as an

2    excited utterance, the declarant's state of mind at the time

3    that the statement was made must preclude conscious

4    reflection on the subject of the statement.

5            For a statement to qualify as an excited

6    utterance, she writes for the Court, the proponent of the

7    exception must establish, one, the occurrence of a startling

8    event; two, that the declarant made the statement while

9    under the stress of excitement caused by the startling

10   event; and three, that the declarant's statement relates to

11   the startling event.  The utterance must be contemporaneous

12   with the excitement caused by the startling event, not

13   necessarily with the startling event itself.

14           And then she says -- I think helpfully in this

15   situation -- if the trial court has access to a recording of

16   the declarant's statement, it may also consider the

17   declarant's tone and tenor of voice in determining whether

18   the declarant made the statement while under the stress of

19   the excitement.

20           Professor Saltzburg, in his treatise, says the

21   most significant differences between the two exceptions,

22   present sense impression and the excited utterance, are

23   that, one, an excited utterance must relate to a startling

24   event or condition while a statement of present sense

25   impression may describe any event or condition; two, the

1    present sense impression must describe the event which the

2    excited utterance need only relate to the event.  The

3    excited utterance exception thus allows a broader scope of

4    subject matter coverage than does present sense impression.

5    And three, the excited utterance exception does not contain

6    an express contemporaneity requirement as does Rule 803(1).

7         So then the third exception that Ms. Medvin relies

8    on is Rule 803(3), then-existing mental, emotional, or

9    physical condition, and it states that a statement of the

10   declarant's then-existing state of mind, such as motive,

11   intent, or plan, or emotional, sensory or physical condition

12   such as mental, feeling pain or bodily health, but not

13   including the statement of memory or belief to prove the

14   fact remembered or believed unless it relates to validity or

15   terms of a declarant's will, which is not our situation

16   here.

17        A good discussion of the state of mind exception

18   is found in *United States v. Lentz*, which you guys cited at

19   282 F. Supp. 2d 399, Eastern District of Virginia, 2002, by

20   Judge Gerald Lee.  And Judge Lee says, "A statement is

21   admissible hearsay under the state of mind exception if it

22   is a statement of" -- and he quotes the rule, then-existing

23   state of mind, et cetera.  "To be admissible, the

24   declaration must mirror a state of mind which, in light of

25   all the circumstances including proximity, is reasonably

1    likely to have been in the same condition existing at the

2    material time."  That's a quote in the opinion.

3          The statement must be limited to a declaration

4    showing the declarant's state of mind and not the factual

5    occurrence engendering the state of mind.  The declarant

6    must not have had an opportunity to reflect and possibly

7    fabricate or misrepresent her thoughts or state of mind.

8    The statement may be excluded when a declarant has time to

9    reflect because the statement may reflect the state of mind

10   as to a past fact as opposed to a present existing fact.  In

11   other words, it has to be a then-existing mental, emotional,

12   or physical condition.

13         As I said in *Partido*, the state of mind exception

14   does not include a statement of memory or belief to prove

15   the fact remembered or believed.  Statements offered to

16   establish truth of a belief are not admissible under 803(3).

17         The advisory committee note says the exclusion of

18   statements of memory or belief to prove the fact remembered

19   or believed is necessary to avoid the virtual destruction of

20   the hearsay rule, which would otherwise result from allowing

21   state of mind provable by a hearsay statement to serve as

22   the basis for an inference of the happening of the event

23   which produced the state of mind.

24         Professor Saltzburg says the same thing.

25   Statements of a past state of mind or physical condition are

1    not admitted.  The theory of trustworthiness supporting the

2    admissibility of these statements is there based on the

3    unique perception; that is, that the declarant has a unique

4    perspective into his own physical condition, feelings or

5    emotions.  But that, he says, makes it all the more

6    important that it be limited to then-existing mental,

7    emotional, or physical condition.  Because it's subject to

8    abuse, and it has to be limited.

9         So I think that's all I have to say at the moment.

10    And hopefully those guidelines as to how I read Rules

11    803(1), (2), and (3) will help us as we go forward in

12    providing guidance to Ms. Medvin in posing certain things

13    and which arguments she wants to make in support of that.

14         And I'll look to the government in terms of when

15    to object and not object, but it does seem to me that the

16    specific statement that we've heard so far is admissible

17    under 803(1) and possibly under all three exceptions, but

18    certainly when he's saying, "I'm getting crushed here; I

19    don't have a choice; I'm getting crushed; I can't move; I

20    can't move," that's a statement describing the event that's

21    happening immediately as it's happening.

22         So anybody want to say anything about what I've

23    just said, or any questions or concerns?

24         MR. HAAG:  Your Honor, if I could clarify my

25    understanding of Rule 803(3) with the then-existing state of

1    mind?  My understanding is that a statement about someone's

2    current state of mind could not be used to prove their state

3    of mind at a prior time.

4           THE COURT:  That's what I understand.  The rule

5    itself says it does not include a statement of memory or

6    belief to prove the fact remembered or believed in the past,

7    and I think that what I've quoted from -- these cases and

8    the advisory committee notes -- supports that.  I'll just

9    take one quick look at the advisory opinion now.

10           Well, I quoted this from the advisory committee

11    note:  Exclusion of statements of memory or belief to prove

12    the fact remembered or believed or some past event is

13    necessary to avoid the virtual destruction of the hearsay

14    rule which would otherwise result from allowing state of

15    mind provable by hearsay to serve as the basis for inference

16    of the happening of the event which produced the state of

17    mind.  It's the then-existing state of mind.

18           I don't think there's any --

19           MR. HAAG:  I think that covers the issue.  Thank

20    you, Your Honor.

21           THE COURT:  Yes.  That was from actually the

22    original advisory committee note, and I don't think they've

23    said anything more since then.

24           All right.  So is there anything else

25    anybody wants to raise before we get the witness and permit

1    Ms. Medvin to proceed with her cross?

2              No?  Okay.

3              MR. HAAG:  Your Honor, there is one brief --

4              THE COURT:  Oh, I can always count on one side or

5    the other.

6              MR. HAAG:  This is just a housekeeping matter.

7    Our Secret Service agent, Lanelle Hawa, is available this

8    afternoon, but she does have a tight schedule.  She will be

9    here at 3:30.  So with the Court's indulgence we would like

10   to call her at that time.  We expect her testimony to be

11   fairly brief.

12             THE COURT:  Okay.  And is she the next witness

13   after this witness?

14             MR. HAAG:  We do have Sergeant Anthony Warner, who

15   would be the one next.

16             THE COURT:  So your point is if we have to

17   interrupt Sergeant Warner and proceed with her, we can do

18   that.

19             MR. HAAG:  Yes, thank you.

20             THE COURT:  Okay.

21             Okay.  So let's get Deputy Lloyd back.

22             (Pause)

23             THE COURT:  Good morning, sir.

24             THE WITNESS:  Good morning, Your Honor.

25             THE COURT:  And you're still under oath from

```
 1    yesterday.
 2                    CHIEF DEPUTY THOMAS LLOYD, Resumed
 3                    CROSS-EXAMINATION, Continued
 4    BY MS. MEDVIN:
 5    Q.  Good morning.
 6    A.  Good morning.
 7    Q.  I will start with the video where we stopped yesterday
 8    just to make things easier, and I'll play it again for you.
 9                THE COURT:  And what's the exhibit number?
10                MS. MEDVIN:  That is Defense 002.
11                THE COURTROOM DEPUTY:  That was not admitted.
12                MS. MEDVIN:  It was not yet admitted.
13                THE COURT:  Well, I think, based on the ruling
14    I've just given, it should be admitted.
15                MS. MEDVIN:  We seek to admit Defense Video 002.
16                THE COURT:  I'll admit it.
17                THE COURTROOM DEPUTY:  Okay.
18                (Video played)
19    Q.  Do you recognize the area where this video was shot?
20    A.  Yes.  It appears to be the main Rotunda doors.
21    Q.  Okay.  And you recognize those Capitol Police officers,
22    don't you?
23    A.  Yes.
24    Q.  Okay.  Do you know them by name?
25    A.  Not offhand.  The young lady right there on your screen
```

1    just retired.  She's a sergeant.  I forget her last name.

2    Q.  And in that video you observed the defendant,

3    Mr. Warnagiris?

4    A.  Yes.

5    Q.  And you observed his mouth moving at least for a portion

6    of that video?

7    A.  Yes.

8    Q.  And you were able to hear his voice, correct?

9    A.  Yes.

10   Q.  And you heard his voice say, "I'm just getting crushed

11   here, man.  I don't have a choice.  I'm just getting

12   crushed.  I'm just getting crushed.  I'm just getting

13   crushed.  I'm just getting crushed.  I'm just getting

14   crushed.  I cannot move.  I cannot move.  I cannot move."

15          MS. LEDERER:  Objection.

16   Q.  Is that what he said?

17          MS. LEDERER:  I'll withdraw the objection, Your

18   Honor.

19          THE COURT:  Okay.  You may answer.

20   A.  That sounds familiar with what was on the screen, yes.

21   Q.  Okay.  And, in fact, from what you observed in the

22   video, it appeared to be a very tight space that, in fact,

23   it appears that the officers and the protesters appear to

24   have both been feeling some kind of crunch or crush?

25          MS. LEDERER:  Objection; form of the question,

1    compound question.

2                 THE COURT:  It is compound, yes.

3                 MS. MEDVIN:  I'll break it down.

4    Q.  You observed protesters in that crowd appear to be

5    crushed through the crowd?

6    A.  No.  I wouldn't say crushed.  It was definitely tight in

7    there, but I'm not aware of any situation on January 6th

8    where a member of the public could not turn around and just

9    leave at any point.

10   Q.  Well, that's not the question I asked you.

11   A.  Okay.

12   Q.  I asked you what you observed in that video, and you

13   said a tight space.

14   A.  Yes.

15   Q.  Okay.  We'll move on.

16                 Did you appear -- did you witness an officer who

17   looked like -- based on the expression on his face, and I'll

18   actually remind --

19                 MS. MEDVIN:  The Court's indulgence.

20                 (Video played)

21   Q.  There are two officers whose facial expressions appear

22   to be those -- the facial expressions of those two officers

23   that you just observed, they appear to be of discontent?

24                 MS. LEDERER:  Objection; speculation.

25                 THE COURT:  Appear to be what?

1              MS. MEDVIN:  Of discontent.

2              THE COURT:  Objection sustained.

3              MS. MEDVIN:  Okay.  We'll move on, Judge.

4              I'm going to ask the government to bring up

5      Government Exhibit 401, so I will unplug and ask the

6      government to plug in.

7              THE COURTROOM DEPUTY:  401 is not in evidence.

8              MS. MEDVIN:  If we could play --

9              THE COURT:  401 is not in evidence.

10              MS. MEDVIN:  Not yet.

11              THE COURT:  Are you offering it?

12              MS. MEDVIN:  I will be.

13              THE COURT:  Okay.

14              MS. MEDVIN:  If we could play Government Exhibit

15      401, please.

16              (Video played)

17              MS. MEDVIN:  I'm going to ask you to pause.

18              We can go back a few seconds and pause right

19      there.

20      Q.  Do you see Mr. Warnagiris on the right side of the

21      screen?

22      A.  Yes.

23      Q.  Can you circle him for me.

24      A.  (Witness complies) There he is.

25      Q.  Okay.

1          MS. MEDVIN:  The witness is circling an individual

2     on the right side of the screen wearing a red hat and a

3     green jacket --

4          MS. LEDERER:  Your Honor --

5          MS. MEDVIN:  -- with yellow trim.

6          MS. LEDERER:  -- at this point I'm just going to

7     object.  I have no problem with counsel narrating what she

8     just did after this exhibit is actually admitted into

9     evidence.  We've had no foundation yet for it to actually be

10    offered up into evidence.

11         MS. MEDVIN:  Okay.

12    Q.  Do you recognize the area surrounding Mr. Warnagiris?

13    A.  It's definitely Washington, D.C.  I can't pinpoint

14    exactly where it's at.

15    Q.  Is he wearing the same clothing he wore when you

16    identified him for other January 6th videos?

17    A.  Yes.

18    Q.  Okay.

19         MS. MEDVIN:  Judge, I'm going to ask to admit

20    Government 401 as Defense 401.

21         THE COURT:  Do you recognize the building on the

22    left side of that?

23         THE WITNESS:  The only thing that looks familiar

24    is maybe the portion of the building in between the two

25    ladies' heads.  It looks similar to the African-American

```
 1   Museum.
 2              THE COURT:  It's not near or at the Capitol
 3   grounds?
 4              THE WITNESS:  No, I do not believe it's near the
 5   Capitol grounds.  Several blocks away from the grounds.
 6              MS. LEDERER:  And, Your Honor, unless counsel can
 7   proffer, I would just object to the relevancy at this time
 8   using this exhibit with the overview witness.
 9              MS. MEDVIN:  The witness is saying it's
10   Washington, D.C., and he's wearing the same clothes he wore
11   on January the 6th.  I think based on that evidence it's
12   sufficient to be admitted as an exhibit, but we can play the
13   entirety so he can recognize more.
14              THE COURT:  Can you proffer that it was, in fact,
15   on January 6th?
16              MS. MEDVIN:  It appears to have been exactly on
17   January 6th based on everything we've seen from this video.
18   I don't think the government believes otherwise.  It is
19   their exhibit.
20              THE COURT:  I mean, I haven't seen the rest of the
21   video.
22              MS. MEDVIN:  If we can play the entirety of the
23   video, please.
24              MS. LEDERER:  And, Your Honor, the issue is not
25   with the exhibit.  It's the relevancy with this witness at
```

 1    this time using this exhibit.  If counsel can explain why

 2    it's relevant with this witness, we can potentially move on.

 3              THE COURT:  And is it within the scope of direct?

 4              MS. LEDERER:  Exactly.

 5              MS. MEDVIN:  It is an identification of the

 6    defendant on the same day.  This witness had identified this

 7    witness in a variety of --

 8              THE COURT:  He can identify the defendant from

 9    this, whether he can.

10              MS. MEDVIN:  It's not important either which way,

11    to be perfectly honest.  I'm trying to get certain exhibits

12    in, but we can move on, and the government can admit it at

13    their pace.

14              THE COURT:  All right.  We'll move on.

15              MS. MEDVIN:  I will ask the government to bring up

16    402A.  If we could play 402 in full, please.

17              (Video played)

18    Q.  Do you recognize the area where this video was shot?

19    A.  Yes.  It appears to be the northwest corner of the

20    Capitol square on January 6th.

21              THE COURT:  The northwest corner of what?

22              THE WITNESS:  The Capitol square right next to the

23    Capitol building.

24    Q.  And in the background, do you see the west lawn of the

25    Capitol?

1    A.  A portion of it, yes.

2    Q.  A portion of it.

3    A.  Yes.

4    Q.  And based on the video that you identified yesterday as

5    Defense 00A yesterday where you observed the signs being

6    removed, are these people in that area where the signs were

7    previously removed?

8    A.  Yes.

9    Q.  Okay.  And you didn't see any signs up on the lawn when

10   you observed these people on the lawn?

11           MS. LEDERER:  Your Honor, I'm just going to

12   interject at this point.  I don't believe that this exhibit

13   has been offered and admitted yet, so I would just --

14           THE COURT:  Well, the question is whether she's

15   laid an adequate foundation.  Do you have an objection to it

16   being admitted?

17           MS. LEDERER:  No, not at all.

18           THE COURT:  Okay.  Let's admit it, and then you --

19           MS. LEDERER:  I would just ask that it be admitted

20   and then ask the question.

21           THE COURT:  Let's admit it, and then you can --

22           MS. MEDVIN:  Judge, we move to admit --

23           THE COURT:  Let's admit it, and then you can ask

24   the substantive questions.  You've laid a foundation.

25           MS. MEDVIN:  The defense moves to admit Government

```
 1    402A as Defense 402A.
 2              MS. LEDERER:  No objection.
 3              THE COURT:  Okay.  It will be admitted.
 4    Q.  You can go ahead and answer.
 5    A.  I forgot the question.  If you could repeat the
 6    question?
 7    Q.  Let's go back.
 8              The individuals who you are currently witnessing
 9    on that lawn, they're on the lawn that you previously
10    identified as having the restricted area signs, correct?
11    A.  Yes.
12    Q.  And the video, as you saw it, no longer had restricted
13    area signs when these individuals were there, correct?
14    A.  Correct.
15    Q.  So presumably these people are there after the signs are
16    removed, correct?
17    A.  Correct.
18    Q.  Okay.  And you didn't see any restricted area signs on
19    that lawn when these people were there contemporaneous to
20    the presence of these individuals?
21    A.  No.  They had been trampled over by then.
22    Q.  Okay.  Well, trampled over or -- what happened in the
23    video in 00A, you observed the signs being trampled or
24    removed by --
25    A.  They were being pulled, but with all these peoples, tens
```

```
 1    of thousands of people coming onto the West Front, they had
 2    to walk over the bike rack, the snow fence, and the signage
 3    to get --
 4    Q.  The specific lawn area where they are, you observed a
 5    single individual pulling all of the signs off and running
 6    with them.  Yes?
 7    A.  That video yesterday, yes, I did see that.
 8    Q.  Okay.  You don't need me to refresh your recollection?
 9    You're remembering what I'm talking about?
10    A.  Yes, I do.
11    Q.  So I'm going to --
12              THE COURT:  Is there any evidence of what time
13    this video was taken?  Any evidence?
14              MS. MEDVIN:  The government's witness -- a
15    subsequent witness will be able to provide time for this
16    video.
17              If we could play the video one more time, please.
18    And if we could pause at 003.
19              (Video played)
20              MS. MEDVIN:  A little bit -- one more second.
21              One more.
22              Okay.  Let's keep going.  Slowly.  The defendant
23    is somewhere in the middle of this.
24              If we can move backwards a little bit, and a
25    little more.  Just keep going back slowly until I say stop.
```

```
1      How's that?
2              If we could pause.
3      Q.  It's a little blurry, but in the center of your screen
4      do you see an individual in a red hat and green jacket with
5      a backpack?
6      A.  Yes.
7      Q.  Okay.
8              MS. MEDVIN:  If we could keep moving that video
9      backwards and keep an eye on him.
10             (Video played)
11     Q.  Do you see him better now?
12     A.  Yes.
13     Q.  Can you identify him as the defendant?
14     A.  Yes.
15     Q.  Okay.
16             MS. MEDVIN:  I'm going to ask the government to
17     bring up 403.  A, 403A.  And I'm going to ask to play it
18     from 0:27 to 0:37.
19             (Video played)
20             MS. ESENE:  Sorry, what exhibit is this?
21             MS. MEDVIN:  403A.  Sorry, this is a different
22     one.
23             THE COURTROOM DEPUTY:  So not 403?
24             MS. MEDVIN:  403A at 0:27.
25             (Video played)
```

1    Q.  Okay.  Do you recognize the area where this video was

2    recorded?

3    A.  Yes.  It appears to be the northwest corner of the

4    Capitol building, so it would be the northwest portion of

5    the West Front.

6    Q.  And does it appear to be January 6th?

7    A.  Yes.

8    Q.  Okay.

9            MS. MEDVIN:  Your Honor, the defense moves to

10   admit Government 403A as Defense 403A.

11           MS. LEDERER:  No objection, Your Honor.

12           THE COURT:  403A will be admitted.

13           MS. MEDVIN:  If we could rewind by three seconds

14   to 00:33.

15           THE COURTROOM DEPUTY:  Ms. Medvin, you're

16   withdrawing 403, correct?

17           THE COURT:  403A.

18           MS. MEDVIN:  403A.

19           THE COURTROOM DEPUTY:  She initially said 403,

20   Your Honor.

21           THE COURT:  Okay.  403A has been admitted.

22           MS. MEDVIN:  403A.

23           THE COURT:  Not the entirety of 403.

24           MS. MEDVIN:  If we could click "Play."

25           (Video played)

 1              MS. MEDVIN:  Sorry, if we can go back to 00:34,

 2     let's try 34.  Either 34 or 35.

 3              MS. LEDERER:  Your Honor, perhaps this would be

 4     better served if defense counsel's investigator would play

 5     this.  Our paralegal does not work for Ms. Medvin, and

 6     clearly she doesn't know where to stop as well as she would

 7     for the government when we provide a cheat sheet of where

 8     we're going to stop.

 9              THE COURT:  You guys work this out, okay?  Work

10     out the logistics.

11              Ms. Medvin will try to be more accurate about

12     where she wants to stop and start.  And I'd appreciate, for

13     now at least, that the government's paralegal would be --

14     because it's all on your system.

15              MS. MEDVIN:  If we could go to 00:34, please, and

16     click "Play."  And stop at 00:36.

17              (Video played)

18     Q.  Were you able to observe the defendant?

19     A.  Yes.

20     Q.  Was he clearly standing there?

21     A.  Yes.

22     Q.  Okay.  And he's wearing the same outfit he was wearing

23     in other videos you've identified of him?

24     A.  Yes.

25     Q.  Okay.  And based on the number of people on that lawn,

```
1   are you able to estimate the amount or what time this

2   occurred?

3            THE COURT:  Estimate what?

4            MS. MEDVIN:  The time that this occurred.

5   A.  It's sometime after 12:53 in the afternoon.  12:53 was

6   the initial breach, so sometime after 12:53.

7   Q.  Sometime after, but you cannot identify the exact time?

8   A.  No.

9   Q.  Okay.  We'll move on.

10           MS. MEDVIN:  I'm going to ask the government to

11  play 404A from 11:40 to 12:57.

12           THE COURT:  All right.  For identification, 404A.

13           MS. ESENE:  I'm sorry, what was the stopping

14  point?

15           MS. MEDVIN:  From 11:40 to 12:57.

16           (Video played)

17  Q.  Do you recognize the area in this video?

18  A.  Yes.  It appears to be the center Rotunda doors on the

19  outside.

20           THE COURT:  Say that again.

21           THE WITNESS:  The center Rotunda doors on the

22  outside.

23  Q.  And does this appear to be January the 6th?

24  A.  Yes.

25           MS. MEDVIN:  We move to admit Government's 404A as
```

```
 1    Defense 404A from 11:40 to 12:57.
 2              THE COURT:  So have you -- are you offering this
 3    in evidence?
 4              MS. MEDVIN:  Yes.
 5              MS. LEDERER:  No objection.
 6              THE COURT:  So 404A will be admitted.
 7              MS. MEDVIN:  From 11:40 to 12:57 specifically.
 8    Q.  And towards the end of the video, did you observe
 9    Mr. Warnagiris?
10    A.  Yes.  I still see him on the screen.
11    Q.  Okay.  And did you observe the crowd going to a chant,
12    "USA, USA"?
13    A.  Yes.
14    Q.  And did you observe Mr. Warnagiris join the chant saying
15    "USA, USA"?
16    A.  Yes.
17    Q.  Okay.
18              MS. MEDVIN:  I'm going to pull up Government's
19    Exhibit 405 myself because it is a little bit complicated to
20    find this one.
21              THE COURT:  405?
22              MS. MEDVIN:  405.
23              I'm going to play Government's 405 starting at
24    16:16.
25              (Video played)
```

1          MS. MEDVIN:  The Court's indulgence.  That's why I

2    was saying it's complicated.  This timestamp was off.  It's

3    saying time remaining, but I will provide the correct time

4    in one moment.

5          (Video played)

6          MS. MEDVIN:  And I'm stopping -- my video is

7    telling me minus 15:44 seconds left on it.  The Court's

8    indulgence.

9          4:15.  So I'm stopping at 4:15.

10   Q.  Were you able to observe that area?

11   A.  Yes.

12   Q.  And what did you see depicted in that video?

13   A.  It's the main Rotunda doors, and it appears that an

14   attempt was being made by a couple of rioters to go into the

15   door.

16         THE COURT:  And this is the outside?

17         THE WITNESS:  Yes, sir.

18   Q.  And does this appear to be January 6th?

19   A.  Yes.

20         MS. MEDVIN:  We move Government 405 as Defense 405

21   into evidence and the timestamp provided.

22         MS. LEDERER:  No objection.

23         THE COURT:  It will be admitted.  405 is admitted.

24   Q.  Did you observe Mr. Warnagiris in this video?

25   A.  Yes.

1    Q.  And what was Mr. Warnagiris doing?

2    A.  It appeared he was facing one of the ceremonial doors.

3    He maybe even had his hands on the ceremonial door.

4    Q.  And where was his head positioned?

5    A.  Facing the door.

6    Q.  Does he appear to be hiding his face?

7              MS. LEDERER:  Objection; speculation.

8              THE COURT:  Sustained.  We can all view the video.

9    It's in evidence.

10             MS. MEDVIN:  Okay.  I'm going to go into Defense

11   008.

12             THE COURT:  Defense 008?

13             MS. MEDVIN:  Defense 008.

14             MS. LEDERER:  Your Honor, for the record, I

15   believe that Defense Exhibit 008 is similar to a government

16   exhibit, if counsel could just be clear for the record what

17   she's double-marking or cross-marking.

18             THE COURT:  Well, it doesn't matter.  I mean, if

19   it's already in evidence in some other number, then you

20   shouldn't have any objection to it.

21             MS. LEDERER:  I have no objection.  I was just

22   asking for it to be clear for the record as this is almost a

23   cross-mark of a government exhibit; that that would be

24   placed on the record so it's clear going forward and for

25   future purposes, especially for you rendering your decision.

1          MS. MEDVIN:  Judge, Defense 008 is the exhibit

2     creating completeness for Government Exhibit 301.  That is

3     the one where we had an objection to where we said we can

4     rectify on cross where 301 was offered without the initial

5     context, and 008 is the complete video.

6          It is 45 minutes in length, and we're just going

7     to play portions.

8          THE COURT:  So it's longer than 301?

9          MS. MEDVIN:  It's longer.

10          THE COURT:  So it's all of -- so just so the

11     record is clear, does the government agree that everything

12     in 008 is already in evidence?

13          MS. LEDERER:  No, Your Honor, but we have no

14     objection to 008 coming in.  I was just asking to clarify

15     for the record that this is a longer version of a government

16     exhibit --

17          THE COURT:  Okay.

18          MS. LEDERER:  -- just so it's --

19          THE COURT:  All right.

20          MS. MEDVIN:  For the record, the only reason we

21     have to bring it in is because Government 301 was

22     incomplete.

23          THE COURT:  She doesn't object.

24          MS. LEDERER:  Thank you, Your Honor.

25          THE COURT:  So it will be admitted without

```
 1    objection, Defense Exhibit 008.

 2                MS. MEDVIN:  All right.  So Defense Exhibit --

 3                THE COURT:  So the entirety of it is in.

 4                MS. MEDVIN:  Okay.

 5                THE COURT:  And you can ask him anything you want

 6    to about it.  I assume you're not going to show all 45

 7    minutes of it.

 8                MS. MEDVIN:  I will not.

 9                THE COURT:  But I can look at it at some point.

10    Q.  What are we looking at right now in Defense 008?

11    A.  This is an interior view of the main Rotunda doors.

12    Q.  Thank you.

13                MS. MEDVIN:  And I'm going to fast forward a bit.

14                THE COURT:  So this is the -- okay.  We are

15    looking from inside the Rotunda to the doors leading into

16    it?

17                THE WITNESS:  Yes.  From the outside, yes.

18                THE COURT:  Right.  But the perspective of this

19    video is from the inside?

20                THE WITNESS:  Yes.

21                MS. MEDVIN:  So I'm going to play from nine

22    minutes and 30 seconds in the video, timestamp 9:30.

23    Q.  What do you observe here?

24    A.  It appears to be a protester.  He's pushing on the door

25    handles in an attempt to open it.
```

```
1    Q.  There's a sign behind him.  What does that sign say?

2    A.  The red sign that you can't see?

3    Q.  Yes, the red sign.

4    A.  Something to the effect of this is an emergency exit

5    only.

6    Q.  Okay.  And did you observe him push open that door?

7    A.  Yes.

8    Q.  How is he able to push open that door?

9    A.  If you hit the bar once, it sets off a timer.  Depending

10   on what door it is, anywhere from 15 to 35 seconds after the

11   door's depressed, it will open on its own.

12   Q.  Okay.

13            THE COURT:  But if the door is -- on a typical

14   day, if a door is open, you say it sets off a timer.  Does

15   that alert somebody that --

16            THE WITNESS:  Yes.  If somebody hits that bar,

17   that sets off the timer.  There's also a local alarm that

18   will notify officers in the area that somebody has pressed

19   the fire exit door, and there's a countdown going on on that

20   particular door.

21            If the door actually opens after the 15 to 35

22   seconds, it will send a breach notification to our

23   communications letting us know that that door has been

24   breached from the inside.

25            THE COURT:  Got it.
```

1    Q.   Now, you observed the defendant on the other side of

2    that door previously, correct?

3    A.   Correct.

4    Q.   And was he wearing a red hat at all of those times?

5    A.   Yes.

6    Q.   Okay.  Do you see, as that door's opening, the defendant

7    standing in the opening of that door right now, or no?

8    A.   No.

9            MS. MEDVIN:  Okay.  Let's keep playing.

10            (Video played)

11    Q.   Do you start seeing the defendant in the red cap?

12    A.   Yes.

13    Q.   And what is happening right now?

14    A.   He's entering the building, and he's lost his hat.

15    Q.   What is happening to his head?

16    A.   It appears to be getting hit with a flagpole.

17            MS. MEDVIN:  If I can rewind a few seconds, let's

18    try again.

19            I have now zoomed in.  If we could keep an eye on

20    his head, what is happening to his head.

21            (Video played)

22    Q.   Is he being hit over the head with a flagpole?

23    A.   Yes.

24    Q.   Repeatedly?

25    A.   Yes.

1    Q.  And does he lose his hat?

2    A.  Yes.

3              MS. MEDVIN:  Okay.  I'm going to pause.

4              So I'm able to zoom in.  Nonetheless, I created a

5    zoomed in version of this exhibit as Defense 065.

6              The Court's indulgence.

7              (Pause)

8              MS. LEDERER:  Your Honor, at this point we would

9    object.  If counsel just zoomed in on Exhibit 008, there's

10   no reason to go watch the same exact exhibit again in a

11   different marked exhibit.

12             THE COURT:  Overruled.  So Defendant 065 --

13             MS. MEDVIN:  Actually I will go back to the

14   original just to make this easier.  I'm sorry, I'll go back

15   to the original.

16             THE COURT:  All right.  So we're not going to talk

17   about --

18             MS. MEDVIN:  I will do 065 at a later point.  I'm

19   going to go back to 008 for now.

20             THE COURT:  All right.

21             MS. MEDVIN:  Okay.  I'm going to play 008 from

22   11:10 to 12:34.

23             Nope.  The Court's indulgence.  Wrong exhibit.

24   Wrong time frame.

25             I'm going to play Defense 008 from 33:50, and I'll

1    pause, and I'll provide a timestamp.  33:50, and I'm going

2    to zoom in.

3    Q.  Okay.  The defendant is standing next to the doors,

4    correct?

5              THE COURT:  I don't see anything --

6              THE WITNESS:  I don't have a picture.

7              THE COURT:  -- on our screens yet.

8              (Video played)

9              MS. MEDVIN:  Sorry, Judge.  I'm having a glitch.

10   I'm going to have to play a little bit longer as a result.

11             Okay.  So this should be from 11:10 to 12:34

12   actually.  It's just -- for some reason on my computer right

13   now it's showing inverse time, but it should be from 11:10

14   to 12:34 in this exhibit that I'm playing.

15             (Video played)

16   Q.  Do you see the defendant letting people into the

17   building, assisting them?

18   A.  He's letting people into the building, yes.

19   Q.  He's assisting them?

20             MS. LEDERER:  Objection to the argumentative

21   nature or the narration that defense is giving.  The witness

22   answered one way, and then defense counsel just --

23             THE COURT:  He said he's letting people in the

24   building.  What else did he say?

25             MS. LEDERER:  And then defense counsel finished up

```
 1    with more of a narration of "he's assisting."

 2              THE COURT:  Oh, well, I'll strike "he's

 3    assisting."  It wasn't a question.

 4              The witness said the defendant is letting people

 5    into the building.

 6              MS. MEDVIN:  Okay.  Let's play it one more time,

 7    and I'm going to ask you to look for police officers that

 8    he's helping into the building.

 9              (Video played)

10    Q.  Do you see a police officer right there?

11    A.  Yes.

12    Q.  That's one.

13              THE COURT:  Is there a question on the table?

14              MS. MEDVIN:  No, Judge.

15              (Video playing)

16              MS. MEDVIN:  I'm not sure what's happening, Judge.

17    I have not had any of these issues preparing.

18              (Video playing)

19              MS. MEDVIN:  The Court's indulgence.  It's now

20    fast forwarding.

21              Sorry, we're going to start at the beginning.

22              Okay.  I don't know why it's freezing.  To

23    expedite the issue, we'll go to Government's 301.  If we can

24    have the government bring it up on their computer since this

25    one is experiencing issues.
```

1                    (Pause)

2                    MS. MEDVIN:  Okay.  If we could move it forward

3       by -- to 2:26 in the timestamp.  Not in the video itself.

4       If we could look up -- you could maybe fast forward with the

5       mouse.

6                    Right there.  Let's just start there.  And if

7       we're able to, zoom in.

8                    That's good enough, if we can move it.

9                    Yes, thank you.  Thank you very much.  If we could

10      click "Play."

11                   And so again we're looking for police officers

12      now.

13                   (Video playing)

14      Q.  Are you able to see any officers?

15      A.  Yes, at least one.

16      Q.  Okay.  Are you able to see this clearly, or does it

17      appear that the people are very dark right now?

18      A.  No, I -- the only one that I can definitely identify is

19      from the patch.  There's another officer there with a patch.

20      He hasn't made it in yet.

21      Q.  Is that an officer right there in black, or no?

22      A.  With the helmet, yes.

23                   (Video playing)

24      Q.  Is that another officer who is coming in?

25      A.  Yes, with the Class A hat, yes.

```
 1    Q.  And do you see any other officers coming in right now?

 2    A.  Another officer just came in.

 3            One more.

 4    Q.  Okay.  Another officer just came in again.

 5            MS. MEDVIN:  I'm going to ask the government to

 6    pause.

 7    Q.  Okay.  How many officers did you count?

 8    A.  About four or five.

 9    Q.  Four or five, okay.

10            And did Ms. Warnagiris appear to stop anyone, or

11    was he treating the officers and the protesters alike --

12            MS. LEDERER:  Objection; speculation.

13    Q.  -- in terms of bringing --

14            THE COURT:  Let's start with one question instead

15    of two.

16    Q.  As he's bringing the individuals into the building, does

17    he not treat both the protesters and the officers alike?

18            MS. LEDERER:  Objection; speculation.

19            MS. MEDVIN:  Okay.  I'll move on, Judge.

20            THE COURT:  You may answer the question.

21    A.  What I observed him was attempting to hold the door

22    open.  As far as assisting or not assisting, I'm not going

23    to judge that, but he's definitely acting as a doorkeeper

24    right there.

25    Q.  Okay.
```

 1              MS. MEDVIN:  So for the record, that was

 2     Government's Exhibit 301 from 1:10 to 2:30.

 3              I'm going to ask the government to bring up 416A,

 4     which has already been admitted into evidence.  I'm going to

 5     ask to play it from the beginning.  Thank you.

 6              (Video playing)

 7     Q.  Were you able to observe Mr. Warnagiris in this video?

 8     A.  Yes.

 9     Q.  Okay.  What was he doing?

10     A.  Walking west, it appeared.

11              THE COURT:  Walking away from where?

12              THE WITNESS:  Walking west towards the Rotunda.

13              MS. MEDVIN:  I'm going to ask the government to

14     now play this exhibit from 2:12 to 3:57.

15              (Video playing)

16              MS. MEDVIN:  I'm going to ask you to pause.

17     Q.  Were you able to see Mr. Warnagiris here?

18     A.  Yes.

19     Q.  And did you hear him say "be quiet, be quiet"?

20              MS. LEDERER:  Objection; hearsay, and also there's

21     no foundation that it was the defendant.  I would ask to

22     rephrase the question.

23              THE COURT:  Well, we can go back to see whether

24     the defendant said something, and then we'll deal with the

25     hearsay objection.

```
 1              So let's go back.

 2              You testified you see the defendant holding up his

 3    hand, right?

 4              THE WITNESS:  Yes, he's definitely holding up his

 5    hand.

 6              (Video playing)

 7              THE COURT:  Did you see him -- did you hear him

 8    say something?

 9              THE WITNESS:  I heard him say "quiet."

10              THE COURT:  Okay.  Is that the objection?

11              MS. LEDERER:  I'm good from here, Your Honor.

12              THE COURT:  All right.

13              MS. MEDVIN:  Okay.  If we can continue playing.

14    Q.  Did he say "quiet" a second time?

15    A.  Yes.

16    Q.  And his hands were up in the air as he was saying that?

17    A.  Yes.

18    Q.  Okay.

19              MS. MEDVIN:  If we can continue playing, please.

20              (Video playing)

21    Q.  Did you observe the defendant with his hand up in the

22    air moving downwards, gesturing down?

23    A.  Yes.

24    Q.  Okay.  And was he gesturing down in response to the

25    person in front of him saying to everyone be quiet?
```

```
 1    A.  It appeared to be, yes.

 2    Q.  Okay.

 3            MS. MEDVIN:  If we can keep playing.

 4            (Video played)

 5            MS. MEDVIN:  Pause.

 6    Q.  What did you hear the individual in front of

 7    Mr. Warnagiris saying?

 8    A.  He made reference to entering the room.  I'm assuming --

 9    Q.  Without an assumption.  Just what did you observe?

10    A.  Okay.  Making reference entering a room.

11    Q.  To do what?

12    A.  You'll have to replay it.

13    Q.  Okay.

14            MS. MEDVIN:  If we can go back by five seconds,

15    please.

16            (Video played)

17            MS. MEDVIN:  Pause.  And go back to timestamp

18    03:00, and if we could play from there.

19            (Video played)

20            MS. MEDVIN:  Pause, please.

21    Q.  Did you hear the individual in front of Mr. Warnagiris

22    say, "Let's have a discussion with these officers"?

23    A.  I missed that part.

24    Q.  Okay.

25            MS. MEDVIN:  If we could rewind by ten seconds.
```

```
 1                    (Video playing)
 2              MS. MEDVIN:  Pause, please.
 3              If you can pause, please.  Thank you.
 4    Q.  Were you able to hear at this time?
 5    A.  Yes.
 6              THE COURT:  Hear what?
 7    Q.  What did you hear this time?
 8    A.  Speaking with the police.
 9    Q.  Okay.  So the individual in front of Mr. Warnagiris is
10    indicating to the crowd that, if they're calm and quiet,
11    they can sit down in a room with the police.  Is that your
12    understanding?
13              THE COURT:  Objection; sustained.
14              MS. MEDVIN:  All right.  I will move on --
15              THE COURT:  I actually didn't hear anything about
16    the police.  I heard "calmly and quietly let's enter the
17    room and sit down."  But if it's there, it's there.
18              MS. MEDVIN:  If we can rewind it by ten seconds,
19    please.
20              THE COURT:  Well, he said he heard it, and he's
21    the witness.
22              MS. MEDVIN:  If the Court wishes to review this,
23    it would be from 003 to -- so -- I'm sorry, from 3:00 to
24    3:57.  If the Court's reviewing this video in chambers,
25    that's where this evidence will be.
```

```
 1              THE COURT:  I will do that.
 2              So whatever this gentlemen said, what do you see
 3     the defendant doing at this point?
 4              THE WITNESS:  The defendant is motioning down with
 5     his arm.
 6              THE COURT:  That was earlier, right?
 7              THE WITNESS:  Yes.
 8              THE COURT:  What do you see him doing at this
 9     point where it's stopped?
10              THE WITNESS:  He's got his arms raised up like
11     that.
12              MS. MEDVIN:  If we could click "Play" and play
13     until -- I'm sorry, and play until 3:57.
14              (Video playing)
15     Q.  Now I'm going to go -- or direct your attention back in
16     time in front of the Capitol Rotunda doors where you
17     observed Mr. Warnagiris helping people into the building in
18     that time period.
19              MS. LEDERER:  Objection.
20              MS. MEDVIN:  One of the --
21              MS. LEDERER:  To the form of the question.  Again,
22     Counsel's narrating.
23              THE COURT:  She hasn't asked a question.
24              MS. LEDERER:  But, Your Honor --
25              THE COURT:  She's making speeches.  I get it.
```

1    And, you know, she shouldn't be doing that.  Lawyers don't

2    testify.  Witnesses testify.  And if a jury were here, I

3    would tell them to disregard what Ms. Medvin just said, so I

4    will do the same.

5              MS. MEDVIN:  Judge, just because we allowed the

6    government quite a bit of leeway in terms of leading

7    questions in their direct, we're just asking --

8              THE COURT:  You can ask leading questions because

9    you're cross-examining.

10              MS. MEDVIN:  I understand.

11              THE COURT:  But you can't make speeches.

12              MS. MEDVIN:  I understand, Judge.  I was just

13    directing his attention.  But I will rephrase.

14    Q.  In front of the Capitol Rotunda doors at the moment

15    where the doors were open, so the time period about 2:25

16    p.m. in the afternoon, that time period, that's where I'm

17    directing your attention.

18              On your direct testimony, you said that the people

19    coming in did not have permission to enter that area?

20              THE COURT:  Is that right?

21              THE WITNESS:  Correct.  Yes, Your Honor.

22    Q.  But you observed five police officers enter that as

23    well, correct?

24    A.  Yes.

25    Q.  Through that door.  And those five officers did have

1    permission to enter; is that correct?

2    A.  I'm sorry?

3    Q.  Those five officers who entered through the Capitol

4    Rotunda doors did have permission to enter the Capitol; is

5    that correct?

6    A.  Yes.

7    Q.  So at least some of the people entering through the

8    doors did have permission to enter?

9    A.  The police officers only.

10   Q.  Okay.  So initially when you testified, all the people

11   who came in through those doors did not have permission to

12   enter.  You're now amending that to say at least the

13   officers --

14            THE COURT:  He's answered the question.

15            MS. MEDVIN:  I'm going to ask the government to

16   pull up Government Exhibit 305.  That has been previously

17   admitted depicting Statuary Hall.  And if we could click

18   "Play."  It's only a minute.

19            (Video playing)

20            MS. MEDVIN:  If we can pause.

21   Q.  The defendant, he's walking within the red velvet ropes;

22   is that correct?

23   A.  Yes.

24   Q.  And you observed a few government CCTV surveillance

25   videos of this area at different times; is that correct?

1    A.  Yes.

2    Q.  And every time you saw Mr. Warnagiris in this area, he

3    remained in the red velvet ropes, correct?

4    A.  I would say that would be accurate, yes.

5    Q.  Yeah?

6         And he was walking the entire time.  He was never

7    running; is that correct?

8    A.  Correct.

9    Q.  And, in fact, as you observed Mr. Warnagiris's movements

10    throughout the Capitol on these videos, at no point was he

11    running.  He was always walking; isn't that right?

12    A.  Yes.

13    Q.  Now, the timestamp on this video is 2:29 p.m.; a little

14    after, 2:29:21.

15         At this point you testified yesterday that the

16    House had already recessed for a second time; isn't that

17    right?

18    A.  Yes.

19    Q.  So at the time that he is walking through Statuary Hall

20    the House has already recessed?

21    A.  Yes.

22         THE COURT:  What's he walking towards?

23         THE WITNESS:  That's the Will Rogers Hallway.

24    It's the small hallway where the press usually set up for

25    members of Congress, and that hallway leads to the House

1    main door.

2    Q.  And where he's walking to is going to be that area we

3    saw in the prior video of him putting up his arms and asking

4    the crowd to calm down; is that correct?

5    A.  Yes.

6    Q.  Okay.  So after he does this walk he goes into that

7    corridor and asks the crowd to calm.  It was after this

8    video?

9    A.  Yes.

10   Q.  Okay.  Now, you were in that crowd, correct?  In the

11   crowd in front of the hallway to the Capitol Rotunda doors?

12   A.  Not the entire time, but I was there at points, yes.

13   Q.  Okay.  And it was very loud?

14   A.  Yes.

15   Q.  Do you recall hearing conversations amongst people, or

16   was it too loud to hear those conversations?

17   A.  I could not hear individual conversations.  I could hear

18   the chanting.

19   Q.  Just the chants of the crowd.

20   A.  Yes.

21           MS. MEDVIN:  I'm going to ask the government --

22   well, I won't.  I'll say this.

23   Q.  Yesterday you viewed a government's exhibit of a crowd

24   in front of the House Rotunda doors.  Do you recall that

25   exhibit?

```
1    A.  Yes.

2    Q.  And Mr. Warnagiris was towards the back of that crowd;

3    is that correct?

4    A.  Are you talking about the outside video or the inside

5    video?

6    Q.  The video that depicts the crowd after the moment that

7    they were in front of the police line, when they make their

8    way towards the doors.

9            MS. LEDERER:  Your Honor, I would ask counsel to

10   be more specific.  I showed at least two separate videos --

11   two separate exhibits from outside the House main doors.

12           MS. MEDVIN:  Let's bring up Government's 418,

13   which was admitted into evidence.  The timestamp -- let's

14   try 32:48.

15           Actually, I'm sorry, let's try 34.

16           35, please.

17           (Pause)

18           MS. MEDVIN:  The Court's indulgence.  Let me make

19   sure I have the right timing.

20           (Pause)

21           MS. MEDVIN:  Judge, may I take a break to reset my

22   device?  It is --

23           THE COURT:  Sure.  Why don't we -- we need to take

24   a break anyway this morning so this is as good a time as

25   any.  It's five after 11:00.  Why don't we come back at 20
```

```
 1    after 11:00.

 2                (Recess taken)

 3                MS. MEDVIN:  If I can ask the government to bring

 4    up Government's Exhibit 419 at timestamp 1:25, please, and

 5    play for 15 seconds.

 6                MS. ESENE: I'm sorry, what was the timestamp?

 7                MS. MEDVIN:  1:25.

 8                (Video playing)

 9                MS. MEDVIN:  We can pause.  Thank you.

10    BY MS. MEDVIN:

11    Q.  Now, that's the moment where the crowd goes forward

12    towards the House doors; is that correct?

13    A.  Yes, the House main door, yes.

14    Q.  The House main door.  And Mr. Warnagiris, as that

15    happens, actually goes to the side, towards the hallway; is

16    that correct?

17    A.  Yes.

18    Q.  Okay.  And at a later point we see him going back

19    towards the doors, but he's standing in the hallway.  That's

20    Government's 418 at 39:10.

21                MS. MEDVIN:  If we could bring up 4 --

22                THE COURT:  Wait a second.  Wait a second.  Wait a

23    second.  Do you have a question for him?

24                MS. MEDVIN:  My apologies, Judge.  I'll pose a

25    question after we bring up this exhibit, Government's 418 at
```

```
1      39:10.
2              MS. LEDERER:  Your Honor, I would just ask to
3      strike all that was said.  It wasn't in the form of a
4      question.
5              THE COURT:  I'll strike her speech.
6              MS. MEDVIN:  And if we can play it for five
7      seconds.
8              (Video played)
9              MS. MEDVIN:  Thank you.
10     Q.  Did you see Mr. Warnagiris in this video?
11     A.  No.
12             MS. MEDVIN:  Okay.  If we can rewind to 39:10
13     again and play for five seconds again, and if your attention
14     could go to the left side of your screen.
15             (Video playing)
16     Q.  Did you see him this time?
17     A.  Yes.
18     Q.  Head bowed.  Okay.
19             Do you see his head bowed --
20             THE COURT:  What was the question?
21     Q.  -- head bowed down?
22     A.  Yes.
23             THE COURT:  I'm sorry, I missed all of this.  What
24     was your question?
25             MS. MEDVIN:  Was his head bowed down?
```

```
 1              THE COURT:  I thought you just said he wasn't in
 2    it?
 3              MS. MEDVIN:  He this time identified him.
 4              THE COURT:  All right.  So he is in the video?
 5              THE WITNESS:  Yes.  On the second replay I did see
 6    him in the video, Your Honor.
 7    Q.  In terms of estimating distance, how far is it from the
 8    House main doors to where he's standing in feet?
 9    A.  He's -- as I explained yesterday, the House main door
10    actually has three sets of doors.  The one he's standing
11    to -- standing next to is the outermost door, which is to
12    the left of the screen.
13              On the inside, if you look to the right of the
14    screen, the white arch, there's a second set of white wooden
15    doors.  They're propped open right now.
16              And the final last set of doors that enters into
17    the House Chamber is right there.
18    Q.  And how far is he from that X that you just drew on the
19    screen?
20    A.  He is approximately ten feet.
21    Q.  Approximately ten feet.  Okay.
22              And in the videos you observed of him yesterday,
23    he was maintaining a distance for approximately ten feet
24    from those doors; is that correct?
25    A.  The innermost doors, correct.
```

1    Q.   Okay.

2              MS. MEDVIN:  If I can ask the government to bring

3    up Government's 307, please, at timestamp 24, 24:00.

4              If we can play that for about ten seconds.

5              (Video played)

6    Q.   Okay.  Do you recall identifying Mr. Warnagiris in this

7    exhibit yesterday?

8    A.   Yes.

9    Q.   Okay.  And Mr. Warnagiris in this exhibit, he is just

10   standing; not doing anything else?

11   A.   It appears that he's walking north, if I'm looking at

12   the correct person right here.

13             No, no, I apologize.  That's not him.  I see him

14   down here to the right.  My apologies.

15   Q.   Okay.

16             MS. MEDVIN:  If we can rewind to 23 minutes and

17   click "Play."

18             The Court's indulgence.  I'm sorry.  Can you

19   pause, please?  I'm going to clear the screen.

20             And if we can go back to 23 minutes.  And if we

21   could play, please.

22             (Video played)

23             MS. MEDVIN:  And if we can now pause.

24   Q.   You observed Mr. Warnagiris going from one hallway to

25   this arch, and then he just paused there; is that correct?

```
1    A.  Yes.

2    Q.  Okay.

3            MS. MEDVIN:  If we could click "Play."

4            (Video playing)

5    Q.  Do you continue seeing him in the screen just standing

6    there?

7    A.  Yes, it appears he just took a swig of water when his

8    arm went up.

9            THE COURT:  And this is about 2:52 p.m., right?

10           THE WITNESS:  Yes, Your Honor.

11           (Video playing)

12           MS. MEDVIN:  If we can pause.  So we just paused

13   at 2:53:27 p.m.

14   Q.  Up until this moment, was he just standing without

15   walking?

16   A.  Yes.

17   Q.  And do you see a Capitol Police officer approach him at

18   2:53:27 p.m.?

19   A.  Yes.

20           MS. MEDVIN:  Okay.  If we could click "Play,"

21   please.

22           (Video playing)

23           MS. MEDVIN:  And if we can pause.

24   Q.  And does he now, after the police officer approaches

25   him, walk back?
```

1    A.  Yes.  He's walking north towards Statuary Hall.

2    Q.  Okay.

3         MS. MEDVIN:  If we could play for another ten

4    seconds, please.

5         (Video played)

6         THE COURT:  He seems to be walking besides

7    somebody.  Does that look to you like a police officer, or

8    not a police officer?

9         THE WITNESS:  No, a nonpolice officer.

10   Q.  And then you recall yesterday observing him walking

11   through Statuary Hall?

12   A.  To leave?

13   Q.  Yes.

14   A.  Yes.

15   Q.  Okay.  And then after that he reaches the Rotunda; is

16   that correct?

17   A.  Yes.

18   Q.  And in the Rotunda you identified a variety of videos

19   including MPD officers, correct?

20   A.  Yes.

21   Q.  Okay.  The MPD officers were wearing body cameras,

22   correct?

23   A.  Some of them were, yes.

24        MS. MEDVIN:  I'm going to ask the government to

25   bring up Government's 501.  And I'm going to ask to play

1    from 5:08 until six minutes.

2            THE COURTROOM DEPUTY:  This is not in evidence.

3            THE COURT:  This is not in evidence.

4            MS. MEDVIN:  Not yet.

5            5:08, please.  If we can play until six minutes.

6    Thank you.

7            (Video played)

8    Q.  Is that the Capitol Rotunda that you were identifying

9    yesterday?

10   A.  It appears to be, yes.

11   Q.  Okay.  And do you see Mr. Warnagiris in that video?

12   A.  Yes.

13   Q.  What was happening to Mr. Warnagiris in that video?

14           MS. LEDERER:  Your Honor --

15           THE COURT:  The question's -- it's not in evidence

16   yet.

17           MS. MEDVIN:  Your Honor, we move to admit

18   Government's 501 as Defense 501.

19           MS. LEDERER:  Your Honor, the government objects

20   at this time on authenticity grounds.  Although this witness

21   can establish where it is, there's been no foundation laid

22   as to the fact that this is, in fact, body-worn cam, what

23   police department this body-worn cam has come from.

24           THE COURT:  Well, you're the ones who have marked

25   it as an exhibit, and you list it under the 500 series of

1    body-worn cameras.

2            MS. LEDERER:  Yes, on the exhibit list.  But

3    there's been no testimony to it up until this point in time.

4            THE COURT:  All right.  Would you please bring

5    Officer Graves in after lunch.

6            MS. MEDVIN:  The defense, Judge?

7            THE COURT:  No, government.  If you're objecting,

8    please produce Officer Graves after lunch.

9            MS. LEDERER:  I was just asking for a little more

10   foundation.

11           THE COURT:  I don't know what more she can do.

12           MS. LEDERER:  She could ask about a timestamp in

13   the top of the corner.  It could relate to the CCTV.

14           THE COURT:  Okay.  I'll admit it over the

15   government's objection.

16           MS. MEDVIN:  Thank you, Judge.

17   Q.  Did you observe Mr. Warnagiris in this video?

18   A.  Yes.

19   Q.  And did Mr. Warnagiris appear to be pushed down towards

20   a statute?

21           MS. LEDERER:  Objection.

22           THE COURT:  Why don't you show him parts of this

23   and ask him what he observes instead of characterizing it

24   yourself.

25           MS. MEDVIN:  If we can rewind by 30 seconds,

1    please.

2           Actually, we can start at the beginning again.  We

3    can start at 5:08 to make it a little easier.

4           (Video played)

5           MS. MEDVIN:  Can you pause.

6    Q.  Can you tell me what you just observed.

7    A.  I observed officers pushing the crowd out to include the

8    defendant, pushing them, trying to push them forward.

9    Q.  Okay.  And was the defendant pushed towards the statue?

10   A.  I'm not sure if he was pushed towards the statue, but he

11   did go down at one point.

12   Q.  Next to a statue?

13   A.  Next to a statue.

14   Q.  Okay.

15          THE COURT:  Can you tell what time of day this is?

16          THE WITNESS:  Yes, Your Honor.  From the body-worn

17   camera, it appears to be 3:17 p.m. on January 6, 2021.

18          MS. MEDVIN:  I'll follow up with that then.

19   Q.  Is that around the time that the defendant was observed

20   on CCTV in the Rotunda?

21   A.  Yes.

22   Q.  When the defendant went down on the ground, did he make

23   any statements?

24   A.  I heard screaming, but I'm not sure if it was from him.

25   Q.  Okay.  Did you observe him make any other statements?

```
 1    A.  I don't recall --

 2              THE COURT:  Observe what?

 3              MS. MEDVIN:  Make any other statements?

 4              THE COURT:  The defendant?

 5              MS. MEDVIN:  Yes.

 6              THE COURT:  In this video?

 7              MS. MEDVIN:  In this video.

 8    A.  I don't recall.  If you want to replay it.

 9              MS. MEDVIN:  If we can rewind by 20 seconds,

10    please.

11              (Video played)

12    Q.  Did you observe him make a statement there?

13    A.  He appeared to say he wanted to keep his flag.

14              THE COURT:  It appears to say what?

15    Q.  Did you hear --

16              THE COURT:  Wait.  He's answering the question.

17    Don't interrupt him.

18              What did it appear to you?

19              THE WITNESS:  It appeared that the cop had his

20    flag, and he wanted the flag back, and he took back the

21    flag.  That's what it appeared to me.

22              THE COURT:  All right.  Go ahead.

23    Q.  If I can rewind, and ask you to tell me if you hear his

24    words.

25    A.  Okay.
```

1          MS. LEDERER:  Objection; asked and answered three

2     times at this point.

3          THE COURT:  This is the third time.

4          MS. MEDVIN:  The witness didn't answer the exact

5     verbiage he used on the video.

6          THE COURT:  Well, he says he appears to have said

7     something or another.  So, you know -- I didn't hear what he

8     said.  But, you know, you can play it one more time.

9          And, Deputy Lloyd, if you hear words, tell us.

10     And if you don't know, tell us.

11          (Video playing)

12     Q.  Were you able to hear it this time?

13     A.  The only thing I can hear is he says "let me have it,"

14     referring to the flag.  That's the only thing I can make

15     out.

16     Q.  Okay.

17          MS. MEDVIN:  We'll move on to Government's Exhibit

18     502.  And we'll ask for this to be played from timestamp

19     2:01 through 2:16.

20          THE COURT:  This also is not in evidence yet.

21          MS. MEDVIN:  Not yet in evidence.

22          THE COURT:  It seems to be another body-worn

23     camera.

24          (Video played)

25          MS. MEDVIN:  Thank you.

```
 1    BY MS. MEDVIN:

 2    Q.  Were you able to observe the defendant in this video?

 3    A.  Yes.

 4    Q.  And is that still the Capitol Rotunda?

 5    A.  Yes.

 6    Q.  And is that January 6, 2021, still?

 7    A.  Yes.

 8              THE COURT:  What time is it?

 9              THE WITNESS:  It is 3:11 p.m. on January 6, 2021.

10              MS. MEDVIN:  We ask to admit Government's 502 into

11    evidence from 2:01 through 2:16.

12              MS. LEDERER:  No objection.

13              THE COURT:  It will be admitted.

14              MS. MEDVIN:  If we could bring up Government's 503

15    from 1:57 to 2:56.

16              (Video played)

17              MS. MEDVIN:  Thank you.

18    Q.  Were you able to observe the defendant on that video?

19    A.  Yes.

20    Q.  Okay.

21              THE COURT:  Where is it?

22              THE WITNESS:  He was off to the left --

23              THE COURT:  Where in the building was it?

24              THE WITNESS:  The Rotunda, Your Honor.

25              THE COURT:  What time was it?
```

```
1              THE WITNESS:  3:15 p.m. on January 6, 2021.

2              MS. MEDVIN:  Judge, we move to admit Government's

3     Exhibit 503 from timestamp 1:57 to 2:56 as Defense 503.

4              MS. LEDERER:  No objection.

5              THE COURT:  It will be admitted.

6     Q.  In the two videos I just showed you, 502 and 503, was

7     the defendant doing anything other than standing?

8     A.  No.

9              MS. MEDVIN:  I'm going to ask to bring up

10    Government's 504.  I'm going to ask to play this exhibit

11    from 00:51 through 2:39.

12             (Video played)

13             THE COURT:  Where is it, and what time is it?

14             THE WITNESS:  Your Honor, it's the Capitol Rotunda

15    at 3:15 p.m. on January 6, 2021.

16             MS. MEDVIN:  The defense seeks to admit

17    Government's 504 as Defense 504.

18             MS. LEDERER:  No objection.

19             THE COURT:  It will be admitted.

20    Q.  In this video did the defendant do anything other than

21    standing around?

22    A.  No.

23    Q.  Was there a crowd of people around the defendant at all

24    times?

25    A.  Yes.
```

```
1              THE COURT:  What was your last question?  I'm
2      sorry?
3              MS. MEDVIN:  Was there a crowd of people around
4      the defendant at all times?
5              THE COURT:  And he said yes.
6              THE WITNESS:  Yes.
7              MS. MEDVIN:  Yes.
8              Judge, you frequently can't hear me.  Is my
9      microphone too low?  Can I increase the volume?
10             THE COURT:  I don't know.  Maybe it's my hearing.
11             MS. MEDVIN:  It has a volume option.  Is this
12     better?
13             THE COURT:  Yes.  Thank you.
14             MS. MEDVIN:  Okay.
15             If I can ask the government to pull up
16     Government's 505 and to play this one from 23:45 through
17     24:15.
18             (Video played)
19     Q.  Did you observe the defendant in this video?
20     A.  Yes.
21     Q.  Where is the video recorded?
22     A.  The Capitol Rotunda at 3:08 p.m. on January 6, 2021.
23             MS. MEDVIN:  The defense seeks to admit Government
24     505 as Defense 505.
25             MS. LEDERER:  No objection.
```

1          THE COURT:  It will be admitted.

2    Q.  Did you observe the defendant pulling his flag from

3    somebody?

4    A.  Yes.  There was an interaction with the flag.  If you

5    want to replay it again, I can give you a better

6    description.

7          But yes, there was interaction involving his flag.

8          THE COURT:  Do you want to play it again?

9          MS. MEDVIN:  If we can rewind to 23:40.

10         (Video played)

11         MS. MEDVIN:  If you can pause.

12   Q.  Are you able to summarize what you just observed?

13   A.  Yes.  He was making sure he remained in control of his

14   flag.

15   Q.  Okay.  And the duration of the video, other than holding

16   onto his flag, did you observe him doing anything other than

17   standing?

18   A.  No.

19   Q.  Okay.

20         MS. MEDVIN:  I'm going to ask the government to

21   pull up Government's 506 and to play this from 33:21 to

22   33:38.

23         (Video played)

24   Q.  Are you able to recognize the location where this video

25   was recorded?

1    A.  Yes, the United States Capitol Rotunda at 3:11 p.m. on

2    January 6, 2021.

3    Q.  And did you observe the defendant in this video?

4    A.  Yes.

5            MS. MEDVIN:  We move to admit Government's 506 as

6    Defense 506.

7            MS. LEDERER:  No objection, Your Honor.

8            THE COURT:  It will be admitted.

9    Q.  Other than standing around, did you see the defendant

10   doing anything else?

11   A.  No, just having a drink of water.

12           MS. MEDVIN:  If we can bring up Government's 507

13   and play that from 22:03 through 22:24.

14           (Video played)

15   Q.  Were you able to see the defendant in this video?

16   A.  Yes.

17   Q.  Okay.  Do you recognize where this was recorded?

18   A.  It's in the United States Capitol Rotunda at 3:06 p.m.

19   on January 6, 2021.

20           MS. MEDVIN:  Okay.  I'm going to ask to move

21   Government's 507 as Defense 507 into evidence for 22:03

22   through 22:24.

23           MS. LEDERER:  No objection.

24           THE COURT:  It will be admitted.

25           MS. MEDVIN:  I'm going to ask for another

1    timestamp in this video as well at a later point.

2    Q.  Did you hear officers here asking people to move back?

3    A.  Yes.

4    Q.  But you didn't hear the officers asking them to exit the

5    Rotunda, did you?

6    A.  I did not hear that sentence.

7    Q.  Okay.

8            MS. MEDVIN:  If we can play this video from 22:30

9    to 24:45.

10           THE COURTROOM DEPUTY:  Ms. Medvin, this is still

11   507, correct?

12           MS. MEDVIN:  This is still 507.

13           (Video played)

14   Q.  Were you able to observe Mr. Warnagiris in this portion?

15   A.  Yes.

16           MS. MEDVIN:  We ask to also admit 23:30 through

17   24:45 in this same video, Exhibit 507.

18           MS. LEDERER:  No objection, Your Honor, and I'd

19   just note, if that wasn't noted for the record, that right

20   now it's paused at 3:09 p.m.

21   Q.  And did you hear the officers in this video say "move"

22   and "move back"?

23   A.  Yes.

24   Q.  And did you see Mr. Warnagiris pushed forward?

25   A.  The only thing I remember, unless you want to replay it,

1    was him getting ahold of his flag again.

2    Q.  Okay.  And once he gets ahold of his flag, do you see

3    officers pushing him or interacting with him at all, or does

4    he just stand?

5    A.  You'll have to replay it again.  I'll take a better

6    look.

7    Q.  Okay.

8              MS. MEDVIN:  If we can go back to 23:30 and play

9    that again.

10             (Video played)

11             MS. MEDVIN:  If we can pause.

12   Q.  Did you see Mr. Warnagiris be pushed forward?

13   A.  Yes.

14   Q.  Okay.  And the command that was given at the moment he

15   was pushed was "move"?

16   A.  Yes.

17   Q.  And then once he moves forward with his flag, they're no

18   longer interacting with him; is that correct?

19   A.  Correct.

20             MS. MEDVIN:  If we could bring up Government's 508

21   and play from the beginning to 00:38.

22             THE COURT:  What's the number?

23             MS. MEDVIN:  Government 508.

24             THE COURTROOM DEPUTY:  I don't have a 508 on the

25   exhibit list.

```
 1              THE COURT:  I don't have a 508.

 2              MS. LEDERER:  There is no 508, Your Honor.

 3              THE COURT:  The 500 series on my list, which is

 4     labeled "Body-Worn Camera," runs from 501 to 507.

 5              Is it another body-worn camera, Ms. Medvin?

 6              MS. MEDVIN:  It is, Judge.  It is an unknown

 7     officer with the Serial Number BKV6.  Those are the ending

 8     digits.

 9              THE COURT:  Do you have it on your list?

10              MS. MEDVIN:  I might.  We had named them a little

11     bit differently because they were un -- I have two unnamed

12     officers.

13              So yes, he's in one of ours.  It's either Defense

14     044 or 045.  The Court's indulgence.

15              THE COURT:  You have it on your list, as I'm

16     looking at it now -- 043, 044, and 045 all seem to be body-

17     worn cameras.

18              MS. MEDVIN:  Defense 044 I will bring up.  And I'm

19     going to play that from the beginning to 38 seconds in.

20              (Video played)

21     Q.  Were you able to observe the location that's depicted in

22     that video?

23     A.  Yes.

24     Q.  And what is that location?

25     A.  U.S. Capitol Rotunda at 3:20 p.m. on January 6, 2021.
```

```
 1    Q.  And did you see the defendant depicted?

 2    A.  Yes.

 3              MS. MEDVIN:  We move to admit Defense 044.

 4              MS. LEDERER:  No objection, Your Honor.

 5              THE COURT:  It will be admitted.

 6    Q.  And what did you observe happening to the defendant in

 7    this video?

 8    A.  Police officers had their hands on his back trying to

 9    move him forward.

10    Q.  Okay.  Same as they were doing with others in the crowd;

11    is that correct?

12    A.  Yes.

13              THE COURT:  Can we see it?  Because it's not up

14    here yet.

15              MS. MEDVIN:  I'm going to play it one more time.

16              (Video played)

17    Q.  And is the defendant in the left-hand corner of this

18    video?

19    A.  Yes.

20              (Video played)

21    Q.  Is he now in the middle?

22    A.  Yes.

23              (Video playing)

24              MS. MEDVIN:  The Court's indulgence.

25              THE COURT:  Sure.
```

1              (Pause)

2         MS. MEDVIN:  The defense has no further questions

3    for this witness, but we will reserve him for the defense.

4         THE COURT:  Very good.  Thank you.

5         So I guess we can start and -- why don't we start

6    with redirect.  I don't know how long you plan to be.

7         MS. LEDERER:  I don't want to shoot myself in the

8    foot, but hopefully not too long.  Hopefully by 12:30.

9         THE COURT:  So why don't we aim for either

10   finishing between 12:30 and 12:45 or taking a break at a

11   convenient time between 12:30 and 12:45.

12        MS. LEDERER:  May I, Your Honor?

13        THE COURT:  Yes.

14                   REDIRECT EXAMINATION

15   BY MS. LEDERER:

16   Q.  Good afternoon, Deputy Chief.

17   A.  Good afternoon.

18   Q.  Chief Deputy Lloyd, Ms. Medvin had shown you a defense

19   exhibit of rioters removing snow fencing from the West

20   Front.  Do you remember that?

21   A.  Yes.

22   Q.  I have a couple of questions.

23        On January 6th did all of the barriers that were

24   out surrounding the Capitol, did those magically disappear

25   on January 6th after the lines were overrun?

```
 1    A.  No.
 2    Q.  Did you have a chance to observe the Capitol grounds
 3    after the riot was dispelled from the grounds?
 4    A.  Yes.
 5    Q.  Did you still see police bike racks out on the grounds?
 6    A.  Yes.
 7    Q.  And after the riot was gone, did you see signs still out
 8    on the grounds?
 9    A.  Yes.  They were disheveled, but they were there.
10    Q.  And how about snow fencing?  Did you see that after the
11    riot left on January 6th?
12    A.  Yes.  Once again disheveled, but the remnants were
13    there.
14    Q.  Now, when officers had to abandon the physical barriers,
15    did the officers themselves become a barrier to rioters
16    getting into the building?
17    A.  Yes.
18    Q.  When we watched video from the main Rotunda doors, did
19    you see officers in front of the main Rotunda doors?
20    A.  Yes.
21    Q.  Did you see on the inside of the main Rotunda doors
22    Mr. Gandalf acting as a barrier?
23    A.  Yes.
24    Q.  When we got to the House main -- yes, the House main
25    doors, was there another police line there?
```

1    A.  Yes.

2    Q.  And what was the purpose of the police line at the House

3    main doors?

4    A.  To stop the surge of the protesters entering into the

5    House Chamber.

6    Q.  You testified on cross-examination that the main Rotunda

7    doors was an emergency exit only; is that correct?

8    A.  Yes.

9    Q.  If an emergency exit door such as the House main door is

10   opened, would an alarm sound?

11   A.  The main Rotunda doors, that alarms sounds.  Not the

12   House.  Not the House, but the Rotunda.  The main Rotunda

13   doors, if that's opened improperly, an alarm will sound.

14   Q.  Thank you for that correction.

15        MS. LEDERER:  For the record, I was discussing the

16   main Rotunda doors.

17   Q.  The main Rotunda doors, you're saying that would have an

18   alarm if opened?

19   A.  Yes.

20   Q.  After observing the defendant entering the Capitol

21   building, does CCTV track him going even further into the

22   building throughout the day?

23   A.  Yes.

24   Q.  Ms. Medvin had asked you questions about the defendant

25   walking versus running through the building.  Do you

1    remember that?

2    A.  Yes.

3    Q.  Even if the defendant was simply taking a strut

4    throughout the building, was the defendant allowed inside

5    that building?

6    A.  No.

7            THE COURT:  What's the question?

8    Q.  Even if the defendant was taking a strut through the

9    building or a stroll, would the defendant be able to be in

10   the building?

11   A.  No.

12   Q.  Ms. Medvin had asked you whether or not the defendant

13   stayed within the velvet barriers at Statuary Hall.  Did it

14   matter whether he was inside or outside those barriers?

15   A.  No.

16   Q.  Was he allowed to be in the building period?

17   A.  No.

18   Q.  Ms. Medvin had asked you a few questions about the House

19   recess.  Could you clarify the times that the House went

20   into recess?

21   A.  Yes.  The House went into two recesses.  This is

22   approximate times.  I think the first one was about 2:18.

23   And then for some reason they came back into session, and

24   closer to 2:28/2:29 they went back into recess.

25           THE COURT:  So there was a recess at 2:18.  They

1   went back, and then recessed again at 2:29 roughly?

2           THE WITNESS:  Yes, Your Honor.

3           THE COURT:  Okay.  Now, is that -- did they stay

4   in the chamber at that point?

5           THE WITNESS:  They stayed in the chamber, yes.

6           THE COURT:  And was that second recess because of

7   the commotion that was going on outside, or for some other

8   reason, if you know?

9           THE WITNESS:  The explanation for the multiple

10  recesses was a lack of control or lack of decision-making in

11  the House Chamber.  There was panic.  There was

12  indecisiveness.  They went to recess.  Somebody said no,

13  we're not recessing, so they went back in session.  And then

14  somebody came back and said we're going into recess.

15          So there was a lot of, I'll call it, panic in the

16  House Chamber.  They didn't really know what to do, and that

17  would explain the multiple recesses.

18          THE COURT:  So the first recess was also because

19  of stuff going on that people were concerned about?

20          THE WITNESS:  Yes.

21          THE COURT:  And then somebody, presumably somebody

22  in authority, whether it was the Speaker or whether it was

23  somebody else, said let's go back.

24          THE WITNESS:  Yes.

25          THE COURT:  And then another 10 or 11 minutes

1    later it was decided they should recess, and that was it

2    until you all helped them evacuate.

3              THE WITNESS:  Yes.

4    Q.  So fair to say the defendant was inside the building

5    while the House was still active on the floor?

6    A.  Yes.

7    Q.  Now, Ms. Medvin had asked you on cross about the

8    defendant's positioning outside the House main doors.  And

9    fair to say we saw a lot of video yesterday, correct?

10   A.  Yes.

11             MS. LEDERER:  I'm going to ask Ms. Esene to pull

12   up Exhibit 433, which a portion -- relevant portion's

13   already in evidence.

14             And I'm going to relate back to that portion, and,

15   Deputy Chief Lloyd, I'm going to have a question about the

16   defendant's positioning.

17             A portion of this was admitted into evidence

18   yesterday.  I'm still referring to that portion that was

19   admitted.

20   Q.  Deputy Chief Lloyd, can you recognize the area?  I know

21   you testified to it yesterday.

22   A.  Yes.

23   Q.  Where is this?

24   A.  This is looking into the House Chamber through the

25   broken glass at the House main door.

1          MS. LEDERER:  If we can please play and pause at

2     17 seconds in.

3               (Video playing)

4          MS. LEDERER:  Paused here at 17 seconds, circling

5     the defendant.

6     Q.  Where is the defendant positioned in this video?

7     A.  He's actually up against the outermost door on the House

8     main door actually in the little hallway.

9     Q.  And when you say "little hallway," can you just orient

10    the Court to the different areas that we can see from this

11    angle.

12    A.  Yes.  In the background you see the Will Rogers hallway,

13    which leads to the main hallway outside the House main door.

14              And then you see the door here to the right.

15    That's the outermost door of the House main door.  He has

16    crossed that threshold, and he appears to be leaning up

17    against that door facing the final House main door set.

18    Q.  So at this location, can you give an approximation of

19    how -- the distance between the defendant and the House main

20    door?

21              THE COURT:  Say that again.  I'm sorry.

22    Q.  From this angle and exhibit, are you able to give an

23    estimation of the distance from the defendant to that door

24    to the House?

25    A.  Seven or eight feet.

```
 1                MS. LEDERER:  We can bring this down.  Thank you.
 2   Q.  Deputy Chief Lloyd, both on direct and cross-examination
 3   there was a lot of questioning about the bearded individual
 4   who was telling everyone to be quiet in Exhibits 418 and
 5   419.  Do you remember that individual?
 6   A.  Yes.
 7   Q.  And in response, I believe on both direct and cross you
 8   had testified that the defendant also was putting his hand
 9   or hands up; is that correct?
10   A.  Yes.
11   Q.  Deputy Chief Lloyd, would it matter if that crowd
12   entered peacefully and quietly onto the House floor?
13   A.  No.
14   Q.  Why not?
15   A.  It's -- the mob came together that day to stop --
16                MS. MEDVIN:  Objection.
17                THE COURT:  Wait.  That's a conclusion.  That's a
18   conclusion.  I'm not going to permit it.
19                Even if the crowd was peaceful and quiet, the
20   question was would that have mattered.
21   Q.  Would that have mattered to you?
22   A.  No.
23   Q.  Why not?
24   A.  Because the crowd at that point had breached the outer
25   perimeter of the complex, and they had broken into the
```

1  actual Capitol building.  So in the course of doing that,

2  dozens of officers were severely injured.

3          MS. MEDVIN:  Objection, Judge.  There's no

4  foundation for knowing that at the time.  The question is

5  not specific.

6          THE COURT:  I'll strike the last part of that.

7  Q.  Do you know -- did you yourself see officers injured?

8  A.  Yes.

9  Q.  Okay.  Based off your experience -- is your answer based

10  off of things that you saw?

11  A.  Yes.

12          THE COURT:  Based on your experience what?

13          MS. LEDERER:  Of things that you saw that day.

14          THE COURT:  Yes.

15  Q.  Can you continue?

16  A.  Can you say the question again.  Sorry.

17  Q.  The question was did it matter if the crowd was going to

18  go peacefully and quietly to the House floor?

19  A.  No.

20  Q.  And why not?

21  A.  Because to get to where they were, they had breached the

22  outer perimeter that was designated with bike rack and snow

23  fence, and they had physically broken into the U.S. Capitol

24  building and, in doing so, violently attacked and assaulted

25  and injured --

```
 1                    MS. MEDVIN:  Objection, Judge.

 2    A.  -- several police officers.

 3                    THE COURT:  Well, I understand his point.  I

 4    understand the objection.

 5    Q.  Deputy Chief Lloyd, your saying that officers were

 6    attacked, is that based on what you yourself witnessed?

 7    A.  Yes.

 8                    THE COURT:  Yes, but it's not responsive to your

 9    question, right?  Even if the -- the question was even if

10    they were quiet and peaceful, would that have been okay

11    anyway?  Even if they were all quiet and peaceful, would

12    that have been okay?  And is the reason it's not okay

13    because people were injured, or is the reason it's not okay

14    because it was a restricted area and no one was permitted

15    and all of those other things we've spent a day and a half

16    talking about?

17    Q.  Deputy Chief Lloyd, why was it not okay for those people

18    to be outside the House main doors?

19    A.  They were there illegally.

20    Q.  And as they stood outside, could the House continue

21    their business?

22    A.  No.

23    Q.  And as the defendant stood right outside the House main

24    doors, could the House continue their business?

25    A.  No.
```

1          MS. MEDVIN:  Objection, Judge.  There's actually

2    testimony from him that the House continued business while

3    people were in the building, and so that will --

4          THE COURT:  Well, if he said inconsistent things,

5    he said inconsistent things.

6          MS. MEDVIN:  Okay.

7          MS. LEDERER:  And to be clear, I'm talking about

8    the House main doors.

9    Q.  At some point you personally evacuated the House,

10   correct?

11   A.  Yes.

12   Q.  And that was -- was that after the crowd came to your

13   police line outside the House main doors?

14   A.  Yes.

15   Q.  And was the defendant in that crowd?

16   A.  Yes.

17   Q.  Now, defense showed you a lot of body cam.  And it was

18   kind of out of chronological order, but essentially did you

19   watch body cam from 3:06 to 3:20 just now?

20   A.  Yes.

21   Q.  And during that 14-minute time span, do we see the

22   defendant go towards the exit?

23   A.  With the assistance of being pushed by the police

24   officers.

25   Q.  And how about of his own accord?

```
 1      A.  No.

 2                 MS. LEDERER:  I have no further questions.  Thank

 3      you.

 4                 THE COURT:  All right.  So I think that we can

 5      excuse Deputy Lloyd, but I understand that it is

 6      conceivable, and possible, that Ms. Medvin may want to

 7      recall him.  Possibly unlikely, but probably -- are you in

 8      town for the next couple of days?

 9                 THE WITNESS:  No, I am in town next month.

10                 THE COURT:  Yes, you are in town the next couple

11      of days.  All right.  Hopefully we won't have to call you

12      back.  Thank you very much.

13                 THE WITNESS:  Thank you, Your Honor.

14                 THE COURT:  Well, it is now 12:22.  What's going

15      to happen after lunch?

16                 MR. HAAG:  Your Honor, the government would call

17      Sergeant Anthony Warner after lunch.  If we could start at

18      1:30, I think we could get through him pretty quickly in

19      time to have Inspector Hawa --

20                 THE COURT:  You're an optimist.

21                 MR. HAAG:  I'm very much an optimist, Your Honor.

22      I think we've covered a significant portion of the evidence

23      in this case through Deputy Chief Lloyd, so I'm hoping to

24      move quickly through Sergeant Warner.

25                 THE COURT:  But the goal is to then put this other
```

1    witness on at 2:30?

2         MR. HAAG:  Yes, Your Honor.

3         THE COURT:  Because her time is limited.

4         MR. HAAG:  Yes.

5         THE COURT:  So why don't you come back at 1:30.

6    You guys, if you're here by 1:25.  And then we'll start at

7    1:30.  And we'll take an afternoon break around 3:15, and

8    then come back and put the other witness on the stand at

9    3:30.  And if we're not done with Officer Warner, either the

10   direct or the cross, he'll have to come back tomorrow.

11        MR. HAAG:  Understood.

12        THE COURT:  I don't know how long the 3:30 witness

13   is going to take.

14        MR. HAAG:  I don't imagine particularly long, Your

15   Honor, but the whole estimation of this trial has been a

16   little bit off.

17        THE COURT:  We'll see how much time is remaining

18   when we finish with that witness and whether it makes sense

19   to put Officer Warner back or to let him go until tomorrow.

20        MR. HAAG:  Understood.  Thank you, Your Honor.

21        THE COURT:  All right.  I'll see you all at 1:30.

22             (Lunch recess taken at 12:24 p.m.)

23

24

25

1          <u>**CERTIFICATE OF OFFICIAL COURT REPORTER**</u>

2

3                  I, LISA A. MOREIRA, RDR, CRR, do hereby

4     certify that the above and foregoing constitutes a true and

5     accurate transcript of my stenographic notes and is a full,

6     true and complete transcript of the proceedings to the best

7     of my ability.

8          Dated this 23rd day of April, 2024.

9

10                              <u>/s/Lisa A. Moreira, RDR, CRR</u>
                                Official Court Reporter
11                              United States Courthouse
                                Room 6718
12                              333 Constitution Avenue, NW
13                              Washington, DC 20001

14

15

16

17

18

19

20

21

22

23

24

25

**/**

**/s/Lisa** [1] - 82:10

**0**

**002** [2] - 13:10, 13:15
**003** [2] - 22:18, 42:23
**008** [14] - 29:11, 29:12, 29:13, 29:15, 30:1, 30:5, 30:12, 30:14, 31:1, 31:10, 34:9, 34:19, 34:21, 34:25
**00:33** [1] - 24:14
**00:34** [2] - 25:1, 25:15
**00:36** [1] - 25:16
**00:38** [1] - 66:21
**00:51** [1] - 61:11
**00A** [2] - 20:5, 21:23
**03:00** [1] - 41:18
**043** [1] - 67:16
**044** [4] - 67:14, 67:16, 67:18, 68:3
**045** [2] - 67:14, 67:16
**065** [3] - 34:5, 34:12, 34:18
**0:27** [2] - 23:18, 23:24
**0:37** [1] - 23:18

**1**

**10** [1] - 73:25
**109** [1] - 1:19
**11** [1] - 73:25
**116** [1] - 6:16
**11:00** [2] - 48:25, 49:1
**11:10** [3] - 34:22, 35:11, 35:13
**11:40** [4] - 26:11, 26:15, 27:1, 27:7
**122** [1] - 6:18
**12:22** [1] - 80:14
**12:24** [1] - 81:22
**12:30** [3] - 69:8, 69:10, 69:11
**12:34** [3] - 34:22, 35:11, 35:14
**12:45** [2] - 69:10, 69:11
**12:53** [3] - 26:5, 26:6
**12:57** [4] - 26:11, 26:15, 27:1, 27:7
**14** [1] - 5:13
**14-minute** [1] - 79:21
**15** [3] - 32:10, 32:21, 49:5
**15:44** [1] - 28:7
**16:16** [1] - 27:24
**17** [2] - 75:2, 75:4
**1:10** [1] - 39:2

**1:21-cr-00382-PLF-1**
[1] - 1:4
**1:25** [3] - 49:4, 49:7, 81:6
**1:30** [4] - 80:18, 81:5, 81:7, 81:21
**1:57** [2] - 60:15, 61:3

**2**

**2** [2] - 1:4, 10:11
**20** [2] - 48:25, 58:9
**20001** [3] - 1:15, 1:24, 82:13
**2002** [1] - 8:19
**2003** [1] - 6:16
**2004** [1] - 5:13
**2018** [1] - 5:14
**202** [2] - 1:15, 1:24
**2021** [9] - 57:17, 60:6, 60:9, 61:1, 61:15, 62:22, 64:2, 64:19, 67:25
**2024** [2] - 1:4, 82:8
**21-382** [1] - 3:3
**22314** [1] - 1:19
**22:03** [2] - 64:13, 64:21
**22:24** [2] - 64:13, 64:22
**22:30** [1] - 65:8
**23** [2] - 52:16, 52:20
**23:30** [2] - 65:16, 66:8
**23:40** [1] - 63:9
**23:45** [1] - 62:16
**23rd** [1] - 82:8
**24** [1] - 52:3
**24:00** [1] - 52:3
**24:15** [1] - 62:17
**24:45** [2] - 65:9, 65:17
**252-7012** [1] - 1:15
**282** [1] - 8:19
**2:01** [2] - 59:19, 60:11
**2:12** [1] - 39:14
**2:16** [2] - 59:19, 60:11
**2:18** [2] - 72:22, 72:25
**2:25** [1] - 44:15
**2:26** [1] - 37:3
**2:28/2:29** [1] - 72:24
**2:29** [2] - 46:13, 73:1
**2:29:21** [1] - 46:14
**2:30** [2] - 39:2, 81:1
**2:39** [1] - 61:11
**2:52** [1] - 53:9
**2:53:27** [2] - 53:13, 53:18
**2:56** [2] - 60:15, 61:3
**2d** [2] - 5:13, 8:19

**3**

**3** [1] - 10:11
**30** [2] - 31:22, 56:25
**301** [6] - 30:2, 30:4, 30:8, 30:21, 36:23, 39:2
**305** [1] - 45:16
**307** [1] - 52:3
**311** [1] - 5:13
**32:48** [1] - 48:14
**331** [1] - 6:16
**333** [2] - 1:23, 82:12
**33:21** [1] - 63:21
**33:38** [1] - 63:22
**33:50** [2] - 34:25, 35:1
**34** [3] - 25:2, 48:15
**35** [4] - 25:2, 32:10, 32:21, 48:16
**354-3187** [1] - 1:24
**38** [1] - 67:19
**399** [1] - 8:19
**39:10** [3] - 49:20, 50:1, 50:12
**3:00** [1] - 42:23
**3:06** [2] - 64:18, 79:19
**3:08** [1] - 62:22
**3:09** [1] - 65:20
**3:11** [2] - 60:9, 64:1
**3:15** [3] - 61:1, 61:15, 81:7
**3:17** [1] - 57:17
**3:20** [2] - 67:25, 79:19
**3:30** [2] - 12:9, 81:9, 81:12
**3:57** [3] - 39:14, 42:24, 43:13
**3d** [1] - 6:16

**4**

**4** [1] - 49:21
**401** [6] - 16:5, 16:7, 16:9, 16:15, 17:20
**402** [1] - 19:16
**402A** [3] - 19:16, 21:1
**403** [5] - 23:17, 23:23, 24:16, 24:19, 24:23
**403A** [10] - 23:17, 23:21, 23:24, 24:10, 24:12, 24:17, 24:18, 24:21, 24:22
**404A** [5] - 26:11, 26:12, 26:25, 27:1, 27:6
**405** [7] - 27:19, 27:21, 27:22, 27:23, 28:20, 28:23
**416A** [1] - 39:3
**418** [4] - 48:12, 49:20,

49:25, 76:4
**419** [2] - 49:4, 76:5
**433** [1] - 74:12
**45** [2] - 30:6, 31:6
**4:15** [2] - 28:9

**5**

**500** [2] - 55:25, 67:3
**501** [4] - 54:25, 55:18, 67:4
**502** [3] - 59:18, 60:10, 61:6
**503** [4] - 60:14, 61:3, 61:6
**504** [3] - 61:10, 61:17
**505** [3] - 62:16, 62:24
**506** [3] - 63:21, 64:5, 64:6
**507** [7] - 64:12, 64:21, 65:11, 65:12, 65:17, 67:4
**508** [5] - 66:20, 66:23, 66:24, 67:1, 67:2
**5:08** [3] - 55:1, 55:5, 57:3

**6**

**6** [9] - 57:17, 60:6, 60:9, 61:1, 61:15, 62:22, 64:2, 64:19, 67:25
**601** [1] - 1:14
**6718** [2] - 1:23, 82:12
**6th** [3] - 3:20, 15:7, 17:16, 18:11, 18:15, 18:17, 19:20, 24:6, 26:23, 28:18, 69:23, 69:25, 70:11

**8**

**803(1** [5] - 4:11, 4:16, 4:25, 10:11, 10:17
**803(1)** [2] - 6:11, 8:6
**803(2** [2] - 4:12, 6:12
**803(3** [3] - 4:13, 8:8, 10:25
**803(3)** [1] - 9:16
**886-4127** [1] - 1:20
**888** [1] - 1:20

**9**

**916** [1] - 1:19
**9:17** [1] - 1:5
**9:30** [1] - 31:22

**A**

**a.m** [1] - 1:5

**abandon** [1] - 70:14
**ability** [1] - 82:7
**able** [23] - 14:8, 22:15, 25:18, 26:1, 28:10, 32:8, 34:4, 37:7, 37:14, 37:16, 39:7, 39:17, 42:4, 59:12, 60:2, 60:18, 63:12, 63:24, 64:15, 65:14, 67:21, 72:9, 75:22
**abuse** [1] - 10:8
**access** [1] - 7:15
**accord** [1] - 79:25
**accurate** [3] - 25:11, 46:4, 82:5
**acting** [2] - 38:23, 70:22
**Action** [2] - 1:3, 3:2
**active** [1] - 74:5
**actual** [1] - 77:1
**adequate** [1] - 20:15
**admissibility** [1] - 10:2
**admissible** [4] - 8:21, 8:23, 9:16, 10:16
**admit** [20] - 13:15, 13:16, 17:19, 19:12, 20:18, 20:21, 20:22, 20:23, 20:25, 24:10, 26:25, 55:17, 56:14, 60:10, 61:2, 61:16, 62:23, 64:5, 65:16, 68:3
**admitted** [28] - 10:1, 13:11, 13:12, 13:14, 17:8, 18:12, 20:13, 20:16, 20:19, 21:3, 24:12, 24:21, 27:6, 28:23, 30:25, 39:4, 45:17, 48:13, 60:13, 61:5, 61:19, 63:1, 64:8, 64:24, 68:5, 74:17, 74:19
**advisory** [7] - 5:4, 6:3, 9:17, 11:8, 11:9, 11:10, 11:22
**African** [1] - 17:25
**African-American** [1] - 17:25
**afternoon** [6] - 12:8, 26:5, 44:16, 69:16, 69:17, 81:7
**agent** [1] - 12:7
**agree** [1] - 30:11
**ahead** [2] - 21:4, 58:22
**ahold** [2] - 66:1, 66:2
**aim** [1] - 69:9
**air** [2] - 40:16, 40:22
**alarm** [4] - 32:17, 71:10, 71:13, 71:18
**alarms** [1] - 71:11

84

**alert** [1] - 32:15
**Alexander** [1] - 6:16
**Alexandria** [1] - 1:19
**alike** [2] - 38:11, 38:17
**allowed** [3] - 44:5, 72:4, 72:16
**allowing** [2] - 9:20, 11:14
**allows** [1] - 8:3
**almost** [1] - 29:22
**amending** [1] - 45:12
**AMERICA** [1] - 1:3
**American** [1] - 17:25
**amount** [1] - 26:1
**Andrew** [1] - 3:4
**ANDREW** [1] - 1:13
**andrew.haag@usdoj.gov** [1] - 1:16
**angle** [2] - 75:11, 75:22
**answer** [5] - 14:19, 21:4, 38:20, 59:4, 77:9
**answered** [3] - 35:22, 45:14, 59:1
**answering** [1] - 58:16
**Anthony** [2] - 12:14, 80:17
**anyway** [2] - 48:24, 78:11
**apologies** [2] - 49:24, 52:14
**apologize** [1] - 52:13
**appear** [14] - 14:23, 15:4, 15:16, 15:21, 15:23, 15:25, 24:6, 26:23, 28:18, 29:6, 37:17, 38:10, 56:19, 58:18
**APPEARANCES** [1] - 1:12
**appeared** [7] - 14:22, 29:2, 39:10, 41:1, 58:13, 58:19, 58:21
**applies** [2] - 5:15, 5:16
**apply** [1] - 4:10
**appreciate** [1] - 25:12
**approach** [1] - 53:17
**approaches** [1] - 53:24
**approximate** [1] - 72:22
**approximation** [1] - 75:18
**April** [2] - 1:4, 82:8
**arch** [2] - 51:14, 52:25
**area** [18] - 13:19, 17:12, 19:18, 20:6, 21:10, 21:13, 21:18, 22:4, 24:1, 26:17,

28:10, 32:18, 44:19, 45:25, 46:2, 47:2, 74:20, 78:14
**areas** [1] - 75:10
**argumentative** [1] - 35:20
**arguments** [1] - 10:13
**arm** [2] - 43:5, 53:8
**arms** [2] - 43:10, 47:3
**assaulted** [1] - 77:24
**assistance** [1] - 79:23
**assisting** [6] - 35:17, 35:19, 36:1, 36:3, 38:22
**assume** [1] - 31:6
**assuming** [1] - 41:8
**assumption** [2] - 6:2, 41:9
**attacked** [2] - 77:24, 78:6
**attempt** [2] - 28:14, 31:25
**attempting** [2] - 3:22, 38:21
**attention** [4] - 43:15, 44:13, 44:17, 50:13
**audio** [1] - 3:21
**authenticity** [1] - 55:20
**authority** [1] - 73:22
**available** [2] - 5:17, 12:7
**Avenue** [1] - 1:23, 82:12
**avoid** [2] - 9:19, 11:13
**aware** [1] - 15:7

**B**

**background** [2] - 19:24, 75:12
**backpack** [1] - 23:5
**backwards** [2] - 22:24, 23:9
**bar** [2] - 32:9, 32:16
**barrier** [2] - 70:15, 70:22
**barriers** [4] - 69:23, 70:14, 72:13, 72:14
**based** [11] - 10:2, 13:13, 15:17, 18:11, 18:17, 20:4, 25:25, 77:9, 77:12, 78:6
**basis** [2] - 9:22, 11:15
**bearded** [1] - 76:3
**become** [1] - 70:15
**BEFORE** [1] - 1:10
**beginning** [6] - 6:18, 36:21, 39:5, 57:2, 66:21, 67:19

**behind** [1] - 32:1
**belief** [7] - 6:23, 8:13, 9:14, 9:16, 9:18, 11:6, 11:11
**believes** [1] - 18:18
**BENCH** [1] - 1:9
**best** [1] - 82:6
**better** [5] - 23:11, 25:4, 62:12, 63:5, 66:5
**between** [5] - 7:21, 17:24, 69:10, 69:11, 75:19
**beyond** [1] - 4:4
**bike** [3] - 22:2, 70:5, 77:22
**bit** [9] - 4:14, 22:20, 22:24, 27:19, 31:13, 35:10, 44:6, 67:11, 81:16
**BKV6** [1] - 67:7
**black** [1] - 37:21
**blocks** [1] - 18:5
**blurry** [1] - 23:3
**bodily** [1] - 8:12
**body** [10] - 54:21, 55:22, 55:23, 56:1, 57:16, 59:22, 67:5, 67:16, 79:17, 79:19
**Body** [1] - 67:4
**body-worn** [6] - 55:22, 55:23, 56:1, 57:16, 59:22, 67:5
**Body-Worn** [1] - 67:4
**bowed** [4] - 50:18, 50:19, 50:21, 50:25
**breach** [2] - 26:6, 32:22
**breached** [3] - 32:24, 76:24, 77:21
**break** [5] - 15:3, 48:21, 48:24, 69:10, 81:7
**brief** [3] - 3:13, 12:3, 12:11
**briefs** [1] - 3:10
**bring** [19] - 16:4, 19:15, 23:17, 30:21, 36:24, 39:3, 48:12, 49:3, 49:21, 49:25, 52:2, 54:25, 56:4, 60:14, 61:9, 64:12, 66:20, 67:18, 76:1
**bringing** [2] - 38:13, 38:16
**broader** [1] - 8:3
**broken** [3] - 74:25, 76:25, 77:23
**building** [26] - 17:21, 17:24, 19:23, 24:4, 33:14, 35:17, 35:18,

35:24, 36:5, 36:8, 38:16, 43:17, 60:23, 70:16, 71:21, 71:22, 71:25, 72:4, 72:5, 72:9, 72:10, 72:16, 74:4, 77:1, 77:24, 79:3
**business** [3] - 78:21, 78:24, 79:2
**BY** [4] - 13:4, 49:10, 60:1, 69:15

**C**

**calm** [3] - 42:10, 47:4, 47:7
**calmly** [1] - 42:16
**cam** [4] - 55:22, 55:23, 79:17, 79:19
**camera** [3] - 57:17, 59:23, 67:5
**Camera** [1] - 67:4
**cameras** [3] - 54:21, 56:1, 67:17
**cannot** [4] - 14:14, 26:7
**cap** [1] - 33:11
**Capitol** [27] - 13:21, 18:2, 18:5, 19:20, 19:22, 19:23, 19:25, 24:4, 43:16, 44:14, 45:3, 45:4, 46:10, 47:11, 53:17, 55:8, 60:4, 61:14, 62:22, 64:1, 64:18, 67:25, 69:24, 70:2, 71:20, 77:1, 77:23
**captured** [1] - 3:21
**case** [8] - 4:7, 4:19, 5:12, 5:14, 80:23
**cases** [1] - 11:7
**caused** [3] - 6:15, 7:9, 7:12
**CCTV** [4] - 45:24, 56:13, 57:20, 71:21
**center** [3] - 23:3, 26:18, 26:21
**ceremonial** [2] - 29:2, 29:3
**certain** [2] - 10:12, 19:11
**certainly** [1] - 10:18
**CERTIFICATE** [1] - 82:1
**certify** [1] - 82:4
**cetera** [1] - 8:23
**Chamber** [5] - 51:17, 71:5, 73:11, 73:16, 74:24
**chamber** [2] - 73:4,

73:5
**chambers** [1] - 42:24
**chance** [1] - 70:2
**chant** [2] - 27:11, 27:14
**chanting** [1] - 47:18
**chants** [1] - 47:19
**characterizing** [1] - 56:23
**cheat** [1] - 25:7
**CHIEF** [2] - 2:3, 13:2
**Chief** [9] - 69:16, 69:18, 74:15, 74:20, 76:2, 76:11, 78:5, 78:17, 80:23
**choice** [2] - 10:19, 14:11
**CHRISTOPHER** [1] - 1:6
**Christopher** [1] - 3:3
**chronological** [1] - 79:18
**circle** [1] - 16:23
**circling** [2] - 17:1, 75:4
**Circuit** [1] - 4:6
**Circuit's** [1] - 6:15
**circumstances** [1] - 8:25
**cited** [2] - 5:14, 8:18
**clarify** [3] - 10:24, 30:14, 72:19
**Class** [1] - 37:25
**clear** [6] - 29:16, 29:22, 29:24, 30:11, 52:19, 79:7
**clearly** [3] - 25:6, 25:20, 37:16
**click** [8] - 24:24, 25:16, 37:10, 43:12, 45:17, 52:17, 53:3, 53:20
**closer** [1] - 72:24
**clothes** [1] - 18:10
**clothing** [1] - 17:15
**COLUMBIA** [1] - 1:1
**coming** [5] - 22:1, 30:14, 37:24, 38:1, 44:19
**command** [1] - 66:14
**committee** [6] - 5:4, 6:3, 9:17, 11:8, 11:10, 11:22
**commotion** [1] - 73:7
**communications** [1] - 32:23
**complete** [2] - 30:5, 82:6
**completeness** [1] - 30:2
**complex** [1] - 76:25

**complicated** [2] - 27:19, 28:2
**complies** [1] - 16:24
**compound** [2] - 15:1, 15:2
**computer** [2] - 35:12, 36:24
**conceivable** [1] - 80:6
**concerned** [1] - 73:19
**concerns** [1] - 10:23
**conclusion** [2] - 76:17, 76:18
**condition** [19] - 4:14, 4:17, 5:2, 5:3, 5:10, 5:11, 6:2, 6:5, 6:9, 6:13, 7:24, 7:25, 8:9, 8:11, 9:1, 9:12, 9:25, 10:4, 10:7
**Congress** [1] - 46:25
**conscious** [3] - 5:8, 5:22, 7:3
**consequently** [1] - 6:21
**consider** [1] - 7:16
**constitutes** [1] - 82:4
**Constitution** [2] - 1:23, 82:12
**contain** [1] - 8:5
**contemporaneity** [3] - 5:6, 5:9, 8:6
**contemporaneous** [8] - 5:7, 5:20, 5:21, 5:23, 5:24, 6:10, 7:11, 21:19
**contemporaneously** [2] - 6:7, 6:8
**context** [1] - 30:5
**continue** [6] - 40:13, 40:19, 53:5, 77:15, 78:20, 78:24
**continued** [1] - 79:2
**Continued** [1] - 13:3
**control** [2] - 63:13, 73:10
**convenient** [1] - 69:11
**conversations** [3] - 47:15, 47:16, 47:17
**cop** [1] - 58:19
**corner** [5] - 19:19, 19:21, 24:3, 56:13, 68:17
**correct** [40] - 14:8, 21:10, 21:13, 21:14, 21:16, 21:17, 24:16, 28:3, 33:2, 33:3, 35:4, 44:21, 44:23, 45:1, 45:5, 45:22, 45:25, 46:3, 46:7, 46:8, 47:4, 47:10, 48:3, 49:12, 49:16,

51:24, 51:25, 52:12, 52:25, 54:16, 54:19, 54:22, 65:11, 66:18, 66:19, 68:11, 71:7, 74:9, 76:9, 79:10
**correction** [1] - 71:14
**corridor** [1] - 47:7
**corroboration** [1] - 4:20
**counsel** [8] - 17:7, 18:6, 19:1, 29:16, 34:9, 35:22, 35:25, 48:9
**counsel's** [1] - 25:4
**Counsel's** [1] - 43:22
**count** [2] - 12:4, 38:7
**countdown** [1] - 32:19
**couple** [4] - 28:14, 69:22, 80:8, 80:10
**course** [2] - 3:12, 77:1
**COURT** [174] - 1:1, 3:7, 3:9, 11:4, 11:21, 12:4, 12:12, 12:16, 12:20, 12:23, 12:25, 13:9, 13:13, 13:16, 14:19, 15:2, 15:25, 16:2, 16:9, 16:11, 16:13, 17:21, 18:2, 18:14, 18:20, 19:3, 19:8, 19:14, 19:21, 20:14, 20:18, 20:21, 20:23, 21:3, 22:12, 24:12, 24:17, 24:21, 24:23, 25:9, 26:3, 26:12, 26:20, 27:2, 27:6, 27:21, 28:16, 28:23, 29:8, 29:12, 29:18, 30:8, 30:10, 30:17, 30:19, 30:23, 30:25, 31:3, 31:5, 31:9, 31:14, 31:18, 32:13, 32:25, 34:12, 34:16, 34:20, 35:5, 35:7, 35:23, 36:2, 36:13, 38:14, 38:20, 39:11, 39:23, 40:7, 40:10, 40:12, 42:6, 42:13, 42:15, 42:20, 43:1, 43:6, 43:8, 43:23, 43:25, 44:8, 44:11, 44:20, 45:14, 46:22, 48:23, 49:22, 50:5, 50:20, 50:23, 51:1, 51:4, 53:9, 54:6, 55:3, 55:15, 55:24, 56:4, 56:7, 56:11, 56:14, 56:22, 57:15, 58:2, 58:4, 58:6, 58:14, 58:16, 58:22, 59:3, 59:6,

59:20, 59:22, 60:8, 60:13, 60:21, 60:23, 60:25, 61:5, 61:13, 61:19, 62:1, 62:5, 62:10, 62:13, 63:1, 63:8, 64:8, 64:24, 66:22, 67:1, 67:3, 67:9, 67:15, 68:5, 68:13, 68:25, 69:4, 69:9, 69:13, 72:7, 72:25, 73:3, 73:6, 73:18, 73:21, 73:25, 75:21, 76:17, 77:6, 77:12, 77:14, 78:3, 78:8, 79:4, 80:4, 80:10, 80:14, 80:20, 80:25, 81:3, 81:5, 81:12, 81:17, 81:21, 82:1
**Court** [7] - 1:22, 1:22, 3:8, 7:6, 42:22, 75:10, 82:11
**court** [1] - 7:15
**Court's** [12] - 12:9, 15:19, 28:1, 28:7, 34:6, 34:23, 36:19, 42:24, 48:18, 52:18, 67:14, 68:24
**Courthouse** [2] - 1:23, 82:11
**COURTROOM** [10] - 3:2, 13:11, 13:17, 16:7, 23:23, 24:15, 24:19, 55:2, 65:10, 66:24
**coverage** [1] - 8:4
**covered** [1] - 80:22
**covers** [1] - 11:19
**created** [1] - 34:4
**creating** [1] - 30:2
**Criminal** [2] - 1:3, 3:2
**critical** [1] - 5:9
**cross** [10] - 12:1, 29:17, 29:23, 30:4, 44:9, 71:6, 74:7, 76:2, 76:7, 81:10
**CROSS** [1] - 13:3
**cross-examination** [2] - 71:6, 76:2
**CROSS-EXAMINATION** [1] - 13:3
**cross-examining** [1] - 44:9
**cross-mark** [1] - 29:23
**cross-marking** [1] - 29:17
**crossed** [1] - 75:16
**crowd** [23] - 15:4, 15:5, 27:11, 42:10,

47:4, 47:7, 47:10, 47:11, 47:19, 47:23, 48:2, 48:6, 49:11, 57:7, 61:23, 62:3, 68:10, 76:11, 76:19, 76:24, 77:17, 79:12, 79:15
**CRR** [3] - 1:22, 82:3, 82:10
**crucial** [1] - 5:25
**crunch** [1] - 14:24
**crush** [1] - 14:24
**crushed** [10] - 10:18, 10:19, 14:10, 14:12, 14:13, 14:14, 15:5, 15:6
**current** [1] - 11:2

## D

**D.C** [4] - 4:6, 6:15, 17:13, 18:10
**dark** [1] - 37:17
**Dated** [1] - 82:8
**days** [2] - 80:8, 80:11
**DC** [3] - 1:15, 1:24, 82:13
**deal** [1] - 39:24
**decided** [2] - 3:13, 74:1
**decision** [2] - 29:25, 73:10
**decision-making** [1] - 73:10
**declarant** [12] - 4:18, 4:19, 5:2, 5:16, 6:6, 6:8, 6:14, 7:8, 7:18, 9:5, 9:8, 10:3
**declarant's** [8] - 6:20, 7:2, 7:10, 7:16, 7:17, 8:10, 8:15, 9:4
**declaration** [2] - 8:24, 9:3
**defendant** [55] - 3:5, 14:2, 19:6, 19:8, 22:22, 23:13, 25:18, 33:1, 33:6, 33:11, 35:3, 35:16, 36:4, 39:21, 39:24, 40:2, 40:21, 43:3, 43:4, 45:21, 57:8, 57:9, 57:19, 57:22, 58:4, 60:2, 60:18, 61:7, 61:20, 61:23, 62:4, 62:19, 63:2, 64:3, 64:9, 64:15, 68:1, 68:6, 68:17, 71:20, 71:24, 72:3, 72:4, 72:8, 72:9, 72:12, 74:4, 75:5, 75:6,

75:19, 75:23, 76:8, 78:23, 79:15, 79:22
**Defendant** [3] - 1:7, 1:18, 34:12
**defendant's** [2] - 74:8, 74:16
**Defense** [24] - 13:10, 13:15, 17:20, 20:5, 21:1, 24:10, 27:1, 28:20, 29:10, 29:15, 30:1, 31:1, 31:2, 31:10, 34:5, 34:25, 55:18, 61:3, 61:17, 62:24, 64:6, 64:21, 67:13, 68:3
**defense** [16] - 20:25, 24:9, 25:4, 29:12, 29:13, 35:21, 35:22, 35:25, 56:6, 61:16, 62:23, 67:18, 69:2, 69:3, 69:18, 79:17
**definitely** [5] - 15:6, 17:13, 37:18, 38:23, 40:4
**deliberate** [3] - 5:8, 5:22, 6:25
**department** [1] - 55:23
**depicted** [3] - 28:12, 67:21, 68:1
**depicting** [1] - 45:17
**depicts** [1] - 48:6
**depressed** [1] - 32:11
**DEPUTY** [12] - 2:3, 3:2, 13:2, 13:11, 13:17, 16:7, 23:23, 24:15, 24:19, 55:2, 65:10, 66:24
**deputy** [5] - 74:20, 76:2, 76:11, 78:5, 78:17
**Deputy** [7] - 12:21, 59:9, 69:16, 69:18, 74:15, 80:5, 80:23
**describe** [2] - 7:25, 8:1
**describes** [1] - 6:5
**describing** [4] - 4:17, 5:1, 6:1, 10:20
**description** [1] - 63:6
**designated** [1] - 77:22
**destruction** [2] - 9:19, 11:13
**determining** [1] - 7:17
**device** [1] - 48:22
**differences** [1] - 7:21
**different** [5] - 4:14, 23:21, 34:11, 45:25, 75:10
**differently** [1] - 67:11
**digits** [1] - 67:8
**direct** [7] - 19:3, 43:15,

44:7, 44:18, 76:2, 76:7, 81:10
**directing** [2] - 44:13, 44:17
**disappear** [1] - 69:24
**discontent** [2] - 15:23, 16:1
**discuss** [1] - 5:12
**discussing** [1] - 71:15
**discussion** [2] - 8:17, 41:22
**disheveled** [2] - 70:9, 70:12
**dispelled** [1] - 70:3
**disregard** [1] - 44:3
**distance** [4] - 51:7, 51:23, 75:19, 75:23
**DISTRICT** [3] - 1:1, 1:1, 1:10
**District** [1] - 8:19
**done** [1] - 81:9
**door** [35] - 28:15, 29:3, 29:5, 31:24, 32:6, 32:8, 32:10, 32:13, 32:14, 32:19, 32:20, 32:21, 32:23, 33:2, 33:7, 38:21, 44:25, 47:1, 49:13, 49:14, 51:9, 51:11, 71:9, 74:25, 75:7, 75:8, 75:13, 75:14, 75:15, 75:17, 75:20, 75:23
**door's** [2] - 32:11, 33:6
**doorkeeper** [1] - 38:23
**doors** [41] - 13:20, 26:18, 26:21, 28:13, 29:2, 31:11, 31:15, 35:3, 43:16, 44:14, 44:15, 45:4, 45:8, 45:11, 47:11, 47:24, 48:8, 48:11, 49:12, 49:19, 51:8, 51:10, 51:15, 51:16, 51:24, 51:25, 70:18, 70:19, 70:21, 70:25, 71:3, 71:7, 71:11, 71:13, 71:16, 71:17, 74:8, 78:18, 78:24, 79:8, 79:13
**double** [1] - 29:17
**double-marking** [1] - 29:17
**down** [14] - 15:3, 40:22, 40:24, 42:11, 42:17, 43:4, 47:4, 50:21, 50:25, 52:14, 56:19, 57:11, 57:22, 76:1
**downwards** [1] - 40:22

**dozens** [1] - 77:2
**drew** [1] - 51:18
**drink** [1] - 64:11
**duration** [1] - 63:15
**during** [1] - 79:21

**E**

**easier** [3] - 13:8, 34:14, 57:3
**Eastern** [1] - 8:19
**effect** [1] - 32:4
**eight** [1] - 75:25
**either** [5] - 19:10, 25:2, 67:13, 69:9, 81:9
**element** [1] - 5:9
**emergency** [2] - 32:4, 71:7, 71:9
**emotional** [5] - 4:13, 8:8, 8:11, 9:11, 10:7
**emotions** [1] - 10:5
**end** [1] - 27:8
**ending** [1] - 67:7
**engendering** [1] - 9:5
**enter** [7] - 42:16, 44:19, 44:22, 45:1, 45:4, 45:8, 45:12
**entered** [2] - 45:3, 76:12
**entering** [6] - 33:14, 41:8, 41:10, 45:7, 71:4, 71:20
**enters** [1] - 51:16
**entire** [2] - 46:6, 47:12
**entirety** [4] - 18:13, 18:22, 24:23, 31:3
**ESENE** [3] - 23:20, 26:13, 49:6
**Esene** [1] - 74:11
**especially** [2] - 5:19, 29:25
**ESQ** [3] - 1:13, 1:13, 1:18
**essentially** [1] - 79:18
**establish** [2] - 7:7, 9:16, 55:21
**estimate** [2] - 26:1, 26:3
**estimating** [1] - 51:7
**estimation** [2] - 75:23, 81:15
**et** [1] - 8:23
**evacuate** [1] - 74:2
**evacuated** [1] - 79:9
**event** [26] - 4:17, 5:2, 5:3, 5:6, 5:7, 5:10, 5:18, 5:20, 6:1, 6:5, 6:9, 6:13, 7:1, 7:8, 7:10, 7:11, 7:12, 7:13, 7:24, 7:25, 8:1, **Exhibits** [1] - 76:4

8:2, 9:22, 10:20, 11:12, 11:16
**Evidence** [1] - 4:1
**evidence** [25] - 16:7, 16:9, 17:9, 17:10, 18:11, 22:12, 22:13, 27:3, 28:21, 29:9, 29:19, 30:12, 39:4, 42:25, 48:13, 55:2, 55:3, 55:15, 59:20, 59:21, 60:11, 64:21, 74:13, 74:17, 80:22
**exact** [3] - 26:7, 34:10, 59:4
**exactly** [3] - 17:14, 18:16, 19:4
**EXAMINATION** [2] - 13:3, 69:14
**examination** [2] - 71:6, 76:2
**examining** [1] - 44:9
**exception** [12] - 4:11, 4:25, 5:5, 5:16, 6:19, 7:7, 8:3, 8:5, 8:7, 8:17, 8:21, 9:13
**exceptions** [5] - 4:1, 4:10, 4:24, 7:21, 10:17
**excited** [10] - 4:12, 6:12, 6:19, 7:2, 7:5, 7:22, 7:23, 8:2, 8:3, 8:5
**excitement** [5] - 6:14, 6:19, 7:9, 7:12, 7:19
**exciting** [1] - 7:1
**exclude** [1] - 5:1
**excluded** [1] - 9:8
**exclusion** [2] - 9:17, 11:11
**excuse** [1] - 80:5
**exhibit** [30] - 13:9, 17:8, 18:8, 18:12, 18:19, 18:25, 19:1, 20:12, 23:20, 29:16, 29:23, 30:1, 30:16, 34:5, 34:10, 34:11, 34:23, 35:14, 39:14, 47:23, 47:25, 49:25, 52:7, 52:9, 55:25, 56:2, 61:10, 66:25, 69:19, 75:22
**Exhibit** [15] - 16:5, 16:14, 27:19, 29:15, 30:2, 31:1, 31:2, 34:9, 39:2, 45:16, 49:4, 59:17, 61:3, 65:17, 74:12
**exhibits** [2] - 19:11, 48:11

**existing** [10] - 4:13, 8:8, 8:10, 8:22, 9:1, 9:10, 9:11, 10:6, 10:25, 11:17
**exit** [6] - 32:4, 32:19, 65:4, 71:7, 71:9, 79:22
**expect** [1] - 12:10
**expedite** [1] - 36:23
**experience** [2] - 77:9, 77:12
**experiencing** [1] - 36:25
**explain** [2] - 19:1, 73:17
**explained** [1] - 51:9
**explaining** [3] - 4:17, 5:2, 6:1
**explains** [1] - 6:5
**explanation** [1] - 73:9
**express** [1] - 8:6
**expression** [2] - 4:16, 15:17
**expressions** [2] - 15:21, 15:22
**extend** [1] - 6:3
**eye** [2] - 23:9, 33:19

**F**

**fabricate** [2] - 6:24, 9:7
**fabrication** [1] - 6:21
**face** [2] - 15:17, 29:6
**facial** [2] - 15:21, 15:22
**facing** [3] - 29:2, 29:5, 75:17
**fact** [14] - 5:23, 8:14, 9:10, 9:15, 9:18, 11:6, 11:12, 14:21, 14:22, 18:14, 46:9, 55:22
**factual** [1] - 9:4
**fair** [2] - 74:4, 74:9
**fairly** [1] - 12:11
**familiar** [2] - 14:20, 17:23
**far** [4] - 10:16, 38:22, 51:7, 51:18
**fast** [3] - 31:13, 36:20, 37:4
**Federal** [1] - 4:1
**feelings** [1] - 10:4
**feet** [5] - 51:8, 51:20, 51:21, 51:23, 75:25
**fence** [2] - 22:2, 77:23
**fencing** [2] - 69:19, 70:10
**few** [4] - 16:18, 33:17,

45:24, 72:18
**filed** [1] - 3:14
**final** [2] - 51:16, 75:17
**finish** [1] - 81:18
**finished** [1] - 35:25
**finishing** [1] - 69:10
**fire** [1] - 32:19
**first** [3] - 3:13, 72:22, 73:18
**firsthand** [1] - 6:6
**five** [7] - 38:8, 38:9, 41:14, 44:22, 44:25, 45:3, 48:25, 50:6, 50:13
**flag** [13] - 58:13, 58:20, 58:21, 59:14, 63:2, 63:4, 63:7, 63:14, 63:16, 66:1, 66:2, 66:17
**flagpole** [2] - 33:16, 33:22
**floor** [2] - 74:5, 76:12, 77:18
**follow** [1] - 57:16
**foot** [1] - 69:8
**FOR** [1] - 1:1
**foregoing** [1] - 82:4
**forget** [1] - 14:1
**forgot** [1] - 21:5
**form** [3] - 14:25, 43:21, 50:3
**forward** [11] - 10:11, 29:24, 31:13, 37:2, 37:4, 49:11, 57:8, 65:24, 66:12, 66:17, 68:9
**forwarding** [1] - 36:20
**foundation** [7] - 17:9, 20:15, 20:24, 39:21, 55:21, 56:10, 77:4
**four** [2] - 38:8, 38:9
**frame** [1] - 34:24
**freezing** [1] - 36:22
**frequently** [1] - 62:8
**FRIEDMAN** [1] - 1:10
**Front** [3] - 22:1, 24:5, 69:20
**front** [10] - 40:25, 41:6, 41:21, 42:9, 43:16, 44:14, 47:11, 47:24, 48:7, 70:19
**full** [2] - 19:16, 82:5
**future** [1] - 29:25

**G**

**Gandalf** [1] - 70:22
**general** [2] - 3:17, 4:2
**gentlemen** [1] - 43:2
**Gerald** [1] - 8:20

**gesturing** [2] - 40:22, 40:24
**given** [2] - 13:14, 66:14
**glass** [1] - 74:25
**glitch** [1] - 35:9
**goal** [1] - 80:25
**Government** [10] - 16:5, 16:14, 17:20, 20:25, 24:10, 28:20, 30:2, 30:21, 45:16, 62:23
**government** [31] - 4:4, 10:14, 16:4, 16:6, 18:18, 19:12, 19:15, 23:16, 25:7, 26:10, 29:15, 29:23, 30:11, 30:15, 36:24, 38:5, 39:3, 39:13, 44:6, 45:15, 45:24, 47:21, 49:3, 52:2, 54:24, 55:19, 56:7, 62:15, 63:20, 66:23, 80:16
**Government's** [24] - 26:25, 27:18, 27:23, 36:23, 39:2, 48:12, 49:4, 49:20, 49:25, 52:3, 54:25, 55:18, 59:17, 60:10, 60:14, 61:2, 61:10, 61:17, 62:16, 63:21, 64:5, 64:12, 64:21, 66:20
**government's** [5] - 3:13, 22:14, 25:13, 47:23, 56:15
**Graves** [2] - 56:5, 56:8
**green** [2] - 17:3, 23:4
**greets** [1] - 3:8
**ground** [1] - 57:22
**grounded** [1] - 5:17
**grounds** [8] - 18:3, 18:5, 55:20, 70:2, 70:3, 70:5, 70:8
**guess** [1] - 69:5
**guidance** [1] - 10:12
**guidelines** [1] - 10:10
**guys** [3] - 8:18, 25:9, 81:6

**H**

**HAAG** [14] - 1:13, 10:24, 11:19, 12:3, 12:6, 12:14, 12:19, 80:16, 80:21, 81:2, 81:4, 81:11, 81:14, 81:20
**Haag** [1] - 3:4
**half** [1] - 78:15
**Hall** [5] - 45:17, 46:19,

54:1, 54:11, 72:13
**Hallway** [1] - 46:23
**hallway** [10] - 46:24, 46:25, 47:11, 49:15, 49:19, 52:24, 75:8, 75:9, 75:12, 75:13
**hand** [5] - 40:3, 40:5, 40:21, 68:17, 76:8
**handles** [1] - 31:25
**hands** [4] - 29:3, 40:16, 68:8, 76:9
**happy** [2] - 3:11
**hat** [6] - 17:2, 23:4, 33:4, 33:14, 34:1, 37:25
**Hawa** [2] - 12:7, 80:19
**head** [9] - 29:4, 33:15, 33:20, 33:22, 50:18, 50:19, 50:21, 50:25
**heads** [1] - 17:25
**health** [1] - 8:12
**hear** [23] - 14:8, 39:19, 40:7, 41:6, 41:21, 42:4, 42:6, 42:7, 42:15, 47:16, 47:17, 58:15, 58:23, 59:7, 59:9, 59:12, 59:13, 62:8, 65:2, 65:4, 65:6, 65:21
**heard** [6] - 10:16, 14:10, 40:9, 42:16, 42:20, 57:24
**hearing** [2] - 47:15, 62:10
**hearsay** [10] - 4:1, 5:1, 5:15, 8:21, 9:20, 9:21, 11:13, 11:15, 39:20, 39:25
**HELD** [1] - 1:10
**helmet** [1] - 37:22
**help** [1] - 10:11
**helped** [1] - 74:2
**helpfully** [1] - 7:14
**helping** [2] - 36:8, 43:17
**Henderson** [1] - 6:17
**hereby** [1] - 82:3
**hiding** [1] - 29:6
**himself** [1] - 4:20
**hit** [3] - 32:9, 33:16, 33:22
**hits** [1] - 32:16
**hold** [1] - 38:21
**holding** [3] - 40:2, 40:4, 63:15
**honest** [1] - 19:11
**Honor** [42] - 10:24, 11:20, 12:3, 12:24, 14:18, 17:4, 18:6, 18:24, 20:11, 24:9,

24:11, 24:20, 25:3, 29:14, 30:13, 30:24, 34:8, 40:11, 43:24, 44:21, 48:9, 50:2, 51:6, 53:10, 55:14, 55:17, 55:19, 57:16, 60:24, 61:14, 64:7, 65:18, 67:2, 68:4, 69:12, 73:2, 80:13, 80:16, 80:21, 81:2, 81:15, 81:20
**HONORABLE** [1] - 1:10
**hopefully** [5] - 4:5, 10:10, 69:8, 80:11
**hoping** [1] - 80:23
**House** [43] - 46:16, 46:20, 46:25, 47:24, 48:11, 49:12, 49:13, 49:14, 51:8, 51:9, 51:17, 70:24, 71:2, 71:5, 71:9, 71:12, 72:18, 72:19, 72:21, 73:11, 73:16, 74:5, 74:8, 74:24, 74:25, 75:7, 75:13, 75:15, 75:17, 75:19, 75:24, 76:12, 77:18, 78:18, 78:20, 78:23, 78:24, 79:2, 79:8, 79:9, 79:13
**housekeeping** [1] - 12:6

**I**

**identification** [2] - 19:5, 26:12
**identified** [7] - 17:16, 19:6, 20:4, 21:10, 25:23, 51:3, 54:18
**identify** [4] - 19:8, 23:13, 26:7, 37:18
**identifying** [1] - 52:6, 55:8
**illegally** [1] - 78:19
**imagine** [1] - 81:14
**immediately** [5] - 4:18, 5:3, 5:11, 6:9, 10:21
**important** [2] - 10:6, 19:10
**impression** [6] - 4:12, 6:1, 7:22, 7:25, 8:1, 8:4
**improperly** [1] - 71:13
**IN** [1] - 1:1
**include** [2] - 9:14, 11:5, 57:7
**including** [3] - 8:13, 8:25, 54:19

**incomplete** [1] - 30:22
**inconsistent** [2] - 79:4, 79:5
**increase** [1] - 62:9
**indecisiveness** [1] - 73:12
**indicating** [1] - 42:10
**individual** [9] - 17:1, 22:5, 23:4, 41:6, 41:21, 42:9, 47:17, 76:3, 76:5
**individuals** [4] - 21:8, 21:13, 21:20, 38:16
**indulgence** [11] - 12:9, 15:19, 28:1, 28:8, 34:6, 34:23, 36:19, 48:18, 52:18, 67:14, 68:24
**inference** [2] - 9:22, 11:15
**influenced** [1] - 6:22
**initial** [2] - 26:6, 30:4
**injured** [4] - 77:2, 77:7, 77:25, 78:13
**innermost** [1] - 51:25
**inside** [9] - 31:15, 31:19, 32:24, 48:4, 51:13, 70:21, 72:4, 72:14, 74:4
**Inspector** [1] - 80:19
**instead** [2] - 38:14, 56:23
**intent** [1] - 8:11
**interacting** [2] - 66:3, 66:18
**interaction** [2] - 63:4, 63:7
**interest** [1] - 6:22
**interior** [1] - 31:11
**interject** [1] - 20:12
**interrupt** [2] - 12:17, 58:17
**introduce** [2] - 3:22, 4:3
**inverse** [1] - 35:13
**investigator** [1] - 25:4
**involving** [1] - 63:7
**issue** [3] - 11:19, 18:24, 36:23
**issues** [2] - 36:17, 36:25
**itself** [4] - 4:22, 7:13, 11:5, 37:3

**J**

**jacket** [2] - 17:3, 23:4
**January** [22] - 3:20, 15:7, 17:16, 18:11, 18:15, 18:17, 19:20,

24:6, 26:23, 28:18, 57:17, 60:6, 60:9, 61:1, 61:15, 62:22, 64:2, 64:19, 67:25, 69:23, 69:25, 70:11
**join** [1] - 27:14
**Judge** [17] - 6:17, 8:20, 16:3, 20:22, 35:9, 36:14, 36:16, 38:19, 44:12, 49:24, 56:6, 56:16, 67:6, 77:3, 78:1, 79:1
**JUDGE** [1] - 1:10
**judge** [8] - 6:18, 17:19, 30:1, 38:23, 44:5, 48:21, 61:2, 62:8
**jury** [1] - 44:2

**K**

**keep** [8] - 22:22, 22:25, 23:8, 23:9, 33:9, 33:19, 41:3, 58:13
**kind** [2] - 14:24, 79:18
**knowing** [1] - 77:4

**L**

**labeled** [1] - 67:4
**lack** [2] - 73:10
**ladies'** [1] - 17:25
**lady** [1] - 13:25
**laid** [3] - 20:15, 20:24, 55:21
**Lanelle** [1] - 12:7
**language** [1] - 4:7
**last** [7] - 3:10, 3:14, 4:15, 14:1, 51:16, 62:1, 77:6
**LAW** [1] - 1:18
**law** [3] - 3:10, 3:17, 4:7
**lawn** [8] - 19:24, 20:9, 20:10, 21:9, 21:19, 22:4, 25:25
**lawyers** [1] - 44:1
**lay** [1] - 3:17
**leading** [3] - 31:15, 44:6, 44:8
**leads** [2] - 46:25, 75:13
**leaning** [1] - 75:16
**least** [6] - 14:5, 25:13, 37:15, 45:7, 45:12, 48:10
**leave** [2] - 15:9, 54:12
**LEDERER** [63] - 1:13, 14:15, 14:17, 14:25, 15:24, 17:4, 17:6, 18:6, 18:24, 19:4,

20:11, 20:17, 20:19, 21:2, 24:11, 25:3, 27:5, 28:22, 29:7, 29:14, 29:21, 30:13, 30:18, 30:24, 34:8, 35:20, 35:25, 38:12, 38:18, 39:20, 40:11, 43:19, 43:21, 43:24, 48:9, 50:2, 55:14, 55:19, 56:2, 56:9, 56:12, 56:21, 59:1, 60:12, 61:4, 61:18, 62:25, 64:7, 64:23, 65:18, 67:2, 68:4, 69:7, 69:12, 69:15, 71:15, 74:11, 75:1, 75:4, 76:1, 77:13, 79:7, 80:2
**Lederer** [1] - 3:5
**Lederer)**....................
.............**69** [1] - 2:4
**Lee** [2] - 8:20
**leeway** [1] - 44:6
**left** [7] - 17:22, 28:7, 50:14, 51:12, 60:22, 68:17, 70:11
**left-hand** [1] - 68:17
**length** [1] - 30:6
**Lentz** [1] - 8:18
**less** [1] - 3:14
**letting** [5] - 32:23, 35:16, 35:18, 35:23, 36:4
**lies** [1] - 6:24
**light** [1] - 8:24
**likelihood** [2] - 5:8, 5:21
**likely** [1] - 9:1
**limited** [5] - 6:1, 9:3, 10:6, 10:8, 81:3
**line** [4] - 48:7, 70:25, 71:2, 79:13
**lines** [1] - 69:25
**Lisa** [1] - 1:22
**LISA** [1] - 82:3
**list** [6] - 55:25, 56:2, 66:25, 67:3, 67:9, 67:15
**Lloyd** [11] - 12:21, 59:9, 69:18, 74:15, 74:20, 76:2, 76:11, 78:5, 78:17, 80:5, 80:23
**LLOYD** [2] - 2:3, 13:2
**local** [1] - 32:17
**location** [4] - 63:24, 67:21, 67:24, 75:18
**logistics** [1] - 25:10
**look** [8] - 10:14, 11:9, 31:9, 36:7, 37:4,

51:13, 54:7, 66:6
**looked** [1] - 15:17
**looking** [6] - 31:10, 31:15, 37:11, 52:11, 67:16, 74:24
**looks** [2] - 17:23, 17:25
**lose** [1] - 34:1
**lost** [1] - 33:14
**loud** [2] - 47:13, 47:16
**low** [1] - 62:9
**Lunch** [1] - 81:22
**lunch** [4] - 56:5, 56:8, 80:15, 80:17

## M

**magically** [1] - 69:24
**main** [33] - 13:20, 28:13, 31:11, 47:1, 48:11, 49:13, 49:14, 51:8, 51:9, 70:18, 70:19, 70:21, 70:24, 71:3, 71:6, 71:9, 71:11, 71:12, 71:16, 71:17, 74:8, 74:25, 75:8, 75:13, 75:15, 75:17, 75:19, 78:18, 78:23, 79:8, 79:13
**maintaining** [1] - 51:23
**man** [1] - 14:11
**Marina** [1] - 3:5
**MARINA** [1] - 1:18
**marina@medvinlaw. com** [1] - 1:20
**mark** [1] - 29:23
**marked** [2] - 34:11, 55:24
**marking** [1] - 29:17
**material** [1] - 9:2
**matter** [7] - 5:25, 8:4, 12:6, 29:18, 72:14, 76:11, 77:17
**mattered** [2] - 76:20, 76:21
**mean** [4] - 4:5, 4:6, 18:20, 29:18
**Medvin** [19] - 3:5, 3:12, 3:22, 4:9, 8:7, 10:12, 12:1, 24:15, 25:5, 25:11, 44:3, 65:10, 67:5, 69:18, 71:24, 72:12, 72:18, 74:7, 80:6
**MEDVIN** [174] - 1:18, 1:18, 13:4, 13:10, 13:12, 13:15, 15:3, 15:19, 16:1, 16:3, 16:8, 16:10, 16:12,

16:14, 16:17, 17:1, 17:5, 17:11, 17:19, 18:9, 18:16, 18:22, 19:5, 19:10, 19:15, 20:22, 20:25, 22:14, 22:20, 23:8, 23:16, 23:21, 23:24, 24:9, 24:13, 24:18, 24:22, 24:24, 25:1, 25:15, 26:4, 26:10, 26:15, 26:25, 27:4, 27:7, 27:18, 27:22, 28:1, 28:6, 28:20, 29:10, 29:13, 30:1, 30:9, 30:20, 31:2, 31:4, 31:8, 31:13, 31:21, 33:9, 33:17, 34:3, 34:13, 34:18, 34:21, 35:9, 36:6, 36:14, 36:16, 36:19, 37:2, 38:5, 38:19, 39:1, 39:13, 39:16, 40:13, 40:19, 41:3, 41:5, 41:14, 41:17, 41:20, 41:25, 42:2, 42:14, 42:18, 42:22, 43:12, 43:20, 44:5, 44:10, 44:12, 45:15, 45:20, 47:21, 48:12, 48:18, 48:21, 49:3, 49:7, 49:9, 49:10, 49:21, 49:24, 50:6, 50:9, 50:12, 50:25, 51:3, 52:2, 52:16, 52:23, 53:3, 53:12, 53:20, 53:23, 54:3, 54:24, 55:4, 55:17, 56:6, 56:16, 56:25, 57:5, 57:18, 58:3, 58:5, 58:7, 58:9, 59:4, 59:17, 59:21, 59:25, 60:1, 60:10, 60:14, 60:17, 61:2, 61:9, 61:16, 62:3, 62:7, 62:11, 62:14, 62:23, 63:9, 63:11, 63:20, 64:5, 64:12, 64:20, 64:25, 65:8, 65:12, 65:16, 66:8, 66:11, 66:20, 66:23, 67:6, 67:10, 67:18, 68:3, 68:15, 68:24, 69:2, 76:16, 77:3, 78:1, 79:1, 79:6
**Medvin)**....................
.............**13** [1] - 2:4
**member** [1] - 15:8
**members** [1] - 46:25
**memory** [5] - 8:13, 9:14, 9:18, 11:5,

11:11
**mental** [5] - 4:13, 8:8, 8:12, 9:11, 10:6
**Michaela** [1] - 3:10
**microphone** [1] - 62:9
**middle** [2] - 22:23, 68:21
**might** [1] - 67:10
**mind** [21] - 6:25, 7:2, 8:10, 8:17, 8:21, 8:23, 8:24, 9:4, 9:5, 9:7, 9:9, 9:13, 9:21, 9:23, 9:25, 11:1, 11:2, 11:3, 11:15, 11:17
**minimizing** [1] - 6:21
**minus** [1] - 28:7
**minute** [1] - 45:18
**minutes** [8] - 30:6, 31:7, 31:22, 52:16, 52:20, 55:1, 55:5, 73:25
**mirror** [1] - 8:24
**misrepresent** [1] - 9:7
**misrepresentation** [2] - 5:8, 5:22
**missed** [2] - 41:23, 50:23
**mob** [1] - 76:15
**moment** [7] - 10:9, 28:4, 44:14, 48:6, 49:11, 53:14, 66:14
**month** [1] - 80:9
**Moreira** [2] - 1:22, 82:10
**MOREIRA** [1] - 82:3
**MORNING** [1] - 1:9
**morning** [6] - 3:7, 12:23, 12:24, 13:5, 13:6, 48:24
**most** [1] - 7:21
**motioning** [1] - 43:4
**motive** [1] - 8:10
**mouse** [1] - 37:5
**mouth** [1] - 14:5
**move** [31] - 10:19, 10:20, 14:14, 15:15, 16:3, 19:2, 19:12, 19:14, 20:22, 22:24, 26:9, 26:25, 28:20, 37:2, 37:8, 38:19, 42:14, 55:17, 59:17, 61:2, 64:5, 64:20, 65:2, 65:21, 65:22, 66:15, 68:3, 68:9, 80:24
**movements** [1] - 46:9
**moves** [3] - 20:25, 24:9, 66:17
**moving** [3] - 14:5,

23:8, 40:22
**MPD** [2] - 54:19, 54:21
**MR** [13] - 10:24, 11:19, 12:3, 12:6, 12:14, 12:19, 80:16, 80:21, 81:2, 81:4, 81:11, 81:14, 81:20
**MS** [237] - 13:4, 13:10, 13:12, 13:15, 14:15, 14:17, 14:25, 15:3, 15:19, 15:24, 16:1, 16:3, 16:8, 16:10, 16:12, 16:14, 16:17, 17:1, 17:4, 17:5, 17:6, 17:11, 17:19, 18:6, 18:9, 18:16, 18:22, 18:24, 19:4, 19:5, 19:10, 19:15, 20:11, 20:17, 20:19, 20:22, 20:25, 21:2, 22:14, 22:20, 23:8, 23:16, 23:20, 23:21, 24:9, 24:11, 24:13, 24:18, 24:22, 24:24, 25:1, 25:3, 25:15, 26:4, 26:10, 26:13, 26:15, 26:25, 27:4, 27:5, 27:7, 27:18, 27:22, 28:1, 28:6, 28:20, 28:22, 29:7, 29:10, 29:13, 29:14, 29:21, 30:1, 30:9, 30:13, 30:18, 30:20, 30:24, 31:2, 31:4, 31:8, 31:13, 31:21, 33:9, 33:17, 34:3, 34:8, 34:13, 34:18, 34:21, 35:9, 35:20, 35:25, 36:6, 36:14, 36:16, 36:19, 37:2, 38:5, 38:12, 38:18, 38:19, 39:1, 39:13, 39:16, 39:20, 40:11, 40:13, 40:19, 41:3, 41:5, 41:14, 41:17, 41:20, 41:25, 42:2, 42:14, 42:18, 42:22, 43:12, 43:19, 43:20, 43:21, 43:24, 44:5, 44:10, 44:12, 45:15, 45:20, 47:21, 48:9, 48:12, 48:18, 48:21, 49:3, 49:6, 49:7, 49:9, 49:10, 49:21, 49:24, 50:2, 50:6, 50:9, 50:12, 50:25, 51:3, 52:2, 52:16, 52:23, 53:3, 53:12, 53:20, 53:23, 54:3, 54:24, 55:4, 55:14, 55:17, 55:19,

56:2, 56:6, 56:9, 56:12, 56:16, 56:21, 56:25, 57:5, 57:18, 58:3, 58:5, 58:7, 58:9, 59:1, 59:4, 59:17, 59:21, 59:25, 60:1, 60:10, 60:12, 60:14, 60:17, 61:2, 61:4, 61:9, 61:16, 61:18, 62:3, 62:7, 62:11, 62:14, 62:23, 62:25, 63:9, 63:11, 63:20, 64:5, 64:7, 64:12, 64:20, 64:23, 64:25, 65:8, 65:12, 65:16, 65:18, 66:8, 66:11, 66:20, 66:23, 67:2, 67:6, 67:10, 67:18, 68:3, 68:4, 68:15, 68:24, 69:2, 69:7, 69:12, 69:15, 71:15, 74:11, 75:1, 75:4, 76:1, 76:16, 77:3, 77:13, 78:1, 79:1, 79:6, 79:7, 80:2

**multiple** [2] - 73:9, 73:17

**Museum** [1] - 18:1

**must** [10] - 5:10, 6:4, 7:3, 7:7, 7:11, 7:23, 8:1, 8:24, 9:3, 9:6

### N

**name** [2] - 13:24, 14:1

**named** [1] - 67:10

**narrating** [2] - 17:7, 43:22

**narration** [2] - 35:21, 36:1

**nature** [1] - 35:21

**near** [2] - 18:2, 18:4

**necessarily** [1] - 7:13

**necessary** [2] - 9:19, 11:13

**need** [3] - 8:2, 22:8, 48:23

**negate** [1] - 5:7

**negates** [1] - 5:21

**never** [1] - 46:6

**next** [10] - 12:12, 12:15, 19:22, 35:3, 51:11, 57:12, 57:13, 80:8, 80:9, 80:10

**night** [3] - 3:10, 3:14, 4:15

**nine** [1] - 31:21

**nonetheless** [1] - 34:4

**nonpolice** [1] - 54:9

**north** [2] - 52:11, 54:1

**northwest** [4] - 19:19, 19:21, 24:3, 24:4

**note** [6] - 5:4, 6:3, 9:17, 11:11, 11:22, 65:19

**noted** [1] - 65:19

**notes** [2] - 11:8, 82:5

**notification** [1] - 32:22

**notify** [1] - 32:18

**number** [4] - 13:9, 25:25, 29:19, 66:22

**Number** [1] - 67:7

**NW** [3] - 1:14, 1:23, 82:12

### O

**oath** [1] - 12:25

**object** [7] - 4:5, 10:15, 17:7, 18:7, 30:23, 34:9

**objecting** [1] - 56:7

**objection** [40] - 14:15, 14:17, 14:25, 15:24, 16:2, 20:15, 21:2, 24:11, 27:5, 28:22, 29:7, 29:20, 29:21, 30:3, 30:14, 31:1, 35:20, 38:12, 38:18, 39:20, 39:25, 40:10, 42:13, 43:19, 56:15, 56:21, 59:1, 60:12, 61:4, 61:18, 62:25, 64:7, 64:23, 65:18, 68:4, 76:16, 77:3, 78:1, 78:4, 79:1

**objectionable** [1] - 4:4

**objections** [1] - 4:8

**objects** [1] - 55:19

**observe** [25] - 25:18, 27:8, 27:11, 27:14, 28:10, 28:24, 31:23, 32:6, 39:7, 40:21, 41:9, 56:17, 57:25, 58:2, 58:12, 60:2, 60:18, 62:19, 63:2, 63:16, 64:3, 65:14, 67:21, 68:6, 70:2

**observed** [22] - 14:2, 14:5, 14:21, 15:4, 15:12, 15:23, 20:5, 20:10, 21:23, 22:4, 33:1, 38:21, 43:17, 44:22, 45:24, 46:9, 51:22, 52:24, 57:6, 57:7, 57:19, 63:12

**observes** [1] - 56:23

**observing** [2] - 54:10, 71:20

**occurred** [2] - 26:2, 26:4

**occurrence** [2] - 7:7, 9:5

**OF** [4] - 1:1, 1:3, 1:9, 82:1

**offered** [4] - 9:15, 17:10, 20:13, 30:4

**offering** [1] - 16:11, 27:2

**offhand** [1] - 13:25

**Officer** [4] - 56:5, 56:8, 81:9, 81:19

**officer** [13] - 15:16, 36:10, 37:19, 37:21, 37:24, 38:2, 38:4, 53:17, 53:24, 54:7, 54:8, 54:9, 67:7

**officers** [35] - 13:21, 14:23, 15:21, 15:22, 32:18, 36:7, 37:11, 37:14, 38:1, 38:7, 38:11, 38:17, 41:22, 44:22, 44:25, 45:3, 45:9, 45:13, 54:19, 54:21, 57:7, 65:2, 65:4, 65:21, 66:3, 67:12, 68:8, 70:14, 70:15, 70:19, 77:2, 77:7, 78:2, 78:5, 79:24

**OFFICIAL** [1] - 82:1

**Official** [1] - 1:22

**official** [1] - 82:11

**once** [5] - 4:5, 32:9, 66:2, 66:17, 70:12

**one** [35] - 3:22, 4:23, 5:14, 7:7, 7:23, 11:9, 12:3, 12:4, 12:15, 22:17, 22:20, 22:21, 23:22, 27:20, 28:4, 29:2, 30:3, 35:22, 36:6, 36:12, 36:25, 37:15, 37:18, 38:3, 38:14, 43:20, 51:10, 52:24, 57:11, 59:8, 62:16, 67:13, 68:15, 72:22, 78:14

**ones** [1] - 55:24

**open** [8] - 31:25, 32:6, 32:8, 32:11, 32:14, 38:22, 44:15, 51:15

**opened** [3] - 71:10, 71:13, 71:18

**opening** [2] - 33:6, 33:7

**opens** [1] - 32:21

**opinion** [4] - 6:15, 6:17, 9:2, 11:9

**opportunity** [1] - 9:6

**opposed** [1] - 9:10

**optimist** [2] - 80:20, 80:21

**option** [1] - 62:11

**order** [1] - 79:18

**orient** [1] - 75:9

**original** [3] - 11:22, 34:14, 34:15

**otherwise** [3] - 9:20, 11:14, 18:18

**outer** [2] - 76:24, 77:22

**outermost** [3] - 51:11, 75:7, 75:15

**outfit** [1] - 25:22

**outside** [14] - 26:19, 26:22, 28:16, 31:17, 48:4, 48:11, 72:14, 73:7, 74:8, 75:13, 78:18, 78:20, 78:23, 79:13

**overruled** [1] - 34:12

**overrun** [1] - 69:25

**overview** [1] - 18:8

**own** [3] - 10:4, 32:11, 79:25

### P

**p.m** [15] - 44:16, 46:13, 53:9, 53:13, 53:18, 57:17, 60:9, 61:1, 61:15, 62:22, 64:1, 64:18, 65:20, 67:25, 81:22

**pace** [1] - 19:13

**Page** [1] - 6:18

**PAGE** [1] - 2:2

**pain** [1] - 8:12

**panic** [2] - 73:11, 73:15

**paralegal** [2] - 25:5, 25:13

**part** [2] - 41:23, 77:6

**particular** [1] - 32:20

**particularly** [1] - 81:14

**Partido** [2] - 5:12, 9:13

**PARTIDO** [1] - 5:13

**parties** [1] - 3:6

**parts** [1] - 56:22

**past** [4] - 9:10, 9:25, 11:6, 11:12

**patch** [2] - 37:19

**PAUL** [1] - 1:10

**pause** [24] - 12:22, 16:17, 16:18, 22:18, 23:2, 34:3, 35:1, 38:6, 39:16, 41:5, 41:17, 41:20, 42:2, 42:3, 45:20, 49:9,

**opposed** — [see above]

52:19, 52:23, 53:12, 53:23, 57:5, 63:11, 66:11, 75:1

**Pause** [5] - 34:7, 37:1, 48:17, 48:20, 69:1

**paused** [4] - 52:25, 53:12, 65:20, 75:4

**peaceful** [3] - 76:19, 78:10, 78:11

**peacefully** [2] - 76:12, 77:18

**people** [23] - 20:6, 20:10, 21:15, 21:19, 22:1, 25:25, 35:16, 35:18, 35:23, 36:4, 37:17, 43:17, 44:18, 45:7, 45:10, 47:15, 61:23, 62:3, 65:2, 73:19, 78:13, 78:17, 79:3

**peoples** [1] - 21:25

**perceived** [5] - 4:18, 5:11, 5:12, 6:6, 6:9

**perceiving** [3] - 5:3, 5:18, 5:19

**perception** [1] - 10:3

**perfectly** [1] - 19:11

**perhaps** [1] - 17:13

**perimeter** [2] - 76:25, 77:22

**period** [4] - 43:18, 44:15, 44:16, 72:16

**permissible** [1] - 5:25

**permission** [5] - 44:19, 45:1, 45:4, 45:8, 45:11

**permit** [2] - 11:25, 76:18

**permitted** [1] - 78:14

**person** [3] - 6:24, 40:25, 52:12

**personally** [1] - 79:9

**perspective** [2] - 10:4, 31:18

**persuaded** [1] - 4:22

**physical** [8] - 4:13, 8:9, 8:11, 9:12, 9:25, 10:4, 10:7, 70:14

**physically** [1] - 77:23

**picture** [1] - 35:6

**pinpoint** [1] - 17:13

**placed** [1] - 29:24

**Plaintiff** [1] - 1:4

**plan** [2] - 8:11, 69:6

**play** [42] - 13:8, 16:8, 16:14, 18:12, 18:22, 19:16, 22:17, 23:17, 25:4, 26:11, 27:23, 30:7, 31:21, 34:21, 34:25, 35:10, 36:6,

39:5, 39:14, 41:18, 43:12, 43:13, 49:5, 50:6, 50:13, 52:4, 52:21, 54:3, 54:25, 55:5, 59:8, 61:10, 62:16, 63:8, 63:21, 64:13, 65:8, 66:8, 66:21, 67:19, 68:15, 75:1

**Play** [8] - 24:24, 25:16, 37:10, 43:12, 45:18, 52:17, 53:3, 53:20

**played** [41] - 13:18, 15:20, 16:16, 19:17, 22:19, 23:10, 23:19, 23:25, 24:25, 25:17, 26:16, 27:25, 28:5, 33:10, 33:21, 35:8, 35:15, 36:9, 41:4, 41:16, 41:19, 50:8, 52:5, 52:22, 54:5, 55:7, 57:4, 58:11, 59:18, 59:24, 60:16, 61:12, 62:18, 63:10, 63:23, 64:14, 65:13, 66:10, 67:20, 68:16, 68:20

**playing** [24] - 33:9, 35:14, 36:15, 36:18, 37:13, 37:23, 39:6, 39:15, 40:6, 40:13, 40:19, 40:20, 41:3, 42:1, 43:14, 45:19, 49:8, 50:15, 53:4, 53:11, 53:22, 59:11, 68:23, 75:3

**PLC** [1] - 1:18

**plug** [1] - 16:6

**point** [21] - 12:16, 15:9, 17:6, 20:12, 26:14, 31:9, 34:8, 34:18, 43:3, 43:9, 46:10, 46:15, 49:18, 56:3, 57:11, 59:2, 65:1, 73:4, 76:24, 78:3, 79:9

**points** [1] - 47:12

**police** [20] - 36:7, 36:10, 37:11, 42:8, 42:11, 42:16, 44:22, 45:9, 48:7, 53:24, 54:7, 54:8, 55:23, 68:8, 70:5, 70:25, 71:2, 78:2, 79:13, 79:23

**Police** [2] - 13:21, 53:17

**portion** [11] - 14:5, 17:24, 20:1, 20:2, 24:4, 65:14, 74:12,

74:14, 74:17, 74:18, 80:22

**portion's** [1] - 74:12

**portions** [1] - 30:7

**pose** [1] - 49:24

**posing** [1] - 10:12

**positioned** [2] - 29:4, 75:6

**positioning** [2] - 74:8, 74:16

**possibility** [1] - 6:21

**possible** [1] - 80:6

**possibly** [3] - 9:6, 10:17, 80:7

**potentially** [1] - 19:2

**powers** [1] - 6:20

**preclude** [1] - 7:3

**premised** [1] - 6:23

**preoccupied** [1] - 6:25

**preparing** [1] - 36:17

**presence** [1] - 21:20

**present** [9] - 3:6, 4:12, 4:16, 5:25, 7:22, 7:24, 8:1, 8:4, 9:10

**press** [1] - 46:24

**pressed** [1] - 32:18

**presumably** [6] - 6:24, 21:15, 73:21

**pretty** [1] - 80:18

**previously** [4] - 20:7, 21:9, 33:2, 45:16

**Prince** [1] - 1:19

**principles** [1] - 3:17

**problem** [1] - 17:7

**proceed** [2] - 12:1, 12:17

**proceedings** [1] - 82:6

**produce** [1] - 56:8

**produced** [2] - 9:23, 11:16

**professor** [2] - 7:20, 9:24

**proffer** [2] - 18:7, 18:14

**proponent** [2] - 6:4, 7:6

**propped** [1] - 51:15

**protester** [1] - 31:24

**protesters** [5] - 14:23, 15:4, 38:11, 38:17, 71:4

**provable** [2] - 9:21, 11:15

**prove** [6] - 8:13, 9:14, 9:18, 11:2, 11:6, 11:11

**provide** [4] - 22:15, 25:7, 28:3, 35:1

**provided** [1] - 28:21

**providing** [1] - 10:12

**proximity** [1] - 8:25

**public** [1] - 15:8

**pull** [5] - 27:18, 45:16, 62:15, 63:21, 74:11

**pulled** [1] - 21:25

**pulling** [2] - 22:5, 63:2

**purpose** [1] - 71:2

**purposes** [1] - 29:25

**push** [3] - 32:6, 32:8, 57:8

**pushed** [7] - 56:19, 57:9, 57:10, 65:24, 66:12, 66:15, 79:23

**pushing** [4] - 31:24, 57:7, 57:8, 66:3

**put** [3] - 80:25, 81:8, 81:19

**putting** [2] - 47:3, 76:8

## Q

**qualify** [2] - 7:1, 7:5

**question's** [1] - 55:15

**questioning** [1] - 76:3

**questions** [8] - 3:18, 3:23, 10:23, 20:24, 44:7, 44:8, 69:2, 69:22, 71:24, 72:18, 80:2

**quick** [1] - 11:9

**quickly** [2] - 80:18, 80:24

**quiet** [10] - 39:19, 40:9, 40:14, 40:25, 42:10, 76:4, 76:19, 78:10, 78:11

**quietly** [3] - 42:16, 76:12, 77:18

**quite** [1] - 44:6

**quote** [1] - 9:2

**quoted** [2] - 11:7, 11:10

**quotes** [1] - 8:22

## R

**rack** [2] - 22:2, 77:22

**racks** [1] - 70:5

**raise** [1] - 11:25

**raised** [3] - 3:18, 3:23, 43:10

**rationale** [1] - 6:18

**RDR** [3] - 1:22, 82:3, 82:10

**reaches** [1] - 54:15

**read** [2] - 3:25, 10:10

**ready** [1] - 3:24

**really** [1] - 73:16

**reason** [7] - 30:20, 34:10, 35:12, 72:23,

73:8, 78:12, 78:13

**reasonably** [1] - 8:25

**REBEKAH** [1] - 1:13

**Rebekah** [1] - 3:5

**rebekah.lederer@ usdoj.gov** [1] - 1:16

**receive** [1] - 3:11

**recess** [10] - 72:19, 72:20, 72:24, 72:25, 73:6, 73:12, 73:14, 73:18, 74:1, 81:22

**Recess** [1] - 49:2

**recessed** [3] - 46:16, 46:20, 73:1

**recesses** [2] - 72:21, 73:10, 73:17

**recessing** [1] - 73:13

**recognize** [11] - 13:19, 13:21, 17:12, 17:21, 18:13, 19:18, 24:1, 26:17, 63:24, 64:17, 74:20

**recollection** [1] - 22:8

**record** [10] - 29:14, 29:16, 29:22, 29:24, 30:11, 30:15, 30:20, 39:1, 65:19, 71:15

**recorded** [4] - 24:2, 62:21, 63:25, 64:17

**recording** [1] - 7:15

**rectify** [1] - 30:4

**red** [8] - 17:2, 23:4, 32:2, 32:3, 33:4, 33:11, 45:21, 46:3

**redirect** [1] - 69:6

**REDIRECT** [1] - 69:14

**reference** [2] - 41:8, 41:10

**referring** [2] - 59:14, 74:18

**reflect** [3] - 9:6, 9:9

**reflection** [3] - 6:20, 6:25, 7:4

**refresh** [1] - 22:8

**regardless** [2] - 5:15, 5:16

**relate** [4] - 7:23, 8:2, 56:13, 74:14

**relates** [2] - 7:10, 8:14

**relating** [1] - 6:13

**relevancy** [2] - 18:7, 18:25

**relevant** [2] - 19:2, 74:12

**relies** [2] - 4:11, 8:7

**remained** [2] - 46:3, 63:13

**remaining** [2] - 28:3, 81:17

**remember** [4] - 65:25,

69:20, 72:1, 76:5

**remembered** [5] - 8:14, 9:15, 9:18, 11:6, 11:12

**remembering** [1] - 22:9

**remind** [1] - 15:18

**reminded** [1] - 4:15

**remnants** [1] - 70:12

**removed** [4] - 20:6, 20:7, 21:16, 21:24

**removing** [1] - 69:19

**rendering** [1] - 29:25

**repeat** [1] - 21:5

**repeatedly** [1] - 33:24

**rephrase** [2] - 39:22, 44:13

**replay** [6] - 41:12, 51:5, 58:8, 63:5, 65:25, 66:5

**Reporter** [3] - 1:22, 1:22, 82:11

**REPORTER** [1] - 82:1

**requirement** [1] - 8:6

**research** [1] - 4:15

**reserve** [1] - 69:3

**reset** [1] - 48:21

**response** [2] - 40:24, 76:7

**responsive** [1] - 78:8

**rest** [1] - 18:20

**restricted** [4] - 21:10, 21:12, 21:18, 78:14

**result** [3] - 9:20, 11:14, 35:10

**Resumed** [2] - 2:3, 13:2

**retired** [1] - 14:1

**review** [1] - 42:22

**reviewing** [1] - 42:24

**rewind** [10] - 24:13, 33:17, 41:25, 42:18, 50:12, 52:16, 56:25, 58:9, 58:23, 63:9

**riot** [3] - 70:3, 70:7, 70:11

**rioters** [3] - 28:14, 69:19, 70:15

**Rogers** [2] - 46:23, 75:12

**Room** [2] - 1:23, 82:12

**room** [4] - 41:8, 41:10, 42:11, 42:17

**ropes** [3] - 45:21, 46:3

**Rotunda** [33] - 13:20, 26:18, 26:21, 28:13, 31:11, 31:15, 39:12, 43:16, 44:14, 45:4, 47:11, 47:24, 54:15, 54:18, 55:8, 57:20,

60:4, 60:24, 61:14, 62:22, 64:1, 64:18, 65:5, 67:25, 70:18, 70:19, 70:21, 71:6, 71:11, 71:12, 71:16, 71:17
**roughly** [1] - 73:1
**rule** [5] - 5:1, 8:22, 9:20, 11:4, 11:14
**Rule** [6] - 4:11, 4:12, 4:13, 8:6, 8:8, 10:25
**Rules** [2] - 4:1, 10:10
**rules** [3] - 4:5, 4:6, 4:7
**ruling** [1] - 13:13
**running** [4] - 22:5, 46:7, 46:11, 71:25
**runs** [1] - 67:4

## S

**Saltzburg** [2] - 7:20, 9:24
**saw** [6] - 21:12, 46:2, 47:3, 74:9, 77:10, 77:13
**scene** [1] - 3:20
**schedule** [1] - 12:8
**scope** [3] - 4:4, 8:3, 19:3
**screaming** [1] - 57:24
**screen** [13] - 4:22, 13:25, 14:20, 16:21, 17:2, 23:3, 27:10, 50:14, 51:12, 51:14, 51:19, 52:19, 53:13
**screens** [1] - 35:7
**second** [10] - 6:6, 22:20, 40:14, 46:16, 49:22, 49:23, 51:5, 51:14, 73:6
**seconds** [20] - 16:18, 24:13, 28:7, 31:22, 32:10, 32:22, 33:17, 41:14, 41:25, 42:18, 49:5, 50:7, 50:13, 52:4, 54:4, 56:25, 58:9, 67:19, 75:2, 75:4
**Secret** [1] - 12:7
**see** [52] - 3:11, 4:21, 16:20, 19:24, 20:9, 21:18, 22:7, 23:4, 23:11, 27:10, 28:12, 32:2, 33:6, 35:5, 35:16, 36:10, 37:14, 37:16, 38:1, 39:17, 39:23, 40:2, 40:7, 43:2, 43:8, 49:18, 50:10, 50:16, 50:19, 51:5, 52:13, 53:17,

55:11, 64:9, 64:15, 65:24, 66:2, 66:12, 68:1, 68:13, 70:5, 70:7, 70:10, 70:19, 70:21, 75:10, 75:12, 75:14, 77:7, 79:21, 81:17, 81:21
**seeing** [2] - 33:11, 53:5
**seek** [1] - 13:15
**seeks** [2] - 61:16, 62:23
**seem** [2] - 10:15, 67:16
**self** [1] - 6:22
**self-interest** [1] - 6:22
**send** [1] - 32:22
**sense** [8] - 3:24, 4:12, 4:16, 5:25, 7:22, 7:24, 8:1, 8:4, 81:18
**sensory** [1] - 8:11
**sentence** [1] - 65:6
**separate** [2] - 48:10, 48:11
**sergeant** [1] - 14:1
**Sergeant** [4] - 12:14, 12:17, 80:17, 80:24
**Serial** [1] - 67:7
**series** [2] - 55:25, 67:3
**serve** [2] - 9:21, 11:15
**served** [1] - 25:4
**Service** [1] - 12:7
**SESSION** [1] - 1:9
**session** [2] - 72:23, 73:13
**set** [4] - 46:24, 51:14, 51:16, 75:17
**sets** [4] - 32:9, 32:14, 32:17, 51:10
**seven** [1] - 75:25
**several** [2] - 18:5, 78:2
**severely** [1] - 77:2
**sheet** [1] - 25:7
**shoot** [1] - 69:7
**shot** [2] - 13:19, 19:18
**show** [3] - 6:4, 31:6, 56:22
**showed** [2] - 48:10, 61:6, 79:17
**showing** [2] - 9:4, 35:13
**shown** [1] - 69:18
**side** [7] - 12:4, 16:20, 17:2, 17:22, 33:1, 49:15, 50:14
**sign** [4] - 32:1, 32:2, 32:3
**signage** [1] - 22:2
**significant** [2] - 7:21, 80:22

**signs** [10] - 20:5, 20:6, 20:9, 21:10, 21:13, 21:15, 21:18, 21:23, 22:5, 70:7
**similar** [2] - 17:25, 29:15
**simply** [1] - 72:3
**simultaneously** [1] - 3:15
**single** [1] - 22:5
**sit** [2] - 42:11, 42:17
**situation** [3] - 7:15, 8:15, 15:7
**six** [2] - 55:1, 55:5
**sleep** [1] - 3:14
**slowly** [2] - 22:22, 22:25
**small** [1] - 46:24
**snow** [4] - 22:2, 69:19, 70:10, 77:22
**sometime** [3] - 26:5, 26:6, 26:7
**somewhere** [1] - 22:23
**soon** [1] - 5:18
**sorry** [17] - 23:20, 23:21, 25:1, 26:13, 34:14, 35:9, 36:21, 42:23, 43:13, 45:2, 48:15, 49:6, 50:23, 52:18, 62:2, 75:21, 77:16
**sort** [1] - 3:16
**sound** [2] - 71:10, 71:13
**sounds** [2] - 14:20, 71:11
**space** [2] - 14:22, 15:13
**span** [1] - 79:21
**Speaker** [1] - 73:22
**speaking** [1] - 42:8
**specific** [4] - 10:16, 22:4, 48:10, 77:5
**specifically** [1] - 27:7
**speculation** [4] - 15:24, 29:7, 38:12, 38:18
**speech** [1] - 50:5
**speeches** [2] - 43:25, 44:11
**spent** [1] - 78:15
**spontaneity** [1] - 6:2
**spontaneous** [1] - 5:24
**square** [2] - 19:20, 19:22
**stand** [2] - 66:4, 81:8
**standing** [14] - 25:20, 33:7, 35:3, 49:19, 51:8, 51:10, 51:11,

52:10, 53:5, 53:14, 61:7, 61:21, 63:17, 64:9
**start** [13] - 3:9, 13:7, 25:12, 33:11, 36:21, 37:6, 38:14, 57:2, 57:3, 69:5, 80:17, 81:6
**starting** [2] - 4:16, 27:23
**startling** [7] - 6:13, 7:7, 7:9, 7:11, 7:12, 7:13, 7:23
**state** [20] - 7:2, 8:10, 8:17, 8:21, 8:23, 8:24, 9:4, 9:5, 9:7, 9:9, 9:13, 9:21, 9:23, 9:25, 10:25, 11:2, 11:14, 11:16, 11:17
**statement** [34] - 3:22, 4:17, 5:1, 5:6, 5:7, 5:10, 5:15, 5:20, 6:4, 6:5, 6:7, 6:13, 7:3, 7:4, 7:5, 7:8, 7:10, 7:16, 7:18, 7:24, 8:9, 8:13, 8:20, 8:22, 9:3, 9:8, 9:9, 9:14, 9:21, 10:16, 10:20, 11:1, 11:5, 58:12
**statements** [13] - 3:19, 4:3, 4:10, 4:23, 5:18, 9:15, 9:18, 9:25, 10:2, 11:11, 57:23, 57:25, 58:3
**states** [1] - 8:9
**STATES** [3] - 1:1, 1:3, 1:10
**States** [8] - 1:13, 3:3, 3:4, 6:16, 8:18, 64:1, 64:18, 82:11
**Statuary** [5] - 45:17, 46:19, 54:1, 54:11, 72:13
**statue** [4] - 57:9, 57:10, 57:12, 57:13
**statute** [1] - 56:20
**stay** [1] - 73:3
**stayed** [2] - 72:13, 73:5
**stenographic** [1] - 82:5
**still** [10] - 12:25, 27:10, 60:4, 60:6, 65:10, 65:12, 70:5, 70:7, 74:5, 74:18
**stood** [2] - 78:20, 78:23
**stop** [8] - 22:25, 25:6, 25:8, 25:12, 25:16, 38:10, 71:4, 76:15

**stopped** [3] - 3:21, 13:7, 43:9
**stopping** [3] - 26:13, 28:6, 28:9
**Street** [2] - 1:14, 1:19
**stress** [6] - 6:14, 7:1, 7:9, 7:18
**strike** [4] - 36:2, 50:3, 50:5, 77:6
**stroll** [1] - 72:9
**strut** [2] - 72:3, 72:8
**stuff** [1] - 73:19
**subject** [4] - 5:25, 7:4, 8:4, 10:7
**subsequent** [1] - 22:15
**substantially** [5] - 5:5, 5:21, 5:24, 6:8, 6:10
**substantive** [1] - 20:24
**sufficient** [1] - 18:12
**Suite** [1] - 1:19
**summarize** [1] - 63:12
**Supp** [2] - 5:13, 8:19
**support** [1] - 10:13
**supporting** [1] - 10:1
**supports** [1] - 11:8
**surge** [1] - 71:4
**surrounding** [3] - 3:18, 17:12, 69:24
**surveillance** [1] - 45:24
**suspends** [1] - 6:20
**sustained** [3] - 16:2, 29:8, 42:13
**swig** [1] - 53:7
**system** [1] - 25:14

## T

**table** [1] - 36:13
**ten** [7] - 41:25, 42:18, 51:20, 51:21, 51:23, 52:4, 54:3
**tenor** [1] - 7:17
**tens** [1] - 21:25
**terms** [5] - 8:15, 10:14, 38:13, 44:6, 51:7
**testified** [6] - 40:2, 45:10, 46:15, 71:6, 74:21, 76:8
**testifies** [1] - 4:23
**testify** [2] - 44:2
**testifying** [1] - 4:21
**testimony** [4] - 12:10, 44:18, 56:3, 79:2
**THE** [222] - 1:1, 1:1, 1:10, 3:2, 3:7, 3:9, 11:4, 11:21, 12:4, 12:12, 12:16, 12:20,

12:23, 12:24, 12:25, 13:9, 13:11, 13:13, 13:16, 13:17, 14:19, 15:2, 15:25, 16:2, 16:7, 16:9, 16:11, 16:13, 17:21, 17:23, 18:2, 18:4, 18:14, 18:20, 19:3, 19:8, 19:14, 19:21, 19:22, 20:14, 20:18, 20:21, 20:23, 21:3, 22:12, 23:23, 24:12, 24:15, 24:17, 24:19, 24:21, 24:23, 25:9, 26:3, 26:12, 26:20, 26:21, 27:2, 27:6, 27:21, 28:16, 28:17, 28:23, 29:8, 29:12, 29:18, 30:8, 30:10, 30:17, 30:19, 30:23, 30:25, 31:3, 31:5, 31:9, 31:14, 31:17, 31:18, 31:20, 32:13, 32:16, 32:25, 34:12, 34:16, 34:20, 35:5, 35:6, 35:7, 35:23, 36:2, 36:13, 38:14, 38:20, 39:11, 39:12, 39:23, 40:4, 40:7, 40:9, 40:10, 40:12, 42:6, 42:13, 42:15, 42:20, 43:1, 43:4, 43:6, 43:7, 43:8, 43:10, 43:23, 43:25, 44:8, 44:11, 44:20, 44:21, 45:14, 46:22, 46:23, 48:23, 49:22, 50:5, 50:20, 50:23, 51:1, 51:4, 51:5, 53:9, 53:10, 54:6, 54:9, 55:2, 55:3, 55:15, 55:24, 56:4, 56:7, 56:11, 56:14, 56:22, 57:15, 57:16, 58:2, 58:4, 58:6, 58:14, 58:16, 58:19, 58:22, 59:3, 59:6, 59:20, 59:22, 60:8, 60:9, 60:13, 60:21, 60:22, 60:23, 60:24, 60:25, 61:1, 61:5, 61:13, 61:14, 61:19, 62:1, 62:5, 62:6, 62:10, 62:13, 63:1, 63:8, 64:8, 64:24, 65:10, 66:22, 66:24, 67:1, 67:3, 67:9, 67:15, 68:5, 68:13, 68:25, 69:4, 69:9, 69:13, 72:7, 72:25, 73:2, 73:3, 73:5, 73:6,

73:9, 73:18, 73:20, 73:21, 73:24, 73:25, 74:3, 75:21, 76:17, 77:6, 77:12, 77:14, 78:3, 78:8, 79:4, 80:4, 80:9, 80:10, 80:13, 80:14, 80:20, 80:25, 81:3, 81:5, 81:12, 81:17, 81:21
**themselves** [2] - 4:7, 70:15
**then-existing** [8] - 4:13, 8:8, 8:10, 8:22, 9:11, 10:6, 10:25, 11:17
**theory** [3] - 5:5, 5:17, 10:1
**thereafter** [2] - 5:4, 6:9
**therefore** [1] - 6:23
**they've** [1] - 11:22
**thinks** [1] - 4:4
**third** [3] - 6:7, 8:7, 59:3
**THOMAS** [2] - 2:3, 13:2
**thoughts** [1] - 9:7
**thousands** [1] - 22:1
**three** [8] - 3:25, 4:10, 7:10, 8:5, 10:17, 24:13, 51:10, 59:1
**threshold** [1] - 75:16
**throughout** [3] - 46:10, 71:22, 72:4
**tight** [4] - 12:8, 14:22, 15:6, 15:13
**timer** [2] - 32:9, 32:14, 32:17
**timestamp** [15] - 28:2, 28:21, 31:22, 35:1, 37:3, 41:17, 46:13, 48:13, 49:4, 49:6, 52:3, 56:12, 59:18, 61:3, 65:1
**timing** [1] - 48:19
**together** [1] - 76:15
**tomorrow** [2] - 81:10, 81:19
**tone** [1] - 7:17
**took** [3] - 3:12, 53:7, 58:20
**top** [1] - 56:13
**towards** [13] - 27:8, 39:12, 46:22, 48:2, 48:8, 49:12, 49:15, 49:19, 54:1, 56:19, 57:9, 57:10, 79:22
**town** [3] - 80:8, 80:9, 80:10
**track** [1] - 71:21
**trampled** [3] - 21:21,

21:22, 21:23
**transcript** [2] - 82:5, 82:6
**TRANSCRIPT** [1] - 1:9
**treat** [1] - 38:17
**treating** [1] - 38:11
**treatise** [1] - 7:20
**TRIAL** [1] - 1:9
**trial** [3] - 6:17, 7:15, 81:15
**tries** [1] - 4:3
**trim** [1] - 17:5
**true** [2] - 82:4, 82:6
**trustworthiness** [1] - 10:1
**trustworthy** [1] - 5:19
**truth** [1] - 9:16
**try** [5] - 25:2, 25:11, 33:18, 48:14, 48:15
**trying** [3] - 19:11, 57:8, 68:8
**Tuesday** [1] - 1:4
**turn** [1] - 15:8
**two** [12] - 7:8, 7:21, 7:25, 15:21, 15:22, 17:24, 38:15, 48:10, 48:11, 61:6, 67:11, 72:21
**typical** [1] - 32:13

**U**

**U.S** [3] - 1:23, 67:25, 77:23
**under** [12] - 4:6, 4:7, 4:23, 6:14, 7:9, 7:18, 8:21, 9:16, 10:17, 12:25, 55:25
**underlying** [2] - 5:4, 6:18
**understood** [2] - 81:11, 81:20
**unique** [2] - 10:3
**UNITED** [3] - 1:1, 1:3, 1:10
**United** [8] - 1:13, 3:3, 3:4, 6:16, 8:18, 64:1, 64:18, 82:11
**unknown** [1] - 67:6
**unless** [3] - 8:14, 18:6, 65:25
**unlikely** [2] - 6:24, 80:7
**unnamed** [1] - 67:11
**unplug** [1] - 16:5
**unreliable** [1] - 6:23
**up** [40] - 16:4, 17:10, 19:15, 20:9, 23:17, 27:18, 35:25, 36:24, 37:4, 39:3, 40:2,

40:4, 40:16, 40:21, 43:10, 45:16, 46:24, 47:3, 48:12, 49:4, 49:21, 49:25, 52:3, 53:8, 53:14, 54:25, 56:3, 57:18, 60:14, 61:9, 62:15, 63:21, 64:12, 66:20, 67:18, 68:13, 74:12, 75:7, 75:16, 76:9
**USA** [4] - 27:12, 27:15
**USAO** [1] - 1:14
**utterance** [12] - 4:12, 6:12, 6:19, 6:22, 7:2, 7:6, 7:11, 7:22, 7:23, 8:2, 8:3, 8:5

**V**

**VA** [1] - 1:19
**validity** [1] - 8:14
**variety** [2] - 19:7, 54:18
**velvet** [3] - 45:21, 46:3, 72:13
**verbiage** [1] - 59:5
**version** [2] - 30:15, 34:5
**versus** [1] - 71:25
**video** [68] - 3:21, 13:7, 13:19, 14:2, 14:6, 14:22, 15:12, 18:17, 18:21, 18:23, 19:18, 20:4, 21:12, 21:23, 22:7, 22:13, 22:16, 22:17, 23:8, 24:1, 26:17, 27:8, 27:25, 28:6, 28:12, 28:24, 29:8, 30:5, 31:19, 31:22, 37:3, 39:7, 42:24, 46:13, 47:3, 47:8, 48:4, 48:5, 48:6, 50:10, 51:4, 51:6, 55:11, 55:13, 56:17, 58:6, 58:7, 59:5, 60:2, 60:18, 61:20, 62:19, 62:21, 63:15, 63:24, 64:3, 64:15, 65:1, 65:8, 65:17, 65:21, 66:10, 67:22, 68:7, 68:18, 70:18, 74:9, 75:6
**Video** [58] - 13:15, 13:18, 15:20, 16:16, 19:17, 22:19, 23:10, 23:19, 23:25, 24:25, 25:17, 26:16, 28:5, 33:10, 33:21, 35:8, 35:15, 36:9, 36:15, 36:18, 37:13, 37:23, 39:6, 39:15, 40:6,

40:20, 41:4, 41:16, 41:19, 42:1, 43:14, 45:19, 49:8, 50:8, 50:15, 52:5, 52:22, 54:5, 55:7, 57:4, 58:11, 59:11, 59:24, 60:16, 61:12, 62:18, 63:10, 63:23, 64:14, 65:13, 67:20, 68:16, 68:20, 68:23, 75:3
**videos** [8] - 17:16, 25:23, 45:25, 46:10, 48:10, 51:22, 54:18, 61:6
**view** [2] - 29:8, 31:11
**viewed** [1] - 47:23
**violently** [1] - 77:24
**Virginia** [1] - 8:19
**virtual** [2] - 9:19, 11:13
**voice** [3] - 7:17, 14:8, 14:10
**volume** [2] - 62:9, 62:11
**vs** [1] - 1:5

**W**

**wait** [6] - 3:12, 49:22, 58:16, 76:17
**walk** [3] - 22:2, 47:6, 53:25
**walking** [15] - 39:10, 39:11, 39:12, 45:21, 46:6, 46:11, 46:19, 46:22, 47:2, 52:11, 53:15, 54:1, 54:6, 54:10, 71:25
**wants** [3] - 10:13, 11:25, 25:12
**WARNAGIRIS** [1] - 1:6
**Warnagiris** [31] - 3:3, 3:19, 4:19, 14:3, 16:20, 17:12, 27:9, 27:14, 28:24, 29:1, 38:10, 39:7, 39:17, 41:7, 41:21, 42:9, 43:17, 46:2, 48:2, 49:14, 50:10, 52:6, 52:9, 52:24, 55:11, 55:13, 56:17, 56:19, 65:14, 65:24, 66:12
**Warnagiris's** [1] - 46:9
**Warner** [6] - 12:14, 12:17, 80:17, 80:24, 81:9, 81:19
**Washington** [5] - 1:15, 1:24, 17:13, 18:10, 82:13
**watch** [2] - 34:10,

79:19
**watched** [1] - 70:18
**water** [2] - 53:7, 64:11
**wearing** [7] - 17:2,
17:15, 18:10, 25:22,
33:4, 54:21
**west** [3] - 19:24,
39:10, 39:12
**West** [3] - 22:1, 24:5,
69:19
**white** [2] - 51:14
**whole** [1] - 81:15
**Wills** [1] - 5:14
**wise** [1] - 3:12
**wishes** [1] - 42:22
**withdraw** [1] - 14:17
**withdrawing** [1] -
24:16
**Witness** [1] - 16:24
**WITNESS** [38] - 2:2,
12:24, 17:23, 18:4,
19:22, 26:21, 28:17,
31:17, 31:20, 32:16,
35:6, 39:12, 40:4,
40:9, 43:4, 43:7,
43:10, 44:21, 46:23,
51:5, 53:10, 54:9,
57:16, 58:19, 60:9,
60:22, 60:24, 61:1,
61:14, 62:6, 73:2,
73:5, 73:9, 73:20,
73:24, 74:3, 80:9,
80:13
**witness** [24] - 5:17,
11:25, 12:12, 12:13,
15:16, 17:1, 18:8,
18:9, 18:25, 19:2,
19:6, 19:7, 22:14,
22:15, 35:21, 36:4,
42:21, 55:20, 59:4,
69:3, 81:1, 81:8,
81:12, 81:18
**witnessed** [1] - 78:6
**witnesses** [1] - 44:2
**witnessing** [1] - 21:8
**wooden** [1] - 51:14
**words** [3] - 9:11,
58:24, 59:9
**wore** [2] - 17:15, 18:10
**worn** [7] - 55:22,
55:23, 56:1, 57:16,
59:22, 67:5, 67:17
**Worn** [1] - 67:4
**worry** [1] - 4:20
**writes** [1] - 7:6
**written** [1] - 6:17

# Y

**yellow** [1] - 17:5

**yesterday** [15] - 13:1,
13:7, 20:4, 20:5,
22:7, 46:15, 47:23,
51:9, 51:22, 52:7,
54:10, 55:9, 74:9,
74:18, 74:21
**young** [1] - 13:25
**yourself** [3] - 56:24,
77:7, 78:6

# Z

**zoom** [3] - 34:4, 35:2,
37:7
**zoomed** [3] - 33:19,
34:5, 34:9