## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>NICHOLAS DECARLO and<br>NICHOLAS OCHS,<br><br>Defendants. | Criminal Action No. 21-00073<br><br>Judge Beryl A. Howell |

## <u>MEMORANDUM OPINION</u>

On September 9, 2022, defendants Nicholas DeCarlo and Nicholas Ochs both entered guilty pleas, pursuant to plea agreements with the government, to one felony obstruction charge under 18 U.S.C. § 1512(c)(2), for their offense conduct on January 6, 2021, at the U.S. Capitol while acting with the intent to obstruct, influence, or impede Congress's certification of the Electoral College vote and using unlawful means to do so, Plea Hr'g Tr. at 37:22–38:23, 51:12–52:6, Sept. 9, 2022, ECF No. 116, and were each subsequently sentenced, on December 9, 2022, to 48 months' incarceration, Sent'g Hr'g Tr. at 71:11–16, 76:4–9, Dec. 9, 2022, ECF No. 110. Nearly two years after pleading guilty and eighteen months after being sentenced, the Supreme Court held, in *Fischer v. United States*, 603 U.S. --, 144 S. Ct. 2176 (2024), that their statute of conviction imposed criminal liability only on defendants who "impaired the availability or integrity for use in an official proceeding of records, documents, objects, or . . . other things used in the proceeding, or attempted to do so." *Id.* at 2190. Both defendants then promptly moved, under 28 U.S.C. § 2255, to vacate as "void" their convictions and associated imposed sentences for violating Section 1512(c)(2). Defs.' Mot. Post-Conviction Relief ("Defs.' Mot.") at 2, 4, ECF

1

No. 112.[1]  The government opposes defendants' pending motion, arguing that consideration of the

merits is barred, due both to defendants' procedural default by failing to file a direct appeal of their

convictions and to their plea agreement waivers of their right, under 28 U.S.C. § 2255, to bring a

collateral attack.  Gov't's Opp'n Defs.' Mot. Vacate Their Convictions Under 28 U.S.C. § 2255

("Gov't's Opp'n") at 2–3, 11–37, ECF No. 121.

For the reasons explained below, defendants' motion to vacate their convictions, pursuant

to 28 U.S.C. § 2255, is GRANTED, subject to a 30-day stay, during which period defendants will

be ordered released on the same conditions as their pre-sentence release, *see* Defs.' Mot. at 6

(requesting these conditions for release, at least pending resolution of defendants' Section 2255

motion).[2]

## I.    BACKGROUND

The facts underlying defendants' offense conduct have been summarized previously in this

Court's prior decision denying defendants' release from incarceration pending resolution of their

Section 2255 motion, *see United States v. DeCarlo*, No. 21-cr-73 (BAH), 2024 WL 4039923, at

*1–3 (D.D.C. Sept. 4, 2024), and is detailed below.

### A.  Offense Conduct

---

[1]      Defendants also moved for immediate release pending resolution of their Section 2255 motion, Defs.' Mot. at 6, which requested relief was briefed separately, *see* Min. Order (July 25, 2024), and ultimately denied on September 4, 2024, *see United States v. DeCarlo*, No. 21-cr-73 (BAH), 2024 WL 4039923 (D.D.C. Sept. 4, 2024).

[2]      The parties have not requested a hearing on this Section 2255 motion, *see generally* Defs.' Mot.; Gov't's Opp'n; Defs.' Reply, which is resolved without a hearing, since no material facts are disputed and resolution does not require information outside the record.  *See United States v. Pollard*, 959 F.2d 1011, 1031 (D.C. Cir. 1992) ("Only where the § 2255 motion raises 'detailed and specific' factual allegations whose resolution requires information outside of the record or the judge's 'personal knowledge or recollection' must a hearing be held" (quoting *Machibroda v. United States*, 368 U.S. 487, 495 (1962))); *see also United States v. Hammond*, 351 F. Supp. 3d 106 (D.D.C. 2018) (granting defendant's Section 2255 motion on the record in the case and without a hearing); *United States v. Booker*, 240 F. Supp. 3d 164, 165 (D.D.C. 2017) (granting Section 2255 motion "[u]pon consideration of the parties' briefs and the relevant legal authorities"); *United States v. Cooper*, 610 F. Supp. 3d 184, 193 (D.D.C. 2022) (partially granting Section 2255 motion without holding a hearing because "[t]he Court needs only the record of this case to decide defendant's petition and does not need to resolve any factual allegations" (citing *Pollard*, 959 F.2d at 1031)).

Defendants both traveled to Washington, D.C., on January 5, 2021—DeCarlo from Fort Worth, Texas, and Ochs, the founder of the Hawaii chapter of the Proud Boys, from Honolulu, Hawaii.  Statement of Offense of Nicholas DeCarlo providing "factual basis for the defendant's guilty plea" ("DeCarlo SOF") Introduction & ¶ 8, ECF No. 79; Statement of Offense of Nicholas Ochs providing "factual basis for the defendant's guilty plea" ("Ochs SOF") Introduction & ¶¶ 8– 9, ECF No. 82.  DeCarlo explained that his trip to D.C. was to "expose those 'tolerant' leftists for their lies and teach them a lesson they'll NEVER forget: The MAGA TRAIN will KEEP ON ROLLIN'! TRUMP 2020 BABAAAY!"  DeCarlo SOF ¶ 8.  Ochs also said he came to D.C. because "the president asked and said it was gonna be wild and that people should wear body cameras."  Ochs SOF ¶ 9.  On January 6, 2021, defendants attended the former president's "Stop the Steal" rally at the Ellipse on the National Mall, following which they joined the crowd marching to the Capitol.  DeCarlo SOF ¶ 9; Ochs SOF ¶ 10.

As they approached the Capitol building, DeCarlo, filming on a GoPro, said, "this is where they are going to steal it.  And they called on us.  They called on us to stop it.  We are putting an end to it.  They said calling all patriots. . . . We're going to put the kai-bosh on this."  DeCarlo SOF ¶ 10; U.S. Rep. Regarding Video Evidence Described in Statement of Offense ("SOF Video Evid.") Ex. 8, ECF No. 74.  Ochs said, "the steal is in fact right here and we are going to stop it."  Ochs SOF ¶ 11; SOF Video Evid., Ex. 8.  The defendants passed through restricted grounds and reached the west side of the Capitol, where preparations were underway for the upcoming presidential inauguration, at which point Ochs told DeCarlo, who was still filming on his GoPro, "we're not supposed to be here, this is beyond the fence," and DeCarlo responded, "we're all felons, yeah!"  DeCarlo SOF ¶ 11; Ochs SOF ¶ 12; SOF Video Evid., Ex. 8.  As police tried to keep the crowd away from the Capitol building, both defendants threw smoke bombs at the police

line. DeCarlo SOF ¶ 12; Ochs SOF ¶ 13; SOF Video Evid., Ex. 12. DeCarlo lamented throwing his without "pulling the pin" and told Ochs, "yeah, pull the pin and throw it." SOF Video Evid., Exs. 12, 13; DeCarlo SOF ¶ 12; Ochs SOF ¶ 13. As defendants filmed the large crowd of rioters amassing outside the Capitol, DeCarlo asked Ochs, "you think they are scared in there?," and Ochs replied, "yeah, and I fucking love it." SOF Video Evid., Ex. 14.

Shortly after other rioters had broken into the Capitol, both defendants also breached the building through the Senate Wing doors at approximately 2:23 p.m. DeCarlo SOF ¶ 13; Ochs SOF ¶ 14. They walked through the halls of the building and arrived in the Crypt in the center of the Capitol building at approximately 2:26 p.m. *Id.* Here, defendants smoked cigarettes and took pictures of themselves doing so, which pictures Ochs posted to social media with the caption "Hello from the Capital lol." DeCarlo SOF ¶ 14; Ochs SOF ¶ 15. In a video obtained from a flashdrive owned by DeCarlo, while inside the Crypt, DeCarlo can be heard yelling out asking about the location of then-Speaker of the House Nancy Pelosi and being aware that Congress had gone into lockdown. DeCarlo SOF ¶ 14; SOF Video Evid., Ex. 18.

Both defendants then moved to the East Lobby of the Crypt. DeCarlo SOF ¶ 15; Ochs SOF ¶ 16. At approximately 2:30 p.m., as retreating Capitol police officers sought to close crash doors in an effort to seal off certain parts of the building from the rioters, defendants encouraged and recorded other individuals, including Proud Boy William Chrestman, who were attempting to block the doors from closing by wedging them open with objects. DeCarlo SOF ¶ 15; Ochs SOF ¶ 16; *see also* SOF Video Evid., Exs. 20, 21. Both defendants continued to walk around the building, roaming into the Capitol Visitor's Center, the East Foyer of the Capitol, the Rotunda, and Statuary Hall. DeCarlo SOF ¶ 16; Ochs SOF ¶ 17. At approximately 2:42 p.m., defendants met up with other rioters, including Proud Boys Ethan Nordean, Paul Rae, and at least one other

person, in the East Foyer.  *Id.*  The group hugged, and Ochs, Nordean, and Rae walked towards

the Capitol Rotunda.  *Id.*  DeCarlo walked from the East Foyer into the Rotunda less than a minute

later.  *Id.*  In the Rotunda, both defendants pointed out directions to Pelosi's office to a group of

rioters gathering there.  DeCarlo SOF ¶ 17; Ochs SOF ¶ 18.

Defendants exited the Capitol building through the Rotunda doors at approximately 3:00

p.m.  *Id.*  Between 3:08 and 3:12 p.m., defendants approached the Chestnut-Gibson Memorial

Door to the Capitol, where Ochs used his cell phone to film DeCarlo writing "Murder the Media,"

the name of defendants' social media channel, on the door in permanent marker, DeCarlo SOF ¶

18; Ochs SOF ¶ 19; SOF Video Evid., Ex. 30, and both men posed for photos with their

promotional graffiti, DeCarlo SOF ¶ 18; Ochs SOF ¶ 19; SOF Video Evid., Ex. 31.  Near the door,

DeCarlo stole a pair of flexcuffs from a Capitol Police duffel bag they found in the area.  DeCarlo

SOF ¶ 19; Ochs SOF ¶ 20; SOF Video Evid., Ex. 31.

Defendants then walked away from the building and documented on video the pride they

had about their conduct that day.  For example, Ochs, in a video filmed on his cell phone, said,

"sorry we couldn't go live when we stormed the fuckin' U.S. Capitol and made Congress flee."

Ochs SOF ¶ 22; SOF Video Evid., Ex. 32.  In another video filmed by Ochs the same day, while

walking through the streets of D.C. with DeCarlo, both defendants celebrated the fact that their

conduct contributed to Congress stopping its certification of the electoral college due to the riot.

Ochs said, "it may resume, but the steal is for now stopped," while DeCarlo said, "we fucking did

it," "that's what I came down here to do," and "we did our job."  DeCarlo SOF ¶ 21; Ochs SOF

¶ 23; SOF Video Evid., Ex. 33.

**B.  Charges, Guilty Pleas and Sentences**

Due to this offense conduct, defendants were each charged together in seven counts, including two felony counts for violating 18 U.S.C. §§ 371 (conspiracy to obstruct, influence, and impede an official proceeding) and 1512(c)(2) (obstruction of an official proceeding), as well as five misdemeanor counts for violating 18 U.S.C. §§ 1361, 641, 1752(a)(1), (2), and (4), and 2. Indictment, Feb. 4, 2021, ECF No. 17.[3]

Defendants moved to dismiss the two felony counts for conspiracy to obstruct and substantive obstruction of an official proceeding, *see* Def. DeCarlo Mot. Dismiss Counts One and Two ("Defs.' MTD"), Dec. 10, 2021, ECF No. 55; Def. Ochs Notice of Adoption of Mot., Dec. 14, 2021, ECF No. 56, on two grounds. First, defendants asserted that Section 1512(c)(2) did not cover defendants' conduct on January 6 because the certification proceeding was only "'ministerial' or 'ceremonial,'" and thus not an official proceeding as defined by the statute, Defs.' MTD at 1–2; *see also id.* at 8, which contemplated a formal hearing "involv[ing] some evidentiary function," *id.* at 6; *see also id.* at 7–8. At the hearing on defendants' motion, DeCarlo's counsel further explained this interpretation, arguing that the certification proceeding consisted of two distinct parts—the tabulation of the vote, and the resolution of any objections to the vote—and that defendants had only been charged with obstructing the *tabulation* of the vote, which was only "ministerial or ceremonial." Tr. Hr'g Defs.' Mot. Dismiss ("MTD Hearing") at 6:20–7:12, Jan. 21, 2022, ECF No. 66. Second, defendants challenged the application of Section 1512(c)(2) to their conduct as void for vagueness because "neither the plain language of the statute, nor the circumstances under which it has been previously applied" would have warned defendants that "entering the Capitol building and then leaving" could qualify as "an effort to 'corruptly' obstruct" the certification proceeding, Defs.' MTD at 2 (citing *Johnson v. United States*, 576 U.S. 591, 594

---

[3]    A subsequent Superseding Indictment filed against both defendants dropped the misdemeanor charge under 18 U.S.C. § 1752(a)(4) and maintained the remaining six charges. First Superseding Indictment, ECF No. 68.

(2015)).  Pointing to the conduct described in the Indictment, defendants asserted that they "did

not enter the Senate chamber, did not stand outside – or inside – the gallery and scream, or even

so much as loudly bang on the door," *id.* at 11–12, and that the language of Section 1512(c)(2),

prohibiting "corruptly" obstructing an official proceeding, therefore did not provide them with fair

notice that their "mere presence in the building"—while an acknowledged criminal trespass—

could be considered a violation of the statute, *id.* at 12; *see also* MTD Hearing at 8:3–9:5, 17:12–

19:3 (defense counsel explaining defendants' position).[4]

The Court orally denied defendants' motion on January 21, 2022, *see* MTD Hearing at

50:13–19, ruling that the January 6, 2021, congressional proceeding to certify the Electoral College

votes qualified as an official proceeding under the statute, *see id.* at 34:4–39:21, and that the statute

was not unconstitutionally vague as applied to defendants, *see id.* at 39:22–48:9.  As to defendants'

first challenge, the Court defined an official proceeding before Congress as a proceeding involving

"a formal assembly or meeting of Congress for purposes of conducting official business," *id.* at

33:24–34:3 (citing *United States v. Montgomery*, 578 F. Supp. 3d 54, 63 (D.D.C. 2021)), and found

that the constitutionally and statutorily mandated certification proceeding "easily falls within" this

definition, *id.* at 33:5–35:18 (citing *United States v. Sandlin*, 575 F. Supp. 3d 16, 22–23 (D.D.C.

2021); *United States v. Caldwell*, 581 F. Supp. 3d 1, 11 (D.D.C. 2021); *United States v. Nordean*,

579 F. Supp. 3d 28, 42 (D.D.C. 2021); *Montgomery*, 578 F. Supp. 3d at 63).  Furthermore, the

Court concluded that Congress indicated no intent to limit the scope of the statute to only official

---

[4]        Notably, defendants' Motion to Dismiss the two felony counts did not raise the same challenge to the scope of Section 1512(c)(2) subsequently found, on March 7, 2022, to be persuasive by another Judge on this Court in *United States v. Miller*, 589 F. Supp. 3d 60, 78 (D.D.C. 2022), *reconsideration denied*, 605 F. Supp. 3d 63 (D.D.C. 2022), and, again, in *United States v. Fischer*, No. 21-cr-234 (CJN), 2022 WL 782413, at *4 (D.D.C. Mar. 15, 2022)—namely, that violating Section 1512(c)(2) requires taking "some action with respect to a document, record, or other object" in order to obstruct an official proceeding.  *Miller*, F. Supp. 3d at 79.  The district court's reasoning in *Miller* and *Fischer* was affirmed by the Supreme Court in *Fischer*.  *See* 144 S. Ct. at 2186, 2190.

proceedings involving investigative, fact-finding, or legislative purposes, noting that if that were the intention, Congress "easily could have done so." *Id.* at 36:5–37:9 (citations omitted).  Nor did examination of the mechanics of the certification support defendants' argument that the certification process consisted of two separate proceedings, with the Court noting that "the joint session does not convene, count all of the votes, adjourn or declare a result, and then reconvene to resolve any objections to the vote count. It is one integrated, monolithic . . . process."  *Id.* at 38:24–39:12.

Defendants' vagueness argument was also rejected, given that acting "corruptly" requires three components—(1) "[i]ntent to obstruct, impede, or influence"; (2) "wrongfulness," *id.* at 44:2–6 (citing Gov't's Opp'n to Def. DeCarlo's Motion to Dismiss Counts One and Two of the Indictment at 20 ("Gov't's Opp'n MTD"), ECF No. 58); and (3) "a defendant engaging in obstructive conduct must have contemplated a particular, foreseeable proceeding . . . and interference with the proceeding must be the natural and probable effect of the defendant's conduct," *id.* at 44:7–15 (citing *United States v. Young*, 916 F.3d 368, 386 (4th Cir. 2019); *United States v. Phillips*, 583 F.3d 1261, 1264 (10th Cir. 2009))—and finding that these requirements "provide[] a clear standard to which a defendant can conform his behavior," *id.* at 44:16–19 (citing *Sandlin*, 575 F. Supp. 3d at 32).  Defendants had fair notice of their potential violation because "the indictment sufficiently allege[d] that [d]efendants acted intentionally, and also did so with consciousness of wrongdoing by engaging in illegal acts including trespass, depredation, and theft."  *Id.* at 47:19–25 (citing Gov't's Opp'n MTD at 25).

Following denial of defendants' motion to dismiss, and at the parties' request, *see* Joint Status Report, ECF No. 70, a scheduling order was entered with a jury trial scheduled to begin on November 4, 2022, *see* Min. Order (Feb. 23, 2022).  Less than two months before the scheduled

trial date, however, on September 9, 2022, pursuant to identical plea agreements with the government, defendants entered guilty pleas to Count Two of the Superseding Indictment, ECF No. 68, charging them with obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2) and 2. *See* Min. Entry, Sept. 9, 2022; Plea Agreement Nicholas DeCarlo ("DeCarlo Plea Agreement"), ECF No. 77; Plea Agreement Nicholas Ochs ("Ochs Plea Agreement"), ECF No. 81.

As relevant to defendants' instant motion, defendants' plea agreements contained a subsection titled "Appeal Rights," which provided that each defendant "agrees to waive, insofar as such waiver is permitted by law, the right to appeal the conviction in this case on any basis, including but not limited to claim(s) that (1) the statute(s) to which [you are] pleading guilty is unconstitutional, and (2) the admitted conduct does not fall within the scope of the statute(s)," except to the extent that such an appeal is based on a claim of ineffective assistance of counsel. DeCarlo Plea Agreement ¶ 10.C; Ochs Plea Agreement ¶ 10.C.

In addition, the plea agreements contained a separate subsection titled "Collateral Attack," which provided that each defendant:

> also waives any right to challenge the conviction entered or sentence imposed under this Agreement or otherwise attempt to modify or change the sentence or the manner in which it was determined in any collateral attack, including, but not limited to, a motion brought under 28 U.S.C. § 2255 or Federal Rule of Civil Procedure 60(b), except to the extent such a motion is based on newly discovered evidence or on a claim that [you] received ineffective assistance of counsel.

DeCarlo Plea Agreement ¶ 10.D; Ochs Plea Agreement ¶ 10.D.

The factual basis supporting defendants' guilty pleas were set out in Statements of Offense executed by defendants and their respective counsel, as well as counsel for the government. *See* DeCarlo SOF; Ochs SOF. To backstop and supplement the Statements of Offense, the government submitted 33 exhibits of photographs and videos captured on defendants' electronic devices, as

well as U.S. Capitol Police closed circuit video.  *See* SOF Video Evid.  At their joint change of plea hearing, both defendants confirmed they had fully read and discussed their respective Statements of Offense with their lawyers, Plea Hr'g Tr. at 18:17–19:1; confirmed they had signed the documents, *id.* at 19:5–19:12, 27:14–27:20; and confirmed, under oath and in response to the Court's inquiries, the veracity of the facts laid out in their respective SOFs, *id.* at 19:13–27:10, 27:21–37:19.

Defendants were both sentenced, on December 9, 2022, to 48 months' imprisonment on their convictions for violating Section 1512(c)(2), to be followed by 36 months of supervised release, and payment of a $100 special assessment, $2,000 in restitution to the Architect of the Capitol, and a criminal fine of $5,000 to Ochs and $2,500 to DeCarlo.  Sent'g Hr'g Tr. at 56:4–7, 71:11–21, 73:12–14, 76:4–13, 78:21–23; *see also* Judgment as to Nicholas Ochs ("Ochs Judgment") at 5, 7, ECF No. 106; Judgment as to Nicholas DeCarlo ("DeCarlo Judgment") at 5, 7, ECF No. 108.  At the conclusion of the sentencing hearing, the government's motion to dismiss the remaining five charges against defendants was granted, Sent'g Hr'g Tr. at 81:13–17, and both defendants were allowed to self-surrender to the custody of the U.S. Bureau of Prisons (BOP) to begin serving their sentences, *id.* at 81:18–23.  In accordance with their plea agreements' appeal waivers, neither defendant filed a direct appeal.

### C.  Pending Section 2255 Motion

Eighteen months after defendants' sentencing, the Supreme Court issued, on June 28, 2024, *Fischer*, holding that 18 U.S.C. § 1512(c)(2) criminalizes "obstruct[ing], influenc[ing], or imped[ing] any official proceeding," 144 S. Ct. at 2181 (quoting 18 U.S.C. § 1512(c)(2)), only if "the defendant impaired the availability or integrity for use in an official proceeding of records, documents, objects, or . . . other things used in the proceeding, or attempted to do so," *id.* at 2190.

Defendants now move, pursuant to 28 U.S.C. § 2255, for vacatur of their convictions, citing the narrowed scope of the offense conduct covered by the statutory provision to which they pled guilty and arguing that this charge "is most likely void *ab initio*," Defs.' Mot. at 2, or, at a minimum, defendants' plea agreements are "void for failure to adequately advise the defendants of the requisite *mens rea*," *id.* at 4, and, finally, since defendants' admitted conduct "no longer" satisfies the statutory requirements, they are now "innocent" of a violation of Section 1512(c)(2), as narrowed in *Fischer*, *id.* at 5; Defs.' Reply in Support of Mot. for Post-Conviction Relief ("Defs.' Reply Supp. Release") at 2, ECF No. 118.

This motion is now ripe for resolution. *See* Gov't's Opp'n; Defs.' Reply Supp. Mot. Post-Conviction Relief ("Defs.' Reply"), ECF No. 122.

## II.   LEGAL STANDARD

Under 28 U.S.C. § 2255, a person in federal custody may ask "the court which imposed" a sentence upon the prisoner to "vacate, set aside, or correct the sentence" on the basis that "the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). "If the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack," the court "shall vacate and set the judgment aside." *Id.* § 2255(b). The filing of such a collateral attack on a conviction and sentence is subject to certain procedural limitations, including "the strict time limits that Congress has placed on prisoners seeking collateral relief." *United States v. Hicks*, 283 F.3d 380, 385 (D.C. Cir. 2002); *see also* 28 U.S.C. § 2255(f).

To vacate a conviction via collateral attack, pursuant to 28 U.S.C. § 2255, "a defendant 'must clear a significantly higher hurdle than would exist on direct appeal.'" *United States v. Henderson*, 108 F.4th 899, 904 (D.C. Cir. 2024) (quoting *United States v. Frady*, 456 U.S. 152, 166 (1982)). As a threshold matter, defendants generally must first raise on direct appeal any claim for relief raised in a collateral attack. *See, e.g.*, *Massaro v. United States*, 538 U.S. 500, 504 (2003); *Bousley v. United States*, 523 U.S. 614, 621–22 (1998); *United States v. Hughes*, 514 F.3d 15, 17 (D.C. Cir. 2008). "Where a defendant has procedurally defaulted a claim by failing to raise it on direct review," that claim may be raised in a Section 2255 motion for habeas relief only if the defendant first shows either (1) cause for the procedural default and actual prejudice from the error, or (2) actual innocence of the underlying offense of conviction. *Bousley*, 523 U.S. at 622; *Dretke v. Haley*, 541 U.S. 386, 388 (2004); *see also Frady*, 456 U.S. at 167; *Henderson*, 108 F.4th at 904.

To establish cause for the procedural default, the defendant must show no direct appeal was filed because he "was impeded by some objective factor external to the defense, such as governmental interference or the reasonable unavailability of the factual basis for the claim." *McCleskey v. Zant*, 499 U.S. 467, 468 (1991). Alternatively, "[t]o establish actual innocence, [a defendant] must demonstrate that . . . 'it is more likely than not that no reasonable juror would have convicted him,'" in light of all the evidence presented. *Bousley*, 523 U.S. at 623 (quoting *Schlup v. Delo*, 513 U.S. 298, 327–28 (1995)); *see also United States v. Baxter*, 761 F.3d 17, 27–28 (D.C. Cir. 2014); *United States v. Bertram*, 762 F. App'x 1, 4 (D.C. Cir. 2019). Actual innocence "means factual innocence, not mere legal insufficiency," meaning that the government may "present any admissible evidence of [the defendant's] guilt even if that evidence was not presented during petitioner's plea colloquy." *Bousley*, 523 U.S. at 623–24. Furthermore, when the case involves a plea of guilty entered pursuant to a plea agreement with the government, and

12

the government has "forgone more serious charges" as part of the plea negotiations, habeas petitioners must show they are actually innocent of those forgone charges as well. *Id.* at 624.

## III.    DISCUSSION

Defendants make three principal arguments for vacatur of their convictions under Section 2255: (1) the Section 1512(c)(2) charge is invalid for failing to include an essential element, as this statute is interpreted in *Fischer*, *see* Defs.' Mot. at 1–2, 4; (2) defendants' guilty pleas are "void for failure to adequately advise the defendants of the requisite *mens rea,*" as identified in *Fischer*, *id.* at 4–5; and (3) defendants are "actually innocent" because their statute of conviction no longer criminalizes their actions, Defs.' Reply Supp. Release at 5; *see also* Defs.' Mot. at 5 (arguing it "is no longer the case" that defendants' actions "satisfy the statute"); Defs.' Reply at 1–4. The government counters that defendants' Section 2255 motion is barred both by their procedural default by failing to raise their claims on direct appeal and by the collateral attack waivers in their plea agreements and, consequently, defendants' substantive claims may not be considered. *See* Gov't's Opp'n at 1–3, 11–37.[5]

Considering the government's arguments, the Court holds, first, that defendants have made a sufficient showing of actual innocence to their charge of conviction to overcome their procedural default, allowing them to raise their claims in a Section 2255 motion, and, second, that the merits of defendants' Section 2255 motion may be considered, notwithstanding the valid collateral attack waivers in defendants' plea agreements, because their showing of actual innocence falls within the D.C. Circuit's miscarriage of justice exception to the enforceability of plea waivers.

---

[5]    The government concedes that defendants timely filed the pending motion, *see* Gov't's Opp'n at 12, and thus the strict limitations period applicable under 28 U.S.C. § 2255(f) is no obstacle for defendants in this case. *See Wood v. Milyard*, 566 U.S. 463, 472–73 (2012) (holding that "it would be an abuse of discretion" for a court to "override a State's deliberate waiver of a limitations defense" (quoting *Day v. McDonough*, 547 U.S. 198, 202 (2006)).

## A.  Procedural Default

As already noted, the government argues that defendants' Section 2255 motion is barred by procedural default, since defendants filed no direct appeal of their convictions and thus none of the arguments advanced in their pending motion were reviewed on direct appeal.  Recall that such procedural default may only be excused by defendants showing either a cognizable cause and actual prejudice for the default or actual innocence of the underlying offense of conviction and any relevant foregone charges.  *Bousley*, 523 U.S. at 622, 624.  While defendants do not satisfy the former excuse, they do the latter.

### 1.  Cause for Procedural Default

"The procedural default rule generally precludes consideration of an argument made on collateral review that was not made on direct appeal, unless the defendant shows cause and prejudice."  *Hughes*, 514 F.3d at 17 (citations omitted).  Establishing cause requires showing that "some objective factor external to the defense impeded counsel's efforts" to timely appeal.  *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  At a minimum, cause exists when a claim is "so novel that its legal basis [was] not reasonably available to counsel" at the time a direct appeal could have been filed.  *Bousley*, 523 U.S. at 622 (quoting *Reed v. Ross*, 468 U.S. 1, 16 (1984)).  At least three circumstances have been recognized as demonstrating novelty:

> (1) the Supreme Court explicitly overrules its own precedent; (2) the Supreme Court changes course on a "longstanding and widespread practice to which [the Supreme Court had] not spoken, but which a near-unanimous body of lower court authority has expressly approved"; and (3) the Supreme Court disapproves of a once-sanctioned practice.

*United States v. Hammond*, 351 F. Supp. 3d 106, 123 (D.D.C. 2018) (alteration in original) (quoting *Reed*, 468 U.S. at 17); *see also United States v. Arrington*, No. 00-cr-159 (RCL), 2024 WL 451306, at *7 (D.D.C. Feb. 5, 2024) (same).

The government is correct that defendants cannot show cause for their procedural default, *see* Gov't's Opp'n at 21–23, and, notably, defendants do not contest this point, *see generally* Defs.' Mot.; Defs.' Reply.  As the government persuasively argues, defendants have identified "no external factor preventing them from bringing this claim."  Gov't's Opp'n at 22.  Furthermore, defendants' claim that Section 1512(c)(2) did not criminalize their actions at the U.S. Capitol was not novel at the time they could have filed a direct appeal.  Before entering their guilty pleas, defendants had moved to dismiss the obstruction charge, arguing that their conduct did not fall under the prohibitions of Section 1512(c)(2) and that the statute was void for vagueness.  DeCarlo MTD at 1–2; *see also* Ochs Notice of Adoption of Mot.  Additionally, as the government points out, questions about the scope of Section 1512(c)(2), as applied to defendants charged with offense conduct at the U.S. Capitol on January 6, 2021, were being "heavily litigated" in this Court throughout the time defendants negotiated their pleas, entered their guilty pleas, were sentenced, and they could have proceeded in a manner allowing the filing of a direct appeal.  Gov't's Opp'n at 7 (citing examples of decisions on this issue, including *Montgomery*, 578 F. Supp. 3d at 58, and *Caldwell*, 581 F. Supp. 3d at 10); *see also, e.g.*, *United States v. Andries*, No. 21-cr-93 (RC), 2022 WL 768684, at *1 (D.D.C. Mar. 14, 2022); *United States v. Robertson*, 610 F. Supp. 3d 229, 232 (D.D.C. 2022); *United States v. Rodriguez*, 21-cr-246 (ABJ), 2022 WL 3910580, at *2 (D.D.C. Aug. 31, 2022); *United States v. Gray*, 652 F. Supp. 3d 112, 118 (D.D.C. 2023) (collecting other cases).  In fact, roughly six months before defendants pled guilty, another Judge on this Court dismissed Section 1512(c)(2) charges in two cases as not covering offense conduct at the Capitol on January 6, 2021, unless that conduct involved taking "some action with respect to a document, record, or other object in order to corruptly obstruct, impede or influence an official proceeding." *United States v. Miller*, 589 F. Supp. 3d 60, 78 (D.D.C. 2022), *reconsideration denied*, 605 F.

Supp. 3d 63 (D.D.C. 2022); *United States v. Fischer*, No. 21-cr-234 (CJN), 2022 WL 782413, at

*4 (D.D.C. Mar. 15, 2022).[6] Both cases were also appealed by the government and were pending

before the D.C. Circuit before defendants in this case entered their pleas.[7] In this case, defendants

cannot establish cause merely because their argument was rejected at the district court level. As

the Supreme Court has explained, "futility cannot constitute cause if it means simply that a claim

was 'unacceptable to that particular court at particular time.'" *Bousley*, 523 U.S. at 623

(quoting *Engle v. Isaac*, 456 U.S. 107, 130 (1982)).

### 2. Actual Innocence

Defendants may still succeed in overcoming their procedural default by showing they are

actually innocent of their conviction. *See id.* at 622. To do so, defendants must establish that "it

is more likely than not that no reasonable juror would have convicted [them]," in light of all the

---

[6]     Further undercutting a characterization of the *Fischer* ruling, at the district court or Supreme Court level, as "novel" is the fact that the reasoning in this decision tracks the view publicly espoused several years earlier by former Attorney General William Barr, who in a June 2018 memorandum to the Department of Justice criticized Special Counsel Robert Mueller's investigation of then-President Trump as "proposing an unprecedented expansion of obstruction laws so as to reach facially-lawful actions taken by the President" and urged that Section 1512(c)(2) should be interpreted as "somehow tied to, and limited by, the character of all the other forms of obstruction listed in the statute," limiting the reach of this statutory subsection to "acts that have the *same kind of obstructive impact* as the listed forms of obstruction – *i.e.*, impairing the availability or integrity of evidence – but cause this impairment in a different way than the enumerated actions do." Memorandum from Bill Barr to Deputy Attorney General Rod Rosenstein, Assistant Attorney General Steve Engel at 2, 4 (June 8, 2018), https://int.nyt.com/data/documenthelper/549-june-2018-barr-memo-to-doj-mue/b4c05e39318dd2d136b3/optimized/full.pdf (emphasis in original); *see also Confirmation Hearing on the Nomination of Hon. William Pelham Barr to be Attorney General of the United States*, 116th Cong. 81–82 (2019) [hereinafter *Barr Hr'g*] (testimony of William Barr) (discussing the memo, his interpretation of the statute, and the "public reports" about the Special Counsel's investigation that led him to write it). This reading of the statute was controversial at the time, *see, e.g.*, Daniel Hemel & Eric Posner, *Bill Barr Just Argued Himself Out of a Job*, N.Y. Times (Dec. 21, 2018), https://www.nytimes.com/2018/12/21/opinion/william-barr-attorney-general-memo-trump.html; Marty Lederman, *A First Take on Bill Barr's Memo on Presidential Authority and the Mueller Investigation*, Just Security (Dec. 20, 2018), https://www.justsecurity.org/61975/legal-arguments-bill-barrs-memo-mueller-investigation/, prompting questions posed to Barr about the memorandum and its conclusions during his confirmation hearing to be Attorney General, *see Barr Hr'g* at 15, 17, 81–82.

[7]     The D.C. Circuit issued its opinion reversing the district court in the case on April 7, 2023, roughly nine months after the appeals were filed and four months after both defendants were sentenced in this case. *United States v. Fischer*, 64 F.4th 329 (D.C. Cir. 2023), *cert. granted*, 144 S. Ct. 537 (2023), and *vacated and remanded*, 144 S. Ct. 2176 (2024). The D.C. Circuit's decision was then appealed to the Supreme Court, which ultimately issued *Fischer*, 144 S. Ct. 2176, on June 28, 2024.

evidence presented. *Bousley*, 523 U.S. at 623 (quoting *Schlup*, 513 U.S. at 327); *see also Baxter*, 761 F.3d at 27–28. Where equal or more serious charges against defendants were forgone by the government as part of the plea bargain, defendants must also make this same showing on the forgone charges. *Bousley*, 523 U.S. at 624; *see also United States v. Caso*, 723 F.3d 215, 221–22 (D.C. Cir. 2013) (extending the *Bousley* rule to charges forgone in plea bargaining that are of equal seriousness). The government insists that defendants cannot show their actual innocence of either their Section 1512(c)(2) convictions or two additional felony charges the government claims to have forgone as part of plea negotiations with defendants. *See* Gov't's Opp'n at 7–8, 24–36.[8] The government's efforts to rebut defendants' claimed actual innocence are not persuasive, however.

### (a) Forgone Charges

The two possible felony charges that the government represents were forgone during plea bargaining are identified as violations of 18 U.S.C. § 111(b) and 18 U.S.C. § 372, which the

---

[8] The other charges in the Superseding Indictment against defendants are not relevant to this analysis and, in fact, the government ignores them. *See generally* Gov't's Opp'n at 24–33. Defendants' innocence of the charge in Count One of conspiracy, in violation of 18 U.S.C. § 371, would rise and fall with the analysis for Section 1512(c)(2), since the object of this charged conspiracy was obstruction of Congress's official proceeding to certify the Electoral College vote. *See* First Superseding Indictment at 5. To prove the charged conspiracy, the government must prove that the defendant (1) entered into an agreement with at least one other person, (2) to commit a specific offense or offenses, (3) with knowledge of the conspiracy and intent to commit the offense, and (4) at least one of the conspirators committed an overt act to further the conspiracy. *United States v. Gatling*, 96 F.3d 1511, 1518 (D.C. Cir. 1996). By establishing their actual innocence of Section 1512(c)(2) because their specific actions were not criminalized by that statute, as limited by *Fischer*, defendants would also establish their innocence of the charged conspiracy, because the government could no longer prove that the charged object of the conspiracy was itself a criminal offense. On the other hand, if defendants failed to prove their actual innocence of Section 1512(c)(2), their actual innocence of Section 371 would no longer be relevant, since defendants would have already failed to carry their burden to succeed in excusing their procedural default.

The remaining charges, in Counts Three through Six in the Superseding Indictment, were misdemeanor charges, *see id.* at 8–10, with statutory maximum penalties less severe than that provided under Section 1512(c)(2), *see* 18 U.S.C. § 3559(a)(6), and likewise less severe sentencing guidelines ranges than defendants' range of 41 to 51 months' incarceration for their Section 1512(c)(2) convictions, *see* Sent'g Hr'g Tr. at 10:10–12 (calculating defendants' guidelines range for their Section 1512(c)(2) convictions); U.S. Sent'g Guidelines Manual § 5G1.1(a) (U.S. Sent'g Comm'n 2023) (establishing that, if the calculated sentencing guidelines range falls above the statutory maximum for the conviction, the statutory maximum "shall be the guidelines sentence"); *see also Caso*, 723 F.3d at 225 (holding that, in the D.C. Circuit, courts measure the relative seriousness of a charge using the sentencing guidelines range). Defendants have served about 21 months in prison already—more than the statutory maximum penalty they would have faced if the sentences for the misdemeanor counts were imposed concurrently.

government contends are both equal to or more serious, under the *Bousley*/*Caso* framework, than defendants' Section 1512(c)(2) convictions. *See* Gov't's Opp'n at 7–8, 24–33. As support, the government makes the following representations in its opposition briefing: after the trial date was set in the case and defendants' Motion to Dismiss had been denied, the government uncovered during trial preparation and "disclosed videos showing the defendants throwing objects at the police during the violent confrontation on the Capitol's West Front." *Id.* at 7. The government explained to defendants that "these videos were evidence of additional felony conduct," prompting plea negotiations to begin. *Id.* at 7–8. Based on these representations, the government argues, defendants must prove they are actually innocent of violating both Sections 111(b) and 372, in addition to Section 1512(c)(2), to overcome the otherwise applicable procedural default. *See id.* at 24–33.

Without questioning the veracity of the government's representations, including as to the additional evidence supporting the two identified-but-uncharged felonies under Sections 111(b) and 372—which representations are not disputed by defendants, *see generally* Defs.' Reply—the absence of record evidence supporting these representations about foregone charges poses a fatal problem. In *Bousley*, the Supreme Court recognized the general rule that a defendant trying to excuse a procedural default of a habeas claim must show his actual innocence of any more serious forgone charges in addition to the crime of conviction. 523 U.S. at 624. Importantly, however, the Court declined to apply this rule to the habeas petitioner in that case because the additional charge the government argued had been forgone in plea bargaining was not charged in the indictment against the petitioner, and "no record evidence" showed "that the [g]overnment elected not to charge petitioner with" that additional crime "in exchange for his plea of guilty." *Id.*

The D.C. Circuit has recognized *Bousley*'s rule that foregone charges must be supported by some amount of record evidence, while declining to delineate exactly how much or what type of evidence is sufficient. For example, in *Caso*, although the defendant was never charged with the additional crime that the government argued had been foregone, the "lead prosecutor" submitted an affidavit into the record "averring that the government had indeed contemplated charging [the defendant] with [the additional crime], but had consciously forgone doing so as part of the plea agreement." *Caso*, 723 F.3d at 220. The court noted that the representations in the affidavit were corroborated by (1) a statement in the plea agreement establishing that the defendant would not be prosecuted for any other crimes established by his Statement of Offense, and (2) admissions in the defendant's Statement of Offense sufficient to establish "at least a presumptive violation" of the additional charge. *Id.* at 220–21. Notwithstanding the submission of a sworn affidavit and corroboration for the attestations contained in the affidavit, the court did not embrace this evidence as conclusive. Rather, the court noted that *Bousley*'s "ambiguous" language did not resolve whether "*post hoc* affidavits" were sufficient evidence of a forgone charge or "whether the government's decision to forgo a charge must have been expressly made or whether it is sufficient that it be implicit in the conduct the defendant acknowledges in his plea." *Id.* at 221. In the end, the court declined to resolve whether the government's affidavit provided a sufficient showing of forgone charges, *id.*, concluding instead that the allegedly foregone charge was less serious based on its applicable sentencing guidelines range in any event, *id.* at 222–27. Since defendant had established his actual innocence of his crime of conviction, *see id.* at 217, defendant successfully overcame his procedural default and the district court's denial of his Section 2255 motion was reversed, *id.* at 221, 227. *Cf. Baxter*, 761 F.3d at 28–29 (citing the rule from *Bousley* and holding

that a defendant formally charged in an indictment with alternative theories of mail and wire fraud must prove his actual innocence of the alternative charged theories).

In this case, the evidence in the record that additional charges were forgone as part of the plea bargain is far less than that provided in *Caso* and more akin to *Bousley*. Indeed, the only representations made by the government about foregoing charges under Sections 111(b) and 372 are in opposition briefing to defendants' pending motion—and arguments made in briefs "are not evidence." *Twin Rivers Paper Co. v. SEC*, 934 F.3d 607, 613 (D.C. Cir. 2019) (citation omitted). Neither the original or Superseding Indictment against defendants, ECF Nos. 17 and 68, charge either defendant with violations of Sections 111(b) and 372. To be sure, the government submitted videos of defendants' conduct at the Capitol on January 6, 2021, in connection with the plea hearing and as support for the defendants' Statement of Offense underlying their guilty pleas, *see* Gov't's Opp'n at 7 (citing SOF Video Evid. Ex. 13), that may contain evidence to support these additional felony charges. Plus, defendants' plea agreements contain provisions expressly stating that defendants will not face further criminal prosecution for the conduct described in their Statements of Offense, possibly alluding to potential additional charges. DeCarlo Plea Agreement ¶ 4; Ochs Plea Agreement ¶ 4. Yet, this record is too thin a reed to support a finding that the additional charges were forgone by the government when no filing—not defendants' plea agreements, Statements of Offense, or any other representation during the plea hearing—mentions any consideration of additional specific charges being filed or forgone against defendants, nor otherwise corroborates the government's representations about forgone charges, as there was in *Caso*, *see* 723 F.3d at 220–21. Just as in *Bousley*, the lack of any evidence in the record is fatal to the government's assertion that additional charges against defendants were forgone as part of the

plea negotiations.[9]  Consequently, to overcome their procedural default, defendants must show their actual innocence of violating only Section 1512(c)(2).

### (b) Actual Innocence of Section 1512(c)(2), Post-**Fischer**

The government vigorously contends that a reasonable juror could find that defendants "impaired (or attempted to impair) the availability of [the] electoral certificates for use in the certification proceeding set to take place on January 6."  Gov't Opp'n at 34.  According to the government, the rioters, including defendants, "caus[ed] or attempt[ed] to cause the electoral ballots to be removed from the Chamber to ensure their safety," which impaired their availability to Congress to conduct the official proceeding.  *Id.*  Set against this factual backdrop, the government reasons, a reasonable juror could find that defendants violated Section 1512(c)(2) in two ways: (1) by actually impairing the availability of the documents for use in the official proceeding in Congress on January 6, 2021, or (2) by attempting to impair the availability of these documents for use in the official proceeding.  Under either theory, this reasoning goes, defendants cannot establish their actual innocence of their Section 1512(c)(2) convictions.  *Id.* at 33–36.

Given the seriousness of the disruption to the constitutionally mandated process of counting Electoral College ballots that occurred on January 6, 2021—and the fact that defendants' conduct directly contributed to stop that process for critical hours during the day—the

---

[9]    The parties raise several substantive arguments as to whether the potential charges under 18 U.S.C. § 111(b) or 18 U.S.C. § 372 qualify as equal or more serious than defendants' Section 1512(c)(2) convictions, including (1) whether language in the Department of Justice Principles of Federal Prosecution that "prosecutors will generally seek a plea to the most serious offense that is consistent with the nature and full extent of the defendant's conduct and likely to result in a sustainable conviction and proportional sentence" indicates the government did not forgo more serious charges in this case, *see* Defs.' Reply Supp. Release at 5 (quoting U.S. Dep't of Just., Just. Manual § 9.27-400 (2022)); Gov't Opp'n at 25–26; Defs.' Reply at 2; (2) whether the sentencing guidelines calculations for any potential Section 111(b) or Section 372 charge against defendants would produce more severe sentencing ranges than those applied to defendants' Section 1512(c)(2) convictions, *see* Defs.' Reply Supp. Release at 5–6; Gov't Opp'n at 27–30, 32–33; and (3) whether the *Bousley* rule remains applicable more generally, *see* Defs.' Reply Supp. Release at 4, 4 n.2; Gov't Opp'n at 26–27; Defs.' Reply at 1–2.  These arguments need not be addressed because the government has pointed to no "record evidence," *Bousley*, 523 U.S. at 624, showing that the potential charges under Sections 111(b) and 372 were forgone by the government during plea negotiations.

government's theory is tempting to adopt. The government's construction of Section 1512(c)(2), however, fails to grapple fully with "the limited reach" imposed by the Supreme Court's *Fischer* decision. *Fischer*, 144 S. Ct. at 2181.

At the outset, the parties do not dispute that certain elements of Section 1512(c)(2) are satisfied by defendants' conduct, including that the certification of the Electoral College on January 6, 2021, was an "official proceeding" or that the electoral ballots critical to this certification process are "documents" within the meaning of § 1512(c)(2), as interpreted by *Fischer*. *See* Defs.' Mot at 1–2 (arguing only that there is no basis to conclude that defendants "affected (or attempted to affect) record[s], documents, or objects"). Additionally, the government does not allege that defendants impaired, or attempted to impair, the availability of any "records, documents, or objects" or "other things" of evidentiary value "used in an official proceeding," *Fischer*, 144 S. Ct. at 2186 (emphasis omitted), other than the electoral ballots. *See* Gov't's Opp'n at 34–37.

In *Fischer,* the Supreme Court held that the scope of Section 1512(c)(2)'s prohibition on corruptly "otherwise obstruct[ing], influenc[ing], or imped[ing] any official proceeding, or attempt[ing] to do so," 18 U.S.C. § 1512(c)(2), is "limited by" and "defined by reference to" the "preceding list of criminal violations" provided in subsection (c)(1), *Fischer*, 144 S. Ct. at 2185, which proscribes "alter[ing], destroy[ing], mutilat[ing], or conceal[ing] a record, document, or other object, or attempt[ing] to do so, with the intent to impair the object's integrity or availability for use in an official proceeding," 18 U.S.C. § 1512(c)(1). In so holding, *Fischer* imported text from Section 1512(c)(1) to limit the scope of Section 1512(c)(2) to cover only actions, other than the four types of actions specifically enumerated by (c)(1)—*e.g.*, "alter[ing], destroy[ing], mutilat[ing], or conceal[ing]," *id.*—that "impair[] the availability or integrity for

22

use in an official proceeding of records, documents, objects, or . . . other things used in the proceeding, or attempt[] to do so." *Fischer*, 144 S. Ct. at 2190. As a consequence, based on this statutory construction, to prove a violation of Section 1512(c)(2), *Fischer* requires that the government prove a defendant "impair[ed] the availability or integrity of records, documents, or objects used in an official proceeding," or "*other* things used in an official proceeding," in ways other than by "alter[ing], destroy[ing], mutilat[ing], or conceal[ing]," 18 U.S.C. § 1512(c)(1), those things. *Fischer*, 144 S. Ct. at 2186 (emphasis in original).[10]

The success of the government's first theory for defendants' criminal liability under Section 1512(c)(2), therefore, rests on whether a reasonable juror could find that defendants' conduct attempted to or obstructed the official proceeding of congressional certification of the 2020 presidential election by causing the removal of the electoral ballots from the Senate or House chamber and, by such conduct, *impaired* the availability or integrity of the ballots for use in the certification proceeding. Put another way, the pertinent legal question applied to defendants' offense conduct is whether engaging in conduct causing the halting of the proceeding and the concomitant removal of the ballots to a more secure location amounts to impairing the availability or integrity of the ballots themselves—and, on the factual record in this case, the answer is no.

---

[10]    The Supreme Court provided examples of conduct that would run afoul of Section 1512(c)(2) by "impair[ing] the availability or integrity of records, documents, or objects used in an official proceeding in ways other than those specified in (c)(1)," as well as the types of "*other* things" of evidentiary value that may be covered by this statutory subsection, *Fischer*, 144 S. Ct. at 2186 (emphasis in original), including (1) "by creating false evidence—rather than altering incriminating evidence," *id*. (citing case example of "transmitting a forged court order"); and (2) by "impairing the availability or integrity of *other* things used in an official proceeding beyond the 'record[s], document[s], or other object[s]' enumerated in (c)(1), such as witness testimony or intangible information," *id*. (emphasis in original) (citing case example of "defendant's attempt to orchestrate a witness's grand jury testimony"). The government does not contend that defendants engaged in "creating false evidence," such as fraudulent electoral ballots for submission to government officials, or tried to impair intangible information of an evidentiary nature used in the certification proceeding, but instead specifically identifies the electoral ballots as the tangible objects defendants sought to impair in some way to obstruct the certification proceeding. Gov't's Opp'n at 34–35).

23

No evidence suggests that the electoral ballots' "integrity," *Fischer*, 144 S. Ct. at 2186, was affected by the events on January 6, 2021, and the government does not argue otherwise. *See* Gov't's Opp'n at 34–37. Instead, the government focuses on the availability of the ballots to Congress for use in the certification proceeding, arguing this availability was impaired upon removal of these documents from the Senate chamber for safekeeping after the rioters' actions forced Congress to temporarily suspend the proceeding. *See id.* at 34. Due to the specific events that occurred on January 6, 2021, this theory of impaired availability stretches beyond a fair reading of *Fischer*.

Impairing the availability of "a record, document, or other object for use in an official proceeding," 18 U.S.C. § 1512(c)(1), means to diminish, weaken, or make worse that availability. *See Impair*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/impair (last visited Oct. 30, 2024) (defining "impair" as "to diminish in function, ability, or quality" or "to weaken or make worse"). For defendants to have violated Section 1512(c)(2) under the government's first theory, the removal of the documents from the congressional chamber must have diminished or worsened the availability of the documents, specifically for use in Congress's official proceeding to certify the Electoral College votes. *See Fischer*, 144 S. Ct. at 2185 (finding that Section 1512(c)(2) is "[t]ether[ed] . . . to the context of (c)(1)," which "consists of many specific examples of prohibited actions undertaken with the intent to impair an object's integrity or availability for use in an official proceeding"). At the time Senate staff members removed the documents from the chamber, however, the proceeding had already been temporarily suspended, *see* Marshall Cohen & Avery Lotz, *The January 6 Insurrection: Minute-by-Minute*, CNN.com (July 29, 2022, 3:43 PM), https://www.cnn.com/2022/07/10/politics/jan-6-us-capitol-riot-timeline/index.html; Chabeli Carrazana, *The Woman Who Saved the Boxes of Electoral Votes*

*During a Riot in the Capitol*, The 19th (Jan. 8, 2021, 4:18 PM), https://19thnews.org/2021/01/the-women-who-saved-the-boxes-of-electoral-college-votes-during-a-riot-in-the-capitol/    (reporting that the ballots were removed "when an announcement was issued to move staff from the Senate chamber and into a safe room"), and "legislators were evacuated from the House and Senate chambers," Gov't's Opp'n at 34 (citing U.S. Br. at 60, *United States v. Fischer*, No. 22-3038 (D.C. Cir.) (filed Aug. 8, 2022)).    The temporary removal of the documents, therefore, did not immediately impact their availability to be used in the certification proceeding, since that proceeding was not in progress and both houses of Congress were recessed due to the security threat posed by the rioters to the Vice President, Members of Congress, and overwhelmed law enforcement personnel.

In the context of the overall catastrophic security breach posed by non-security screened rioters roaming Capitol corridors and rooms, the removal of the ballots from the Senate and House chambers *preserved* their availability for use in the certification process, rather than *impaired* that availability.    As the government acknowledges, the electoral ballots were removed from the chamber when the rioters began to breach the Capitol grounds and building in order to "maintain custody of the ballots and make sure nothing happen[ed] to them."    *Id.* (alteration in original) (quoting U.S. Br. at 60, *United States v. Fischer*, No. 22-3038 (D.C. Cir.) (filed Aug. 8, 2022)). This action was crucial to ensuring both the integrity of the ballots and that the ballots remained available to be used when the proceeding resumed later in the evening.    *See* Carrazana, *supra* at III.A.2.(b) (quoting Sen. Tammy Duckworth as saying, "One of the staff members was very quick thinking and was able to grab and secure the electoral college ballots and take them with her to this location, *so we have them with us and we will be able to proceed as long as Mitch McConnell calls us back into session*" (emphasis supplied)); *id*. (quoting Sen. Jeff Merkley as saying that

removing the ballots "rescued the voice of the American people" from being damaged by the rioters). While the disruption to Congress caused by the rioters, including defendants, was severe, the electoral ballots remained intact, unaltered, unimpaired, and within the control of the appropriate congressional personnel to ensure their availability for use when the official proceedings could safely resume. *See id.*; Gov't's Opp'n at 34 (acknowledging that the documents were moved to "maintain custody" over them and "make sure nothing happened to them").

The government's focus on the fact that the ballots could not be readily used to certify the election when the certification proceedings were suspended due to the security threat the rioters posed broadens the range of obstructive conduct made illegal under the Section 1512(c)(2) beyond the strict reading given in *Fischer,* which requires a "focus on evidence impairment." 144 S. Ct. at 2185; *see also id.* at 2186 (concluding "that subsection (c)(2) was designed by Congress to capture other forms of evidence and other means of impairing its integrity or availability beyond those Congress specified in (c)(1)"). Embracing the government's theory would risk "transforming this evidence-focused statute into a one-size-fits-all solution to obstruction of justice," *id.* at 2189, simply because documents in the form of electoral ballots were to be used in the proceeding. This is what the Supreme Court sought to avoid. Indeed, the Supreme Court expressly rejected a reading of Section 1512(c)(2) that would "authorize [] penalties for *any* conduct that delays or influences a proceeding in *any* way," noting that "[i]nstead, Section 1512 mentions 'record,' 'document,' or other 'object' 26 times." *Id.* (emphasis in original). In other words, while defendants and the other rioters certainly prevented the immediate ability of Congress to use the ballots in the official proceeding as intended, they did so by stopping the official proceeding itself, not by "impair[ing]" the ballots' "integrity or availability for use in an official proceeding." 18 U.S.C. § 1512(c)(1); *Fischer,* 144 S. Ct. at 2185. The government's theory of

obstruction—that by forcing Congress's official proceeding to be halted, defendants prevented the use of the ballots as intended to certify the Electoral College vote—is the exact interpretation rejected by the Supreme Court in *Fischer*. *See* 144 S. Ct. at 2182–83, 2189–90. Justice Barrett expressly recognized this rejected application of Section 1512(c)(2), stating, in dissent, that the Court's narrow "evidentiary focus" in interpreting this statute means that "[o]ther means of obstructing a proceeding—*say, by shutting it down*—are out." *Id.* at 2196 (Barrett, J., dissenting) (emphasis supplied). Thus, the government's theory that "[b]locking an official proceeding from moving forward" and "forc[ing] the delay of Congress's joint session on January 6th," *id.* at 2195, so that Members of Congress are simply unable to count electoral ballots, cannot be the basis of criminal liability for defendants here.[11] As the facts demonstrate, while the proceeding itself was clearly obstructed by being halted, neither the ballots themselves nor their availability for use in the proceeding were impaired by their temporary removal from the Senate chamber to ensure their safety. Consequently, post-*Fischer*, no properly instructed, reasonable juror could find defendants guilty of violating Section 1512(c)(2) simply because defendants' conduct was intended to stop— and succeeded in stopping, at least temporarily—the certification proceeding.

The record also does not provide enough evidence for a reasonable juror to find defendants guilty of attempting to violate Section 1512(c)(2), for a similar reason. Under *Bousley*, a defendant attempting to prove actual innocence must establish that, "in light of all the evidence," "it is more

---

[11]     In proffering this theory, the government expressly acknowledges the invitation in Justice Jackson's concurrence to determine whether conduct at the Capitol on January 6, 2021, "involved the impairment (or the attempted impairment) of the availability or integrity of things used during the January 6 proceeding 'in ways other than those specified in (c)(1),'" *Fischer*, 144 S. Ct. at 2194 (Jackson, J., concurring) (quoting *id.* at 2180), and if the conduct did, then a prosecution under Section 1512(c)(2) "can, and should, proceed," *id. See* Gov't's Opp'n at 34– 35 (referencing the *Fischer* concurring opinion). In this case, however, the government has failed to show how its theory that stopping the certification impaired the availability of the electoral ballots falls within the *Fischer* majority's narrow interpretation of (c)(2) as an "evidence-focused statute," *Fischer*, 144 S. Ct. at 2189 (majority opinion), requiring focus on actions that impair "the availability or integrity . . . of records, documents, objects, or . . . other things used in the proceeding," *id.* at 2190.

likely than not that no reasonable juror would have convicted" him of the crime, *Bousley*, 523 U.S. at 623 (quoting *Schlup*, 513 U.S. at 327–28)—here, an attempted violation of Section 1512(c)(2), as narrowed by *Fischer*.   This statute prohibits "corruptly . . . obstruct[ing], influenc[ing] or imped[ing] any official proceeding, or attempt[ing] to do so."  18 U.S.C. § 1512(c)(2).  When a specific definition of attempt is not provided in a criminal statute, the D.C. Circuit has generally applied the common law definition of criminal attempt.  *See United States v. Duran*, 96 F.3d 1495, 1507–08 (D.C. Cir. 1996); *see also United States v. Jabr*, 18-cr-105 (PLF), 2019 WL 13110682, at *12 (D.D.C. May 16, 2019).  The required elements to establish a criminal attempt under the common law are "(1) an intent to do an act or to bring about certain consequences which would in law amount to a crime; and (2) an act in furtherance of that intent which . . . goes beyond mere preparation."  *United States v. Nitschke*, 843 F. Supp. 2d 4, 10 (D.D.C. 2011) (alteration in original) (quoting *United States v. Washington*, 106 F.3d 983, 1005 (D.C. Cir. 1997)).  The Supreme Court has alternatively described the first element as requiring "a specific intent to commit the unlawful act."  *Braxton v. United States*, 500 U.S. 344, 351 n.* (1991).

    To convict defendants of attempting to violate Section 1512(c)(2), the government would have to show that defendants had "not simply the general intent to do the immediate act with no particular, clear, or undifferentiated end in mind," but also "the additional deliberate and conscious purpose or design of accomplishing a very specific and more remote result," 21 Am. Jur. 2d *Criminal Law* § 114, which in this context means the intent to impair the availability of documents, records, or other things for use in Congress's certification proceeding, *see Fischer*, 144 S. Ct. at 2190.  In proving this intent, defendants' "mere knowledge that a result is substantially certain to follow from one's actions is not the same as the specific intent or desire to achieve that result."  21 Am. Jur. 2d *Criminal Law* § 114 (footnote omitted).

Here, the government asserts that defendants "do not show that no reasonable juror could find that they would have taken an action to impede the ballots' availability or integrity for use" if presented with an opportunity. Gov't's Opp'n at 35–36. This assertion, however, cites to no specific evidence indicating these defendants were looking for or would even recognize an electoral ballot, and thus appears somewhat speculative. The government's "speculation as to the [defendants'] mental state," Defs.' Reply at 3, is simply not enough to show the required intent for an attempted violation of Section 1512(c)(2). The evidence in the record could not support a finding that defendants had a "deliberate and conscious purpose or design" to impair the availability of documents, records, objects, or other things used in the certification proceeding. To the contrary, the record amply shows defendants' intent to stop Members of Congress from proceeding with the certification, but Members are not evidence to be used in the proceeding, as required for Section 1512(c)(2) to apply. *Fischer*, 144 S. Ct. at 2186 (concluding "that subsection (c)(2) was designed by Congress to capture other forms of evidence and other means of impairing its integrity or availability").

Certainly, forcing the evacuation of the Members of Congress, whose participation was necessary for the certification proceeding, impaired the Members' availability, and the government points to strong evidence that such a work stoppage was defendants' goal. For example, as defendants approached the Capitol building, they discussed whether the people in the building were "scared in there." SOF Video Evid., Ex. 14. While inside the Capitol, defendants "called out for 'Nancy' and pointed other rioters toward Speaker Pelosi's office." Gov't's Opp'n at 35. In defendants' Statements of Offense, defendants are quoted, after leaving the Capitol, celebrating "storm[ing] the fuckin' U.S. Capitol" and making "Congress flee," DeCarlo SOF ¶ 20; Ochs SOF ¶ 22, as well as the fact that the rioters "stopped the vote when we stormed the Capitol," DeCarlo

SOF ¶ 21; Ochs SOF ¶ 23. No matter how chilling these statements may be, given the obvious concerns they raise about the safety of Members of Congress on January 6, 2021, they demonstrate only that defendants were focused on stopping Members of Congress and the proceeding to certify the Electoral College vote, which falls short of showing any specific intent by defendants to "impair the availability or integrity" of the electoral ballots themselves, *Fischer*, 144 S. Ct. at 2186. Nowhere does the government allege that defendants mentioned any ballots or other records, documents, objects, or "other forms of evidence," *id.*, to be used in the certification proceeding; searched for or had any contact with any records, documents, or other tangible or intangible evidence to be used in the certification proceeding; or suggested that any other rioters should search any Capitol areas or offices or take any actions with respect to documents, records, or other evidence for the proceeding. As already discussed, the theory of obstruction premised on defendants' efforts to stop the congressional vote on certification was the interpretation of Section 1512(c)(2) specifically rejected by the Supreme Court in *Fischer*. *See* 144 S. Ct. at 2182–83, 2189–90; *id.* at 2196 (Barrett, J., dissenting) (recognizing that, after *Fischer*, "means of obstructing a proceeding," including "*shutting it down*," that do not involve the impairment of evidence, can no longer be charged under Section 1512(c)(2) (emphasis supplied)).

The government also points to evidence that defendants "defaced the Capitol" and stole a pair of flexcuffs from a Capitol Police bag. Gov't's Opp'n at 35. The fact that defendants vandalized the Capitol building with permanent marker, DeCarlo SOF ¶ 18; Ochs SOF ¶ 19, and stole flexcuffs, DeCarlo SOF ¶ 19; Ochs SOF ¶ 20, however, does nothing to establish or even suggest that defendants had a specific intent or desire to impair the availability or integrity of the electoral ballots for use in the certification proceeding. Such evidence certainly indicates that defendants were willing to (and did) commit crimes in the Capitol building, and may support

prosecution of defendants for other crimes, but these incidents do not elucidate any intentions defendants may have had with respect to electoral college ballots, and thus do not provide a basis on which a reasonable juror could convict defendants of attempting to violate Section 1512(c)(2).

In sum, no evidence currently in the record shows defendants' specific intent to impair the availability of documents, records, or other things to be used in the certification proceeding and the government proffers no additional evidence to show that defendants violated Section 1512(c)(2), as narrowly interpreted by *Fischer*.  The Court must therefore find that no evidence has been presented on which a properly instructed, reasonable juror could find that defendants violated Section 1512(c)(2), either by actually impairing the availability of documents, records, objects or other things of evidentiary value for use in the official proceeding in Congress or by attempting to do so.  As a result, defendants have demonstrated their actual innocence of their Section 1512(c)(2) convictions and made the requisite showing to overcome their procedural default, allowing them to raise the claims in their Section 2255 motion on collateral attack.

### B.  Defendants' Collateral Attack Waivers

Although defendants' claims are not barred by their procedural default, the government additionally argues judicial review is barred by defendants' plea waivers.  Gov't's Opp'n at 12.  Recall, *see supra*, Part I.B., defendants' executed plea agreements contain identical waivers of the right to challenge their convictions by filing a motion under 28 U.S.C. § 2255.  DeCarlo Plea Agreement ¶ 10.D; Ochs Plea Agreement ¶ 10.D.  As discussed below, defendants' waivers of collateral attack in their plea agreements are valid, but, due to the D.C. Circuit's exception for "miscarriage of justice" to vitiate waivers of appellate rights in plea agreements, defendants' claims raised in the Section 2255 motion may be considered.

### 1.  *Appellate Waivers Generally Enforced*

In general, as part of plea negotiations, defendants may waive their rights to raise certain claims on direct appeal and via collateral attack. *See, e.g.*, *Khadr v. United States*, 67 F.4th 413, 419–23 (D.C. Cir. 2023); *United States v. Guillen*, 561 F.3d 527, 530 (D.C. Cir. 2009). The D.C. Circuit favors the enforcement of such waivers to give defendants an "additional bargaining chip" in the plea negotiation process that "improves the defendant's bargaining position and increases the probability he will reach a satisfactory plea agreement with the [g]overnment." *Guillen*, 561 F.3d at 530 (citing *United States v. Teeter*, 257 F.3d 14, 22 (1st Cir. 2001)). Such waivers are generally enforced if (1) the waivers are valid, and (2) the scope of the waiver covers the appeal or collateral attack the defendants seek to advance. *United States v. Hunt*, 843 F.3d 1022, 1027 (D.C. Cir. 2016).

A waiver is valid only when made "knowing[ly], intelligent[ly] and voluntar[ily]." *Khadr*, 67 F.4th at 419; *see also United States v. Powers*, 885 F.3d 728, 733 (D.C. Cir. 2018) ("We . . . enforce a bargained-for appeal waiver unless the defendant enters into it unknowingly, unintelligently, or involuntarily."). "Even an anticipatory waiver—a waiver made before the defendant knows what his sentence will be—is enforceable as long as the defendant 'is aware of and understands the risks involved in his decision.'" *Khadr*, 67 F.4th at 419 (quoting *Guillen*, 561 F.3d at 529). The scope of waivers contained in plea agreements are interpreted using principles of contract law. *Id.*; *United States v. Henry*, 758 F.3d 427, 431 (D.C. Cir. 2014). Where language in a waiver is ambiguous, courts construe it against the government. *Henry*, 758 F.3d at 431; *Hunt*, 843 F.3d at 1027. Ultimately, if a waiver is valid and enforceable against the claims for which a defendant seeks judicial review, courts dismiss the claims without considering their merits. *See Khadr*, 67 F.4th at 418–19 ("A dismissal based on an appeal waiver is a determination that the merits may not be reached"); *United States v. Ortega-Hernandez*, 804 F.3d 447, 451 (D.C. Cir.

2015) (holding that a valid, enforceable appeal waiver means courts "should not consider" the merits of the underlying appeal); *see also, e.g.*, *In re Sealed Case*, 40 F.4th 605, 607–09 (D.C. Cir. 2022) (dismissing an appeal due to a valid appeal waiver without considering the merits of the claim raised on appeal).

### 2.    *Defendants' Collateral Attack Waivers Are Valid*

In the instant case, the government is unquestionably correct that defendants' pending Section 2255 motion falls within the scope of "the plain language of the plea agreement," *see* Gov't's Opp'n at 12–13, and would be barred by the agreements' terms because this motion does not purport to raise either a claim of ineffective assistance of counsel or newly discovered evidence, *see generally* Defs.' Mot.; Defs.' Reply.  Certainly, *Fischer*, the ground on which defendants claim entitlement to vacatur, *see* Defs.' Mot. at 1–4, does not qualify as "newly discovered" evidence.

Defendants' argument to find "the plea agreement is void for failure to adequately advise the defendants of the requisite *mens rea*," Defs.' Mot. at 4, is not persuasive.  In fact, the D.C. Circuit recently rejected a similar argument in *Khadr*, where a former Guantanamo Bay detainee attempted to challenge his convictions despite his waiver of his right to appeal.  67 F.4th at 415. In rejecting the defendant's claim that the judge in his case "misinformed him about the nature . . . of the charges against him," rendering his plea invalid—a claim similar to what defendants here raise—the Circuit made clear that allowing defendants to circumvent plea waivers with such a challenge would essentially amount to permitting defendants to "have the merits of" the claims they forewent and agreed to waive "reviewed on appeal by arguing [the] waiver was invalid because those claims were wrongly decided." *Id.* at 424.  A defendant cannot make an argument in the district court, lose, "expressly waive his right to appeal those erroneous (in his view)

rulings," and then later seek to have a court review those same claims by arguing that the ruling against him made those express waivers involuntary. *Id.*

The record in this case demonstrates that defendants' agreement to waive their collateral attack rights was knowing, intelligent, and voluntary. "An appeal waiver is knowing, intelligent, and voluntary if the defendant 'is aware of and understands the risks involved' in waiving the right to appeal." *United States v. Lee*, 888 F.3d 503, 506 (D.C. Cir. 2018) (quoting *Guillen*, 561 F.3d at 529). Here, the plea agreements accepted and signed by both defendants were in writing, which is "strong evidence" that the waiver was knowing, intelligent, and voluntary. *Id.* at 507.[12] Defendants knew the district court had denied their motion to dismiss and chose expressly to waive their right to appeal this ruling, despite ongoing litigation in this District and the D.C. Circuit about the scope of the prohibition in Section 1512(c)(2). *See supra*, Part III.A.1.[13] Additionally, *Lee* lays out other factors to consider in making this determination, all of which demonstrate that defendants' agreement to their collateral attack waivers was knowing, intelligent, and voluntary. *See Lee*, 888 F.3d at 508; *United States v. Davis*, 45 F.4th 73, 80–81 (D.C. Cir. 2022); *United States v. McCrimmon*, No. 22-3044, 2024 WL 1953951, at *1 (D.C. Cir. May 3, 2024). For instance, the language of the waiver is clear and unambiguous, informing defendants and their lawyers exactly which rights defendants are agreeing to forego. *See* DeCarlo Plea Agreement ¶ 10.D; Ochs Plea Agreement ¶ 10.D. Both defendants and their respective counsels signed the waivers. DeCarlo Plea Agreement at 11; Ochs Plea Agreement at 11. At defendants' change of

---

[12]    At their change of plea hearing, both defendants confirmed they have no difficulty reading or writing. Plea Hr'g Tr. at 8:12–14; 10:15–17.

[13]    Awareness of the ongoing litigation regarding the scope of Section 1512(c)(2) does not cut only in one direction; the government also knew, in finalizing the plea agreements with defendants, that its interpretation of this charged statute had been rejected by one Judge in this District and was on appeal to the D.C. Circuit, but proceeded with a plea offer to this single felony charge, even when, based on representations in opposition briefing, the government believed it "could have charged the defendants . . . with multiple other felony crimes." Gov't's Opp'n at 18.

plea hearing, the Court read the collateral attack waiver provision to them verbatim and asked whether both defendants understood the waiver, to which both defendants orally confirmed their understanding. Plea Hr'g Tr. at 16:11–17:1. Both defendants also confirmed they had agreed to the plea agreements and the terms therein voluntarily. *Id.* at 50:12–51:11. The plea hearing and documents presented at that hearing clearly show that defendants knew they were waiving their right to file a collateral attack, understood the consequences of that decision, and agreed to the waiver voluntarily.

Nor do changes in the law after a plea agreement is executed render the plea unknowing or involuntary or undermine the validity of a plea agreement that was entered into knowingly, intelligently, and voluntarily at the time it was executed, as the government correctly argues. *See* Gov't's Opp'n at 14–17. "[A]bsent misrepresentation or other impermissible conduct by state agents, a voluntary plea of guilty intelligently made in the light of the then applicable law does not become vulnerable because later judicial decisions indicate that the plea rested on a faulty premise." *Brady v. United States*, 397 U.S. 742, 757 (1970) (internal citation omitted). A defendant cannot avoid the consequences of his guilty plea "merely because he discovers long after the plea has been accepted that his calculus misapprehended the quality of the State's case." *Id.* As the Supreme Court has held, accepting a guilty plea "does not require" that the defendant have "complete knowledge of the relevant circumstances," but instead a plea may be accepted "despite various forms of misapprehension under which a defendant might labor." *United States v. Ruiz*, 536 U.S. 622, 630 (2002) (citing *Brady*, 397 U.S. at 757).

Although *Brady* dealt with decisions about the admissibility of evidence, other circuits have applied this same principle to hold that subsequent legal developments that change and narrow the interpretation of criminal laws do not render appeal and collateral attack waivers

involuntary or unknowing for defendants who pled guilty to crimes under the previous, more expansive interpretations. For instance, in *Portis v. United States*, 33 F.4th 331 (6th Cir. 2022), the Sixth Circuit considered a Section 2255 motion filed by two defendants who pled guilty to using a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c), seven years before the Supreme Court ruled in *United States v. Davis*, 588 U.S. 445 (2019), that the residual clause in that statute was unconstitutionally vague. Although the law of conviction no longer covered the defendants' conduct, the court found that the Section 2255 motion was barred by a knowing and voluntary waiver in defendants' plea agreement, because of the "mainstream" legal rule that "future changes in law do not vitiate collateral-challenge waivers." *Portis*, 33 F.4th at 335. "Subsequent 'developments in the law,'" the court found, "do not 'suddenly make the plea involuntary or unknowing or otherwise undo its binding nature.'" *Id.* (quoting *United States v. Bradley*, 400 F.3d 459, 463 (6th Cir. 2005)); *see also, e.g., Cook v. United States*, 84 F.4th 118, 120 (2d Cir. 2023) (enforcing collateral attack waivers in plea agreements against defendants, who pled guilty under the expansive version of 18 U.S.C. § 924(c), because "subsequent changes in the law do not allow [them] to back out of their valid agreements with the government"); *United States v. Goodall*, 21 F.4th 555, 562 (9th Cir. 2021) (finding that a change in the law after a plea is entered "does not make [the] plea involuntary and unknowing" (quoting *United States v. Cardenas*, 405 F.3d 1046, 1048 (9th Cir. 2005)); *United States v. Sahlin*, 399 F.3d 27, 31 (1st Cir. 2005) (same, citing *Brady*); *United States v. Lockett*, 406 F.3d 207, 213 (3d Cir. 2005) ("Waivers of appeal, if entered knowingly and voluntarily, are valid, unless they work a miscarriage of justice. The waiver of an appeal will not be invalidated merely because unanticipated events occur in the future." (internal citation omitted)); *United States v. Barnes*, 953 F.3d 383, 389 (5th Cir. 2020) ("[D]efendants can waive the right to challenge both illegal and unconstitutional sentences.");

*Oliver v. United States*, 951 F.3d 841, 845 (7th Cir. 2020) ("We have consistently rejected arguments that an [express] appeal waiver is invalid because the defendant did not anticipate subsequent legal developments." (quoting *United States v. McGraw*, 571 F.3d 624, 631 (7th Cir. 2009)) (alteration in original)); *United States v. Cooney*, 875 F.3d 414, 416–17 (8th Cir. 2017); *United States v. Porter*, 405 F.3d 1136, 1144 (10th Cir. 2005) ("Supreme Court precedent is quite explicit that as part of a plea agreement, criminal defendants may waive both rights in existence and those that result from unanticipated later judicial determinations." (citing *Brady*, 397 U.S. at 757)); *King v. United States*, 41 F.4th 1363, 1370 (11th Cir. 2022) ("[T]o the extent that other jurisdictions are willing to ignore a defendant's voluntary choice to sign an appeal waiver simply because the law has changed, we find their reasoning unpersuasive.").  Applied to this case, these principles make plain that defendants' plea waivers, which were agreed to knowingly, intelligently, and voluntarily, did not become invalid due to the Supreme Court's decision in *Fischer*, and furthermore that the explicit textual scope of the waivers covers the collateral attack that defendants have filed.

These principles demonstrate that defendants' attack on their guilty plea as invalid for not containing an essential element of the Section 1512(c)(2) charge, is without merit.  *See* Defs.' Mot. at 1–2, 4; *see also id.* at 5 (defendants arguing that defendants were not adequately informed and "did not admit to an essential element" of the Section 1512(c)(2) charge when they pled guilty).  Defendants knowingly, intelligently, and voluntarily entered into the plea agreements and the waivers they contained, which reality is not changed by an intervening change in law.  *Fischer* also does not impact the validity of the indictment against defendants, and thus also does not invalidate their guilty plea as unknowing or involuntary.  As the D.C. Circuit has held, an indictment is "generally sufficient" if it "set[s] forth the offense in the words of the statute itself,

as long as those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished." *United States v. Williamson*, 903 F.3d 124, 130 (D.C. Cir. 2018) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)).  Here, Count Two of the Superseding Indictment charged that "[o]n or about January 6, 2021, within the District of Columbia and elsewhere," defendants "attempted to and did corruptly obstruct, influence, and impede an official proceeding," which was identified as "a proceeding before Congress, specifically, Congress's certification of the Electoral College vote."  First Superseding Indictment at 8.  This indictment "echoes the operative statutory text while also specifying the time and place of the offense," *Williamson*, 903 F.3d at 130, and sets forth the offence and all its elements, "parroting the language of [the] federal criminal statute" under which defendants were charged, *id.* (quoting *United States v. Resendiz-Ponce*, 549 U.S. 102, 109 (2007)).  Nothing about *Fischer* changed the language of Section 1512(c)(2); it merely clarified and limited the conduct covered by the statute.  *See* 144 S. Ct. at 2190.  Therefore, nothing about the indictment against defendants or their guilty pleas undermines the knowing, intelligent, and voluntary nature of their plea.

### 3.  D.C. Circuit's Miscarriage of Justice Exception

Defendants' third and final argument—that they are actually innocent because the statute of conviction no longer criminalizes their conduct, *see* Defs.' Mot. at 5; Defs.' Reply at 1–4; Defs.' Reply Supp. Release at 2–4—is a different matter.  The "plain language" of defendants' collateral attack waivers appears sufficiently broad to bar defendants from challenging their convictions via any collateral attack on any ground, *see* Gov't's Opp'n at 12, and, as this Court has previously explained in denying defendants' request for release pending resolution of their Section 2255 motion, "[i]n general, courts enforce waivers in plea agreements" to dismiss the filed collateral

attack in such circumstances, *United States v. DeCarlo*, 2024 WL 4039923, at *5 (citing *Hunt*, 843 F.3d at 1027, and *United States v. Koontz*, No. 16-cr-16 (EGS), 2024 WL 3225980, at *5–6 (D.D.C. June 28, 2024)); *see also* Gov't's Opp'n at 13. While not addressed by the parties, either in connection with defendants' request for release or in briefing submitted regarding the pending motion, the D.C. Circuit has recognized a narrow exception to the enforceability of otherwise valid appeal or collateral attack waivers when enforcing such a waiver would create a "miscarriage of justice." *United States v. Adams*, 780 F.3d 1182, 1184 (D.C. Cir. 2015) (citing *United States v. Blue Coat*, 340 F.3d 539, 542 (8th Cir. 2003)); *Guillen*, 561 F.3d at 531.

In *Guillen* and subsequent cases, the D.C. Circuit has defined the miscarriage of justice exception solely in terms of errors committed at sentencing, providing as examples: (1) if the district court "utterly fails to advert to" the sentencing factors in 18 U.S.C. § 3553(a) in imposing a sentence; (2) if the district court imposes a sentence that is unlawful by exceeding the statutory maximum; or (3) if a defendant "colorably allege[s]" that the sentence imposed rested on a "constitutionally impermissible factor, such as the defendant's race or religion." *Guillen*, 561 F.3d at 531; *Adams*, 780 F.3d at 1183–84. These three examples listed in *Guillen* as triggers for the miscarriage of justice exception are not exhaustive, however, and this exception extends to any "comparably serious procedural failure" a district court might commit. *Adams*, 780 F.3d at 1184. The question raised by defendants' third argument as to their actual innocence is whether a cognizable Section 2255 motion filed by a defendant, who can demonstrate actual innocence, falls within the D.C. Circuit's miscarriage of justice exception to permit consideration of the merits of the Section 2255 motion, notwithstanding valid waivers in a plea agreement that would otherwise bar such a collateral attack. The D.C. Circuit has not answered this question directly, but guidance

distilled from both Supreme Court and D.C. Circuit caselaw confirms that the answer to this question is affirmative.[14]

The Supreme Court has recognized a miscarriage of justice exception in federal habeas cases where a prisoner has procedurally defaulted a claim and cannot meet the usual cause and prejudice standard to overcome such a default. *See, e.g.*, *House v. Bell*, 547 U.S. 518, 536 (2006); *Bousley*, 523 U.S. at 622. This exception allows judicial review of defaulted claims where the prisoner can establish his actual innocence of the crime of conviction, putting aside the normal "principles of comity and finality that inform the concepts of cause and prejudice," in order to vindicate "the imperative of correcting a fundamentally unjust incarceration." *House*, 547 U.S. at 536 (quoting *Murray*, 477 U.S. at 495). While a case must generally be "extraordinary" to meet this standard, the Supreme Court has recognized the need for this safety valve to provide a "meaningful avenue by which to avoid a manifest injustice." *Schlup*, 513 U.S. at 327. In so holding, the Supreme Court invoked the oft-repeated maxim that "it is far worse to convict an innocent man than to let a guilty man go free." *Id.* at 325 (quoting *In re Winship*, 397 U.S. 358, 372 (1970) (Harlan, J., concurring)).

The same need for a mechanism for judicial review in rare cases where actual innocence, as defined by *Bousley*, has been shown also exists when the issue before a court is the enforcement of plea waivers.[15] The vast majority of cases involving plea waivers do not raise a claim of actual

---

[14] Defendants' filings allude to the general unfairness of their situation, *see* Defs.' Mot at 2, 5–6; Defs.' Reply at 4; Defs.' Reply Supp. Release at 1–2, 6, without meaningfully addressing their plea agreements' collateral attack waivers or the jurisprudential doctrine recognized by the D.C. Circuit permitting courts to "disregard" such waivers if enforcement would result in a miscarriage of justice. *Guillen*, 561 F.3d at 532. While the government has not directly addressed this exception either, the government's filings cite the case in which this doctrine was recognized. *See* Gov't's Opp'n at 13–14 (citing *Guillen*, 561 F.3d at 530); Gov't's Opp'n Defs.' Request Release Pending Adjudication Mot. under 28 U.S.C. § 2255 ("Gov't's Opp'n Release") at 13–14, ECF No. 117 (citing *Guillen*, 561 F.3d at 530).

[15] Successfully showing innocence under the *Bousley* standard does not mean defendants are adjudged actually innocent of all possible charges against them, a fact that defendants themselves recognize. *See* Defs.' Mot.

innocence, much less successfully prove it, and in such cases, as the D.C. Circuit has held, valid waivers that cover the appeal or collateral attack filed by the defendant should be enforced, *see Guillen*, 561 F.3d at 530; *Hunt*, 843 F.3d at 1027, for the reasons already noted, *supra* in Part III.B.1.  As the Supreme Court has recognized, however, "concern about the injustice that results from the conviction of an innocent person has long been at the core of our criminal justice system." *Schlup*, 513 U.S. at 325.  "Core" concerns of our legal system do not vanish merely because defendants have knowingly, intelligently, and voluntarily agreed to a plea agreement containing appeal and collateral attack waivers.  The D.C. Circuit has recognized as much by adopting a miscarriage of justice exception to plea waiver enforceability to allow courts to correct sentences that fail to consider the required statutory factors, illegally exceed statutory maximums, or impermissibly consider race or religion, *Guillen*, 561 F.3d at 531, as well as those that suffer from other "comparably serious" failures, *Adams*, 780 F.3d at 1184.  The plea-bargaining process is not infallible, and while defendants should almost always be held to the consequences of their knowing, intelligent, and voluntary negotiations, that principle must give way in the face of a defendant's successful proof of *Bousley* actual innocence, given the criminal justice system's "core" concern with the incarceration of a person innocent of the conduct criminalized by the statute of conviction.  *See Schlup*, 513 U.S. at 325.  In fact, as the Supreme Court has recognized, "the individual interest in avoiding injustice is *most compelling* in the context of actual innocence." *Id.* at 324 (emphasis supplied).  Given the nature of this "most compelling" interest, the conviction and incarceration of a defendant who is actually innocent of the crime charged, as well as other

---

at 7 ("The defense recognizes that vacating the convictions may not end this criminal case"); Defs.' Reply at 2 ("[T]he Government has not been deprived of any opportunity to pursue charges it believes it can prove at trial if this habeas petition were granted.").  Rather, this showing simply means that defendants are innocent of their Section 1512(c)(2) charge of conviction and any equal or more serious charges that the government has demonstrated, through evidence in the record, that was forgone in the process of plea bargaining. *See supra*, Part III.A.  As defendants concede, they may still be charged and convicted for their offense conduct during the January 6, 2021, attack on the Capitol in the future. *See* Defs.' Mot. at 7; Defs.' Reply at 2.

charges forgone, must be understood as a failure that is "comparably serious" to the others

recognized by the D.C. Circuit as falling within the miscarriage of justice exception. *Adams*, 780

F.3d at 1184. Vindication of this interest necessitates an examination of the underlying claims

raised in a Section 2255 motion when a defendant can establish his actual innocence of the crime

of conviction in the narrow circumstances described above.

        In light of these core principles of our legal system, which have led both the Supreme

Court to excuse procedural defaults for habeas petitioners who can demonstrate their actual

innocence under *Bousley*, and the D.C. Circuit to recognize a miscarriage of justice exception to

the enforceability of plea waivers, the Court holds that the D.C. Circuit's miscarriage of justice

exception to the general enforceability of valid plea waivers allows defendants, who have filed a

cognizable Section 2255 motion and have demonstrated their actual innocence of their crime of

conviction (and any foregone charges under *Bousley*), to have the merits of their Section 2255

motion considered, notwithstanding the otherwise-enforceable plea waivers that would bar the

challenge filed.

        The Fourth Circuit, like the D.C. Circuit, has adopted a miscarriage of justice exception to

the enforceability of plea waivers, and has taken the explicit step of applying this exception to the

situation presented in this case.[16] In *United States v. Adams*, 814 F.3d 178 (4th Cir. 2016), the

Fourth Circuit acknowledged the general principle that a plea "waiver remains valid even 'in light

of a subsequent change in the law,'" *id.* at 182 (quoting *United States v. Copeland*, 707 F.3d 522,

---

[16]        Not every circuit has adopted a miscarriage of justice exception to the enforceability of plea waivers. *See, e.g.*, *King*, 41 F.4th at 1368 n.3 (noting that the Eleventh Circuit has "never adopted a general 'miscarriage of justice' exception" to plea waiver enforcement); *Portis*, 33 F.4th at 339 (declining to apply "miscarriage of justice" exception because the Sixth Circuit "has not adopted this exception in a published opinion," noting that references to the exception have only been "in dicta," and "even then only as a possible, not a given, exception"); *Roselien v. United States*, No. 23-630, 2024 WL 4341361, at *3 (2d Cir. Sept. 30, 2024) ("Even assuming that this Court recognizes that a miscarriage of justice renders a waiver unenforceable . . ."). The D.C. Circuit, in contrast, has adopted this exception. *Guillen*, 561 F.3d at 531; *Adams*, 780 F.3d at 1184 (citing *Blue Coat*, 340 F.3d at 542).

529 (4th Cir. 2013)), but drawing on the definition of "miscarriage of justice" in the procedural default context, the court held that a "proper showing of 'actual innocence' is sufficient to satisfy the 'miscarriage of justice' requirement" for an exception to plea waiver enforceability, *id.* (quoting *Wolfe v. Johnson*, 565 F.3d 140, 160 (4th Cir. 2009)). "Such a showing renders the claim outside the scope of the waiver," meaning that if a cognizable claim of actual innocence is raised, the Section 2255 motion would not be barred. *Id.*; *see also Williams v. United States*, 568 F. Supp. 3d 1115, 1121–23 (W.D. Wash. 2021) (applying the Ninth Circuit's miscarriage of justice exception, recognized for sentences that violate the law, to decline to enforce the defendant's collateral attack waiver where the defendant had shown his actual innocence because enforcing the waiver would result in a miscarriage of justice).

This holding also does not conflict with the general principle cited by the government that "future changes in law do not vitiate collateral-challenge waivers," Gov't's Opp'n at 14 (quoting *Portis*, 33 F.4th at 335), nor the cases the government cites in support of its argument, *see id.* at 14–17. The Sixth Circuit's decision in *Portis* held that "[s]ubsequent 'developments in the law' that would make a right to bring a postconviction challenge more valuable do not 'suddenly make the plea involuntary or unknowing or otherwise undo its binding nature.'" 33 F.4th at 335 (quoting *Bradley*, 400 F.3d at 463). This Court does not disagree. Nothing about this decision holds that the Supreme Court's decision in *Fischer* made the instant defendants' agreement to the plea deal and its waivers unknowing or involuntary. *See supra*, Part III.B.2. Had defendants failed to establish their actual innocence of their Section 1512(c)(2) convictions, the plea waivers would have barred this challenge, regardless of any intervening changes in law or arguments raised by defendants in their motion. Rather, this decision merely holds that the D.C. Circuit's miscarriage of justice exception applies to permit review of a Section 2255 motion in a narrow class of

exceptional cases where the defendant can establish his actual innocence of the charge of conviction, as well as any forgone charges, as required by the *Bousley* standard, notwithstanding an otherwise valid and enforceable plea waiver.

The Seventh Circuit's decision in *Oliver*, cited by the government to support its argument that defendants' plea waivers remain valid despite *Fischer*'s intervening change in law, Gov't's Opp'n at 17 (discussing *Oliver*, 951 F.3d 841), is easily distinguishable from the instant case and demonstrates why the ruling regarding the miscarriage of justice exception in this case remains a narrow one. In *Oliver*, the defendants pled guilty to using, carrying, or possessing a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c). *See* 951 F.3d at 843. After the Supreme Court struck down the residual clause in that statute as unconstitutional in *United States v. Davis*, 588 U.S. 445 (2019), the defendants filed collateral attacks on their convictions, despite having agreed to collateral attack waivers in their plea agreements. *See id.* The Seventh Circuit refused to apply its miscarriage of justice exception and rejected the defendants claims because the conduct the defendants had admitted would have still allowed the government to prove a violation of § 924(c) post-*Davis*. 951 F.3d at 847. The Seventh Circuit reasoned that the miscarriage of justice exception should not be applied to "put [defendants] in a better position than they would have been in if all relevant actors had foreseen" the intervening change of law. *Id.* In other words, because the defendants could not prove their actual innocence of their § 924(c) conviction, enforcing their collateral attack waivers would not be a miscarriage of justice. For defendants who can establish their actual innocence, however—an unusual occurrence the Supreme Court has recognized will only happen in "truly extraordinary" cases, *House*, 547 U.S. at 537 (quoting *Schlup*, 513 U.S. at 327) (internal quotations omitted)—this rationale would not justify enforcing plea waivers to bar their claims.

Defendants here have succeeded in demonstrating their actual innocence. *See supra*, Part III.A.3. The remaining question, then, is whether they have filed a cognizable Section 2255 motion. Neither the Supreme Court nor the D.C. Circuit have decided whether a freestanding claim of actual innocence is cognizable to obtain relief when raised in a Section 2255 motion. *See, e.g.*, *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013) ("We have not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence."); *Dist. Att'y's Off. for Third Jud. Dist. v. Osborne*, 557 U.S. 52, 71 (2009) (noting that whether the defendant's "asserted federal constitutional right to be released upon proof of 'actual innocence'" exists is an "open question"). This case does not require the resolution of that thorny question, however, because defendants raise the more specific claim that they were convicted and are currently incarcerated for acts that the law no longer criminalizes, *see* Defs.' Mot. at 5; Defs.' Reply at 3–4, and the Supreme Court has made clear such claim is cognizable under Section 2255, *see Davis v. United States,* 417 U.S. 333, 346–47 (1974) (recognizing that a claim that the defendant's "conviction and punishment are for an act that the law does not make criminal" is a cognizable issue in a Section 2255 proceeding).

Therefore, defendants have overcome their procedural default by failing to raise their instant claims on direct appeal by demonstrating their actual innocence of the crime of conviction. Further, because the showing of actual innocence also satisfies the D.C. Circuit's miscarriage of justice exception to the rules generally favoring enforcement of plea waivers, the merits of defendants' Section 2255 motion may be considered.

### C. The Merits of Defendants' Section 2255 Motion

On the merits, defendants have demonstrated that their conviction for violating Section 1512(c)(2) "resulted from 'a fundamental defect which inherently results in a complete miscarriage

of justice,'" *Pollard*, 959 F.2d at 1020 (quoting Fed. R. Crim. P. 32, Advisory Committee's Note on 1983 Amendment), and thus that they are entitled to have their convictions vacated.  Post-*Fischer*, these defendants are imprisoned for offense conduct, as set out in the extant record underlying their guilty pleas, that the law of conviction does not make criminal.  *See Fischer*, 144 S. Ct. at 2190; *supra*, Part III.A.2.(b).  As the Supreme Court held in *Davis*, 417 U.S. 333, "[t]here can be no room for doubt that such a circumstance 'inherently results in a complete miscarriage of justice' and 'present(s) exceptional circumstances' that justify collateral relief under [Section] 2255."  417 U.S. at 346–47 (quoting *Hill v. United States*, 368 U.S. 424, 429 (1962)).  The same is true here.

Importantly, granting defendants' Section 2255 motion does not "put [defendants] in a better position than they would have been in if all relevant actors had foreseen" the intervening change of law.  *Oliver*, 951 F.3d at 847.  Unlike in *Oliver*, discussed *supra* in Part III.B.3, where the conduct admitted by the defendants continued to support a conviction on the same charge after the intervening change in the law, *see id.*, defendants here have demonstrated their actual innocence of the statute of conviction, *see supra* at Part III.A.2.(b).  The government has established no alternative viable theories of criminal liability, under Section 1512(c)(2), to rebut defendants' claim of innocence of this statute of conviction on the evidence provided, unlike the situation in *Oliver*.  *See* 951 F.3d at 847.  Furthermore, as defendants note, vacating defendants' Section 1512(c)(2) conviction does not deprive the government "of any opportunity to pursue charges it believes it can prove at trial," because the conduct at issue took place on January 6, 2021, which "is still well within the five-year statute of limitations."  Defs.' Reply at 2; *see also* Defs.' Mot at 7 (recognizing that vacatur of their convictions "may not end [their] criminal case").  Of course, that the government still may bring other criminal charges against defendants does not

mean the government will suffer no prejudice from this decision. The Court is well aware that bringing additional charges or reviving the dismissed charges against defendants would require the expenditure of additional time and resources on this case by the government. These considerations, however, pale in comparison to the "most compelling" interest each defendant has, *see Schlup*, 513 U.S. at 324, in not remaining incarcerated on a conviction for which the law now says their offense conduct does not qualify and they are innocent.[17]

## IV.    CONCLUSION

For the foregoing reasons, defendants' Motion for Post-Conviction Relief, ECF No. 112, pursuant to 28 U.S.C. § 2255, is **GRANTED**. Defendants' convictions on Count Two of the Superseding Indictment for obstruction of an official proceeding, in violation of 18 U.S.C. §1512(c)(2), Ochs Judgment at 1; DeCarlo Judgment at 1, are vacated, pending a 30-day stay to allow the government to determine whether to revive dismissed charges or bring additional charges against defendants. During the stay, defendants will be ordered promptly released from the custody of the Bureau of Prisons on the same conditions of release previously imposed prior to their surrender to serve their sentences.

An order consistent with this Memorandum Opinion will be filed contemporaneously.

Date: November 1, 2024

---

[17]    Defendants' request for release pending resolution of their Section 2255 motion was denied to allow consideration of the "government's argument that defendants' collateral attack waiver should be enforced," an argument which presented "threshold legal issues" that might have prevented review of the merits of defendants' Section 2255 motion. *DeCarlo*, 2024 WL 4039923, at *5. Had defendants' plea waivers been enforced, the merits of defendants' *Fischer* claims could not have been considered, *see Khadr*, 67 F.4th at 418–19, and, as a result, the motion would not raise any substantial questions of law for consideration, *see DeCarlo*, 2024 WL 4039923, at *5, as required for release pending resolution of a collateral attack, *see id.* at *3 (collecting cases). The question of the enforceability of defendants' plea waivers, however, was "inextricably intertwined with the briefing" on the merits of defendants' Section 2255 motion, which was not yet ripe for consideration. *Id.* at *5. Now, with the benefit of full briefing on the Section 2255 motion itself, the question whether defendants' plea waivers bar their Section 2255 motion has been answered in the negative, *see supra*, Part III.B.3, and defendants have shown their entitlement to have their convictions vacated on the merits, *see supra*, Part III.C. Accordingly, defendants are now entitled to release.

47

_____
**BERYL A. HOWELL**
United States District Judge